# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| NICK MCCLURE, individually and on behalf of others similarly situated, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:22-CV-3898-SEG |
| TOYOTA MOTOR CORPORATION; TOYOTA MOTOR NORTH AMERICA, INC.; TOYOTA MOTOR MANUFACTURING CANADA, INC.; and TOYOTA MOTOR SALES U.S.A., INC., | |
| Defendants. | |

**O R D E R**

This matter is before the Court on Defendants' motion to dismiss (Doc. 23) and associated request for judicial notice (Doc. 23-5). After careful consideration, the Court enters the following order.

**I.    Background[1]**

This is a putative class action alleging that Toyota Motor Corporation and other Toyota entities concealed a battery defect in one of their vehicles,

---

[1] The following facts are derived from Plaintiff's complaint. (Doc. 1.)  For purposes of resolving the pending motion to dismiss, the Court accepts the well-pled allegations as true and construes them in the light most favorable to Plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

the 2020 Toyota RAV4 ("RAV4" or "Vehicle"). Plaintiff Nick McClure, a citizen of Georgia, contends that the RAV4 contains a defect that causes the Vehicle's battery power to drain when the Vehicle is turned off, which can disable the battery, make it impossible for a driver to start the Vehicle, and prompt certain driving systems and safety features to malfunction. (Compl., Doc. 1 ¶ 1.) Plaintiff seeks to bring claims on behalf of a nationwide class against Defendants Toyota Motor Corporation ("TMC"); Toyota Motor North America, Inc. ("TMNA"); Toyota Motor Manufacturing Canada, Inc. ("TMMC"); and Toyota Motor Sales, U.S.A., Inc. ("TMS") for violation of Georgia's Fair Business Practices Act, breach of express and implied warranties, unjust enrichment, and fraudulent concealment.

### A. The Parasitic Drain Defect

Plaintiff alleges that the RAV4 contains a battery defect—the "Parasitic Drain" Defect (the "Defect")—that causes its electrical system and several associated safety features to malfunction. (Doc. 1 ¶ 1.) The Defect stems from the failure of electrical components called electronic control modules ("ECMs"). (*Id.* ¶ 2.) ECMs regulate the flow of electricity from the battery, and under normal circumstances, they prevent drainage of electricity from the battery to other Vehicle components when the car is turned off. (*Id.*) But in the RAV4, the ECMs fail to prevent drainage, instead continuing to draw electricity from

2

the battery even when the Vehicle is not in use, causing what Plaintiff calls "parasitic drain" on the battery.  (*Id.* ¶¶ 2, 68.)  According to Plaintiff, this battery drainage problem results from the improper design, manufacture, or installation of the ECMs in the Vehicle.  (*Id.* ¶ 68.)  In addition to the ECMs, other factors can contribute to parasitic drain, including faulty wiring, poor installation, and defective fuses within the Vehicle's electrical subsystem.  (*Id.*)  Plaintiff asserts that Defendants have "uniformly designed and/or manufactured the Class Vehicles with ECMs and associated electrical subsystems that cause parasitic drain," and the defective components were "designed, installed, and/or manufactured by Defendants, and were present in the Class Vehicles at the time of sale."  (*Id.* ¶ 69.)

Plaintiff alleges that the Parasitic Drain Defect adversely affects the RAV4 in several ways.  For instance, excessive drainage of the battery reduces the charge of the RAV4's battery below the threshold required to start its engine.  (*Id.* ¶ 4.)  As a result, the Vehicle becomes "inoperable until the battery is recharged through extraneous means."  (*Id.*)  That solution is only temporary, however, because the Defect will cause the battery to fail again. (*Id.*)  Moreover, the Defect poses a "safety hazard."  (*Id.* ¶¶ 4, 5.)  Plaintiff asserts that RAV4 owners can become stranded on the roadway when their Vehicle's battery fails and they cannot start their Vehicles.  (*Id.* ¶ 5.)  The

3

Defect can also cause safety features like headlights and hazard lights to fail. In addition, the Defect "impairs the Class Vehicles' power steering mechanism, causing the Vehicles to drift off-center and even to veer dangerously between driving lanes." (*Id.* ¶ 5.)

Toyota has allegedly failed to remedy the Defect, which it has attempted to do through Vehicle firmware updates prescribed in several service bulletins in 2020 and 2021. (*Id.* ¶¶ 106-11.)

## B. Toyota's Alleged Concealment of the Defect

Plaintiff contends that Defendants have misrepresented the reliability of the RAV4 and concealed the existence of the Defect. (*Id.* ¶ 10.) Defendants allegedly became aware of the Defect before January 2019 through pre-release testing of the Vehicle. (*Id.* ¶¶ 6-7, 80-84.) In January 2019, Toyota issued a "Technical Service Bulletin" ("TSB") to their dealerships concerning the 2020 RAV4. (*Id.* ¶ 85.) The TSB instructed dealerships to follow a specific battery inspection procedure, a procedure which included testing the batteries "no more than 48 hours prior to customer vehicle delivery" and disconnecting the batteries to reduce parasitic drain if the Vehicles were to remain in storage for a week or more. (*Id.*) Plaintiff argues that this battery inspection program was an effort to conceal the Defect from consumers by ensuring that the Defect

would manifest only once the Vehicles were in the hands of buyers, rather than while they remained on the lot.  (*Id.* ¶¶ 86-87.)

Plaintiff also alleges that Toyota learned of the Defect through consumer complaints.  (*Id.* ¶ 79.)  After the Vehicle went on sale, consumers began to file complaints with the National Highway Traffic Safety Administration ("NHTSA") and to post complaints on consumer websites and message boards dedicated to the Vehicle such as "Rav4World" or the Reddit forum "Rav4Club," which Defendants allegedly monitor.  (*Id.* ¶¶ 89-96.)  Furthermore, Plaintiff alleges, Toyota had notice of the Defect through the large number of complaints received by Toyota dealerships and the company's maintenance and roadside assistance plan, ToyotaCare, as well as through data regarding warranty claims and parts sales.  (*Id.* ¶¶ 97-101.)

In light of Toyota's knowledge of the alleged Defect, Plaintiff argues that Toyota made "false and misleading" representations about the safety and reliability of the RAV4 in its advertising.  (*Id.* ¶ 63.)  Plaintiff quotes several examples of Toyota's promotional materials touting the quality, safety, and reliability of Toyota vehicles in general and the RAV4 in particular.  (*Id.* ¶¶ 58-60.)  The promotional materials also represented that the typical battery life of the Vehicle is 3-5 years.  (*Id.* ¶ 61.)  Plaintiff alleges that he viewed many such advertisements—he "was exposed to these and similar representations by

Defendant virtually every time he opened an internet browser for two years"—and that he relied on such representations in deciding to buy his RAV4.  (*Id.* ¶ 62.)  According to Plaintiff, none of Toyota's advertisements disclosed that the Defect renders the Vehicles "unsafe, unreliable, and unfit for normal use." (*Id.* ¶ 63.)

## C. The New Vehicle Limited Warranty

RAV4s sold and leased by Toyota are covered by a written New Vehicle Limited Warranty ("NVLW") that is valid for three years or 36,000 miles, whichever occurs first.  (*Id.* ¶ 112; Doc. 23-4 at 16.)[2]  Plaintiff alleges that, with some exclusions, "the NVLW covers the entire vehicle—including the electric system and battery, to the extent they are defective—as well as 'adjustments

---

[2] Defendants request that the Court consider the RAV4 Warranty & Maintenance Guide ("Warranty Guide"), which specifies the terms of the NVLW, as a document incorporated into the complaint by reference.  (Doc. 23-4, 23-5.)  Plaintiff does not address this request in his response, (Doc. 26), which the Court construes as a lack of opposition.  On a motion to dismiss, courts may consider "documents incorporated into the complaint by reference[.]"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A document is "incorporated by reference" if the document is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged."  *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).  Both requirements are met here.  First, the NVLW provides the basis for Plaintiff's express warranty claim and portions of the Warranty Guide are quoted in the complaint.  (Doc. 1 ¶¶ 112, 114.)  Second, the parties do not dispute the authenticity of the Warranty Guide.  Accordingly, Defendants' request for judicial notice (Doc. 23-5) is granted with respect to the Warranty Guide.

6

needed to correct defects in materials or workmanship of any part supplied by Toyota.'" (*Id.* ¶ 112.)  TMS is identified as the "Warrantor" of the NVLW. (*Id.* ¶ 113.)  "[T]he NVLW provides that coverage is transferred automatically, without charge, to subsequent vehicle owners." (*Id.* ¶ 115.)

### D. The Parties

Plaintiff Nick McClure is a Georgia citizen who purchased a used 2020 Toyota RAV4 from an authorized Toyota dealer in May 2021.  (*Id.* ¶¶ 21-22.) At the time of Plaintiff's purchase, the Vehicle had approximately 8,000 miles on the odometer and was still covered by the NVLW.  Plaintiff alleges that he first experienced the Defect in January 2022, approximately seven months following his purchase.  After leaving his RAV4 parked for twenty-four hours with all user-operated functions like the headlights and cabin lights turned off, Plaintiff found that it would not start. (*Id.* ¶ 28.)  To restart his Vehicle, Plaintiff purchased a replacement battery, but during his return home, he discovered that the car had developed a problem with its steering. (*Id.*)  Even while holding the steering wheel steady, the car drifted to one side, and the steering wheel "behaved unpredictably . . . as though the car itself were guiding the wheel, even though no user controlled assistive steering devices of any kind were turned on." (*Id.*)

7

After experiencing these problems, Plaintiff brought the Vehicle to an authorized Toyota dealership/repair center, but the center was unable to identify the source of the problems. (*Id.* ¶ 29.) Following two further trips to the dealership, technicians replaced the car's steering rack, but this did not solve the problem with the steering. (*Id.* ¶ 29.) Nor did it solve the problem with the battery, which the dealership had not been able to explain. (*Id.* ¶ 29.) The day after Plaintiff picked up his Vehicle from the dealership following the steering rack replacement, the battery failed again, this time after the car had been left parked for no more than 30 minutes. (*Id.* ¶ 30.) When Plaintiff returned to the Toyota dealership, the dealership was unable to explain the battery failure or persistent steering problems, other than by attributing them to Plaintiff. (*Id.* ¶ 31.) An independent repair center confirmed, however, that the Vehicle was experiencing a leftward drift, though it also could not find the source of either the battery depletion or the steering issue. (*Id.* ¶ 32.) Plaintiff alleges that had he known of the Defect at the time he purchased his Vehicle, he would not have bought the Vehicle, or else he would have paid substantially less for it. (*Id.* ¶ 13.)

Defendant Toyota Motor Corporation ("TMC") is a multinational Japanese corporation headquartered in Toyota City, Aichi Prefecture, Japan. (*Id.* ¶ 35.) Plaintiff alleges that "TMC controls and oversees the design,

manufacturing, marketing, and distribution of Toyota and Lexis branded vehicles, including the Class Vehicles, directly and through its operating subsidiaries located worldwide." (*Id.*)

Defendant Toyota Motor North America, Inc. ("TMNA") is a wholly owned subsidiary of TMC that is incorporated in California and headquartered in Plano, Texas. (*Id.* ¶ 38.) TMNA conducts several Toyota operations in North America including R&D, manufacturing, sales, marketing, and corporate functions. (*Id.* ¶ 38.)

Defendant Toyota Motor Manufacturing Canada, Inc. ("TMMC") is a wholly owned subsidiary of TMC that is headquartered in Ontario, Canada. (*Id.* ¶ 39.)  Plaintiff alleges that TMCC, under the direction of its parent company TMC, manufactured Plaintiff's defective Vehicle. (*Id.* ¶ 39.)

Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a wholly owned subsidiary of TMC that is incorporated in the State of California and headquartered in Plano, Texas.  (*Id.* ¶ 40.)  Together with TMNA, TMS allegedly controls the sale, marketing, distribution, and servicing of Toyota vehicles in the United States, including the Class Vehicles. (*Id.* ¶ 40.)  TMS is also represented as the "Warrantor" for the New Vehicle Limited Warranty for the Vehicles. (*Id.* ¶ 40.)

9

Plaintiff alleges that TMC exercises "control over TMNA, TMMC, and TMS's work, including but not limited to the design and manufacture" of the RAV4, as well as its marketing and the provision of written warranties. (*Id.* ¶ 41.)  In addition, Plaintiff contends that "TMC has held TMNA and TMS out as its agents for all purposes in the United States[.]" (*Id.* ¶ 42.)  Plaintiff also pleads that subject to the control of TMC, the four Defendants "jointly supervise, direct, cause, and exercise control over the advertising, promotion, warranting, testing, and/or repair of 'Toyota' and 'Lexus' brand vehicles." (*Id.* ¶ 43.)

### E. Procedural History

Plaintiff filed this putative class action lawsuit on September 27, 2022, asserting the following five claims:[3]

- Count I: Violations of Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-390, *et seq.* (against Defendants TMC, TMNA, and TMS)

- Count II: Breach of Express Warranty under O.C.G.A. §§ 11-2-313 and 11-2A-210 (against TMS)

- Count III: Breach of the Implied Warranty of Merchantability under O.C.G.A. §§ 11-2-314 and 11-2A-212 (against all Defendants)

---

[3] The Court reproduces the numbering in Plaintiff's complaint, which skips from Count III to Count V. (*See* Doc. 1 at 91.)

- Count V: Unjust Enrichment, in the alternative to Count Two (against all Defendants)

- Count VI: Fraudulent Concealment (against TMC, TMNA, and TMS)

Plaintiff seeks declaratory and monetary relief, (Doc. 1 ¶¶ 100-01), for himself and on behalf of a class of RAV4 owners defined as:

> All persons who purchased or leased in the State of Georgia a 2020 Toyota Rav4 in all configurations and trim levels, including the LE, XLE, XLE Premium, Adventure, TRD Off-Road, Limited, LE Hybrid, XLE Hybrid, XSE Hybrid, and Limited Hybrid, and (hereinafter, "Class Vehicle").

(*Id.* ¶ 124.) Defendants have moved to dismiss Plaintiff's claims. (Doc. 23.)

## II. Legal Standard

Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Rule 12(b)(1) allows for dismissal of a case when the court "lack[s] subject matter jurisdiction." "Because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2002). A Rule 12(b)(1) motion may present either a facial or a factual attack on the complaint. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). A "facial attack" challenges whether a plaintiff "has

11

sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* (cleaned up). A "factual attack," by contrast, "challenges the existence of subject matter jurisdiction irrespective of the pleadings, and extrinsic evidence may be considered." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021). "A district court evaluating a factual attack on subject matter jurisdiction . . . is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (cleaned up).

Rule 12(b)(6) provides for dismissal of a case when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than

a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

When, as here, a plaintiff alleges claims of fraud, he must satisfy Rule 9(b)'s heightened pleading standard. That rule requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this "particularity" standard, the plaintiff must set forth facts "as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014). Plaintiff, in other words, must plead the "who, what, when, where, and how" of the alleged fraud. *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 873 (11th Cir. 2023).

## III.   Discussion

Defendants contend that Plaintiff fails to state a claim for relief with respect to his five causes of action. In addition, Defendants argue that Plaintiff

lacks standing to seek injunctive or declaratory relief because, according to extrinsic evidence of which they ask the Court to take judicial notice, Plaintiff no longer owns the RAV4 that he purchased in 2020.  The Court considers each argument in the order it is presented in Defendants' motion.  (Doc. 23-1.)

### A. Breach of Express Warranty

Plaintiff brings a breach of express warranty claim against TMS, alleging that it failed to repair or replace his Vehicle in accordance with its New Vehicle Limited Warranty ("NVLW").  (Doc. 1 ¶¶ 150-170.)  Defendants contend that Plaintiff's claim for breach of the NVLW fails for two reasons. First, they argue that Plaintiff has only alleged a "design" defect, which is not covered by the NVLW, rather than a defect in manufacturing or workmanship. (Doc. 23-1 at 9-10.)  Second, Defendants argue that Plaintiff cannot obtain damages as a remedy for any breach of warranty because the NVLW contains a limitation clause expressly precluding such damages.  (Doc. 23-1 at 10-12.)

### 1. Whether Plaintiff Has Plausibly Pled a Breach of the NVLW

"An express warranty is a contract, and the construction of a contract is a matter of law for the court." *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1285 (N.D. Ga. 2018) (quoting *Atlanta Tallow Co. v. John W. Eshelman & Sons, Inc.*, 140 S.E.2d 118, 127 (Ga. Ct. App. 1964) and O.C.G.A. § 13-2-1) (cleaned up).  "Where the terms of a written contract are clear and

14

unambiguous, the court will look to the contract alone to find the intention of the parties." *Id.* (quoting *UniFund Fin. Corp. v. Donaghue*, 653 S.E.2d 513, 515 (Ga. Ct. App. 2007)).

It is undisputed that Toyota's NVLW "covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota," subject to certain exceptions not relevant here. (Doc. 23-4 at 16; Doc. 1 ¶ 157.) Courts in this district have construed similar language in vehicle warranties to cover only manufacturing defects and to exclude design defects. *See Amin*, 301 F. Supp. 3d at 1285-87; *Callen v. Daimler AG*, No. 1:19-CV-1411-TWT, 2020 WL 10090879, at *7 (N.D. Ga. June 17, 2020); *cf. Lloyd's Syndicate No. 5820 v. AGCO Corp.,* 756 S.E.2d 520, 523-24 & n.7 (Ga. 2014) (construing policy provision limiting coverage to "*manufacturing* defects in workmanship or materials" as covering only manufacturing defects, but noting that "[t]he cases on the meaning of 'workmanship or materials' are more evenly divided" and declining to "determine what that phrase would mean standing alone"). Plaintiff does not dispute Defendants' construction of the warranty language. (*See* Doc. 25 at 12-15.) Instead, Plaintiff argues that the complaint sufficiently alleges a manufacturing defect that falls within the scope of the NVLW's language.

A manufacturing defect is one in which "there was a flaw from the manufacturing process, not in the design or specifications of the product." *Whitehead v. Green*, 879 S.E.2d 698, 711 (Ga. Ct. App. 2022) (cleaned up). As such, "a manufacturing defect will always be identifiable as a deviation from some objective standard or a departure from the manufacturer's specifications established for the creation of the product." *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1358 (N.D. Ga. 2016) (quoting *Jones v. Amazing Products, Inc.*, 231 F. Supp. 2d 1228, 1236 (N.D. Ga. 2002)). A design defect, by contrast, "calls for the finder of fact to employ a loose balancing test to determine whether the manufacturer properly designed the product." *Brazil*, 196 F. Supp. 3d at 1359 (quoting *Jones*, 231 F. Supp. 2d at 1236). "[T]he distinction [between a manufacturing defect and a design defect] is between an unintended configuration, and an intended configuration that may produce unintended and unwanted results." *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989).

The complaint alleges that the Parasitic Drain Defect is a "design and/or manufacturing defect." (Doc. 1 ¶ 128.) Nothing prevents a products liability plaintiff from pleading design and manufacturing defects in the alternative. *See* Fed. R. Civ. P. 8(d)(2); *Bailey v. Janssen Pharmaceutica, Inc.*, 288 F. App'x 597, 605-06 (11th Cir. 2008) (reversing the dismissal of a complaint for failure

to distinguish between manufacturing and design defects, in part, because "it would be difficult at such an early stage in the litigation for a plaintiff to know whether a defect was due to a product's design or manufacture"); *Dye v. Covidien LP*, 470 F. Supp. 3d 1329, 1336 (S.D. Fla. 2020) ("Courts in the Eleventh Circuit regularly allow plaintiffs to plead multiple theories [of liability] (e.g., both design and manufacturing defect), providing that they adequately allege the defect."). Defendants acknowledge this, (Doc. 27 at 8 n.1), but nevertheless contend that whatever labels Plaintiff gives the defect, the complaint's factual allegations cannot be read to plausibly describe anything other than a design defect. (Doc. 1 ¶ 69; *see* Doc. 23-1 at 10; Doc. 27 at 3.) They argue that because the allegations describe the Vehicles as being "*uniformly* designed and/or manufactured . . . Plaintiff is describing an issue with the entire product line—in other words, a design defect." (Doc. 23-1 at 10.)

To the contrary, Plaintiff's allegations are sufficient to allege a defect in "materials or workmanship." For instance, the complaint alleges that while "ECMs are designed to work together," they can fail to do so if they are "improperly designed, *manufactured*, or *installed* in a vehicle," such that they "draw upon the battery at an excessive rate, causing the battery to lose charge prematurely and one or more of the systems that depend on the battery to fail."

17

(Doc. 1 ¶ 68 (emphasis added).)   In addition, Plaintiff pleads that "faulty wiring, *poor installation*, and defective fuses within the vehicle's electrical subsystems also cause or contribute to parasitic drain." (*Id.* (emphasis added).) While Defendants make much of the language that "ECMs are designed to work together" because of the inclusion of the word "designed," (Doc. 27 at 8), this paragraph can be plausibly read to suggest that the Vehicles *depart from their intended design*—that is, they suffer from a "departure from the manufacturer's specifications . . . ." *Brazil*, 196 F. Supp. 3d at 1358.

That Plaintiff alleges that the Defect *uniformly* affects the RAV4 does not preclude the possibility that it was created by a manufacturing error. Indeed, if the ECMs or other related components were improperly manufactured or improperly installed throughout the line of Vehicles, it would still constitute a defect in materials or workmanship. *See, e.g.*, *Callen*, 2020 WL 10090879, at *7 (finding that the plaintiffs had plausibly pled a defect in "materials or workmanship" where they alleged that "the same UV protectant issue . . . affect[ed] *every Class Vehicle* in the product line" (emphasis added)). Accepting Plaintiff's well-pled allegations as true, it remains plausible that the Defect was introduced not through the design of the Vehicle, but through unintended configuration in the manufacturing process.

**2. Whether Plaintiff Can Seek Damages as a Remedy for Breach**

Defendants contend that Plaintiff cannot seek damages to remedy a breach of the NVLW, because the NVLW expressly limits available remedies to repair or replacement of defective parts.  (Doc. 23-1 at 10-11.)  The NVLW states that "[t]he performance of necessary repairs and adjustments is the exclusive remedy under this warranty or any implied warranty . . . Toyota shall not be liable for incidental or consequential damages resulting from breach of this written warranty."  (Doc. 23-4 at 15.)   While Plaintiff acknowledges the NVLW's repair-or-replace remedy limitation, he argues that the provision is void because it fails of its essential purpose and is unconscionable.

"Under O.C.G.A. § 11-2-719, parties to a contract subject to the Uniform Commercial Code ("UCC") may agree to substitute limited remedies in place of those provided for by the UCC."  *Pulmonary Assocs. of Charleston P.L.L.C. v. Greenway Health, L.L.C.*, 508 F. Supp. 3d 1268, 1276 (N.D. Ga. 2020).[4]  Per O.C.G.A. § 11-2-719, an agreement between parties "may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's

---

[4] The agreement at issue here, the NVLW, is subject to the Uniform Commercial Code because it concerns the sale of goods.  O.C.G.A. §§ 11-2-102; 11-2-105.

remedies to . . . repair and replacement of nonconforming goods or parts."
However, § 11-2-719 carves out two exceptions: limiting provisions fail "[w]here
circumstances cause an exclusive or limited remedy to fail of its essential
purpose" and where "the limitation or exclusion is unconscionable."  O.C.G.A.
§§ 11-2-719(2); 11-2-719(3).  If the limited remedy is void, then "remedy may
be had as provided in the [UCC.]"  *Jacobs v. Metro Chrysler-Plymouth, Inc.*,
188 S.E.2d 250, 253 (Ga. Ct. App. 1972) (citing O.G.C.A. § 11-2-719).  "The
[UCC], of course, provides for optional remedies on breach of warranty[,]"
including damages.  *Id.*

Plaintiff claims that the NVLW's remedy limitation is void both because
it is unconscionable and because the limited remedy fails of its essential
purpose.  (Doc. 1 ¶ 167; *Id.* ¶¶ 28-32, 111, 190.)  The Court need not decide
whether the NVLW's limitation is unconscionable, as Plaintiff has sufficiently
alleged that the repair-or-replace remedy fails of its essential purpose.  "[A]
repair-or-replace warranty fails of its essential purpose if the warrantor does
not successfully repair defects within a reasonable time or within a reasonable
number of attempts."  *Pulmonary Assocs.*, 508 F. Supp. 3d at 1276.  "Although
Georgia courts have not articulated specific standards for finding that a
limitation or exclusion fails in its essential purpose, Georgia courts have
required a showing of multiple attempts to repair a defect in order to sustain

20

a breach of warranty claim." *Helpling v. Rheem Manufacturing Company*, No. 1:15-CV-2247-WSD, 2016 WL 1222264, at *8 (N.D. Ga. Mar. 23, 2016). "Whether a remedy fails of its essential purpose is generally a question of fact for summary judgment or at trial." *Pulmonary Assocs.*, 508 F. Supp. 3d at 1276. "Thus, Plaintiffs need only plead that the limited remedies fail of their essential purpose to survive a motion to dismiss." *Id.*

Plaintiff describes four attempts to repair his Vehicle pursuant to the NVLW after he began experiencing problems with his Vehicle's steering— problems allegedly caused by the Defect—yet his Vehicle was never fixed. (Doc. 1 ¶¶ 28-29.)  "Directly after" he first experienced steering issues stemming from the Defect, "Plaintiff brought his Class Vehicle to an authorized Toyota dealership and repair center, Cherokee County Toyota, in Canton, Georgia, for repair and inspection." (*Id.* ¶ 29.)  The dealer could not identify the source of the problem.  Plaintiff alleges he then brought his Vehicle back two more times over the coming weeks as he continued to experience problems steering.  (*Id.*)  Still, the dealership was unable to fix the problem.  Although the dealer replaced the entire steering rack, "Plaintiff continued to find that the steering wheel was persistently about 10 degrees off-center to the left while driving." (*Id.*)  Moreover, the day after picking up his car from having the steering rack replaced, the battery died again while on a local trip.  (*Id.* ¶ 30.)

So "Plaintiff returned, for the fourth time, to Cherokee Toyota, where the Vehicle was again tested and evaluated. The dealership reported that they could find nothing wrong with the Vehicle." (*Id.* ¶ 31.)

At this stage, Plaintiff's allegations about his multiple attempts to repair his RAV4 pursuant to the NVLW and Toyota's inability to repair the Vehicle are sufficient to plausibly demonstrate that the NVLW failed of its essential purpose. *See Pulmonary Assocs.,* 508 F. Supp. 3d at 1276 (concluding that plaintiffs' allegations regarding "numerous failed efforts" to seek repair were "sufficient at the pleading stage to show a failure of the repair-or-replace warranty's essential purpose"); *see also McDonald v. Mazda Motors of Am., Inc.*, 603 S.E.2d 456, 460 (Ga. Ct. App. 2004) ("It is the refusal to remedy within a reasonable time, or a lack of success in the attempts to remedy which would constitute a breach of warranty." (cleaned up)).

In sum, Plaintiff has adequately alleged that the Defect results from the RAV4's manufacture and that the NVLW fails of its essential purpose, allowing him to seek damages. Accordingly, Defendant's motion to dismiss is denied with respect to Plaintiff's breach of express warranty claim. (Count II.)

## B. Breach of Implied Warranty of Merchantability

Plaintiff alleges that Defendants breached the implied warranty of merchantability by selling him and other putative class members a Vehicle

that was unfit for its ordinary purpose.  (Doc. 1 ¶¶ 171-83.)  Defendants contend that Plaintiff has not plausibly alleged a breach of the implied warranty of merchantability because (1) Plaintiff's Vehicle was not in fact unfit for its ordinary purpose, and (2) Plaintiff cannot establish privity with the Defendants.  (Doc. 23-1 at 12-14.)

### 1. Whether Plaintiff has Alleged that his Vehicle was Unfit for its Ordinary Purpose

O.C.G.A. § 11-2-314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  To be merchantable, goods "must be at least such as . . . [a]re fit for the ordinary purposes for which such goods are used."  O.C.G.A. § 11-2-314(c).  "The ordinary purpose of a vehicle is to provide safe and reliable transportation."  *Bolling v. Mercedes-Benz USA, LLC*, No. 1:23-CV-671-TWT, 2024 WL 3972987, at *12 (N.D. Ga. Aug. 27, 2024).  Cars are unfit for their ordinary purpose under O.C.G.A. § 11-2-314(a) where "the defect at issue affects the driveability, safety, and usefulness of their cars." *Amin,* 301 F. Supp. 3d at 1288; *see also Johnson v. Jaguar Cars, Inc.*, No. 1:05-CV-3161-RLV, 2006 WL 1627125, at *4 (N.D. Ga. June 6, 2006) (finding that a plaintiff adequately pled breach of implied warranty where he alleged that Jaguar sold him a vehicle that was of "insufficient quality" and "not fit for the

23

ordinary purpose" for which it is used); *McDonald*, 603 S.E.2d at 462 ("Whether or not there is enough evidence for . . . a breach of [implied] warranty is generally for a jury to decide.").

Plaintiff alleges that the Defect causes his Vehicle to be unfit for ordinary use in several ways, including:

(a) Premature battery expiration prior to the normal life of the battery as represented by Defendants for the Class Vehicles (i.e., 3-5 years), which causes the engine to fail to turn on, and associated safety features such as the headlights, taillights, interior lights, and hazard lights to fail;

(b) Dimming and malfunctioning of the Vehicles' safety features, including the headlights, taillights, interior lights, and hazard lights, while the Vehicle is in operation;

(c) Malfunctioning of the power steering system, which causes the Vehicle to drift off-center while the Vehicle is in operation, including while driving at a high speed; and

(d) Stalling of the engine while the Vehicle is in use.

(Doc. 1 ¶ 178.)  Plaintiff alleges that he personally experienced issues with premature battery expiration and malfunctioning of the power steering system, including steering wheel drift.  Specifically, Plaintiff asserts that the car "drifted off-center even when he held the steering wheel steady," a problem which "worsened at higher speeds."  (*Id.* ¶ 28.)  Additionally, "the wheel behaved unpredictably—as though the car itself were guiding the wheel, even though no user-controlled assistive steering devices of any kind were turned

on." (*Id.*)  And "[o]n one occasion, these inputs from the car were so strong that the wheel jerked out of Plaintiff's hands while he was directing the car into a traffic circle." (*Id.*)  These allegations clearly go to the "driveability, safety, and usefulness" of the RAV4.  *Amin,* 301 F. Supp. 3d at 1288

Defendants contend that several allegations in Plaintiff's complaint undermine the notion that his RAV4 was not suitable for driving.  For instance, Defendants note that Plaintiff "drove the vehicle, without issue, for approximately seven months before the alleged Defect manifested" and "continued to drive the Subject Vehicle for well over a year." (Doc. 23-1 at 12.) They also argue that Plaintiff's assertion that the Defect could have caused the Vehicle to fail in the midst of traffic is "speculative." (*Id.* at 12-13). Furthermore, Defendants question whether the steering issue is related to the alleged Defect at all. (*Id.*)

Defendants' arguments cannot succeed because they largely attack the merits of Plaintiff's allegations regarding the Defect's adverse effects on the RAV4's driveability.  Such arguments are unpersuasive at the pleading stage, where Plaintiff's well-pled allegations must be accepted as true.  *Resnick*, 693 F.3d at 1321-22.  Moreover, courts do not require plaintiffs claiming breach of implied warranty to demonstrate that their vehicles were *impossible* to drive, or that once a defect manifested, they never drove the vehicle again.  *See, e.g.,*

*Nalley v. General Motors LLC,* No. 1-21-CV-4174-WMR, 2022 WL 18459646, at *4 (N.D. Ga. Aug. 30, 2022) ("The fact that Plaintiff continued to drive his vehicle does not foreclose his implied warranty claims as a matter of law."); *Hurry v. Gen. Motors LLC*, 622 F. Supp. 3d 1132, 1148 (M.D. Ala. 2022) ("Neither [General Motor's] cited authority nor common sense support the proposition that a vehicle is merchantable so long as it provides transportation, regardless of any other problems with the vehicle.").  It is sufficient for a plaintiff—as here—to allege that a defect "impact[s] the safety, driveability, and usefulness of the Class Vehicles . . . ." *Amin*, 301 F. Supp. 3d at 1288.  Of course, in discovery, Defendants may probe when the purported Defect manifested and whether the steering issue was caused by the Defect.  At this stage, however, Plaintiff has plausibly alleged that the Defect impaired the driveability and safety of his RAV4 and thus made it unfit for its ordinary purpose.

### 2. Whether Plaintiff has Privity with Defendants

"As [the implied warranty of merchantability] clearly arises out of a contract of sale of goods, it can only run to a buyer who is in privity of contract with the seller." *Chaffin v. Atlanta Coca Cola Bottling Co.*, 194 S.E.2d 513, 515 (Ga. Ct. App. 1972).  Defendants argue that Plaintiff cannot bring claims for breach of implied warranty of merchantability because he cannot establish

that he was in privity of contract with them.  Specifically, Defendants argue that Plaintiff lacks privity because he did not purchase his Vehicle directly from Defendants.  (Doc. 23-1 at 13.)

Usually, "Georgia's implied warranties for goods do not pass to a second or subsequent purchaser, and may be enforced only by the original buyer, who stands in privity of contract with the seller-defendant." *Gill v. Blue Bird Body Co.,* 147 F. App'x 807, 810 (11th Cir. 2005).  However, Georgia courts recognize an exception to privity "where an automobile manufacturer, through its authorized dealer issues to a purchaser . . . a warranty by the manufacturer running to the purchaser[.]" *Chrysler Corp. v. Wilson Plumbing Co.*, 208 S.E.2d 321, 323 (Ga. Ct. App. 1974).  "This exception to the general privity rule is a means of implying privity where the sale is effectively a direct sale between the manufacturer and the remote consumer." *Dermatology Specialists of Augusta, Inc. v. Daikin Applied Americas Inc.*, No. CV 116-058, 2019 WL 97831, at *5 (S.D. Ga. Jan. 3, 2019).  As such, courts interpreting Georgia law have found privity where a purchaser bought a second-hand vehicle from a manufacturer's authorized dealership.  *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 652 (E.D. Mich. 2021) ("Because Hancock purchased her second-hand vehicle directly from a dealership as opposed to an original purchaser, the fact that her vehicle was used is irrelevant."); *McCabe v. Daimler AG*, 948 F. Supp.

2d 1347, 1362 n.5 (N.D. Ga. 2013) (finding that a plaintiff who purchased a used Mercedes-Benz from an authorized dealer was in privity with Mercedes-Benz USA).[5]

Here, Plaintiff purchased his RAV4 from Hennessy Lexus Atlanta, an authorized Toyota dealer.  (Doc. 1 ¶¶ 22-23.)  At the time of sale, the Vehicle had less than 8,000 miles on it and was still covered by its original warranty issued by TMS.  (*Id.* ¶ 27.)  Because Plaintiff purchased the Vehicle from an authorized dealer while it was still covered by its original warranty, he plausibly satisfies Georgia law's exception to privity with respect to the warrantor of his RAV4—that is, TMS.

---

[5] Defendants cite *Helpling v. Rheem Mfg. Co.*, No. 1:15-CV-2247-WSD, 2016 WL 1222264, at *4-6 (N.D. Ga. Mar. 23, 2016) and *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 845 (S.D. Ohio 2012) for the proposition that Georgia's exception to privity, as articulated in *Chrysler Corp. v. Wilson Plumbing Co.*, 208 S.E.2d 321 (Ga. Ct. App. 1974), is no longer good law.  The Court is not persuaded.  Neither case involved the sale of products through a manufacturer's *authorized dealership*, and neither case found that *Chrysler* had been overruled.  *See Helpling*, 2016 WL 1222264, at *5 (dismissing an implied warranty claim because the plaintiffs "fail[ed] to allege that Taylor purchased his Rheem Unit from a Rheem-authorized dealer"); *In re Porsche Cars*, 880 F. Supp. 2d at 845 (dismissing an implied warranty claim, in part, because the plaintiff did not allege that he purchased his vehicle from a Porsche authorized dealer).  Although some cases appear to limit Georgia's privity exception to the purchase of *new* products, excluding used products, it is unclear what reasoning supports such a distinction.  Because Defendants have not been able to provide any persuasive justification for such a distinction in Georgia law, the Court will apply the rule articulated in *Chrysler*.

But Plaintiff brings implied warranty claims not only against TMS, but against all Defendants, including TMC, TMNA, and TMMC.  He alleges he is in privity with each of these Defendants because they function jointly as agents of TMC.  (Doc. 1 ¶ 180.)

Under Georgia law, "an agency relationship can arise . . . expressly, by implication, or through subsequent ratification by the principal of the agent's conduct."  *J'Carpc, LLC v. Wilkins*, 545 F. Supp. 2d 1330, 1337 (N.D. Ga. 2008) (citing O.C.G.A. § 10-6-1).  An agency relationship is "created by the actions of the principal."  *Ellis v. Fuller,* 638 S.E.2d 433, 435 (Ga. Ct. App. 2006).  If an agency relationship exists, a principal may be held vicariously liable for the acts of an agent "under three circumstances: where the principal authorized the act prior to its commission, ratified the act after its commission, or where the act was committed within the scope of the agency."  *Stewart v. Storch*, 617 S.E.2d 218, 221 (Ga. Ct. App. 2005).  While a "parent/subsidiary relationship does not in and of itself establish the subsidiary as . . . the parent's actual or apparent agent[,] . . . the mere fact that one corporation is a subsidiary of another does not alone serve to insulate the parent where the evidence can establish the legal requirements of an actual or apparent agency relationship between the two corporations."  *Kissun v. Humana, Inc.*, 479 S.E.2d 751, 753-54 (Ga. 1997).  The existence of an agency relationship is generally a question

of fact. *Aiken v. Drexler Shower Door Co.*, 270 S.E.2d 831, 833 (Ga. Ct. App. 1980).

> Plaintiff asserts that
>
> Plaintiff and Class Members were either in privity with all Defendants as original purchasers or lessees or as subsequent purchasers because the warranty itself states that "[w]arranty coverage is automatically transferred at no cost to subsequent vehicle owners." The New Vehicle Limited Warranty states that TMS is the "Warrantor." TMNA controls the operations of TMS; as TMNA admits on its website, "[s]ince 2017, as part of "One Toyota" initiative, all operations in North America (R & D, manufacturing, sales, marketing, after sales and corporate functions) are conducted under "Toyota Motor North America (TMNA)." As alleged, TMNA and TMS act as TMC's agents for all commercial purposes in the United States.

(Doc. 1 ¶ 180.) Furthermore, Plaintiff contends that "TMC has, and at all relevant times has had, the actual authority to exercise, and in practice exercises, control over TMNA, TMMC, and TMS's work, including but not limited to . . . the scope of written warranties of all Class Vehicles sold or leased, [and] the scope of repairs in practice to be covered under warranty of all Class Vehicles[.]" (*Id.* ¶ 41.) Moreover, "TMC has held TMNA and TMS out as its agents for all purposes in the United States, but especially for sales, leasing, and marketing of Class Vehicles and for ongoing management of relationships with purchasers and lessees of Class Vehicles[.]" (*Id.* ¶ 42.) In addition, Plaintiff alleges that "TMC, TMNA, TMMC, and TMS jointly supervise, direct, cause, and exercise control over the advertising, promotion,

warranting, testing, and/or repair of 'Toyota' and 'Lexus' brand vehicles." (*Id.* ¶ 43.)

These allegations, considered alongside the complaint's other allegations relating to agency, (*id.* ¶¶ 41-46), plausibly demonstrate (1) the existence of an agency relationship between TMC and its subsidiaries TMS, TMNA, and TMMC; (2) that TMC authorized its subsidiaries' allegedly unlawful acts; (3) that the subsidiaries acted within the scope of the agency provided by TMC; and (4) that the four Defendants acted jointly to advertise, sell, and warrant the RAV4. Plaintiff specifies how the agency relationship was formed between the Defendants and the manner in which TMC exercised control over TMS, TMNA, and TMMC. The factual allegations therefore rise above the level of mere conclusory statements of agency. *Cf. S.B. v. Tenet Healthcare Corp.*, No. 1:17-CV-00075-RWS, 2017 WL 6389675, at *5 (N.D. Ga. Aug. 11, 2017) (deeming a plaintiff's allegation that the defendant "utilized Clinica as its agent in furthering the fraudulent conduct" to be "merely conclusory"). Moreover, the information that will ultimately prove or disprove the existence of an agency relationship is likely in the exclusive possession of Defendants. Indeed, it is "improbable that [Plaintiff's] agency allegations could have been pleaded with further specificity at this stage without the benefit of discovery[.]"

*Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1352, 1357 (N.D. Ga. 2018).

Plaintiff has sufficiently alleged privity and an agency relationship between Defendants.  Accordingly, at this early stage, Defendants' motion to dismiss is denied with respect to Plaintiff's breach of implied warranty claim against all Defendants.

## C. Fraudulent Concealment

Plaintiff alleges that Defendants engaged in fraudulent concealment by making "false representations and material omissions" with respect to the Parasitic Drain Defect.  (Doc. 1 ¶ 197.)  Defendants seek dismissal of Plaintiff's fraud claim, arguing that Plaintiff "has not alleged (1) with sufficient particularity that he viewed or relied upon any specific statements made by Defendants; (2) the statements themselves, if any, were false; (3) TMS, TMNA, or TMC had an affirmative duty to disclose the alleged Defect; and (4) his justifiable reliance on any misrepresentation or omission from TMS, TMNA, or TMC concerning the alleged Defect."  (Doc. 23-1 at 14.)

As a preliminary matter, the Court notes that Count VI of Plaintiff's complaint, labelled "fraudulent concealment," appears to describe two "intertwined but distinct claims"—one for fraudulent misrepresentation and one for fraudulent omission.  (Doc. 1 ¶¶ 194-207); *see Callen*, 2020 WL

10090879, at *15 (disaggregating a plaintiff's fraudulent misrepresentation and fraudulent omission claims, which were pled together as claims for "fraud and suppression").   Plaintiff alleges both that Defendants made "false representations" and that Defendants made "materials omissions." (*See* Doc. 1 ¶ 197).  "The elements of proof for claims of fraudulent misrepresentation and fraudulent concealment are not co-extensive." *Callen*, 2020 WL 10090879, at *15.  As such, the Court will consider whether Plaintiff has properly pled fraudulent misrepresentation and fraudulent concealment separately.

## 1. Whether Plaintiff has Pled Fraudulent Misrepresentation

Under Georgia law, "[t]he tort of fraudulent misrepresentation has five essential elements." *Grand Master Contracting, L.L.C. v. Lincoln Apartment Mgmt. Ltd. P'ship,* 724 S.E.2d 456, 458 (Ga. Ct. App. 2012).  Plaintiff must demonstrate: (1) that Defendants made false representations; (2) that Defendants knew the representations were false at the time (scienter); (3) that Defendants made representations intending to deceive Plaintiff; (4) that Plaintiff justifiably relied upon such representations; and (5) that Defendants' misrepresentations resulted in damages and loss to Plaintiff.  *Id.*

### a. Rule 9(b)

Litigants pursuing fraud-based causes of action must meet a heightened pleading standard to bring their claims in federal court.  *Callen*, 2020 WL

10090879, at \*6.  Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  A complaint satisfies this particularity requirement where it

> sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875 (11th Cir. 2023) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)). "[U]nadorned conclusions" do not satisfy Rule 9(b); instead, the plaintiff must allege "the who, what, when, where, and how" of the alleged fraud.  *Jones v. Gen. Motors, LLC*, No. 23-11102, 2024 WL 861064, at \*3 (11th Cir. Feb. 29, 2024) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)).  "Allegations that the fraudulent statements or omissions were made with the requisite intent and knowledge, however, may be alleged generally." *Nalley*, 2022 WL 18459646, at \*5; *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

Defendants contend that Plaintiff has failed to plead the required elements of fraudulent misrepresentation with particularity, specifically that

Plaintiff has not sufficiently alleged that Defendants made false statements and that Plaintiff justifiably relied on those statements. (Doc. 23-1 at 14.)[6] According to Defendants, "Plaintiff fails to specifically indicate which advertisements he actually saw, when, which one contained a misrepresentation, if at all, and/or whether the misrepresentation even related to the battery functions of the Subject Vehicle." (*Id.* at 15.) Similarly, they contend, "the Complaint omits what specific information, if any, Plaintiff actually viewed pre-purchase, who produced and distributed it, and where the information could be found." (*Id.*) Defendants argue that Plaintiff's allegations amount to generalized criticism of puffery in Defendants' marketing materials and "do not meet the particularity standard for fraud-based claims." (*Id.* at 17.)

---

[6] Defendants have not provided any argument with respect to the knowledge (scienter) or intent elements of fraudulent misrepresentation or concealment. Given Plaintiff's extensive allegations regarding Defendants' knowledge of the Defect, (Doc. 1 ¶¶ 79-101), and Plaintiff's general pleading of intent, (*id.* ¶ 207), as well as Defendants' failure to address either element, the Court finds that the knowledge and intent elements have been sufficiently pled. *See Ramsey v. Bd. of Regents of Univ. Sys. of Georgia*, No. 1:11-CV-3862-JOF-JSA, 2013 WL 1222492, at *29 (N.D. Ga. Jan. 30, 2013), *aff'd*, 543 F. App'x 966 (11th Cir. 2013) ("When a party fails to address a specific claim, or fails to respond to an argument made by the opposing party, the Court deems such claim or argument abandoned."); LR 7.1(B), NDGa.

As to the content of the statements, Plaintiff alleges that Defendants made false representations by "[c]onsistently representing in their marketing and promotional materials disseminated widely over the internet and provided in-person through their authorized dealers that the Class Vehicles are safe and reliable, . . . that *the Class Vehicles reliably start when the Vehicle operator attempts to turn them on*[,]" and "that the batteries of the Class Vehicles last 3-5 years."  (Doc. 1 ¶ 197 (emphasis added).)  The complaint also identifies several specific statements that Toyota made regarding the RAV4's safety and reliability:

- "If you want that all-important combination of safety and reliability, the 2020 Toyota RAV4 has you covered."
- "Safe for every adventure."
- "RAV4 is loaded with advanced safety features."
- "Designed for safety."
- "Durability and reliability are . . . manufactured into every aspect of RAV4 . . . right from where they are assembled and built"
- "Once RAV4 passes the final check it is driven off the assembly line, with some vehicles even heading onto the test track where they undergo noise, vibration, and harshness testing and more driving tests to ensure quality, durability, and reliability, just like all Toyota models."
- "When it's time to get away, RAV4 is ready to help you take on any trip."
- "Once inside, just press the Push Button Start and you're ready to go."

(*Id.* ¶ 60.)  Plaintiff also asserts that Defendants represent that the typical battery life of the Class Vehicles is 3-5 years on the websites of their authorized dealers.  (*Id.* ¶ 61.)

With respect to Plaintiff's viewing of the statements, the complaint alleges "[t]he above-described representations are similar or identical in content to the advertising and promotional materials that Plaintiff viewed while researching his purchase of the Class Vehicle between the summer of 2019 and May 2021."  (*Id.* ¶ 62.)  "Plaintiff was exposed to these and similar representations by Defendant virtually every time he opened an internet browser for two years . . . at minimum, on at least seven-hundred discrete occasions."  (*Id.*)

The Court finds that these allegations satisfy the particularity requirement of Rule 9(b) and the elements of fraudulent misrepresentation. Plaintiff alleges that Defendants (who) made several false statements as specified above (what) between the summer of 2019 and May 2021 (when) in their online advertising and promotional materials (where) and promised that the RAV4 and its battery and electrical systems possessed reliability that Toyota knew it didn't have (how).

Moreover, Plaintiff plausibly alleges the falsity of certain statements made by Toyota regarding the reliability of the RAV4.  While some of the

37

statements may qualify as nonactionable "puffery" as Defendants contend, other alleged misrepresentations are "statements of fact" that implicate the reliability of the electrical systems that Plaintiff claims was defective. *Randall v. Smith*, 222 S.E.2d 664, 666 (Ga. Ct. App. 1975).  For instance, Plaintiff alleges that "Defendants represent through the websites of their authorized dealers that the typical battery life of the Class Vehicles is 3-5 years." (Doc. 1 ¶ 61.)  This is a specific representation about the durability of RAV4's battery that—accepting Plaintiff's other allegations—is plausibly false.  In addition, the statement that "[o]nce inside, just press the Push Button Start and you're ready to go" also implicates the reliability of the RAV4's electrical system.  (*Id.* ¶ 60.)  Whether a start button reliably turns on the Vehicle is a factual issue that does not rely upon one's opinion.  A consumer "could reasonably infer" from such a statement "that the Defendants would not clear a Class Vehicle for sale with a known defect" in the electrical system that would prevent the Vehicle from turning on when pressing the start button.  *Callen*, 2020 WL 10090879, at *18.

### b. Justifiable Reliance

Defendants' arguments that Plaintiff has failed to allege justifiable reliance are similarly unavailing.  The justifiable reliance element of fraud requires the plaintiff to "allege specific facts to support a finding that he acted

upon or refrained from acting upon [the defendant's] actions." *Dixon v. Branch Banking & Tr. Co.*, 824 S.E.2d 760, 766 (Ga. Ct. App. 2019). Plaintiff has done so here. He has pled that he "was exposed to Defendants' consistent and unequivocal representations of the Vehicles' safety, at a minimum, on at least seven-hundred discrete occasions" on an internet browser, and that the misrepresentations "were material to [his] decision to buy" the RAV4. (Doc. 1 ¶ 62.) Furthermore, Plaintiff alleges that he "relied on similar instances of Defendants' uniform advertising message touting the quality and dependability of their vehicles, and of the Class Vehicles in particular, in deciding to buy his Class Vehicle." (*Id.*) Even though Plaintiff does not specifically state which statements he found most material to his decision to purchase the RAV4, "that omission is not fatal because the promotional materials conveyed a common allegedly fraudulent message" that the RAV4's battery system was dependable and durable. *Morrison v. TriVita, Inc.*, No. 12-CV-1387 BEN BLM, 2013 WL 1148070, at *5 (S.D. Cal. Mar. 19, 2013).

At this early stage, Plaintiff's allegations with respect to the content of Defendants' purported misrepresentations and his reliance upon them are sufficient to state a claim for fraudulent misrepresentation. *See, e.g.*, *Callen*, 2020 WL 10090879, at *18 (finding that fraudulent misrepresentation was adequately pled where the complaint specified "where the Plaintiffs saw these

statements, what the statements contained, and how they affected the Plaintiffs' purchasing decisions"); *In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig.*, ML 12–2317 CAS JEMx, 2012 WL 6062047, at *15 (C.D. Cal. Dec. 3, 2012) ("By identifying a clear common message in the advertising campaign and identifying numerous examples that repeat this message, plaintiffs have adequately notified defendants of the who, what, when, where and how of the misconduct charged." (cleaned up)).

### 2. Whether Plaintiff Has Pled Fraudulent Concealment

"In a claim for fraudulent concealment, a plaintiff must prove the same five elements of a fraud claim." *Hanlon v. Thornton,* 462 S.E.2d 154, 157 (Ga. Ct. App. 1995). Again, these are: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *ReMax N. Atlanta v. Clark,* 537 S.E. 2d 138, 141 (Ga. Ct. App. 2000). Additionally, where a fraud claim is based on the alleged failure to disclose a material fact, liability arises only if there exists "an obligation to disclose" the fact. *Middleton v. Troy Young Realty*, 572 S.E.2d 334, 337 (Ga. Ct. App. 2002) (citing O.C.G.A. § 23-2-53); *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1350 (N.D. Ga. 2015).

Defendants argue that Plaintiff has not stated a valid claim for fraudulent concealment because he has not alleged that "TMS, TMNA, or TMC

had an affirmative duty to disclose the alleged Defect" and he has not alleged, with sufficient particularity, his justifiable reliance on any omission concerning the alleged Defect. (Doc. 23-1 at 14.)[7] The Court will first consider whether Plaintiff has satisfied Rule 9(b)'s heightened pleading requirement and then turn to Defendants' arguments regarding duty to disclose and justifiable reliance.

### a. Rule 9(b)

The Rule 9(b) particularity requirement functions differently in the context of omission-based fraud claims. "By the very nature of fraudulent concealment, plaintiffs cannot be expected to point to the time, place, and precise substance of what should have been disclosed." *Monopoli*, 2022 WL 409484, at *10. Instead, it is enough for a plaintiff "to allege that a fact was material and that it could have, and should have, been disclosed prior to the time plaintiffs acted upon the omission[.]" *Nalley*, 2022 WL 18459646, at *5 (quoting *Monopoli*, 2022 WL 409484, at *10); *see also Callen*, 2020 WL 10090879, at *15 ("While a claim for fraudulent misrepresentation is typically

---

[7] As discussed in the preceding section of this order, Defendants have not provided any argument with respect to the knowledge (scienter) or intent elements of fraudulent concealment. Based on Defendants' failure to challenge those elements and an independent review of Plaintiff's allegations, the Court finds that the knowledge and intent elements have been sufficiently pled.

premised on an affirmative misrepresentation involving a specific statement made at a specific place and time, fraudulent concealment or omission is premised on the defendant's failure to speak and is by its very nature, difficult to plead with particularity." (cleaned up)).

Plaintiff has satisfied Rule 9(b) by pleading the who, what, when, where, and how of Defendants' alleged fraudulent omissions.  He specifically alleges that Defendants (who) failed to disclose the existence of the Parasitic Drain Defect despite knowing of it since at least January 2019 (what) prior to the sale of the RAV4 (when).  (Doc. 1 ¶¶ 6-8; 197-99.)  Defendants allegedly failed to disclose the Defect in their "marketing and promotional materials provided on-line, on television, and at the point of sale" (where) and allegedly promised in its marketing materials that the RAV4's electrical system possessed durability and reliability qualities that Toyota knew it did not have (how).  (*Id.* ¶¶ 197-99.)  These allegations are sufficient to meet Rule 9(b)'s pleading requirements.  *See, e.g., Nalley*, 2022 WL 18459646, at *5 (concluding that Rule 9(b) was satisfied by similar allegations); *Amin*, 301 F. Supp. 3d at 1296 (same); *McCabe*, 948 F. Supp. 2d at 1367 (same).

### b. Duty to Disclose

Under Georgia law, only the "[s]uppression of a material fact which a party is under an obligation to communicate" can support a fraudulent

omission claim.  O.C.G.A. § 23-2-53.  A duty of disclosure may arise either from the "confidential relations of the parties" *or* "from the particular circumstances of the case."  *Id.*  "The particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of 'intrinsic qualities of the article which the other party *by the exercise of ordinary prudence and caution could not discover.*'"  *McCabe*, 948 F. Supp. 2d at 1368 (quoting *Rivers v. BMW of N. Am., Inc.*, 449 S.E.2d 337, 340 (Ga. Ct. App. 1994)) (emphasis added).  Whether the circumstances of a case give rise to a duty to disclose is generally a jury question.  *ASC Constr. Equip. USA, Inc. v. City Commer. Real Estate, Inc.*, 693 S.E.2d 559, 565 (Ga. Ct. App. 2010).

Here, Plaintiff alleges that Defendants (1) knew about the Parasitic Defect (Doc. 1 ¶¶ 79-101), (2) failed to disclose the defect in its promotional materials and other communications with customers (*id.* ¶¶ 34, 197), (3) actively concealed the defect (*id.* ¶¶ 8-9, 86, 197, 199), and (4) denied the existence of the defect (*id.* ¶¶ 116-118, 199).  Furthermore, Plaintiff alleges that he and other purchasers could not have discovered the Parasitic Drain Defect through "the exercise of ordinary prudence," *McCabe*, 948 F. Supp. 2d at 1368, because they "had no opportunity to test the ECMs, safety features, and associated electrical systems of the Class Vehicles before purchasing them, and because Defendants assured them that the Vehicles were safe and fit for

their ordinary purposes." (Doc. 1 ¶ 201.)  In light of these allegations, the Court concludes—as others in this district have on similar facts—that Plaintiff plausibly alleges that Defendants have concealed "intrinsic qualities" of the Vehicles which Plaintiff could not have discovered through the exercise of ordinary prudence.  *See e.g., Amin*, 301 F. Supp. 3d at 1296 (finding a duty to disclose where plaintiffs alleged that Mercedes knew about the defect, denied its existence, and actively concealed it); *Bolling*, 2024 WL 3972987, at *16 (finding a duty to disclose where plaintiffs alleged, *inter alia*, that Mercedes knew about but failed to disclose the defect, and that consumers could not discover the defect through reasonable diligence); *see also McCabe*, 948 F. Supp. 2d at 1368; *Monopoli*, 2022 WL 409484, at *11-12; *Nalley*, 2022 WL 18459646, at *6.

Whether Toyota had a duty of disclosure is a question of fact that is better suited for adjudication on a more developed record.  At this early stage, Plaintiff has plausibly alleged Defendants' duty to disclose the existence of the Defect.[8]

_____

[8] Defendants also contend that there is no duty to disclose because Plaintiff fails to show that Toyota had *superior knowledge* of the Defect.  Specifically, Defendants point to some of Plaintiff's allegations regarding publicly-available sources, such as online consumer complaints, that Defendants argue were equally accessible to Plaintiff.  (Doc. 23-1 at 19.)  But Defendants have cited no Georgia case that infers a lack of superior knowledge based on the mere

### c. Justifiable Reliance

With respect to justifiable reliance, Defendants contend that Plaintiff fails to allege the specific misrepresentation he relied upon, and that those he has identified constitute mere "puffery." (Doc. 23-1 at 21.) The Court already addressed these arguments in the preceding section analyzing Plaintiff's fraudulent misrepresentation claim. Of course, "allegations sufficient to show justifiable reliance on an *omission* differ from those sufficient to show reliance on a *misrepresentation.*" *Monopoli*, 2022 WL 409484, at *10. To make out his omission-based fraud claim, it is sufficient for Plaintiff to allege that a

---

existence of online complaints. The only case that Defendants cite—*Meyer v. Waite*, 606 S.E.2d 16, 20 (Ga. Ct. App. 2004)—is easily distinguishable. *Meyer* involved a real estate transaction where the buyers complained of a hidden problem in the "stucco" of a property, after failing to avail themselves of a "stucco inspection" that was expressly available to them in the contract for sale. *Id.* The buyers also alleged that the sellers concealed certain issues with the property, such as termite damage, that the sellers had in fact disclosed in documents provided before sale. *Id.* at 20-21. The case at bar is very different. Defendants did not disclose the Defect in the RAV4's contract for sale or provide a means for Plaintiff to discover the Defect prior to sale. Moreover, Plaintiff alleges that Defendants had superior knowledge of the extent and nature of the Defect from several non-public sources of information including "(1) pre-release testing data; (2) their own records of customers' complaints about the Defect to Defendants' dealers for vehicle repairs; (3) aggregate data from Defendants' dealers, including their repair records and orders; (4) consumer complaints to the NHTSA and resulting notice from the NHTSA; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the problem." (Doc. 1 ¶ 79.) These allegations plausibly demonstrate superior knowledge of the Defect.

concealed fact was "material" and that he would have acted differently had it been disclosed. *Id.*

Plaintiff adequately pleads justifiable reliance here. Viewed together with his allegations regarding the Defect's adverse effects on the safety and driveability of the RAV4, Plaintiff plausibly avers that "[t]he existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease" the RAV4. (Doc. 1 ¶ 103.) "Reasonable consumers, like Plaintiff, expect that a vehicle's battery and electrical system will function in a manner that will not pose a safety risk, be free from defects, and not impair the usage of the Class Vehicles for their intended purpose." (*Id.* ¶ 104.) Moreover, Plaintiff alleges that had "Plaintiff and other Class members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them at all." (*Id.* ¶ 103.) These allegations are sufficient to state the justifiable reliance element of an omission-based fraud claim. *See, e.g.*, *McCabe*, 948 F. Supp. 2d at 1368 (Plaintiffs alleged "that they expected to receive vehicles free from design or manufacturing defects and that they would not have purchased their vehicles had they known of the defect. Thus, they have plausibly alleged justifiable reliance.").

Having found that Plaintiff has satisfied Rule 9(b)'s pleading requirements and plausibly alleged all elements of both fraudulent

misrepresentation and fraudulent omission, the Court denies Defendants'
motion to dismiss with respect to fraudulent concealment.  (Count VI.)

## D. Georgia Fair Business Practices Act

The Georgia Fair Business Practices Act ("FBPA") "forbids and declares
unlawful any unfair or deceptive acts or practices in the conduct of consumer
transactions[.]" *Henderson v. Gandy*, 608 S.E.2d 248, 252 (Ga. Ct. App. 2008);
O.C.G.A. § 10-1-390, *et seq.*  "A violation of the FBPA has three elements: (1) a
violation of the Act, (2) causation, and (3) injury." *Jenkins v. BAC Home Loan
Servicing, LP*, 822 F. Supp. 2d 1369, 1375 (M.D. Ga. 2011).  "In addition,
'justifiable reliance is an essential element of an FBPA claim.'" *Amin*, 301 F.
Supp. 3d at 1289-90 (quoting *Crown Ford, Inc., v. Crawford*, 473 S.E.2d 554,
557 (Ga. Ct. App. 1996)).  "Thus, a claimant who alleges the FBPA was violated
as a result of a misrepresentation must demonstrate that he was injured as
the result of the reliance upon the alleged misrepresentation." *Jenkins,* 822 F.
Supp. 2d at 1375 (quoting *Zeeman v. Black*, 273 S.E.2d 910, 916 (Ga. Ct. App.
1980)) (cleaned up).

In response to Plaintiff's FBPA claim, Defendants contend—like they did
in the fraud context—that Plaintiff has not established justifiable reliance.

47

(Doc. 23-1 at 22).[9]  For the reasons explained in the preceding section of this order, the Court disagrees.  Moreover, Plaintiff has made a prima facie showing of the other elements required for an FBPA claim.  He has plausibly alleged that Toyota (1) knew about the Parasitic Drain Defect before he purchased his RAV4 (Doc. 1 ¶¶ 79-101), (2) failed to disclose the defect in its promotional materials and other communications with customers (*id.* ¶¶ 34, 197), (3) actively concealed the defect (*id.* ¶¶ 8-9, 86, 197, 199), (4) denied the existence of the defect (*id.* ¶¶ 116-118, 199); and that (5) Plaintiff overpaid for a defective Vehicle (*id.* ¶¶ 10, 169, 206), which (6) he would not have purchased (or for which he would have paid less) had he known about the defect (*id.* ¶¶ 103-04).

Accepting these allegations as true, the Court finds that Plaintiff has adequately pled his FBPA claim.  S*ee, e.g.*, *Nalley*, 2022 WL 18459646, at *7-8 (concluding that a plaintiff successfully stated an FBPA claim where he alleged that his vehicle's manufacturer concealed a defect and that he would not have purchased the vehicle had the defect been disclosed); *Amin*, 301 F. Supp. 3d at 1290-91 (similar); *In re Arby's Rest. Grp. Inc. Litig.*, 317 F. Supp. 3d 1222, 1224-28 (N.D. Ga. 2018) (finding that plaintiffs adequately pled a FBPA claim where they alleged that defendants made representations indicating compliance with

---

[9] Defendants do not provide any argument with respect to the other elements of Plaintiff's FBPA claim.  (Doc. 23-1 at 22.)

data security protection standards and failed to disclose data vulnerabilities that would have impacted the plaintiffs' purchase decisions).

## E. Unjust Enrichment

Defendants seek dismissal of Plaintiff's unjust enrichment claim, arguing that the existence of a valid warranty precludes any claims of unjust enrichment.  (Doc. 23-1 at 22-24.)

"The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." *May v. S.E. GA Ford, Inc.*, 811 S.E.2d 14, 18 (Ga. 2018); *St. Paul Mercury Ins. Co. v. Meeks*, 508 S.E.2d 646, 648 (Ga. 1998) ("[U]njust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract." (cleaned up)).  "A claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails." *Wachovia Ins. Servs. v. Fallon*, 682 S.E.2d 657, 665 (Ga. Ct. App. 2009) (cleaned up).  But "[a] party may plead the claims in the alternative only if one or more of the parties contests the existence of the express contract." *Ed Federkeil Racing, Inc. v. Fire Service Plus, Inc.,* No. 3:20-CV-141-TCB, 2021 WL 2555582, at *7 (N.D. Ga. Mar 16, 2020).  "[A] plaintiff may not plead an unjust enrichment claim . . . when it is undisputed (or when the court has

found) that a valid contract exists." *Techjet Innovations Corp. v. Benjelloun,* 203 F. Supp. 3d 1219, 1234 (N.D. Ga. 2016).

The existence of a valid contract in this case precludes Plaintiff's unjust enrichment claims. Although Plaintiff contends that the repair-or-replace provision of the NVLW fails of its essential purpose and is unconscionable, he does not dispute the underlying validity of the warranty. *See*, *e.g.*, *In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, No. 1:13-CV-2195-TWT, 2014 WL 3360233, at *3 (N.D. Ga. July 9, 2014) (dismissing an unjust enrichment claim where "Plaintiffs allege[d] that the Defendant ha[d] not honored warranty claims . . . and that the warranty contain[ed] unenforceable *limitations*, [but] they never den[ied] the general validity of the warranty."). Indeed, Plaintiff's express warranty claim is predicated on the validity of the NVLW because he seeks a remedy for its breach. As such, Plaintiff "may not rely on unjust enrichment" because "[a] legal contract governs the dispute at issue[.]" *Bonem v. Golf Club of Ga., Inc.*, 591 S.E.2d 462, 467-68 (Ga. Ct. App. 2003); *see, e.g., Callen*, 2020 WL 10090879, at *13 (dismissing unjust enrichment claim where plaintiffs did "not dispute that the parties [were]

bound by the terms of the" warranties.).  Plaintiff's unjust enrichment claim is

dismissed.  (Count V.)[10]

## F. Standing for Declaratory or Injunctive Relief

Defendants argue that Plaintiff does not have standing to pursue

declaratory or injunctive relief because he no longer owns a RAV4.  (Doc. 23-1

at 24-25.)[11]  To establish this fact, Defendants rely on a CARFAX report outside

the pleadings and ask the Court to take judicial notice of its contents.  (Doc.

23-5.)  In so doing, Defendants raise a "factual attack" on the Court's subject

matter jurisdiction to hear claims for declaratory or injunctive relief.  *See*

*Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021).  "A

district court evaluating a factual attack on subject matter jurisdiction . . . is

free to weigh the evidence and satisfy itself as to the existence of its power to

---

[10] The only case Plaintiff cites in support of his unjust enrichment count—*Ed Federkeil Racing, Inc. v. Fire Service Plus, Inc.*—is of no help to Plaintiff.  No. 3:20-CV-141-TCB, 2021 WL 2555582, at *7 (N.D. Ga. Mar. 17, 2021).  While *Federkeil* allowed alternative pleading of an unjust enrichment claim, it only did so because one of the parties "dispute[d] the existence of a contract."  *Id.* Neither party disputes the existence of the NVLW.

[11] It is unclear whether Plaintiff even seeks injunctive relief.  He does not mention injunctive relief in the "Relief Requested" section of his complaint. (Doc. 1 ¶ 208.)  The only portion of the complaint that refers to injunctive relief is a paragraph alleging questions of law and fact that are common to the putative class.  (*Id.* ¶ 127(o).)  Plaintiff does, however, clearly pursue declaratory relief.  (*Id.* ¶ 208.)

hear the case." *Id.* (cleaned up).  However, courts may "judicially notice a fact" only if it "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  While judicial notice of certain documents may be appropriate "for the [limited] purpose of determining what statements the documents contain," it is not appropriate for "prov[ing] the truth of the documents' contents." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

The Court finds that the CARFAX report's contents are not judicially noticeable and thus insufficient to demonstrate a lack of subject matter jurisdiction over Plaintiff's request for equitable relief.  CARFAX, as a private business website, is not the "sort[ ] of 'source[ ] whose accuracy cannot reasonably be questioned[,]'" making it ill-suited for judicial notice.  *L.R. v. Cigna Health and Life Insurance Company*, No. 6:22-CV-1819-RBD-DCI, 2023 WL 3479064, at *2 (M.D. Fla. May 16, 2023) (quoting *Estrella v. Ltd. Fin. Servs., LP*, 2015 WL 6742062, at *2 n.4 (M.D. Fla. Nov. 2, 2015)).  "Indeed, one court has gone so far as to describe information available from private Internet websites as not remotely akin to the type of facts which may be appropriately

judicially notice[d]." *Daniels v. Howe Law Firm, P.C.*, No. 1:15-CV-827-SCJ-RGV, 2016 WL 11581822, at *2 (N.D. Ga. May 17, 2016) (cleaned up).[12]

For those reasons, the Court denies Defendants' request for judicial notice with respect to the CARFAX report and denies Defendants' motion to dismiss Plaintiff's claims for declaratory and injunctive relief.  Of course, Plaintiff's current ownership or non-ownership of a RAV4 is a fact that should be easily ascertainable in discovery.  Defendants are free to re-raise their challenge to standing for declaratory or injunctive relief at a later stage of the case.

---

[12] Even if the Court were inclined to accept the CARFAX report's contents, as Plaintiff points out, the report does not actually name the previous or current owners of the RAV4; rather, it merely lists three unknown owners, the year in which each owner purportedly purchased the Vehicle, and the "[e]stimated" length of ownership.  (Doc. 23-3; Doc. 26.)

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss. (Doc. 23.)  The motion is granted with respect to Plaintiff's unjust enrichment claim (Count V).  The motion is denied as to Plaintiff's FBPA claim (Count I), breach of express warranty claim (Count II), breach of the implied warranty of merchantability claim (Count III), and fraudulent concealment claim (Count VI).

The parties are **DIRECTED** to file their joint preliminary report and discovery plan within 14 days of the entry date of this order.

**SO ORDERED**, this 11th day of December, 2024.

SARAH E. GERAGHTY
United States District Judge