# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALEXANDER SOWA, et al.,

    Plaintiffs,

    v.

MERCEDES-BENZ GROUP AG,
MERCEDES-BENZ USA, LLC,

    Defendants.

CIVIL ACTION NO.

1:23-CV-636-SEG

## O R D E R

This matter is before the Court on Defendants Mercedes-Benz USA, LLC's ("MBUSA") and Mercedes-Benz Group AG's ("MBG") motions to dismiss. (Doc. 28, 32.) After careful consideration, the Court enters the following order.

## I.    Background

This is a putative class action alleging that Mercedes concealed a serious defect in several of its vehicles (the "Class Vehicles").[1] Plaintiffs are Mercedes vehicle owners from 17 different states who contend that the Class Vehicles contain a dangerous defect that causes the rear subframe, and nearby parts,

---

[1] The Class Vehicles are the: 2010-2022 Mercedes-Benz C-Class, 2010-2022 Mercedes-Benz E-Class, 2010-2015 Mercedes-Benz GLK-Class, 2010-2022 Mercedes-Benz CLS-Class, 2010-2020 Mercedes-Benz SLK/SLC-Class, 2016-2022 Mercedes-Benz GLC-Class, and 2010-2022 Mercedes-Benz SL-Class. (Consolidated Class Action Complaint ("CAC"), Doc. 25 ¶ 2.)

to prematurely rust or corrode to the point of failure.  Plaintiffs seek to bring claims on behalf of a nationwide class and 17 state subclasses for breach of express and implied warranty, violations of various state consumer protection statutes, fraudulent omission, and unjust enrichment.

### A. The Rear Subframe Defect

A rear subframe is an essential structural component of a vehicle that supports its suspension and drivetrain.  (Consolidated Class Action Complaint ("CAC"), Doc. 25 ¶¶ 302-03.)  Plaintiffs allege that each Class Vehicle is equipped with a rear subframe that has a dangerous defect that causes premature corrosion to the subframe, attached components, and other nearby parts (the "Rear Subframe Defect" or "Defect").  (*Id.* ¶ 3.)  The Rear Subframe Defect results from "a) a design that allows water and salt to collect on the interior of the subframe, leading to premature corrosion from the inside out, and/or b) an inadequate type or amount of rust coating to withstand ordinary and expected use."  (*Id.*)

The Defect "poses a material safety risk," because it can cause a rear subframe to fail while a Class Vehicle is in motion on the road.  (*Id.* ¶¶ 5, 10.)  Such a failure while driving can cause "(a) the rear of the vehicle to fishtail, especially while braking; (b) the vehicle to suddenly veer to one side, potentially into a parallel or oncoming lane of traffic; and/or (c) complete or

partial loss of control for the driver." (*Id.* ¶ 8.)  Class Vehicle owners have also experienced mechanical issues involving the "corrosion of the rear suspension springs, rear brake lines, exhaust system, gas lines, and/or rear axle, all of which are located near the rear subframe in the back of the vehicle." (*Id.* ¶ 9.) Because subframe corrosion occurs "from the inside out," it is very difficult to detect, "even in a meticulously maintained vehicle, and even by a trained mechanic." (*Id.* ¶¶ 11, 317.)  As a result, "the Class Vehicles provide little to no warning before becoming dangerously unstable." (*Id.* ¶ 317.)

Plaintiffs allege that MBUSA and MBG have known about the Rear Subframe Defect since at least 2009 but failed to disclose it until February 2023, when they issued an extended warranty (the "Extended Warranty") in response to Plaintiffs' notice of intent to sue.[2]  (*Id.* ¶¶ 12-15.)  In addition, Defendants concealed the existence of the Rear Subframe Defect in its marketing materials and communications with Plaintiffs.  (*Id.* ¶¶ 377-85.) Plaintiffs have suffered damages as a result of Defendants' conduct: they (a) unknowingly purchased a vehicle with a dangerous defect, (b) incurred out-of-pocket expenses relating to the Rear Subframe Defect, and (c) were forced to

---

[2] Plaintiffs also assert that Defendants' issuance of the extended warranty is "not adequate to warn Class Members about the serious safety risks posed by the Rear Subframe Defect." (*Id.* ¶ 15.)

stop or limit using their vehicles prematurely or sell them at a steep discount. (*Id.* ¶ 17.)   Plaintiffs also allege that the Extended Warranty does not adequately reimburse them for their economic damages.  (*Id.*)

## B. The Warranties

Defendant MBUSA issued two warranties relevant to this action—the New Vehicle Limited Warranty ("NVLW") and the Extended Warranty.  The NVLW warrants that MBUSA would "make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period."  (*Id.* ¶ 418.)  The NVLW period was "4 years/50,000 miles[.]" (Doc. 25-5.)[3]  On February 10, 2023, MBUSA issued the Extended Warranty, allegedly in response to Plaintiffs serving a notice of intent to sue.  (Doc. 25 ¶ 15.)  The Extended Warranty "extended the warranty for the rear subframe" for certain Class Vehicles "from the original New Vehicle Limited Warranty of 4 years/50,000 miles to 20 years/unlimited miles, and applies to the vehicle regardless of ownership."  (Doc. 25-5 at 2.)  It covers the replacement of the rear subframe, but only "[i]n the event the rear subframe experiences corrosion

---

[3] The NVLW is not attached to the Plaintiffs' CAC, and the parties have not attached it to their motions or briefing.  Plaintiffs, however, quote the key portions of the NVLW in the CAC.  (Doc. 25 ¶ 418.)  Additionally, the Extended Warranty, which *is* attached to the CAC, states that "the original New Vehicle Limited Warranty" period was "4 years/50,000 miles[.]"  (Doc. 25-5.)

with perforation (holes), . . . ."  (*Id.*)  And it does not apply to "any other components[.]"  (*Id.*)

## C. The Parties

Plaintiffs are 23 individuals from 17 states who purchased or leased a Class Vehicle.  They acquired various Class Vehicles in different states and in different years, as summarized in the following table provided by Defendants:

| Plaintiff | Model | Model Year | Acquired | State |
|---|---|---|---|---|
| Tenika Neil | GLK 350 | 2012 | 2014 | California |
| Stephen Caggiano | C 300 | 2012 | 2014 | Connecticut |
| Steven Averbach | GLK 350 | 2010 | 2020 | Florida |
| Christian Kodom | E 350 | 2014 | 2021 | Illinois |
| Lisa Turner | C 300 | 2012 | 2021 | Kentucky |
| Mike Xie | GLK | 2010 | 2010* | Maryland |
| Pasquale Russolillo | C 300 | 2010 | 2022 | Massachusetts |
| Michael Jacobs | C 300 | 2010 | 2010* | Michigan |
| Thomas Koby | E 350 | 2010 | 2018 | Missouri |
| Monique Edwards | C 300 | 2014 | 2015 | Missouri |
| Yauwen Lin | C 300 | 2011 | 2011* | New Jersey |
| Stanley King | E 350 | 2010 | 2012 | New Jersey |
| Samuel Ortiz | E 350 | 2015 | 2014* | New York |
| Jack Simpson | C 300 | 2013 | 2020 | Ohio |
| Brian Laakso | E 350 | 2011 | 2022 | Ohio |
| Giuseppe Garofalo | C 300 | 2013 | 2018 | Pennsylvania |
| Anthony Russell | C 300 | 2013 | 2012** | Pennsylvania |
| Alexander Sowa | C 300 | 2014 | 2017 | Rhode Island |
| Raymond Robinson | E 350 | 2014 | 2014 | Rhode Island |
| Park C. Thomas | C 300 | 2013 | 2015 | Tennessee |
| Curtis Willis | E 550 | 2013 | 2019 | Texas |
| Alma Brown | E 350 | 2011 | 2015 | Texas |
| Owen Licht | C 300 | 2012 | 2020 | Virginia |

(Doc. 28 at 3; Doc. 25 ¶¶ 19-274.)  Since the filing of this action, Plaintiff Steven Averbach of Florida has died, and Plaintiffs have not moved to substitute him.

As such, his claims must be dismissed.  Fed. R. Civ. P. 25(a)(1).[4]  Because Mr. Averbach was the only representative of the Florida subclass, no Florida state law claims (Counts 21, 22, 23, 24, & 25) remain.[5]

Defendant MBG, formerly named Daimler AG, is a German corporation with its principal place of business in Germany.  (Doc. 25 ¶¶ 275-78.)  MBG designed and manufactured the Class Vehicles.  (*Id.*)  Defendant MBUSA is a wholly owned subsidiary of MBG.  (*Id.* ¶ 284.)  MBUSA is a Delaware corporation with its principal place of business in Sandy Springs, Georgia.  (*Id.* ¶ 282.)  Prior to July 2015, MBUSA's principal place of business was in New Jersey.  (*Id.* ¶ 283.)  MBUSA marketed, warranted, distributed, sold, leased,

---

[4] On October 20, 2023, Plaintiffs filed a notice of suggestion of death as to Plaintiff Steven Averbach of Florida.  (Doc. 47.)  Fed. R. Civ. P. 25(a)(1) states that: "If a party dies and the claim is not extinguished, the court may order substitution of the proper party. . . . If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."  Plaintiffs filed a certificate of service stating that Mr. Averbach's wife, Rosa Averbach, was served with the notice of suggestion of death on May 4, 2024.  (Doc. 60.)  No motion to substitute has been filed.  Because the 90-day substitution period has elapsed, the Court must dismiss Mr. Averbach's claims.  (Counts 21, 22, 23, 24, & 25.)

[5] Plaintiffs' counsel represent that "two individuals who own Class Vehicles purchased in Florida have retained Plaintiffs' Counsel since the filing of the Consolidated Complaint on May 1, 2023, and stand prepared to join the litigation as Plaintiffs and Proposed Class Representatives."  (Doc. 58 ¶ 3.)  Until Plaintiffs move for leave to join additional class representatives, however, the Court has no jurisdiction to entertain any Florida-related claims.

and serviced the Class Vehicles in the United States.  (*Id.* ¶ 286.)  Plaintiffs allege that MBG holds MBUSA out as its agent for all purposes in the United States, including for selling and marketing the Class Vehicles.  (*Id.* ¶ 280.)

## D. Procedural History

This putative class action lawsuit was filed on February 10, 2023.  (Doc. 1.)  On April 7, 2023, the Court granted Plaintiffs' motion to consolidate this case with five other, related cases in this court.  (Doc. 18.)  On May 1, 2023, Plaintiffs filed the CAC, which aggregated the claims of the consolidated cases. (Doc. 25.)

The CAC asserts 94 causes of action.  (*Id.*)  Nine claims are brought on behalf of a putative nationwide class: (1) breach of express warranty under O.C.G.A. § 11-2-313; (2) breach of implied warranty under O.C.G.A. § 11-2-314;[6] (3) breach of express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; (4) breach of implied warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; (5) violation of the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*; (6) violation of the

---

[6] Plaintiffs caption their nationwide breach of implied warranty claim as brought under O.C.G.A. § 84-2-314 (Count 2, Doc. 25 at 160), but this appears to be a scrivener's error.  The statutory provision addressing implied warranty of merchantability is O.C.G.A. § 11-2-314, which Plaintiffs properly cite in the paragraphs addressing the substance of their claim.  (Doc. 25 ¶ 439.)

Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370, *et seq.*;

(7) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1,

*et seq.*; (8) common law fraudulent omission; and (9) common law unjust

enrichment. Plaintiffs also assert claims on behalf of 17 state sub-classes, with

each Plaintiff seeking to represent his or her home state's subclass. Each

proposed subclass asserts claims under the laws of the respective subclass

states for: (1) breach of express warranty; (2) breach of implied warranty; (3)

violation of the state's consumer protection statutes; (4) common law

fraudulent omission; and (5) common law unjust enrichment. Plaintiffs seek

damages and injunctive relief "requiring Mercedes to issue notice of the Rear

Subframe Defect to consumers and provide free, regular inspections to screen

for rear subframe corrosion in the Class Vehicles[.]" (*Id.* ¶ 18.)

Defendants have moved to dismiss Plaintiffs' claims. (Doc. 28, 32.) The

motions are fully briefed, and the Court held oral argument. (Doc. 56.)

## II.   Legal Standard

Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of

the Federal Rules of Civil Procedure.

Rule 12(b)(1) allows for dismissal of a case when the court "lack[s] subject

matter jurisdiction." "Because a federal court is powerless to act beyond its

statutory grant of subject matter jurisdiction, a court must zealously insure

that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2002). A Rule 12(b)(1) motion may present either a facial or a factual attack on the complaint. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Here, Defendants bring a facial attack. Such motions are based on the allegations of jurisdiction in the complaint, and the court accepts the allegations in the complaint as true. *Id.* at 1529.

Rule 12(b)(6) provides for dismissal of a case when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability,

9

it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

When, as here, a plaintiff alleges claims of fraud, he must satisfy Rule 9(b)'s heightened pleading standard. That rule requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this "particularity" standard, the plaintiff must set forth facts "as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014). Plaintiffs, in other words, must plead the "who, what, when, where, and how" of the alleged fraud. *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 873 (11th Cir. 2023).

## III.   Discussion

Defendants seek dismissal of Plaintiffs' claims. First, Defendants raise several jurisdictional issues, arguing that (1) Plaintiffs lack standing to bring claims based on vehicle models they did not own; (2) Plaintiffs lack standing to seek injunctive relief; and (3) Plaintiffs' claims are not ripe. Second,

Defendants contend that Georgia's choice-of-law rules require dismissal of some of Plaintiffs' nationwide claims.  Third, Defendants argue that Plaintiffs have not adequately alleged an agency relationship that could render MBG liable for MBUSA's conduct.  Fourth, and relatedly, Defendants assert that the CAC is a shotgun pleading because it fails to properly distinguish between MBUSA and MBG.  Fifth, Defendants attack Plaintiffs' claims on the merits, contending that they fail to state a claim under Fed. R. Civ. P. 12(b)(6).  The Court will address each argument in turn.

### A. Jurisdictional Issues

#### 1. Standing to Assert Claims Based on Vehicle Models Not Purchased or Leased by Named Plaintiffs

Defendants argue that Plaintiffs lack standing to assert claims based on vehicle models and model years that they did not own or lease.  (Doc. 28 at 27-28.)  It is undisputed that the "Class Vehicle" definition encompasses certain vehicle models and model years that Plaintiffs have not owned or leased.  But Plaintiffs contend that consideration of whether Plaintiffs may assert claims on behalf of absent class members' vehicles is relevant to class certification and thus premature at the motion-to-dismiss stage.

Article III limits the "judicial power of the United States" to "Cases" and "Controversies[.]"  U.S. Const. art. III, § 2.  Standing to sue is "rooted in the

traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In the class action context, "at least one named class representative [must have] Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Whether a class representative has standing to represent a class is determined by "two related, but distinct, inquiries[.]" *Fox v. Ritz-Carlton Hotel Co., L.L.C.*, 977 F.3d 1039, 1046 (11th Cir. 2020). First, "the class representative must satisfy the individual standing prerequisites of the case or controversy requirement." *Id.* (cleaned up). Second, "the class representative must also be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (cleaned up). The district court must not "conflate[ ] the requirements of individual standing with those for a class representative." *Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 311 (5th Cir. 2024) (quoting *Fox*, 977 F.3d at 1047.)

"The first inquiry is the familiar three-part standing test that requires a plaintiff to have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* at 1046 (quoting *Spokeo*, 578 U.S. at 338). The second inquiry examines "the relation between the class representative's injuries and those he alleges on behalf of the class." *Id.*

Defendants do not dispute that Plaintiffs have sufficiently alleged their individual standing in satisfaction of the first inquiry. Nor could they. Plaintiffs have alleged that: (1) they suffered economic injuries by purchasing Mercedes vehicles containing the Rear Subframe Defect, which significantly reduced the vehicle's value and caused severe, premature corrosion;[7] (2) such injuries are traceable to Defendants, who manufactured the allegedly defective Class Vehicles and allegedly concealed the existence of the Rear Subframe Defect from Plaintiffs; and (3) a favorable decision would provide redress in the form of money damages.[8] The named Plaintiffs have individual standing to pursue their subclaims, and related nationwide claims.

The matter becomes more difficult with respect to the second inquiry: whether Plaintiffs "possess the same interest and suffer the same injury as the class members." *Prado-Steiman*, 221 F.3d at 1279. A question of timing arises. That is, when is the appropriate time to consider the named plaintiffs' standing to assert claims on behalf of absent class members—at the pleading stage *or* the Rule 23 class-certification stage? "Federal courts have taken divergent

---

[7] Economic injuries are concrete injuries that satisfy Article III's requirements. *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019).

[8] Plaintiffs also seek injunctive relief. Whether they have standing to seek such relief is discussed below.

approaches" to this question. *Bolling v. Mercedes-Benz USA, LLC*, No. 1:23-CV-671-TWT, 2024 WL 3972987, at *4 (N.D. Ga. Jan. 30, 2024).[9] While some courts have found at the motion-to-dismiss stage that "a named plaintiff in a consumer class action cannot raise claims relating to those other products which he did not purchase[,]" *see, e.g., Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1394 (S.D. Fla. 2014), others have deemed this "fact-intensive" standing inquiry to be "better suited to the class-certification stage[,]" *see, e.g., Porter v. Chrysler Grp. LLC*, No. 6:13-CV-555-ORL-37, 2013 WL 6839872, at *2-3 (M.D. Fla. Dec. 27, 2013).

This district has generally employed the latter approach. For example, in *Hadjian v. Mercedes-Benz, USA, LLC*, Judge Jones noted that the Supreme Court has permitted courts to defer ruling on certain standing objections until class certification, "where certification issues are 'logically antecedent to Article III concerns.'" No. 1:21-CV-00469-SCJ, 2022 WL 3699603, at *5 (N.D. Ga. Mar. 31, 2022) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)

---

[9] *See also* 1 *Newberg and Rubenstein on Class Actions* § 2:2 (6th ed.) ("[W]hen a defendant challenges the named plaintiff's own standing, courts universally decide that issue at the outset of the case . . . . However, when the question is whether the named plaintiffs have standing to assert claims on behalf of the putative class, courts have diverged on whether that standing question should be deferred until class certification.").

(noting that "it is appropriate to reach" "dispositive" class certification issues before determining certain standing issues when class certification is "logically antecedent to the existence of any Article III issues"). On this basis, Judge Jones found the issue of whether a plaintiff had "standing to include vehicles that he did not purchase into his 'Class Vehicles' definition" to be "more appropriate" for consideration "in the Rule 23 context[.]" *Hadjian*, 2022 WL 3699603, at *4. Other judges of this Court have found the same.[10]

In this case, consideration of the standing issue raised by Defendants will be more appropriate at the class certification stage. The particular standing objection raised here may be obviated by the scope of the class that is ultimately certified—that is, if a class is certified at all. For now, Plaintiffs have alleged a sufficient basis for standing. Plaintiffs plausibly allege that

---

[10] *Bolling*, 2024 WL 3972987, at *4-5 (deferring until class certification the issue of whether the plaintiffs "have standing to assert claims regarding vehicle models and/or model years that are different from the ones the Plaintiffs purchased"); *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1284 (N.D. Ga. 2018) ("As Plaintiffs have alleged an adequate threshold factual basis for their standing, Mercedes['] arguments are more appropriate for the Rule 23 context and that is when the Court will address them."); *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1374 (N.D. Ga. 2013) (noting that consideration of issues relating to the propriety of a proposed class was premature at the Rule 12(b)(6) stage; *see also Haynes v. Walmart, Inc.*, 2021 WL 5811732, at *4 (N.D. Ala. Dec. 6, 2021) ("When class certification is the source of the potential standing problems, the best approach is to treat class certification as 'logically antecedent' to standing." (cleaned up)).

they have suffered injuries arising from the Rear Subframe Defect that are traceable to Mercedes and redressable by a favorable decision in this case. They assert that the same Rear Subframe Defect at the heart of their claims is common to all Class Vehicles, including vehicles that Plaintiffs themselves did not purchase. (Doc. 25 ¶ 4 ("[A]ll Class Vehicles are substantially the same from an engineering standpoint, and all contain the Rear Subframe Defect"); *id.* ¶ 584 ("The Class Vehicles share a common defect (*i.e.*, the Rear Subframe Defect)").) Plaintiffs also allege that Mercedes' fraudulent omissions were made in connection with all Class Vehicles, and that all putative class members have suffered economic injuries just as the Plaintiffs have. (Doc. 25 ¶¶ 17, 377, 404.) These factual allegations are "sufficient to articulate Plaintiffs' individual standing in connection with their claims regarding a variety of the Mercedez–Benz models[.]" *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1284-85 (N.D. Ga. 2018) (finding the plaintiffs' allegations that all class vehicles contained the same defect sufficient to establish standing at the pleading stage). While it may be necessary to "probe behind the pleadings" to assess Plaintiffs' standing at the class certification stage, *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 891 (11th Cir. 2023), that determination will be guided by the issues raised at that juncture.

## 2. Standing to Seek Injunctive Relief

Next, Defendants contend that Plaintiffs lack standing to seek their requested injunctive relief, (Doc. 28 at 29-30), which includes an order "requiring Mercedes to issue notice of the Rear Subframe Defect to consumers and provide free, regular inspections to screen for rear subframe corrosion in the Class Vehicles[.]"  (Doc. 25 ¶ 18.)

"[A] plaintiff must demonstrate standing separately for each form of relief sought."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021) (quotation omitted).  Thus, "even if a plaintiff can establish standing to pursue separate claims for monetary relief based on allegations of *past* harm, before a court may grant that plaintiff injunctive relief, the plaintiff must separately establish a threat of 'real and immediate,' as opposed to 'conjectural or hypothetical,' future injury." *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1253 (11th Cir. 2023) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

There are three requirements for Article III standing for equitable relief.  *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 (11th Cir. 1991).  First, the plaintiff must "demonstrate that he is likely to suffer future injury; second, that he is likely to suffer such injury at the hands of the defendant; and third, that the relief the plaintiff seeks will likely prevent such injury from

occurring." *Id.* at 1203-04.   Moreover, "[t]o satisfy the injury-in-fact requirement for constitutional standing, a plaintiff seeking injunctive relief in relation to future conduct must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 832 (11th Cir. 2017) (internal quotation marks omitted).

Defendants argue that Plaintiffs lack standing to seek injunctive relief for four reasons.  First, Defendants argue that Plaintiffs have not shown that they lack an adequate remedy at law and to the contrary, expressly seek damages as a form of relief.  (Doc. 28 at 29.)  The Court declines to dismiss the claims for injunctive relief on this basis, as "the Federal Rules of Civil Procedure authorize parties to plead for 'alternative or different types of relief.'"  *Bolling*, 2024 WL 3972987, at *6 (quoting Fed. R. Civ. P. 8(a)(3)) ("[T]he fact that the Plaintiffs seek damages does not necessitate dismissal of the Plaintiffs' request for equitable relief.").

Second, Defendants contend that Plaintiffs have not shown that they will suffer irreparable injury in the absence of injunctive relief.  In support of this argument, Defendants again note that Plaintiffs seek damages as a form of relief and that such damages can remediate their alleged injures.  (Doc. 28 at 29.)  The Court is not persuaded.  One basis for Plaintiffs' request for injunctive

18

relief is that many Class Vehicle owners are allegedly unaware that they are operating a car that presents an immediate danger to their safety.  According to Plaintiffs, "uninspected cars will continue to fail, including at highway speeds."  (Doc. 31 at 17; Doc. 25 ¶¶ 8-11.)  Moreover, because subframe corrosion is so difficult to detect until it is "near the point of failure," Class Vehicle owners are unlikely to apprehend the safety risk until Defendants provide notice of the Rear Subframe Defect.  (Doc. 25 ¶ 11.)  Accepted as true, the allegations in the CAC indicate that consumers may suffer actual physical harm if they are not provided notice of the Rear Subframe Defect in their vehicles.  Such physical harm constitutes irreparable injury.

Third, Defendants argue that Plaintiffs have not shown a real and immediate threat of future injury because MBUSA no longer sells the Class Vehicles, as the newest vehicles in the class are by now two years old.  (Doc. 28 at 29-30.)  Although MBUSA may no longer be selling the Class Vehicles, they are still on the road.  Plaintiffs contend that as long as the Class Vehicles continue to be on the road uninspected, they will continue to pose a safety hazard to Class Vehicle owners and others.  At this stage, Plaintiffs have alleged a sufficient likelihood of future injury.

Fourth, MBUSA argues, in its reply brief, that Plaintiffs' requested relief—notice to Class Vehicle owners of the Subframe Defect—is already

"being provided in the ordinary course of business[,]" as "MBUSA has notified all customers of the Extended Warranty."  (Doc. 37 at 6-7.)  True, MBUSA has notified customers of the Extended Warranty.  But the Extended Warranty does not provide notice of the Rear Subframe Defect, as Plaintiffs' requested injunction would require.  Rather, the Extended Warranty simply "advise[s]" vehicle owners "of additional benefits . . . regarding [their] vehicle ownership." (Doc. 25-5 at 2.)  The Extended Warranty does not inform customers that their vehicle contains a "defect . . . that causes the rear subframe[], attached components, and nearby parts to prematurely rust or corrode."  (Doc. 25 ¶ 3.) Thus, Defendants have not already provided the injunctive relief that Plaintiffs seek.  As such, the Court finds that Plaintiffs have adequately alleged their standing to seek injunctive relief.

### 3. Ripeness

Defendants also dispute the ripeness of Plaintiffs' warranty claims. (Doc. 28 at 23-27.)  Ripeness "is one of the several strands of justiciability doctrine that go to the heart of the Article III case or controversy requirement." *Mulhall v. UNITE HERE Loc. 355*, 618 F.3d 1279, 1291 (11th Cir. 2010) (quoting *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1246 (11th Cir. 2010)) (cleaned up).  The ripeness inquiry therefore determines "whether the district court ha[s] subject matter jurisdiction to hear the case."  *Greenbriar, Ltd. v. City of*

*Alabaster,* 881 F.2d 1570, 1573 n.7 (11th Cir. 1989). Ripeness doctrine focuses on "the timing of the suit." *Mulhall*, 618 F.3d at 1291. It "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Harrell*, 608 F.3d at 1257-58 (quoting *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir.1997)); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

To determine whether a claim is ripe, courts "assess both the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial review." *Mulhall*, 618 F.3d at 1291 (quoting *Harrell,* 608 F.3d at 1258). "The fitness prong is typically concerned with questions of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Id.* (cleaned up). "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." *Id.* (cleaned up).

Challenges to ripeness are brought pursuant to Rule 12(b)(1). *See Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1182 (11th Cir. 2007) ("We have repeatedly said that when a district court disposes of a case on

justiciability . . . grounds we will treat the district court's determination as if it was ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)[.]").  The Eleventh Circuit has "cautioned . . . that the district court should only rely on Rule 12(b)(1) if the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action*."  *Morrison v. Amway Corp.*, 323 F.3d 920, 924-25 (11th Cir. 2003) (quoting *Garcia v. Copenhaver, Bell & Associates*, 104 F.3d 1256, 1261 (11th Cir. 1997)) (cleaned up).  If a jurisdictional challenge "implicates an element of the cause of action, then the proper course of action for the district court is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case."  *Garcia*, 104 F.3d at 1261 (cleaned up).  Thus, when a ripeness challenge "indirect[ly] attacks" the merits of a claim, a court should proceed under Rule 12(b)(6), not 12(b)(1).  *Id.*

Defendants argue that Plaintiffs' claims are not ripe because their "theoretical" injuries can be "readily addressed by the Extended Warranty[,]" and no Plaintiff alleges that he or she sought repair or reimbursement under the Extended Warranty before filing this lawsuit.  (Doc. 37 at 9.)  According to

Defendants, Plaintiffs only "speculate"[11] that "the Extended Warranty *might* not prove to be sufficient" to remedy their injuries.  (Doc. 28 at 6-8.)

As a threshold matter, it is not clear whether Defendants intend to challenge ripeness with respect to *all* of Plaintiffs' claims or only Plaintiffs' express warranty claims.  At times, Defendants' ripeness arguments refer to "Plaintiffs' claims" without qualification, (Doc. 28 at 6), but at others, Defendants specifically address the ripeness of Plaintiffs' express warranty claims "about the inadequacy of the Extended Warranty . . . ," (Doc. 37 at 10).  The Court will first address the ripeness of Plaintiffs' express warranty claims, and then turn to the rest of Plaintiffs' claims.

While Plaintiffs did not seek reimbursement or repair under the Extended Warranty before filing this lawsuit, their warranty claims are nevertheless ripe.  Whether Plaintiffs were required to present their vehicles for repair or reimbursement prior to filing this lawsuit is an issue that implicates the merits of Plaintiffs' warranty claims.  As discussed below, Defendants seek dismissal of Plaintiffs' express warranty claims on the same

---

[11] In their motion to dismiss briefing, Defendants misquote Plaintiffs' CAC as stating that Plaintiffs "speculate as to parts availability and the inconvenience and delay that might be caused."  (Doc. 28 at 25 (misquoting CAC ¶ 375).)  That is not what the CAC says.  Instead, Defendants attribute a quote from *Strama v. Toyota Motor Sales, U.S.A., Inc*., cited in the preceding sentence of their brief, to Plaintiffs' CAC.  2016 WL 561936, at *2 (N.D. Ill. Feb. 12, 2016).

ground as the one asserted here with respect to ripeness. That is, Defendants argue that Plaintiffs' express warranty claims fail on the merits because "none of the plaintiffs claim that they sought repairs of their subframes under" the relevant warranties. (Doc. 28 at 19.) In response to both Defendants' ripeness arguments and merits arguments, Plaintiffs argue that they were not *required* to present their vehicles for repair or reimbursement because the Extended Warranty, by its express terms, does not cover all of Plaintiffs' claimed damages. The Extended Warranty, for instance, does not compensate or provide for (1) corrosion inspections *before* the vehicles experience potentially catastrophic failure on the road; (2) lost use for owners whose vehicles are out of service while awaiting repair; (3) non-subframe replacement components that fail due to the Defect; or (4) rear subframe replacement absent severe corrosion, *i.e.* "corrosion with perforation (holes)." (Doc. 25-5; Doc. 25 ¶¶ 371-374.)

Determining whether Plaintiffs were required to seek repairs or reimbursement under the warranties requires an examination of the merits of Plaintiffs' express warranty claims. Because Defendants' ripeness argument "implicates an element of the cause of action," the "proper course of action" is to address the argument with respect to the merits of Plaintiffs' warranty claims. *Garcia*, 104 F.3d at 1261; *see also In re Honda Idle Stop Litig.*, 694 F.

24

Supp. 3d 1293, 1302 (C.D. Cal. 2023) (concluding that vehicle warranty claims were ripe even though plaintiffs "sued Defendant without seeking the remedies available to them pre-suit" where plaintiffs alleged "that the various remedies existing at the time of filing would not have resolved the . . . defect" (alteration adopted)).

To the extent that Defendants contend that the Extended Warranty renders Plaintiffs' non-express warranty claims unripe, the Court disagrees. At this stage, "it is enough that Plaintiffs allege damages outside the coverage of the [warranty] Program" to demonstrate the ripeness of their other claims. *Rosen v. Mercedes-Benz USA, LLC*, No. 1:21-CV-00787-WMR, 2022 WL 20766104, at *3 (N.D. Ga. Nov. 1, 2022). Plaintiffs plausibly allege that the Extended Warranty will not address the Rear Subframe Defect in the absence of severe corrosion, does not sufficiently reimburse out-of-pocket expenses that Plaintiffs have already expended, and fails to cover their overpayment at the time of sale for the Class Vehicles. (Doc. 25 ¶¶ 16, 370-74); *see In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1121 (S.D. Fla. 2019) (rejecting the argument that plaintiffs failed to allege an economic injury-in-fact because they were eligible for replacement of defective parts, where plaintiffs alleged they were "entitled to damages comprising the value they overpaid for their vehicles . . . and for the diminution in value," and that "they

suffered a variety of other economic injuries, including out-of-pocket expenses"). These allegations of damages outside of the Extended Warranty's coverage are adequate to establish the ripeness of Plaintiffs' claims.

### B. Whether Plaintiffs May Assert Nationwide Claims Under Georgia (or New Jersey) Law, Consistent with Georgia Choice-of-Law Rules

Plaintiffs assert certain nationwide claims on behalf of a putative nationwide class. The nationwide claims are: (1) breach of express and implied warranty under Georgia law (Counts 1 & 2); (2) violations of Georgia consumer protection statutes (Counts 5 & 6); (3) violations of the New Jersey Consumer Fraud Act ("NJCFA") (Count 7);[12] (4) violations of the federal Magnuson-Moss Warranty Act ("MMWA") (Counts 3 & 4); and (5) common-law fraudulent omission and unjust enrichment claims (Counts 8 & 9). Defendants argue that Georgia's choice-of-law rules require dismissal of certain nationwide claims. Specifically, Defendants contend that, under Georgia's choice-of-law rules, Plaintiffs' claims are governed only by the laws of the states in which they purchased their vehicles, and no Plaintiff purchased his or her vehicle in

---

[12] The nationwide New Jersey Consumer Fraud Act claim is brought in the alternative, to the extent that Georgia law does not govern MBUSA's conduct before it moved its headquarters from New Jersey to Georgia in 2015. (Doc. 25 ¶ 299.)

Georgia.  (Doc. 28 at 15-16.)  Defendants therefore argue that no Plaintiff has a cause of action arising under Georgia law.

As an initial matter, the Court observes that Defendants' choice-of-law arguments apply only to the nationwide claims that Plaintiffs seek to bring under Georgia law: the Georgia state-law breach of warranty claims (Counts 1 and 2), Georgia state-law statutory consumer protection claims (Counts 5 and 6), and the common-law fraudulent omission and unjust enrichment claims (Counts 8 and 9).[13]  The nationwide MMWA claims (Counts 3 and 4) are brought under federal law and are therefore available to all Plaintiffs.  Moreover, two plaintiffs allege that they purchased their vehicles in New Jersey and can therefore assert NJCFA claims.  (Doc. 25 ¶¶ 130, 142.)[14]  The

---

[13] In one section of the CAC, Plaintiffs assert that the nationwide claims are brought under Georgia or New Jersey law *(Id.* ¶¶ 298-300).  Elsewhere in the CAC, it is alleged in the alternative that the nationwide fraudulent omission and unjust enrichment claims are brought under the laws of all fifty states, the District of Columbia, and Puerto Rico.  (Doc. 25 ¶¶ 530, 548.)

[14] The issue of whether the New Jersey plaintiffs may assert NJCFA claims *on behalf of a nationwide class* is one that Defendants have not addressed and, in any event, is more appropriately decided at the class certification stage.  *See Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1230 (S.D. Fla. 2015) (explaining that the issue of whether the named plaintiff's injuries "are sufficiently similar to those of the purported class to justify the prosecution of a nationwide class action, . . . is properly determined at the class certification stage, when the court may consider commonality and typicality issues with respect to the named plaintiffs and other putative class members." (cleaned up)).

question is whether Plaintiffs (none of whom purchased a vehicle in Georgia) may assert a claim arising under Georgia law.

"When a federal court decides a state law claim, whether acting pursuant to diversity or supplemental jurisdiction, it applies the choice-of-law rules of the jurisdiction in which it[ ] sits." *Carter v. Porsche Cars N. Am., Inc.*, No. 1:19-CV-5508-MLB, 2021 WL 6805718, at *4 (N.D. Ga. June 25, 2021); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998) ("Federal courts sitting in diversity apply the forum state's choice-of-law rules."); *Ideal Elec. Sec. Co., Inc. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997) ("When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit.").  Under these rules, Georgia applies *lex loci contractus* (law of the state of contract) to contract actions and *lex loci delecti* (law of the state where the injury occurred) to tort actions.  *Terrill v. Electrolux Home Prods., Inc.*, 753 F. Supp. 2d 1272, 1280 (S.D. Ga. 2010).

Under *lex loci contractus*, "contracts are 'governed as to their nature, validity and interpretation by the law of the place where they were made' unless the contract is to be performed in a state other than that in which it was made." *Boardman Petroleum*, 135 F.3d at 752 (quoting *Gen. Tel. Co. v. Trimm*, 311 S.E.2d 460, 461 (Ga. 1984)).  "In order to determine where a contract was

made, the court must determine where the last act essential to the completion of the contract was done." *Trimm*, 311 S.E.2d at 461.

"Under the rule of *lex loci delicti*, tort cases are governed by the substantive law of the state where the tort was committed." *Federated Rural Elec. Ins. Exchange v. R.D. Moody & Associates, Inc.*, 468 F.3d 1322, 1325 (11th Cir. 2006) (citing *Fed. Ins. Co. v. Nat'l Distrib. Co., Inc.*, 417 S.E.2d 671, 673 (Ga. Ct. App. 1992)). "A tort is committed where the last event occurred necessary to make an actor liable for the alleged tort." *Erler v. Hasbro, Inc.*, 506 F. Supp. 3d 1275, 1291 (N.D. Ga. 2020) (cleaned up). For torts sounding in fraud, "the 'last event' necessary for liability is the place 'where that injury was sustained.'" *Monopoli v. Mercedes-Benz USA, LLC*, No. 1:21-cv-01353-SDG, 2022 WL 409484, at *5 (N.D. Ga. Feb. 10, 2022) (quoting *Int'l Bus. Machs. Corp. v. Kemp*, 536 S.E.2d 303, 306 (Ga. Ct. App. 2000)).

Georgia law, however, carves out an exception to *lex loci delicti* where "no foreign statutes are involved." *In re ConAgra Peanut Butter Prod. Liab. Litig.*, No. 1:07-MD-1845-TWT, 2012 WL 3779088, at *2 (N.D. Ga. Aug. 29, 2012) (quoting *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 678 (N.D. Ga. 2003)). "When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law." *Frank Briscoe Co., Inc. v. Georgia Sprinkler Co., Inc.*, 713 F.2d 1500, 1503 (11th Cir. 1983); *Coon v. Med.*

29

*Ctr., Inc.*, 797 S.E.2d 828, 834 (Ga. 2017) ("In the absence of a statute, . . . at least with respect to a state where the common law is in force, a Georgia court will apply the common law as expounded by the courts of Georgia.")  Thus, if a claim arises under common law, "Georgia courts apply the common law as developed in Georgia rather than foreign case law." *Frank Briscoe Co*, 713 F.2d at 1503; *see also Nationwide Prop. & Cas. Ins. Co. v. Renaissance Bliss, LLC*, 823 F. App'x 815, 822 (11th Cir. 2020) ("Georgia courts do not apply other states' common law.").

Moreover, courts in this district generally presume that a claim arises under common law, and will therefore apply Georgia law, where "the parties have not identified any foreign statutes" governing the claim.  *See, e.g., In re Stand N' Seal, Prods. Liab. Litig.*, No. 1:07-MD-1804, 2009 WL 2998003, at *2 (N.D. Ga. Sept. 15, 2009); *Tri-State Crematory Litig.*, 215 F.R.D. at 678 n.6 ("[B]ecause the parties have not directed the Court's attention to statutes of foreign States in their pleadings, the Court presumes the law of the State of Georgia applies."); *Elder v. Reliance Worldwide Corp.*, 563 F. Supp. 3d 1221, 1231 (N.D. Ga. 2021) (applying Georgia law where "neither party reference[d] any statutes on point" for the claims).

Georgia's choice-of-law approach in this regard may fairly be characterized as anachronistic.  As *Monopoli* noted, scholars have roundly

criticized Georgia's common law exception to *lex loci delicti* as "uncommonly silly, wholly disingenuous, . . . indefensible, singularly unappealing, and a covert tool for engineering a choice of Georgia law."  2022 WL 409484, at *4 n.50 (quoting Symeon C. Symeonides, *Choice of Law in the American Courts in 2020: Thirty-Fourth Annual Survey*, 69 Am. J. Comp. L. 177, 190 (2021)).[15] Even worse, it is unclear whether this choice-of-law approach applies to common law claims that arise in *all* states, or only those where "the other state was one of, or formed from the territory of one of, the original 13 colonies that inherited the common law of England."  *Coon*, 797 S.E.2d at 834 n.5.  Both the Georgia Supreme Court and the Eleventh Circuit have recently declined to address the question.  *Id.* ("Because Alabama was formed predominantly from the territory of Georgia, we need not address today whether the common law also may apply in other states."); *Nationwide Prop. & Cas. Ins. Co. v. Renaissance Bliss, LLC*, 823 F. App'x 815, 823 (11th Cir. 2020) (declining to

---

[15] For instance, two legal scholars have argued that Georgia's choice-of-law approach "produces inequitable 'administration of the law,' in violation of the Equal Protection Clause of the Fourteenth Amendment as condemned by *Erie Railroad Co. v. Tompkins*," and "creates a blanket application of Georgia law without regard to the actual content of sister-state laws that 'is sufficiently arbitrary and unfair as to exceed constitutional limits' established by the Article IV Full Faith and Credit Clause and Fourteenth Amendment Due Process Clause."  Joanna B. Apolinsky & Jeffrey A. Van Detta, *The Antebellum Irony of Georgia's Disguised Lex Fori Doctrine: O Where Have You Gone, Brainerd Currie?*, 50 Cumb. L. Rev. 407, 410 (2020) (footnote omitted).

address, on waiver grounds, the argument "that Georgia's exclusion of other jurisdictions' common law is limited to states that were formed from the original thirteen colonies"). Eighty years ago, however, the Georgia Supreme Court applied the common law exception to at least one state (Florida) that was not formed from the land of the original thirteen colonies. *Motz v. Alropa Corp.*, 15 S.E.2d 237, 238 (Ga. 1941).

Even though "Georgia courts stand alone in following this century-old, controversial [choice-of-law] practice," the Court is nevertheless constrained to follow it. *Monopoli*, 2022 WL 409484, at *4. At this stage, because the Georgia Supreme Court has—at least once—applied the common law exception outside the original thirteen colonies (and states formed from them), the Court will apply the rule to all state subclasses.

### 1. State-Law Warranty Claims

Plaintiffs bring their nationwide claims for breach of express warranty and breach of implied warranty under Georgia law. (Counts 1 & 2.) Georgia courts reach different conclusions as to whether breach of warranty claims should be considered contract claims (subject to *lex loci contractus*) or tort claims (subject to *lex loci delicti*). *Compare Andrews v. RAM Med., Inc.*, No. 7:11-CV-147 HL, 2012 WL 1358495, at *2 (M.D. Ga. Apr. 19, 2012) (noting that "there is no consistent approach to determining how warranty claims should

be interpreted" and applying a "tort theory" to plaintiff's warranty claims because the alleged injury "sounds in tort"); *with Carrier v. Jordan*, 746 F. Supp. 2d 1341, 1349 (S.D. Ga. 2010) (applying contract choice-of-law rules to warranty claims where "express and implied warranties in connection with a contract for the sale of the Vessel [we]re at issue").

That distinction makes no difference for present purposes, however, because under either rule, Plaintiffs' warranty claims do not arise under Georgia law.  No Plaintiff resides in Georgia, and no Plaintiff alleges to have entered a contract or been injured in Georgia.  Rather, each Plaintiff received the warranty, and was allegedly injured, in his or her home state.  Under both *lex loci contractus* and *lex loci delicti*, Plaintiffs' warranty claims are governed by the laws of their home states.  *See, e.g., Callen v. Daimler AG*, No. 1:19-CV-1411-TWT, 2020 WL 10090879, at *8 (N.D. Ga. June 17, 2020) (finding, with respect to warranty claims, that "Georgia's choice-of-law rules direct this Court to apply the substantive law of the states where the Plaintiffs purchased their vehicles[.]").  The nationwide claim for breach of express warranty brought under Georgia law must therefore be dismissed.[16]

---

[16] All Plaintiffs also bring breach of warranty claims under the laws of their respective home states.  Those claims are discussed below.

The Court turns next to the nationwide implied warranty claim. The overwhelming majority of Plaintiffs' state-law, implied warranty claims are brought under the foreign *statutes* of their home states.[17]  *See Terrill*, 753 F. Supp. 2d at 1281 (explaining that plaintiffs' warranty claims were "governed by statutes in each of the named-Plaintiffs' home states").[18]  Those Plaintiffs therefore cannot invoke the common law exception to *lex loci delecti* because it only applies to common law—not statutory—causes of action.  *See, e.g.*, *Monopoli*, 2022 WL 409484, at *5 (dismissing a Georgia consumer protection claim because each plaintiff brought their claim under the foreign consumer protection statute of their home state); *Callen v. Daimler AG*, No. 1:19-CV-1411-TWT, 2021 WL 4523436, at *7 (N.D. Ga. Oct. 4, 2021).

But there is one breach of implied warranty claim brought under common law: breach of implied warranty "in tort" raised by the two Ohio

---

[17] Counts 11, 12, 17, 18, 22, 23, 27, 31, 32, 36, 37, 41, 42, 46, 47, 51, 52, 56, 57, 61, 62, 66, 71, 72, 76, 77, 81, 82, 86, 87, 91, and 92.

[18] The fact that the parties have identified specific, foreign statutes that govern Plaintiffs' warranty claims distinguishes this case from those that have applied Georgia law to warranty claims. *See Elder v. Reliance Worldwide Corp.*, 563 F. Supp. 3d 1221, 1231 (N.D. Ga. 2021) ("[E]ven though breach of implied warranty claims are created by statute . . . neither party references any statutes on point for these claims. Georgia law should therefore apply."); *In re Stand N' Seal, Prods. Liab. Litig.*, No. 1:07-MD-1804, 2009 WL 2998003, at *2 (N.D. Ga. Sept. 15, 2009) (applying Georgia law to implied warranty claims because "the parties have not identified any foreign statutes" for those claims).

Plaintiffs.[19]  (Doc. 25 ¶¶ 1454-61.)  In Ohio, "[i]mplied warranty in tort is a common law cause of action that imposes liability upon a manufacturer or a seller for breach of an implied representation that a product is of good and merchantable quality, fit and safe for its ordinary intended use."  *Risner v. Regal Marine Indus., Inc.*, 8 F. Supp. 3d 959, 995 (S.D. Ohio 2014) (cleaned up).  Because this is a common law claim, Georgia's choice-of-law approach requires the application of Georgia law, which is precisely what Plaintiffs plead.  *Frank Briscoe Co.*, 713 F.2d at 1503.  Thus, the Ohio Plaintiffs *may* be able to assert breach of implied warranty claims under Georgia law on behalf of a nationwide class.

In sum, Plaintiffs' nationwide breach of express warranty claim (Count 1) is dismissed under Georgia's choice-of-law rules, because no named plaintiff can assert that claim.  Plaintiffs' nationwide breach of implied warranty claim (Count 2), however, is not dismissed on this basis.[20]

### 2.  Statutory Consumer Protection Claims

Plaintiffs assert nationwide statutory claims under the Georgia Fair Business Practices Act (the "GFBPA"), O.C.G.A. §§ 10-1-390, *et seq.* (Claim 5);

---

[19] Count 67.

[20] As discussed in a later section of this order, Plaintiffs' nationwide breach of implied warranty claim (Count 2) fails for lack of privity.

and the Georgia Uniform Deceptive Trade Practices Act (the "GUDTPA"),
O.C.G.A. §§ 10-1-370, *et seq.* (Claim 6). "[E]ven though Mercedes allegedly
made misrepresentations or omissions in Georgia, each named Plaintiff was
injured, for choice-of-law purposes, in the state in which that Plaintiff
purchased the Mercedes vehicle with the alleged defect." *Monopoli*, 2022 WL
409484, at *5. Because no Plaintiff has suffered an injury in Georgia and these
claims arise under statute, Plaintiffs cannot assert GFBPA or GUDTPA
claims. *See, e.g., id.* (dismissing a GUDTPA claim where "each Plaintiff was
injured in his or her home state, not Georgia"). Each Plaintiff, moreover,
brings claims under the consumer protection statute of his or her home state.
It will, accordingly, be appropriate to "apply the foreign consumer protection
statutes rather than GUDTPA [and GFBPA] to Plaintiffs' consumer protection
claims." *Id.*; *see also Elder*, 563 F. Supp. 3d at 1230 ("[Class action] Plaintiffs'
consumer protection claims are governed by foreign law because each claim is
expressly raised under another state's statute"). Plaintiffs' claims under the
GUDTPA and GFBPA (Counts 5 and 6) are therefore dismissed.

### 3. Fraudulent Omission and Unjust Enrichment Claims

Plaintiffs bring nationwide, common-law fraudulent omission and unjust
enrichment claims (Counts 8 & 9). They argue that these claims are governed
by Georgia law. Once again, absent an applicable foreign statute, "Georgia

36

courts apply the common law as developed in Georgia rather than foreign case law." *Frank Briscoe Co.*, 713 F.2d at 1503. As Plaintiffs have pled their fraudulent omission and unjust enrichment claims under common law, and not pursuant to a foreign statute, "[t]he relevant common law here is the common law of Georgia." *Elder*, 563 F. Supp. 3d at 1231 (holding that, under Georgia choice-of-law rules, Georgia law governed nationwide unjust enrichment and negligence claims); *Bolling*, 2024 WL 3972987 at *14, 17 (concluding that Georgia common law applied to Plaintiffs' fraud and unjust enrichment claims); *Monopoli*, 2022 WL 409484, at *5 (finding that plaintiffs had standing to bring Georgia common-law claims for fraud, negligence, and unjust enrichment on behalf of a nationwide class). As such, Plaintiffs' nationwide fraudulent omission and unjust enrichment claims will not be dismissed on choice-of-law grounds. Consistent with Georgia choice-of-law rules, the fraudulent omission and unjust enrichment claims are governed by Georgia law regardless of where each plaintiff was injured. Those claims are further discussed below.

In sum, Plaintiffs' Georgia breach of express warranty and consumer protection claims (Counts 1, 5, & 6) are dismissed because, under Georgia's choice-of-law rules, no named plaintiff can assert such claims. Plaintiffs' nationwide breach of implied warranty, MMWA, NJCFA, fraudulent omission,

37

and unjust enrichment claims (Counts 2, 3, 4, 7, 8, & 9) are not dismissed on choice-of-law grounds.

## C. Agency Relationship

A critical issue in this case is whether Plaintiffs have adequately alleged an agency relationship between MBUSA and its Germany-based parent company, MBG. With the exception of Plaintiffs' nationwide warranty claims, which are asserted against MBUSA only, Plaintiffs assert all claims against both MBUSA and MBG. Although MBG manufactured and designed the Class Vehicles, (Doc. 25 ¶ 277), MBUSA was the warrantor of the relevant warranties and the entity that marketed and sold the vehicles in the United States, (*id.* ¶ 286). The viability of many of Plaintiffs' claims against MBG, therefore, is largely dependent on a finding of vicarious liability. Absent an agency relationship between MBG and MBUSA, for example, Plaintiffs will likely be unable to state a breach of warranty claim against MBG, which was not a party to the warranty. *See, e.g., Elfaridi v. Mercedes-Benz USA, LLC*, No. 4:16 CV 1896 CDP, 2018 WL 4071155, at *9 (E.D. Mo. Aug. 27, 2018) (dismissing breach of warranty claim against MBG where "the language of the NVLW itself makes it clear the warranty was issued by and obligates MBUSA, not [MBG]").

Under Georgia law,[21] "an agency relationship can arise . . . expressly, by implication, or through subsequent ratification by the principal of the agent's conduct." *J'Carpc, LLC v. Wilkins*, 545 F. Supp. 2d 1330, 1337 (N.D. Ga. 2008) (citing O.C.G.A. § 10-6-1).  An agency relationship is "created by the actions of the principal." *Ellis v. Fuller,* 638 S.E.2d 433, 435 (Ga. Ct. App. 2006).  If an agency relationship exists, a principal may be held vicariously liable for the acts of an agent "under three circumstances: where the principal authorized the act prior to its commission, ratified the act after its commission, or where the act was committed within the scope of the agency." *Stewart v. Storch*, 617 S.E.2d 218, 221 (Ga. Ct. App. 2005).  While a "parent/subsidiary relationship does not in and of itself establish the subsidiary as . . . the parent's actual or apparent agent[,] . . . the mere fact that one corporation is a subsidiary of another does not alone serve to insulate the parent where the evidence can establish the legal requirements of an actual or apparent agency relationship between the two corporations." *Kissun v. Humana, Inc.*, 479 S.E.2d 751, 753-

---

[21] The parties have not addressed which state's laws govern the issue of agency. The undersigned, and at least one other judge in this district, could not locate an "established conflict of laws test in Georgia law with respect to issues of agency." *Kahn v. Visador Holding Corp.*, No. 2:07-CV-73, 2009 WL 10669538, at *3 (N.D. Ga. July 17, 2009).  Given that the parties have not identified a foreign statute that controls the issue of agency, the Court will assume, for purposes of this order, that Georgia law applies. *See Frank Briscoe Co.*, 713 F.2d at 1503.

54 (Ga. 1997). The existence of an agency relationship is generally a question of fact. *Aiken v. Drexler Shower Door Co.*, 270 S.E.2d 831, 833 (Ga. Ct. App. 1980).

Plaintiffs contend that "MBUSA has been and has acted as an agent of MBG and subject to MBG's control" at all relevant times. (*Id.* ¶ 285.) In support of this contention, Plaintiffs plead that MBG has "the contractual right to exercise, and in practice has exercised, control over MBUSA's work" relating to "the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Rear Subframe Defect." (Doc. 25 ¶ 279.) MBG allegedly directed MBUSA, as well as MBUSA's authorized dealers, in the handling of consumer complaints regarding the Rear Subframe Defect. (*Id.*) Plaintiffs also allege that MBG held MBUSA out as its agent for the purpose of conducting business in the United States, "especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers of Class Vehicles." (*Id.* ¶ 280.)

These allegations, considered alongside the CAC's other allegations relating to agency, (*Id.* ¶¶ 275-81), plausibly demonstrate (1) the existence of an agency relationship; (2) that MBG authorized MBUSA's allegedly unlawful

acts; and (3) that MBUSA acted within the scope of the agency.  Plaintiffs specify how the agency relationship was formed between the Defendants and the manner in which MBG exercised control over MBUSA.  The factual allegations therefore rise above the level of mere conclusory statements of agency.  *Cf. S.B. v. Tenet Healthcare Corp.*, No. 1:17-CV-00075-RWS, 2017 WL 6389675, at *5 (N.D. Ga. Aug. 11, 2017) (deeming plaintiff's allegation that the defendant "utilized Clinica as its agent in furthering the fraudulent conduct" to be "merely conclusory").  Moreover, the information that will ultimately prove or disprove the existence of an agency relationship is likely in the exclusive possession of Defendants.  Indeed, it is "improbable that Plaintiffs' agency allegations could have been pleaded with further specificity at this stage without the benefit of discovery[.]"  *Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1352, 1357 (N.D. Ga. 2018).  As such, the Court will not dismiss Plaintiffs' claims against MBG for failure to allege an agency relationship.

### D. Whether the CAC is a Shotgun Complaint

Defendants argue that Plaintiffs' consolidated complaint should be dismissed as a shotgun complaint.  This argument is derivative of Defendants' agency argument in that they contend that Plaintiffs improperly refer to MBG

and MBUSA collectively as "Mercedes" throughout the CAC without distinguishing which entity did what.

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). One flavor of "shotgun pleadings" are those that "assert[ ] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions[.]" *Id.* at 1323. But "[t]he fact that defendants are accused collectively does not render the complaint deficient" where "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000).

In the preceding section of this order, the Court found that Plaintiffs have adequately alleged an agency relationship, which is a basis for imputing MBUSA's acts to MBG. It is therefore reasonable to infer that MBG can be held responsible for the alleged acts of MBUSA. Discovery will reveal whether there is in fact such an agency relationship. At this early stage, Plaintiffs' practice of referring to Defendants collectively as "Mercedes" does not warrant dismissal on shotgun-pleading grounds. *See, e.g., Amin*, 349 F. Supp. 3d at 1353-54 (concluding that plaintiffs did not violate Rule 8 by referring to

Daimler and MBUSA collectively as "Mercedes" where plaintiffs alleged an agency relationship).

### E. Express Warranty Claims

All Plaintiffs bring breach of express warranty claims under the laws of their respective home states.  Plaintiffs' express warranty claims are all premised on certain terms in the NVLW that are quoted in the CAC. Specifically, the NVLW provides that MBUSA will "make any repairs or replacements necessary to correct defects in material or workmanship arising during the [4-year/50,000-mile] warranty period."  (Doc. 25 ¶¶ 418, 671, 752, 830, 892, 973, 1051, 1129, 1208, 1287, 1366, 1442, 1516, 1594, 1668, 1747, 1825; *see also* Doc. 25-5.)  The NVLW further states that "[MBUSA's] intention is to repair under warranty, without charge to you, anything that goes wrong with your vehicle during the warranty period which is our fault."  (Doc. 25 ¶ 418.)  According to Plaintiffs, the above-stated language in the NVLW is "substantively the same in all warranties covering the Class Vehicles."  (*Id*. ¶¶ 418, 671, 752.)

In Count 1, Plaintiffs allege that Defendants breached the NVLW's terms by failing to: "(1) repair the Class Vehicles' rear subframes, which it knew or should have known were defective at the time of sale, to make them resistant to corrosion in ordinary and expected use; or (2) diagnose and replace

the rear subframes experiencing advanced corrosion at no cost to Class Members."[22]  (*Id.* ¶ 426.)  In their other breach-of-express-warranty claims (*see, e.g.*, Counts 17, 22, 31, 36, 61, 66) Plaintiffs similarly allege that Mercedes breached the express warranty to repair parts defective in material or workmanship by failing to repair the Rear Subframe Defect.  (*See, e.g., id.* ¶¶ 674, 755, 895, 976, 1369, 1495.)

Defendants seek dismissal of Plaintiffs' express warranty claims on three grounds: (1) Defendants did not deny repair requests under the warranty, (2) the alleged defect is a "design defect" that is not covered by the warranty, and (3) certain express warranty claims fail for lack of privity.  (Doc. 28 at 18-21.)  The Court need not address the latter two arguments because, as set forth below, Defendants' first argument requires dismissal of Plaintiffs' express warranty claims.

---

[22] At oral argument, counsel for Plaintiffs clarified that their express warranty claims are based on the alleged breach of the NVLW, not the Extended Warranty.  (Doc. 64 at 35:10-12 ("As I understand[ ] it, we plead breach of the original warranty, . . . not breach of the extended warranty.")  In any event, none of the Plaintiffs have alleged that they sought repairs under the Extended Warranty, precluding any express warranty claim asserting breach of the Extended Warranty.  Each Plaintiff who requested repair did so before the Extended Warranty was issued in February 2023.  (Doc. 25 ¶¶ 77, 89-91, 103, 115, 124-25, 135, 147, 150, 160, 202, 224, 241, 260-61, 269-270.)

Defendants contend that the express warranty claims should be dismissed because no Plaintiff has sought subframe repairs within the NVLW's warranty period. (Doc. 28 at 19.) In response, Plaintiffs argue that many of them did in fact seek repairs from Mercedes, but regardless, they were not required to do so because the NVLW's repair/replace remedy fails of its essential purpose. (Doc. 31 at 33-34.)

Plaintiffs' first argument is a nonstarter. Although certain Plaintiffs sought vehicle repairs from Mercedes, each did so *after* the vehicle had been driven for 50,000 miles and/or four years after purchase. (Doc. 25 ¶¶ 77, 89-91, 103, 115, 124-25, 135, 147, 150, 160, 202, 224, 241, 260-61, 269-270.) The CAC's allegations thus concede that no Plaintiff sought to avail himself of the NVLW's repair remedy within the warranty period. Plaintiffs, in other words, do not plausibly allege facts to show that MBUSA failed or refused to comply with its express warranty obligations. As a result, Plaintiffs' express warranty claims depend on the alternative argument that the NVLW's remedy "failed of its essential purpose."

"U.C.C. § 2–719 allows parties to limit remedies available under a contract to repair or replace." *Haft v. Haier US Appliance Sols., Inc.*, 578 F.

Supp. 3d 436, 456 (S.D.N.Y. 2022).[23]  Warranty limitations, such as durational

limitations, are rendered invalid, however, if the remedy "fail[s] of it essential

purpose[.]"  U.C.C. § 2-719; *Haft*, 578 F. Supp. 3d at 456; *Demorato v. Carver*

*Boat Corp.*, 304 F. App'x 100, 102 (3d Cir. 2008).  If a remedy "fails of its

essential purpose," then the limitation on the remedy will be stricken, and the

plaintiff will be permitted to pursue remedies provided under the U.C.C.,

which include consequential damages.  *S. Fin. Grp., LLC v. McFarland State*

*Bank*, 763 F.3d 735, 741 (7th Cir. 2014); *Arkwright-Bos. Mfrs. Mut. Ins. Co. v.*

*Westinghouse Elec. Corp.*, 844 F.2d 1174, 1179 (5th Cir. 1988) (noting that

"[c]ourts have frequently employed § 2.719(b) [Texas's codification of UCC § 2-

---

[23] Both sides invoke the Uniform Commercial Code ("UCC") in their briefing, and the relevant UCC article—Article 2—has been adopted, in one form or another, by all states relevant to this action.  *See* Stacy-Ann Elvy, *Hybrid Transactions and the Internet of Things: Goods, Services, or Software?*, 74 Wash. & Lee L. Rev. 77, 143 (2017) ("By 1975, the UCC had been adopted in every American state with Louisiana adopting only specific articles of the UCC."); *Pennzoil Co. v. FERC*, 789 F.2d 1128, 1142 (5th Cir. 1986) ("[A]ll states except Louisiana have adopted the UCC").  Given the near-universal acceptance of Article 2, and that no party has identified material variations between the relevant state laws, the Court will conduct a single analysis applicable to all Plaintiffs on this issue.  *See, e.g., Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245, at *9 (S.D. Fla. July 12, 2018) ("[T]he Parties do not expressly analyze the implied warranty of merchantability claim under the substantive law of each of the relevant states, but rather engage in a general discussion of the law of the implied warranty of merchantability and the Uniform Commercial Code.  Thus, the Court will tailor its discussion to the law of the Uniform Commercial Code.").

719] to strike 'repair or replacement' remedy limitations" when the remedy fails of its essential purpose).

"A repair remedy fails of its essential purpose when the seller is unwilling or unable to repair the defective goods within a reasonable period of time." *BAE Sys. Info. & Elecs. Sys. Integration, Inc. v. SpaceKey Components, Inc.*, 752 F.3d 72, 76 (1st Cir. 2014) (cleaned up); *Philippine Nat'l Oil Co. v. Garrett Corp.,* 724 F.2d 803, 808 (9th Cir. 1984) ("[A] repair or replace remedy fails of its essential purpose only if repeated repair attempts are unsuccessful within a reasonable time"); *Pulmonary Assocs. of Charleston PLLC v. Greenway Health, LLC*, 508 F. Supp. 3d 1268, 1276 (N.D. Ga. 2020) ("[A] repair-or-replace warranty fails of its essential purpose if the warrantor does not successfully repair defects within a reasonable time or within a reasonable number of attempts.").

Put differently, "before the exclusive repair and replace remedy is considered to have failed of its essential purpose, 'the seller *must be given an opportunity* to repair or replace the product.'" *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970 (N.D. Cal. 2014) (quoting *Asp v. Toshiba Am. Consumer Prod., LLC*, 616 F. Supp. 2d 721, 729 (S.D. Ohio 2008)); *Hackler v. Gen. Motors LLC*, No. 221-CV-019, 2022 WL 270867, at *10 (S.D. Ga. Jan. 28, 2022) ("For a warranty to fail of its essential purpose [under Florida law], it

47

must be that the seller will not or cannot cure a defect within the warranty period."); *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1046 (4th Cir. 1989) ("Generally, in the commercial cases, the 'essential purpose' exclusion arises only where the seller has refused to make repairs as he was required or where he cannot repair the product.").  Indeed, "numerous courts conclude that a plaintiff cannot allege a claim for failure of essential purpose where a cause of action occurs after the expiration of the warranty period—in those circumstances, the parties did not bargain for repair or replacement during the periods for which a warranty was disclaimed, cannot claim a breach, and it cannot be said that they are entitled to remedies for that breach such that the bargain failed in its essential purpose." *Haft*, 578 F. Supp. 3d at 457 (collecting cases); *Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) ("To plead that a remedy failed its essential purpose, Plaintiffs must plead facts sufficient to allege that they sought the limited remedy in the warranty period and that the remedy was ineffective.").

Here, the NVLW's repair/replace remedy cannot be said to have failed of its essential purpose because no Plaintiff sought repair or replacement within the 4-year/50,000-mile warranty period.  Mercedes has not refused or failed to make repairs under the NVLW because it was never given an opportunity to do so.  As such, Plaintiffs cannot state an express warranty claim.  *See, e.g.*,

48

*Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("The repairs in this case were made after the warranty period expired. Therefore, we affirm the dismissal of the express warranty claims."); *Brisson v. Ford Motor Co.*, 349 F. App'x 433, 434 (11th Cir. 2009) (holding that plaintiffs' "express warranty claim was properly dismissed because plaintiffs failed to allege that they ever presented their vehicles to a Ford dealership for repair or that the Ford dealership failed to make the repair"); *Chan v. Daimler AG*, No. CIV.A. 11-5391 JLL, 2012 WL 5827448, at *7 (D.N.J. Nov. 9, 2012) (dismissing express warranty claims where "it [wa]s clear that [plaintiffs] took their vehicles to the dealership for repair *after* their respective warranties had expired").

Plaintiffs argue that they were not required to seek repairs under the warranty in connection with the breach-of-express-warranty claims because the Rear Subframe Defect is a hidden defect that could not have been discovered within the warranty period. But that argument does not help Plaintiffs. The NVLW is a contract that required MBUSA to make certain repairs or replacements arising *during the warranty period*. The alleged existence of a hidden defect is relevant to other claims (*i.e.* breach of implied warranty, fraudulent omission), but it does not save the breach-of-express-

warranty claims where there are no facts alleged to support a breach of the NVLW's terms.

Courts, moreover, "almost uniformly hold[ ] that time-limited warranties do not protect buyers against hidden defects—defects that may exist before, but typically are not discovered until after, the expiration of the warranty period." *Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 993 (1st Cir. 1992); *Wisconsin Power & Light Co. v. Westinghouse Elec. Corp.*, 830 F.2d 1405, 1412 (7th Cir. 1987) ("A purchaser cannot claim that a warranty provision has failed of its essential purpose merely because a potential claim does not arise until after the warranty period has expired."); *Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 250 (2d Cir. 1986) (holding that express warranties did not cover automobile defects that manifested after the expiration of time and mileage limits); *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 123 (Cal. Ct. App. 2006) ("In giving its promise to repair or replace any part that was defective in material or workmanship and stating the car was covered for three years or 36,000 miles, [the defendant] did not agree, and plaintiffs did not understand it to agree, to repair latent defects that lead to a malfunction after the term of the warranty." (cleaned up)).

Additionally, the fact that a warrantor "may have been aware of a defect during the period of an express warranty does not extend the period of the

warranty's protection beyond its terms, or give rise to a valid claim for breach of warranty." *Chan*, 2012 WL 5827448, at *6 (D.N.J. Nov. 9, 2012). "Several courts have expressly rejected the proposition that a latent defect, discovered outside the limits of a written warranty, may form the basis for a valid express warranty claim if the warrantor knew of the defect at the time of sale." *Daugherty*, 51 Cal. Rptr. 3d at 122. As the Second Circuit explained almost forty years ago:

> [V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a "latent defect" that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. . . . A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 250 (2d Cir. 1986).[24]

Finally, Plaintiffs contend that the repair remedy fails of its essential purpose because certain Plaintiffs who sought repairs after the warranty

---

[24] The sole case Plaintiffs point to, *Pulmonary Assocs. of Charleston*, 508 F. Supp. 3d 1268 (N.D. Ga. 2020), does not support their latent defect argument. The cited portion of the case addresses the effect of a latent defect on a "limited refund provision." *Id.* at 1276-77. Limited refund provisions are not at issue in this case. Elsewhere, *Pulmonary Assocs. of Charleston* discusses a repair or replace provision, finding that the plaintiffs there adequately pled that the provision failed of its essential purpose because they "allege[d]—in considerable detail—*numerous* failed efforts by [defendant] to repair the errors in" the defective product. *Id.* at 1276. The Plaintiffs here have not presented analogous allegations.

period were told that the subframe corrosion was due to "wear and tear" or that replacement parts were not available. (Doc. 31 at 23.) Plaintiffs therefore suggest that the NVLW fails of its essential purpose because presenting their vehicles within the warranty period would have been an exercise in futility. But this suggestion is speculative, and Plaintiffs cite no case in support of their position, much less one that would compel the Court to depart from the "general rule . . . that an express warranty does not cover repairs made after the applicable time or mileage periods have elapsed." *Clemens*, 534 F.3d at 1023; *Abraham*, 795 F.2d at 250. At least one court has rejected a similar argument. *MyFord Touch*, 46 F. Supp. 3d at 970 ("To the extent Plaintiffs make the alternative argument that they are excused from bringing in their cars for repairs because to do so would have been futile, the Court is not persuaded.").

For the foregoing reasons, under the laws of all relevant states, Plaintiffs' express warranty claims must be dismissed because Plaintiffs did not seek repairs or replacements within the warranty period and have not plausibly alleged breach of the NVLW. Plaintiffs' state-law express warranty claims are dismissed.[25]

---

[25] Counts 1, 11, 17, 27, 31, 36, 41, 46, 51, 56, 61, 66, 71, 76, 81, 86, and 91.

### F. Implied Warranty Claims

Plaintiffs bring claims for breach of the implied warranty of merchantability under the laws of their home states.  Defendants argue that the claims should be dismissed because (1) the Class vehicles were not unmerchantable, (2) the claims are time-barred, and (3) certain claims fail for lack of privity.

### 1. Whether the Class Vehicles Were Unmerchantable

The Court first considers whether Plaintiffs have adequately alleged the unmerchantability of the Class Vehicles.  Under the Uniform Commercial Code, it is implied in a contract for sale of goods that the goods "shall be merchantable[.]"  U.C.C. § 2-314(1).[26]  For goods to be "merchantable[,]" they "must be . . . fit for the ordinary purposes for which such goods are used."  U.C.C. § 2-314(2)(c).  In determining whether a vehicle is merchantable, courts generally "require[ ] a showing that the vehicle operates in a 'safe condition' or provides 'safe transportation.'"  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 112 (E.D. Mich. 2019) (surveying the laws of California, Illinois, Maryland, Michigan, New Jersey, Ohio, Pennsylvania, and Texas); *see*

---

[26] Except for Count 2 (asserted under Georgia law), the implied warranty claims are brought pursuant to the state laws in effect in Plaintiffs' respective jurisdictions.  Neither side has identified any material difference in the merchantability analysis under the laws of the relevant states.

*also Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 541 (E.D.N.Y. 2006) (New York law).  "[C]ars are not merchantable merely because they are able to provide transportation.  Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects."  *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019); *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1015 (S.D. Cal. 2020) (stating that, to be fit for its ordinary purpose, a vehicle must be safe, reliable, and substantially free from defects).

Relevant here, a "vehicle that operates for some time after purchase may still be deemed 'unfit for ordinary purposes' if its components are so defective that the vehicle becomes inoperable within an unacceptably short period of time."  *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1243 (C.D. Cal. 2011); *see also Hadjian v. Mercedes-Benz*, USA, LLC, No. 1:21-CV-00469-SCJ, 2022 WL 3699603, at *12 (N.D. Ga. Mar. 31, 2022) ("[C]ourts decline[ ] to dismiss implied warranty claims where, as here, the complaint alleges latent defects that pose a danger of catastrophic vehicle engine failure.").  While some courts have dismissed implied warranty claims where the plaintiff drove the car for years before the defect manifested, "a key factor" in those cases "was the fact that the plaintiffs were still able to drive their cars"

54

even after the defect manifested.  *Brown v. Hyundai Motor Am.*, No. CV1811249SDWJAD, 2019 WL 4126710, at *5 (D.N.J. Aug. 30, 2019) (dismissing implied warranty claim where, even after discovery of defect, plaintiff "can—and does—still drive her car").

Other relevant factors include the nature and expected lifespan of the defective part.  For example, in *Bolling v. Mercedes-Benz USA, LLC*, the class vehicles contained a defect that caused the vehicle's sunroof to suddenly shatter under normal driving conditions.  2024 WL 3972987, at *1.  Even though the affected vehicles drove "without any issues for long periods of time[,]" Judge Thrash found that the plaintiffs adequately pled unmerchantability because the alleged defect "implicate[d] the safety and reliability of the vehicles[.]"  *Id.* at *13.  Judge Thrash also distinguished the case from those involving defective brake pads, tires, or batteries, which are "ordinarily expected . . . to be regularly inspected and sometimes replaced[,]" because a sunroof is expected to last the life of the vehicle, regardless of mileage or time.  *Id.*

The alleged defect in this case, though present at the time of sale, is latent and does not immediately cause subframe failure.  The Plaintiffs who experienced subframe failure did so only after they had driven their cars for over 50,000, or in some cases more than 100,000, miles.  Defendants argue that

the Plaintiffs got what they paid for—a car that drove tens of thousands of miles without incident.  In response, Plaintiffs emphasize that the alleged defect profoundly compromises the safety of the vehicles.  They contend that the rear subframe, unlike, say, tires, should *never* fail during the useful life of the vehicle, and the fact that the alleged defect is not immediately discoverable does not preclude a finding of unmerchantability.

Plaintiffs have the better argument.  They have plausibly alleged the existence of a dangerous defect that affects the safety and reliability of the Class Vehicles.  *See, e.g.*, *Monopoli*, 2022 WL 409484, at *14 ("A headrest that may deploy randomly and strike a driver in the head during normal operation presents a risk that implicates the vehicle's safety and reliability . . . making it potentially unfit for its ordinary purpose."); *Amin*, 301 F. Supp. 3d at 1288 (finding that plaintiffs adequately pled breach of implied warranty where they alleged that an air conditioning system defect "affect[ed] the driveability, safety, and usefulness" of their cars); *Johnson v. Jaguar Cars, Inc.*, No. 1:05-CV-3161-RLV, 2006 WL 1627125, at *4 (N.D. Ga. June 6, 2006) (explaining that a plaintiff sufficiently alleged breach of implied warranty where he asserted that Jaguar sold him a car of "insufficient quality" that contained a brake defect).  Accepted as true, the CAC illustrates that the Rear Subframe Defect can cause a vehicle to dangerously lose control while traveling at a high

56

speed.  (Doc. 25 ¶ 8.)  One Plaintiff alleges that this very event happened to him as he was travelling on the highway at around 70 miles per hour, causing him to "swerve[ ] uncontrollably" and "nearly roll[ ] over."  (*Id.* ¶ 43.)

This is therefore not a case in which a vehicle owner can continue safely driving his vehicle after the onset of the defect.  Once the Rear Subframe Defect begins to cause subframe corrosion, "Mercedes-authorized dealers and independent mechanics often advise Class Vehicle owners . . . not to drive their Class Vehicles[.]"  (*Id.* ¶ 10.)  As in *Bolling*, Plaintiffs allege that the part in question—the rear subframe—is one that affects the safety of the vehicle and "should last the life of a vehicle without needing replacement."  (*Id.* ¶ 316.)  That Plaintiffs drove their vehicles for many miles before the Rear Subframe Defect manifested does not preclude a finding that their vehicles were unmerchantable.  The Court concludes that Plaintiffs have plausibly alleged the unmerchantability of the Class Vehicles.

### 2.  Statute of Limitations

Defendants argue that Plaintiffs' implied warranty claims are time-barred.  "A statute of limitations bar is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in its complaint."  *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024) (cleaned up).  Accordingly, "dismissal on statute-of-limitations grounds is proper only where it is apparent

from the face of the complaint that the claim is time-barred." *Id.*; *see also Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) ("A complaint need not anticipate and negate affirmative defenses and should not ordinarily be dismissed based on an affirmative defense unless the defense is apparent on the face of the complaint.").

"Under Georgia law, and the rule of *lex fori,* 'procedural or remedial questions are governed by the law of the forum[.]'" *McCabe*, 948 F. Supp. 2d at 1361 (quoting *Fed. Ins. Co. v. Nat'l Distrib. Co.*, 417 S.E.2d 671, 673 (Ga. Ct. App. 1992)). Because "statutes of limitations are considered procedural" for choice-of-law purposes, Georgia law governs the timeliness of Plaintiffs' implied warranty claims. *Id.* (citing *Gray v. Armstrong*, 474 S.E.2d 280, 281 (Ga. Ct. App. 1996)); *see, e.g., Elder*, 563 F. Supp. 3d at 1234 n.3 (applying Georgia statute of limitations in a putative nationwide class action).

Georgia has adopted the UCC's four-year statute of limitations with respect to contracts for the sale of goods. O.C.G.A. § 11-2-725(1). This limitations period applies to breach of implied warranty claims. *Amin*, 301 F. Supp. 3d at 1288; *McCabe*, 948 F. Supp. 2d at 1361; *Heritage Roof Truss, Inc. v. Leeper*, 880 S.E.2d 362, 364 n.1 (Ga. Ct. App. 2022). Under O.C.G.A. § 11-2-725, "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." § 11-2-725(2). "A breach of

warranty occurs when tender of delivery is made[.]" *Id.* This statute, however, "does not alter the law on tolling of the statute of limitations[.]" § 11-2-725(4).

Defendants argue that 19 Plaintiffs' implied warranty claims are time-barred because their vehicles were initially sold (*i.e.,* "tender[ed]" for delivery) more than four years before this case was filed.[27] Plaintiffs argue that these claims were tolled by Defendants' fraudulent concealment of the Rear Subframe Defect.

Under Georgia law, a statute of limitations is tolled "[i]f the defendant . . . [is] guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action." O.C.G.A. § 9-3-96; *Kane v. Shoup*, 260 Ga. App. 723, 726 (Ga. Ct. App. 2003) ("Actual fraud, through nondisclosure of a known injury or through acts to conceal the injury, which deters or debars the bringing of the action, tolls the running of the statute until discovery of the fraud.") In such circumstances, the limitations period runs "from the time of the plaintiff's discovery of the fraud." *Id.* To invoke tolling under Section 9-3-96, a plaintiff must make three showings: (1) "the defendant committed actual fraud"; (2) "the fraud concealed the cause of action from the plaintiff, such that the plaintiff

---

[27] (*See* Doc. 25 ¶¶ 20, 27, 62, 71, 86, 97, 110, 120, 130, 142, 154, 186, 196, 209, 219, 236, 247, 257, 266.)

was debarred or deterred from bringing an action"; and (3) "the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation." *Doe v. Saint Joseph's Cath. Church*, 870 S.E.2d 365, 371 (Ga. 2022) (quoting *Daniel v. Amicalola Elec. Membership Corp.*, 711 S.E.2d 709, 716 (Ga. 2011)) (cleaned up).

Accepting the CAC's well-pled factual allegations as true, Plaintiffs satisfy the three requirements for tolling pursuant to O.C.G.A. § 9-3-96. As discussed in a latter section of the order, Plaintiffs have plausibly alleged that Defendants fraudulently concealed the Rear Subframe Defect despite having a duty to disclose it. First, Plaintiffs allege that Mercedes knew of the Rear Subframe Defect since at least 2009, but "concealed from or failed to disclose to Plaintiffs, Class Members, and the public of the full and complete nature of the . . . Defect, even when directly asked about it by Class Members during communications with Mercedes, Mercedes Customer Care, Mercedes dealerships, and Mercedes service centers." (Doc. 25 ¶ 390.) Second, this concealment prevented Plaintiffs from bringing this action because they had no way of knowing that their vehicles were defective until "after a professional inspection revealed significant corrosion of the rear subframe." (*Id.* ¶ 394.) Third, the CAC asserts that, despite the exercise of diligence, Plaintiffs could not have discovered the Rear Subframe Defect—or Defendants' alleged fraud—

within the statutory period because the defect causes corrosion "from the inside out" and was thus not detectable "even to a trained mechanic until the rear subframe was dangerously corroded, near total failure[.]" (*Id.*) These allegations, and those described below with respect to Plaintiffs' fraudulent concealment claims, *see infra* Section III(H), are sufficient to plead the applicability of O.C.G.A. § 9-3-96. *See, e.g., Nalley v. Gen. Motors LLC*, No. 1:21-CV-04174-WMR, 2022 WL 18459646, at *4 (N.D. Ga. Aug. 30, 2022) (concluding that a plaintiff who became aware of an oil consumption defect in March 2015, but only filed his lawsuit until October 2021, nevertheless adequately pled tolling under O.C.G.A. § 9-3-96).

"In most cases[,] 'issues concerning a plaintiff's diligence in discovering fraud . . . must be resolved by the trier of fact.'" *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1306 (N.D. Ga. 2021) (quoting *Cochran Mill Assocs. v. Stephens*, 648 S.E.2d 764, 769 (Ga. Ct. App. 2007)). Whether Plaintiffs' implied warranty claims will be tolled hinges on issues of fact premature for adjudication at the pleading stage. *See, e.g., Elder*, 563 F. Supp. 3d at 1235 ("[B]ecause it cannot at this stage conclude beyond a doubt that [plaintiffs'] claims are time barred, the Court declines to dismiss [them] at this juncture." (internal quotation marks omitted)); *State Farm Mut. Auto. Ins. Co. v. Proactive Spine & Relief Ctr., Inc.*, No. 1:19-CV-04866-AT, 2020 WL 5951333, at *5 (N.D. Ga. Sept. 30,

2020) ("Plaintiffs have adequately pleaded a basis for the delayed discovery doctrine in their Complaint, and the question of when precisely the Plaintiffs should have known of their alleged injury, through the exercise of due diligence, is a factual question [for] the jury."). Defendants' request to dismiss Plaintiffs' implied warranty claims on statute-of-limitations grounds is denied.

### 3. Privity

Defendants contend that the laws of Connecticut, Georgia, Kentucky, Massachusetts, New York, Ohio, Rhode Island, Tennessee, and Virginia require privity of contract for implied warranty claims.[28] (Doc. 28 at 41; Doc. 32 at 21.) Because the Plaintiffs from these states acquired their vehicles from third-party dealers,[29] and therefore did not directly contract with Mercedes, Defendants argue that their claims should be dismissed for lack of privity. Defendant MBG also asserts that Plaintiff Neil's implied warranty claim (Count 12)—based on California's Song-Beverly Act—cannot proceed because that Act expressly precludes any implied warranty obligation for "original manufacturers" with respect to used goods. (Doc. 32 at 22.) As the parties

---

[28] Defendants also argue that such a requirement exists under Florida law. As explained above, the Florida implied warranty claim (Count 23) must be dismissed because the sole Florida plaintiff has died and has not been substituted within the requisite timeframe.

[29] (Doc. 25 ¶¶ 27, 62, 86, 168, 177, 209, 236, 266.)

have identified material differences between the privity laws of the relevant states, the Court will analyze the privity issue state-by-state.

### i.  Massachusetts

Massachusetts law does not require privity for a breach of implied warranty claim where, as here, the plaintiff is someone who could be reasonably expected to use the product.  "Mass. Gen. Laws. ch. 106, § 2-318 was amended in 1971 to abolish the privity rule in breach of warranty cases." *Organic Mulch & Landscape Supply of New England, LLC v. PROBEC, Inc.*, No. CV 16-10658-RGS, 2017 WL 3122561, at *1 (D. Mass. July 21, 2017).  In relevant part, the amended statute provides that:

> Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might *reasonably have expected to use, consume or be affected by the goods*.

Mass. Gen. Laws. ch. 106, § 2-318 (emphasis added).  A person may be reasonably "expected to use" a product regardless of whether he was "an initial owner or . . . a subsequent owner." *Sebago, Inc. v. Beazer E., Inc.*, 18 F. Supp. 2d 70, 102 (D. Mass. 1998).  Plaintiffs, as consumers who purchased their Class Vehicles secondhand, were foreseeable buyers who were expected to use their

Mercedes vehicles to travel on roads. Plaintiffs' Massachusetts implied warranty claim will therefore not be dismissed for lack of privity.

### ii. Rhode Island

In Rhode Island, a "seller's or a manufacturer's or a packer's warranty, whether express or implied . . . extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty." R.I. Gen. Laws § 6A-2-318; *see also Olshansky v. Rehrig Int'l*, 872 A.2d 282, 291 n.4 (R.I. 2005) ("Although [plaintiff] is not the purchaser of the shopping cart, warranties of merchantability discussed in G.L. 1956 § 6A-2-314 extend to 'any person who may reasonably be expected to use, consume, or be affected by the goods.'"). Plaintiffs, as the end-users of the Class Vehicles, could be reasonably expected to be affected by the Rear Subframe Defect. The Rhode Island implied warranty claim will not be dismissed on privity grounds.

### iii. Virginia

As with Massachusetts and Rhode Island, under Virginia law,

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods[.]

Va. Code § 8.2-318. "Virginia law does not require privity between a reasonably foreseeable user and the manufacturer of an allegedly defective good to sustain a products liability action." *Porter v. DePuy Orthopaedics, Inc.*, No. 3:19CV007 (REP), 2019 WL 3979656, at *5 (E.D. Va. Aug. 6, 2019), *R&R adopted*, No. 3:19CV7, 2019 WL 3978407 (E.D. Va. Aug. 22, 2019) (citing Va. Code § 8.2-318); *see also McCabe*, 948 F. Supp. 2d at 1362 ("Virginia has generally eliminated the privity requirement for breach-of-warranty claims."). Plaintiffs are foreseeable users of the Class Vehicles and therefore can state an implied warranty claim under Virginia law.[30]

### iv.   New York

"New York recognizes a third-party beneficiary exception to the privity requirement, which is particularly apposite in the context of cases involving a manufacturer with an extensive established network of authorized dealers that sell its cars." *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 677 (E.D. Mich. 2020); *Dixon v. Ford Motor Co.*, 2015 WL 6437612, at *5 (E.D.N.Y. Sept. 30, 2015) ("Some courts have held that a plaintiff can escape the privity

---

[30] Plaintiffs point to statutory authority (Doc. 31 at 40 n.37) to show that privity is not required in connection with the implied warranty claims under the laws of Massachusetts, Rhode Island, and Virginia. *See* Mass. Gen. Laws. ch. 106, § 2-318; R.I. Gen. Laws § 6A-2-318; Va. Code Ann. § 8.2-318. Defendants reassert their privity arguments in their reply briefs without mentioning the directly contrary statutes. (Doc. 37 at 22 n.5; Doc. 39 at 17.)

requirement under a third-party beneficiary theory."). The determination as to whether a plaintiff is a third-party beneficiary of an agreement between a manufacturer and a dealer is "a fact-intensive exercise not amenable to resolution at the pleading stage." *Francis*, 504 F. Supp. 3d at 677; *O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 947 (N.D. Ill. 2021) (Under New York law, "the Court sees little reason why Plaintiffs must, necessarily, plead specific terms of the contracts between Ford and its authorized dealers. Plaintiffs would not be expected to have access to such contracts (which Defendants do not deny exist) without the benefit of discovery.").

The New York Plaintiff, Samuel Ortiz, purchased his vehicle from a Mercedes dealership. (Doc. 25 ¶ 154.) Moreover, Plaintiffs have alleged that they were "intended third-party beneficiaries of the transactions between Mercedes and its network of authorized dealers." (*Id.* ¶ 691(b).) The "Mercedes' authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were designed for and intended to benefit the ultimate purchases of the Class Vehicles[.]" (*Id.*) At the motion to dismiss stage, these allegations plausibly satisfy New York's standard for intended third-party beneficiaries. *See, e.g., Morales v. Toyota Motor Sales, U.S.A., Inc.*, No. 19-01611, 494 F. Supp. 3d 709, 719 (C.D. Cal. 2020) ("Plaintiff claims that Toyota has contracts with its dealerships that

were designed for and intended to benefit the ultimate customers only.  These

allegations . . . are sufficient to establish that Plaintiff is an intended third-

party." (citations omitted)); *O'Connor*, 567 F. Supp. 3d at 945-47.[31]  Plaintiffs

have adequately pled an exception to privity under New York law.

### v.    Connecticut

Connecticut law contains an exception to the privity requirement where

an agency relationship exists between the manufacturer and its dealership.

*Napoli-Bosse v. Gen. Motors LLC*, No. 18-1720 (MPS), 2022 WL 3585769, at *7

(D. Conn. Aug. 22, 2022) ("Connecticut courts have allowed plaintiffs who are

not in privity to recover from a manufacturer in some circumstances.  For

example, they have recognized an exception to the privity requirement where

an agency relationship exists between the vehicle manufacturer and the

---

[31] Several federal district courts in New York have "faulted [plaintiffs] for not identifying specific contracts and contract terms between the manufacturer and its dealers" at the motion to dismiss stage.  *O'Connor*, 567 F. Supp. 3d at 945-47 (citing *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 313 (N.D.N.Y. 2019); *Catalano v. BMW of North America, LLC*, 167 F. Supp. 3d 540, 557 (S.D.N.Y. 2016); and *Dixon*, 2015 WL 6437612, at *6).  This Court, like others, finds such a pleading requirement too stringent, particularly where, as here, the "Plaintiffs would not be expected to have access to such contracts . . . without the benefit of discovery."  *O'Connor v.*, 567 F. Supp. 3d at 947; *see Johnson v. Nissan North America, Inc.*, 272 F. Supp. 3d 1168 (N.D. Cal. 2017) (concluding that a New York plaintiff plausibly alleged she was a third-party beneficiary of contracts between Nissan and its dealers without identifying specific contractual provisions).

dealer.").  "[T]he three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Wesley v. Schaller Subaru, Inc.*, 893 A.2d 389, 400 (Conn. 2006). "The existence of an agency relationship is a question of fact." *Id.* (quoting *Beckenstein v. Potter & Carrier, Inc.*, 464 A.2d 6, 14 (Conn. 1983))

The Connecticut Plaintiff, Stephen Caggiano, purchased his vehicle from a Mercedes dealership.  (Doc. 25 ¶ 27.)  In addition, Plaintiffs allege the existence of an agency relationship between Mercedes and its dealers:

> [T]here is privity because Plaintiff's and Class Members' dealerships were agents of Mercedes . . . Mercedes controlled the marketing and sale of the Class Vehicles, Mercedes set the MSRP [manufacturer's suggested retail price] and controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Mercedes, that the dealership acted as Mercedes' agent in connection with the sale, and the dealership bound Mercedes to contractual obligations with the sale of the Class Vehicles.

(*Id.* ¶ 1386.)  Given the fact-intensive nature of the agency inquiry, these allegations are sufficient to plausibly show the existence of an agency relationship between Defendants and Mercedes dealers.  *See*, *e.g.*, *In re Chrysler Pacifica Fire Recall Prod. Liab. Litig.*, 706 F. Supp. 3d 746, 779 (E.D. Mich. 2023) (denying motion to dismiss Connecticut implied warranty claim

because the agency analysis "calls for a fact-intensive inquiry that cannot be resolved in a principled manner at the pleading stage").

### vi.   Ohio and Georgia

While privity is required to bring a *statutory* implied warranty of merchantability claim in Ohio, *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 865 (S.D. Ohio 2012), Plaintiffs bring their Ohio implied warranty claim "in tort." (Doc. 25 at 433.) In Ohio, "[i]mplied warranty in tort is a common law cause of action that imposes liability upon a manufacturer or a seller for breach of an implied representation that a product is of good and merchantable quality, fit and safe for its ordinary intended use." *Risner v. Regal Marine Indus., Inc.*, 8 F. Supp. 3d 959, 995 (S.D. Ohio 2014) (cleaned up). Because this is a common-law claim, Georgia's choice-of-law rules require application of Georgia common law. *Frank Briscoe Co.*, 713 F.2d at 1503 ("When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law.").

Georgia courts recognize an exception to privity "where an automobile manufacturer, through its authorized dealer issues to a purchaser . . . a warranty by the manufacturer running to the purchaser[.]" *Chrysler Corp. v. Wilson Plumbing Co.*, 208 S.E.2d 321, 323 (Ga. Ct. App. 1974). "This exception to the general privity rule is a means of implying privity where the sale is

effectively a direct sale between the manufacturer and the remote consumer." *Dermatology Specialists of Augusta, Inc. v. Daikin Applied Americas Inc.*, No. CV 116-058, 2019 WL 97831, at *5 (S.D. Ga. Jan. 3, 2019). Notably, this exception applies only when the manufacturer "issues a warranty to remote purchasers through an *authorized dealer* and when the warranty is part of the remote consumer's purchase." *In re Porsche Cars*, 880 F. Supp. 2d at 845 (citing *Chrysler Corp.*, 208 S.E.2d at 323) (emphasis added); *see, e.g., Helpling v. Rheem Mfg. Co.*, No. 1:15-CV-2247-WSD, 2016 WL 1222264, at *5 (N.D. Ga. Mar. 23, 2016) (finding that privity exception did not apply where plaintiffs failed to allege that they purchased a product from defendant's "authorized dealer").

Georgia's exception to privity does not apply here because the Ohio Plaintiffs do not allege that they purchased their vehicles from authorized dealers. Mr. Simpson purchased his vehicle at a "private party sale[,]" and Mr. Laakso purchased his vehicle from "Logic Auto Sales[.]" (Doc. 25 ¶¶ 168, 177.) These independent resellers are not alleged to be authorized Mercedes dealers. (*See id.* ¶¶ 1454-61.) The Ohio implied warranty claim (Count 67) therefore fails for lack of privity.

For the same reasons, Plaintiffs' nationwide breach of implied warranty claim (Count 2), which is brought under Georgia law, must also be dismissed

for lack of privity. As discussed in Section III(B) of this order, Georgia's choice-of-law rules leave the Ohio Plaintiffs as the only subset of Plaintiffs who could assert an implied warranty claim based on Georgia law. Because their implied warranty claims fail for lack of privity pursuant to Georgia law, they cannot serve as representatives for a nationwide claim brought under Georgia law. As such, Plaintiffs' nationwide breach of implied warranty claim (Count 2) is also dismissed.

### vii.   Kentucky and Tennessee

Kentucky and Tennessee require privity of contract to state an implied warranty claim. *Blanton v. Remington Arms Co., LLC*, No. 7:20-CV-71-REW-EBA, 2022 WL 4125071, at *2 (E.D. Ky. Sep. 9, 2022) ("The Kentucky Supreme Court has repeatedly refused to extend warranties beyond those in privity. . . . This applies to both express and implied warranty claims." (cleaned up)); *Norris Bros. Excavating, LLC v. S. Pipe & Supply Co., Inc.*, No. 3:21-CV-00357-DCLC-DCP, 2023 WL 7389986, at *2 (E.D. Tenn. July 27, 2023) (noting that Tennessee "require[s] privity of contract to recover economic losses on an implied-warranty claim.").

Ms. Turner, the sole Kentucky Plaintiff, purchased her Class Vehicle used from a non-Mercedes dealership. (Doc. 25 ¶ 62.) Mr. Thomas, the Tennessee Plaintiff, purchased his Class Vehicle used from a private party.

(Doc. 25 ¶ 236). Neither Ms. Turner nor Mr. Thomas were in privity with MBUSA or MBG when they purchased their respective vehicles, so they cannot bring breach of implied warranty claims under Kentucky or Tennessee law.[32]

Plaintiffs counter that MBUSA's issuance of the Extended Warranty was a "direct dealing" that "revived" privity of contract with all recipients of the warranty. (Doc. 31 at 40-41.) In support of their "revival" theory, Plaintiffs cite a single case—*In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 807 (N.D. Ill. 2016). *Rust-Oleum* applied a limited "direct dealing" exception to privity, recognized by California law, to a different factual scenario than the one at issue here. *Id.* The *Rust-Oleum* court examined the sale of an allegedly defective paint product through retail home improvement stores, concluding that the manufacturer's advertising of the reliability of their product might place them in privity with plaintiffs who used the product. *Id.* But the retail sale of paint products is not analogous, with

---

[32] There is authority to suggest that privity is *not* required under Tennessee law where the product in question is unreasonably dangerous and causes physical harm to person or property. *Americoach Tours, Inc. v. Detroit Diesel Corp.*, No. 04-2016 B/V, 2005 WL 2335369, at *6 (W.D. Tenn. Sept. 23, 2005). Mr. Thomas does not make allegations of physical harm to person or property. As such, privity is required to support his implied warranty claim. *See id.* at *8 ("The Court has found no opinion in which a Tennessee court has held that in the absence of privity a plaintiff could bring a claim for breach of an implied warranty to recover only economic damages . . .").

respect to privity, to the sale of used cars by private sellers.  Nor does *Rust-Oleum* provide any support for the idea that a manufacturer "revives" privity with owners of vehicles it manufactured—privity that never existed to begin with—by unilaterally offering an additional warranty to repair a defect.

More fundamentally, Plaintiffs' "revival" theory, which they fail sufficiently to explain, contravenes the basic function of the privity requirement in the implied warranty context.  The implied warranty that "goods shall be merchantable is implied in *a contract for their sale* . . . ."  U.C.C. § 2-314(1) (emphasis added); Ky. Rev. Stat. Ann. § 355.2-314; Tenn. Code Ann. § 47-2-314.  Section 2-314 of the U.C.C., which both Kentucky and Tennessee have adopted, expressly conditions the imposition of implied warranty on a *contract for sale*; that is, implied warranty attaches to the *sale* of the good.  *See Johnson v. Nat'l Sea Prod., Ltd.*, 35 F.3d 626, 630 (1st Cir. 1994) ("[A]bsent any sale of the [goods] or contract for the sale of the [goods], no warranty of merchantability could have attached.")  Thus, where privity is required to state a breach of implied warranty claim, the relevant inquiry is whether the *contract for sale*, not some other agreement, establishes privity between the parties.  Put differently, a "buyer and seller stand in privity [only] if they are in adjoining links of the *distribution* chain."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (emphasis added); *Brown Sprinkler*

73

*Corp. v. Plumbers Supply Co.*, 265 S.W.3d 237, 240 (Ky. Ct. App. 2007) ("[T]he privity requirement . . . clearly limits warranty protections to those engaged in a buyer-seller relationship."); *see also* 18 *Williston on Contracts* § 52:41 ("Vertical privity exists only between immediate links in a distribution chain; a buyer in the same chain who did not purchase directly from a seller is 'remote' as to that seller.").

Mercedes' issuance of the Extended Warranty cannot be understood to create any sort of *contract for sale* between Mercedes and Plaintiffs that would give rise to an implied warranty.  At least one Kentucky court has rejected the argument that a manufacturer's post-sale offer to replace a buyer's defective product can satisfy or waive the privity requirement.  *Brown Sprinkler*, 265 S.W.3d 237, 240 (Ky. Ct. App. 2007) (rejecting the argument that a manufacturer waived the privity requirement by dealing directly with a buyer and offering to replace defective sprinklers).  For the foregoing reasons, the Court declines to adopt Plaintiffs' "revival" theory of privity.  The Kentucky implied warranty claim (Count 32) and Tennessee implied warranty claim (Count 82) are dismissed.

### viii.    California

Defendant MBG contends that Plaintiff Neil's implied warranty claim (Count 12)—based on California's Song-Beverly Act—cannot proceed because

that Act precludes any implied warranty obligation for "original manufacturers" with respect to used goods.  (Doc. 32 at 22.)  In response, Plaintiffs argue that Plaintiff Neil purchased the car "certified pre-owned" at an authorized Mercedes dealership and California courts recognize that authorized dealers can sometimes be deemed agents of manufacturers like MBG.  (Doc. 34 at 23.)

The Song-Beverly Act mandates that "every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."  Cal. Civ. Code § 1792.  "[C]onsumer goods" are defined as "new product[s]."  *Id.* § 1791(a).  Elsewhere, however, the Act's mandate is expanded to cover "used consumer goods," with the qualification that

> [i]t shall be the obligation of the distributor or retail seller making *express warranties* with respect to used consumer goods (and not the original manufacturer*, distributor, or retail seller making express warranties with respect to such goods when new) to maintain sufficient service and repair facilities within this state to carry out the terms of such *express warranties*.

*Id.* § 1795.5(a) (emphasis added).  As MBG points out, some courts have interpreted this limiting provision, Section 1795.5(a), to mean that "the Song-Beverly Act does not create any [implied warranty] obligation on behalf of . . . the original car manufacturer, with respect to used goods."  *Johnson v. Nissan*

*N. Am., Inc.*, 272 F. Supp. 3d 1168, 1179 (N.D. Cal. 2017); *Foulkrod v. Ford Motor Co.*, 2019 WL 3064478, at *4 (C.D. Cal. Apr. 10, 2019) ("The party responsible for that implied warranty . . . is not the original manufacturer, but rather the third party distributor or retailer.").

The plain language of Section 1795.5(a), however, does not mention *implied* warranties at all; it only refers to "*express* warranties." Cal. Civ. Code § 1795.5(a) (emphasis added). Moreover, the two federal district court cases that MBG cites in support of their argument—*Foulkrod*, 2019 WL 3064478, at *4 (C.D. Cal. Apr. 10, 2019); *Johnson*, 272 F. Supp. 3d at 1179—did not address the statutory text's focus on *express* warranties. At this stage, it is unclear to the Court why the Song-Beverly Act would preclude Plaintiffs from bringing an *implied* warranty claim against MBG on the theory that MBUSA is an agent of MBG. *See, e.g.*, *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 808 (C.D. Cal. 2022) (recognizing that "under certain circumstances, it is possible for plaintiffs to allege sufficient facts to show an agency relationship between a manufacturer and an authorized dealership . . ." (quoting *Murphy v. Toyota Motor Sales, USA, Inc.*, No. 22-CV-05892 VAP,

2021 WL 2801452, at *6 (C.D. Cal. July 1, 2021))).  Accordingly, MBG's motion to dismiss Plaintiffs' Song-Beverly Act implied warranty claim will be denied.[33]

In sum, the implied warranty claims brought under the laws of Georgia (Count 2), Kentucky (Count 32), Ohio (Count 67), and Tennessee (Count 82) are dismissed for lack of privity.  The Florida implied warranty claim (Count 23) has also been dismissed, not for lack of privity, but rather because the sole Florida plaintiff has died and has not been substituted within the requisite timeframe.  All other implied warranty claims may proceed.[34]

### G. Magnuson-Moss Warranty Act Claims

Plaintiffs assert nationwide express and implied warranty claims against MBUSA under the Magnuson-Moss Warranty Act (the "MMWA"), 15 U.S.C. §§ 2301, *et seq.* (Counts 3 and 4).

"The [MMWA] does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law." *Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1200 n.14 (N.D. Ga. 2005).  Because Plaintiffs have failed to plausibly allege state-law express

---

[33] The parties have not briefed whether the plain language of the Song-Beverly Act contradicts the holdings in cases like *Foulkrod* and *Johnson*.  *Foulkrod*, 2019 WL 3064478, at *4 (C.D. Cal. Apr. 10, 2019); *Johnson*, 272 F. Supp. 3d at 1179.  They may re-raise this issue at a later stage of the proceedings.

[34] Counts 12, 18, 42, 47, 52, 57, 62, 72, 77, 87, 92.

warranty claims, their MMWA express warranty claims fail as well. *See, e.g.,*
*McCabe*, 948 F. Supp. 2d at 1364. Plaintiffs' MMWA express warranty claim,
Count 3, is therefore dismissed.

As set forth in an earlier section of this order, Section III(F), certain
Plaintiffs have plausibly alleged state-law implied warranty claims. However,
this is not the end of the MMWA inquiry. The MMWA contains a jurisdictional
requirement that "[n]o claim shall be cognizable in a suit brought [in federal
court] . . . if the action is brought as a class action, and the number of named
plaintiffs is less than one hundred." 15 U.S.C. § 2310(d)(3). Plaintiffs do not
dispute that they failed to meet the MMWA's 100-plaintiff requirement, but
they argue that the provision is superseded by the jurisdictional requirements
of the Class Action Fairness Act ("CAFA"). Section 1332(d) of CAFA "expanded
federal subject matter jurisdiction to include class actions in which minimal
diversity exists and the amount in controversy exceeds $5 million." *Monopoli*,
2022 WL 409484, at *6; 28 U.S.C. § 1332(d).[35]

---

[35] 28 U.S.C. § 1332(d) provides, in relevant part, that:

> The district courts shall have original jurisdiction of any civil
> action in which the matter in controversy exceeds the sum or value
> of $5,000,000, exclusive of interest and costs, and is a class action
> in which--
>> (A) any member of a class of plaintiffs is a citizen of a State
>> different from any defendant;

CAFA was enacted after the MMWA, and some courts have found that "when Congress enacted CAFA, it did so with the knowledge of the MMWA's jurisdictional requirements. . . . Therefore, once plaintiffs have satisfied CAFA, the MMWA's additional requirements do not apply." *Velez v. RM Acquisition, LLC*, 670 F. Supp. 3d 620, 631-32 (N.D. Ill. 2023) (collecting cases); *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013) (concluding in a case with fewer than 100 plaintiffs that "the district court had jurisdiction notwithstanding the MMWA's jurisdictional limitations" and noting that "district courts have, as a general rule, held that the CAFA effectively supercedes [sic] the MMWA's more stringent jurisdictional requirements."). Other courts, including the Third and Ninth Circuits, have held that CAFA did not implicitly repeal MMWA's 100-plaintiff jurisdictional requirement. *See Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023) (noting the "strong presumption against the implied repeal of one federal statute by another" and reasoning that "[a]llowing CAFA to govern MMWA class claims would undercut the MMWA's requirement and allow an MMWA class action

---

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

to proceed in contravention of the MMWA"); *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1035 (9th Cir. 2020) (finding no irreconcilable conflict between CAFA and MMWA and holding that "CAFA may not be used to evade or override the MMWA's specific numerosity requirement").

"[T]he Eleventh Circuit has yet to consider the issue." *Lewis*, 530 F. Supp. 3d at 1206. But the Eleventh Circuit has noted that, "a repeal by implication" requires a finding that the two statutes conflict. *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1299 (11th Cir. 2010). "The conclusion that two statutes conflict, however, is one that courts must not reach lightly. If any interpretation permits both statutes to stand, the court must adopt that interpretation, 'absent a clearly expressed congressional intention to the contrary.'" *Id.* (quoting *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir. 2006)). "Because a repeal by implication requires the most speculation about the intent of Congress, there is a presumption against finding one." *Id.* (citing *TVA v. Hill,* 437 U.S. 153, 189 (1978)); *Patel v. Quality Inn S.,* 846 F.2d 700, 704 (11th Cir. 1988) ("Only when Congress' intent to repeal or amend is clear and manifest will we conclude that a later act implicitly repeals or amends an earlier one.").

Plaintiffs have not demonstrated that CAFA's jurisdictional requirements conflict with the MMWA's numerosity provision. Nor is the

Court convinced that such an irreconcilable conflict exists. *See Floyd*, 966 F.3d at 1035 ("[T]he statutory language of the MMWA and of CAFA is not irreconcilable—the MMWA simply prevents claims under that Act from proceeding in federal court absent the satisfaction of certain jurisdictional prerequisites."). Absent an irreconcilable conflict, the Court cannot conclude that CAFA impliedly repealed the MMWA's express numerosity requirement. Plaintiffs' MMWA claims (Counts 3 & 4) will therefore be dismissed. *See, e.g., Monopoli*, 2022 WL 409484, at *6 (dismissing MMWA claims for failure to comply with the act's numerosity requirement).

### H. Fraudulent Omission Claims

Plaintiffs allege that Defendants engaged in fraud by "conceal[ing] and suppress[ing] material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions." (Doc. 25 ¶ 532.) Plaintiffs bring their claims labeled "fraudulent omission" under common law.[36] As such,

---

[36] Plaintiffs bring 18 claims under the heading "fraudulent omission," including one nationwide claim and 17 claims under the laws of the Plaintiffs' respective home states. None of the fraudulent omission causes of action cites to any state statute, so the Court presumes that Plaintiffs assert these claims under common law. To the extent that Plaintiffs' response brief refers to their "statutory fraudulent omission claims," the Court assumes that Plaintiffs are referring here to the various state consumer protection laws asserted in other counts of the CAC.

Plaintiffs' fraud claims are governed by Georgia law. "Under Georgia law, '[t]he tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.'" *McCabe*, 948 F. Supp. 2d at 1368 (quoting *ReMax N. Atlanta v. Clark*, 537 S.E.2d 138, 141 (Ga. Ct. App. 2000)). Additionally, where, as here, a fraud claim is based on the alleged failure to disclose a material fact, liability arises only where there exists "an obligation to disclose" the fact. *Middleton v. Troy Young Realty*, 572 S.E.2d 334, 337 (Ga. Ct. App. 2002) (citing O.C.G.A. § 23-2-53).

The Court will address six issues regarding Plaintiffs' fraudulent omission claims: (1) whether Plaintiffs satisfy Rule 9(b)'s heightened pleading standard, (2) whether Plaintiffs adequately allege Defendants' pre-sale knowledge of a defect, (3) whether Defendants had a duty to disclose the Rear Subframe Defect, (4) whether Plaintiffs adequately allege their justifiable reliance, (5) whether plaintiffs adequately allege causation, and (6) whether Plaintiffs' fraud claims are barred by the economic loss rule.

### 1. Rule 9(b)

Defendants argue that Plaintiffs fail to plead their fraud claims with particularity under Rule 9(b). (Doc. 28 at 43-45.) Fraud claims asserted in federal court must comply with Fed. R. Civ. P. 9(b), which requires that "the

circumstances constituting fraud or mistake shall be stated with particularity." The Eleventh Circuit has explained:

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) [them], and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875 (11th Cir. 2023) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)). "[U]nadorned conclusions" do not satisfy Rule 9(b); instead, the plaintiff must allege "the who, what, when, where, and how" of the alleged fraud. *Jones v. Gen. Motors, LLC*, No. 23-11102, 2024 WL 861064, at *3 (11th Cir. Feb. 29, 2024) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)). "A 'more lenient pleading standard' is appropriate under rule 9(b)," however, "when 'evidence of fraud [i]s uniquely held by the defendant,' provided that 'the complaint . . . set[s] forth a factual basis for such belief.'" *Wireman v. Park Nat'l Corp.*, No. 20-14096, 2021 WL 3045347, at *5 (11th Cir. July 20, 2021) (quoting *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002)).

The Court agrees with Defendants that Plaintiffs' fraud claims, if based on affirmative misrepresentations, would not satisfy Rule 9(b). Plaintiffs do

not, for example, identify "specific [fraudulent] statements", "the time and place of such statement[s]", or the "content of the statement[s]". *Lucky Cap. Mgmt., LLC v. Miller & Martin, PLLC*, 741 F. App'x 612, 619 (11th Cir. 2018).

Plaintiffs make clear, however, that their fraud claims are *omission*-based. (Doc. 31 at 43.) Viewed through that lens, Plaintiffs have satisfied Rule 9(b) by pleading the who, what, when, where, and how of Defendants' alleged fraudulent omissions. They specifically allege that Mercedes (who) failed to disclose the existence of the Rear Subframe Defect despite knowing of it since at least 2009 (what) prior to the sale of the Class Vehicles (when). (Doc. 25 ¶¶ 386-89.) Mercedes allegedly failed to disclose the defect in its various consumer communications, advertisements, and marketing materials (where) and allegedly promised in its marketing materials that the Class Vehicles possessed safety and reliability qualities that Mercedes knew that they did not have (how). (*Id.* ¶¶ 378-85, 389.) Although Plaintiffs have not identified the specific persons responsible for the alleged fraudulent omission, they have pled a sufficient basis for relaxing this aspect of the Rule 9(b) standard: "Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Mercedes responsible for" concealing the defect. (*Id.* ¶ 389(a)); *see, e.g., Bolling*, 2024 WL 3972987, at *14 ("Plaintiffs plead a fraud-by-omission case, and in cases where the fraud alleged is the fraudulent

omission of information within the exclusive control of the Defendant, the Rule 9(b) standard is relaxed." (cleaned up)).   The Court therefore finds that Plaintiffs have satisfied Rule 9(b)'s heightened-pleading requirement.   *See, e.g., Nalley*, 2022 WL 18459646, at *5 (concluding that Rule 9(b) was satisfied by similar allegations); *Amin*, 301 F. Supp. 3d at 1296 (same); *McCabe*, 948 F. Supp. 2d at 1367 (same).

### 2. Knowledge

Where, as here, a fraud claim is premised on the alleged concealment of material information, "the scienter element requires that 'the alleged defrauder had actual, not merely constructive, knowledge of the fact concealed.'" *McCabe*, 948 F. Supp. 2d at 1368 (quoting *ReMax*, 537 S.E.2d at 141); *Argentum Int'l, LLC v. Woods*, 634 S.E.2d 195, 200 (Ga. Ct. App. 2006) ("In all cases of fraud involving a concealment of a material fact, scienter, or knowledge of the alleged falsehood, is an essential element of the tort.").   The plaintiff must show "the silent party's actual knowledge that the defect exists at the time of the sale[.]" *ReMax*, 537 S.E.2d at 142.   Under Rule 9(b), however, "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).   In other words, Rule 9(b) "does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements [or omissions] were made." *Mizzaro*, 544 F.3d at 1237.

Plaintiffs allege that by 2009—the year before the first Plaintiff purchased his Class Vehicle—Mercedes had knowledge of the Rear Subframe Defect. (Doc. 25 ¶¶ 498-99.) Mercedes allegedly had at least nine "sources of knowledge" of the Rear Subframe Defect:

(1) pre-release design, manufacturing, and testing data (*id.* ¶¶ 334-37),

(2) data gathered by Mercedes about a large number of Rear Subframe Defect repairs by authorized Mercedes dealers (*id.* ¶ 333(b)),

(3) consumer complaints submitted in 2018 and later to the National Highway and Traffic Safety Administration's Office of Defect Investigations (*id.* ¶¶ 338-42),

(4) a 2018 service bulletin sent by Mercedes to its dealerships advising technicians to check the rear subframe of certain models (*id.* ¶¶ 343-47),

(5) Mercedes' receipt of a higher-than-expected number of orders for replacement subframes (*id.* ¶¶ 348-50),

(6) consumer complaints about the Rear Subframe Defect that were submitted directly to Mercedes (*id.* ¶¶ 35, 79-80, 92, 137, 231, 351-52),

(7) consumer complaints made on online vehicle-owner forums (*id.* ¶¶ 353-54),

86

(8) MBG's issuance of a subframe-corrosion warranty for vehicles in its European markets (*id.* ¶¶ 316, 333(h)), and

(9) Mercedes service center employees' familiarity with and knowledge of the Rear Subframe Defect (*id.* ¶¶ 333(i), 349).

The foregoing allegations are sufficient to plausibly show Defendants' pre-sale knowledge of the Rear Subframe Defect.[37]  Importantly, the question is not whether each individual allegation, standing alone, establishes Mercedes's knowledge of the defect.  Instead, the Court considers whether the allegations, viewed together, support an inference of knowledge.  *Pinon v. Daimler AG*, No. 1:18-CV-3984-MHC, 2019 WL 11648560, at *24 (N.D. Ga. Nov. 4, 2019) (collecting cases).  Such an inference is supported here.

---

[37] Defendants argue that Plaintiffs fail to allege MBUSA's pre-sale knowledge of a defect.  They observe that (1) Plaintiffs' vehicles span six model years (2010 to 2015); and that (2) several of the purported sources of knowledge listed above did not exist until 2018 or later.  (Doc. 64 at 7-12; Doc. 28 at 47-51.)  The point is well-taken, and some of the named Plaintiffs may have a heavy lift at summary judgment, depending on when they purchased their respective Vehicles.  Having said that, several Plaintiffs purchased their Vehicle *after 2018*.  (*See* Doc. 25-5 ¶¶ 51, 62, 86, 168, 177, 247, 266).  Moreover, at this stage, the Court must view the allegations in the light most favorable to Plaintiffs, and Plaintiffs allege, *inter alia*, pre-sale testing that would have alerted Defendants of the existence of the Defect with respect to *all* of Plaintiffs' vehicles.  For the reasons stated in this section, the Court finds that Plaintiffs' allegations of Defendants' pre-sale knowledge are sufficient *at the motion-to-dismiss stage*.

The allegations, for example, must be understood against the backdrop of the extensive testing to which Mercedes vehicles are allegedly subject before they are sold on the market.  Plaintiffs set forth detailed allegations about the kinds of pre-sale tests that a "reasonably prudent vehicle manufacturer" would generally perform, and Plaintiffs further explain how these tests would tend to reveal the Rear Subframe Defect.  (Doc. 25 ¶ 337.)  Specifically, Plaintiffs state that, due to the "well-known threat of corrosion[,]" vehicle manufacturers generally conduct (1) an initial "weathering test," which assesses the integrity of the anti-corrosion coating in simulated environmental conditions; (2) a "corrosion test of individual vehicle components[,]" during which engineers expose vehicle parts to a corrosive agent; (3) a "general corrosion test of the entire vehicle under driving conditions"; and (4) a "soap test" in which engineers simulate "the long-term effects of exposure to corrosive agents on the vehicle." (*Id.* ¶ 336.)  Plaintiffs allege that Mercedes performed or should have performed each of these tests on the Class Vehicles before they were sold to consumers.  (*Id.*)

While Plaintiffs do not allege the results of any pre-sale tests, they explain that such data is within the exclusive control of Mercedes.  (Doc. 25 ¶ 334); *see Monopoli*, 2022 WL 409484, at *9 ("True, Plaintiffs still fail to allege which specific tests Mercedes *actually* conducted or what the *actual* results of

those tests were.  But this is unsurprising, as Defendants have exclusive

custody and control over the details of [ ] testing and the results of that testing."

(cleaned up)).  Accepted as true, Plaintiffs' allegations regarding pre-sale

testing show that Mercedes closely monitored corrosion-related issues before

the Class Vehicles were sold on the market, making it more plausible that

Mercedes knew about the Rear Subframe Defect.  The Court considers

Plaintiffs' allegations regarding pre-sale testing and data to be sufficiently

detailed and finds that the allegations, at the very least, raise "the reasonable

inference that the Defendants did, in fact, conduct various tests that could have

revealed the existence of the defect."  *Callen*, 2020 WL 10090879, at *16; *see

also Bolling*, 2024 WL 3972987, at *15 (explaining that plaintiffs' allegation

that "Defendants conducted pre-sale durability testing on its sunroofs that

would have revealed the alleged defect" supported an inference that they knew

about the defect).[38]

---

[38] *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183 (S.D. Fla. 2021)—
a case on which Defendants rely to dispute the sufficiency of the pre-sale
testing allegations—is distinguishable.  In that case, the court found the
plaintiffs' allegations of pre-sale testing to be insufficient to establish
knowledge because plaintiffs "simply allege[d] that testing was completed and
showed a defect."  *Id.* at 1221.  The *Lewis* plaintiffs notably failed to provide
any details about the alleged pre-production testing or analysis completed
based on that testing.  *Id.* at 1220-21.  Here, by contrast, Plaintiffs have
described four tests that Mercedes performed or should have performed, the
purpose of such tests, and how each test would tend to reveal that the rear

Plaintiffs' allegations of consumer complaints about the Rear Subframe Defect further bolster the inference of pre-sale knowledge. For instance, Plaintiffs allege that Defendants knew about the Rear Subframe Defect because "numerous consumers," including certain Plaintiffs, "complained directly to Mercedes about the defect." (Doc. 25 ¶¶ 35, 79-80, 92, 137, 231, 351-52.) Plaintiffs also note that Class Vehicle owners have lodged complaints about the Rear Subframe Defect with the National Highway Traffic Safety Administration's ("NHTSA") Office of Defect Investigations, which are publicly available on NHTSA's complaint database. (Doc. 25 ¶¶ 338-42.) Four such NHTSA complaints are included in the complaint. (*Id.* ¶ 342.) Mercedes allegedly monitors this database and therefore should have been alerted to the Rear Subframe Defect by multiple complaints describing it. (*Id.*) Class Vehicle owners also posted complaints about the Rear Subframe Defect on other, online public fora, which, according to Plaintiffs, are tracked by Mercedes. (*Id.* ¶¶ 353-54.) Plaintiffs have provided five examples of these complaints. (*Id.* ¶¶ 353(a)-(e).) These allegations, accepted as true, "indicate that Mercedes

---

subframe was prone to corrosion. (Doc. 25 ¶ 336.) Unlike in *Lewis*, Plaintiffs' allegations regarding pre-sale testing are probative of Defendants' alleged knowledge. *See, e.g., Monopoli*, 2022 WL 409484, at *9 (distinguishing *Lewis* and finding that plaintiffs' allegations about pre-production testing "add[ed] to the plausibility of Mercedes's knowledge[,]" as plaintiffs "describe[d] each test, its purpose, and, critically, how the test would have revealed" the defect).

was notified on several occasions" that the Class Vehicles suffered from premature corrosion of rear subframe. *Monopoli*, 2022 WL 409484, at *9 (reasoning that similar allegations of online consumer complaints weighed in favor of a finding of knowledge); *Pinon*, 2019 WL 11648560, at *23 (same).[39]

The Court also finds persuasive Plaintiffs' allegation that "the higher than expected number of replacement rear subframes ordered from Mercedes" should have alerted Mercedes to the Rear Subframe Defect. (Doc. 25 ¶¶ 348-50.) According to Plaintiffs, so many vehicle owners have ordered replacement subframes from Mercedes, through Mercedes service centers, that the part is currently backordered, causing owners to have to wait several months for a repair. (*Id.* ¶¶ 349-50.) Plaintiffs allege that Mercedes likely has "detailed and accurate data regarding the number and frequency of replacement part orders, including replacement rear subframes." (*Id.* ¶ 349.) These allegations enhance

---

[39] The Court acknowledges that the earliest representative sample of a consumer complaint provided by Plaintiffs is from 2018, even though Plaintiffs are alleged to have acquired their vehicles as early as 2010. The representative samples, however, are exactly that—*representative samples*. Plaintiffs allege that "[t]he full universe of complaints . . . [is] presently in the exclusive custody and control of Mercedes and is not yet available to Plaintiffs prior to discovery." (Doc. 25 ¶ 352.) Under these circumstances, Plaintiffs are entitled to a degree of "leeway" with respect to the specificity with which they allege Defendants' sources of knowledge. *United States v. Baxter Int'l*, Inc., 345 F.3d 866, 881 (11th Cir. 2003) ("Courts typically allow the pleader an extra modicum of leeway where the information supporting the complainant's case is under the exclusive control of the defendant.").

the inference that Mercedes knew about the Rear Subframe Defect. *See, e.g.,* *Bolling*, 2024 WL 3972987, at *16 (finding that "repair requests at dealerships," and accompanying data, weighed in favor of finding knowledge).

Finally, the Court considers that in May 2018, Mercedes issued, "[d]ue to recent events[,]" a "technical service bulletin" ("TSB") to its dealers in the United States, advising service technicians to check the rear subframe of certain Class Vehicles for corrosion. (Doc. 25 ¶ 343-47.) The TSB indicates that—at least for all Plaintiffs who acquired their vehicles after May 2018— Mercedes was aware of a need to examine rear subframes for corrosion. *See, e.g., Amin*, 301 F. Supp. 3d at 1290 (finding that Mercedes' issuance of technical bulletins relating to the alleged defect was relevant to knowledge of a defect).

In sum, accepting as true the allegations of pre-production testing and data, customer complaints about rear subframe corrosion, rear subframe replacement requests, and the issuance of the 2018 TSB, Plaintiffs have plausibly alleged Mercedes's pre-sale knowledge of the Rear Subframe Defect. *See, e.g., Bolling*, 2024 WL 3972987, at *16 (allegations of pre-sale testing, consumer complaints, and repair requests were, taken together, sufficient to support an inference of knowledge); *Monopoli*, 2022 WL 409484, at *10 (allegations of industry-standard pre-production testing, the issuance of a TSB,

and consumer complaints collectively showed Mercedes' pre-sale knowledge);
*Pinon*, 2019 WL 11648560, at *24 (same).

### 3. Duty to Disclose

Defendants next argue that Plaintiffs' fraudulent omission claims fail
because they had no duty of disclosure.   Under Georgia law, only the
"[s]uppression of a material fact which a party is under an obligation to
communicate" can support a fraudulent omission claim.  O.C.G.A. § 23-2-53.  A
duty of disclosure may arise either from the "confidential relations of the
parties" *or* "from the particular circumstances of the case." *Id.*  "The particular
circumstances of the case may give rise to an obligation to communicate where
there is a concealment of intrinsic qualities of the article which the other party
by the exercise of ordinary prudence and caution could not discover." *Amin*,
301 F. Supp. 3d at 1296 (quoting *McCabe*, 948 F. Supp. 2d at 1368) (cleaned
up).  Whether the particular circumstances of a case give rise to a duty to
disclose is generally a jury question. *ASC Constr. Equip. USA, Inc. v. City
Commer. Real Estate, Inc.*, 693 S.E.2d 559, 565 (Ga. Ct. App. 2010).

Here, Plaintiffs allege that Defendants (1) knew about the Rear
Subframe Defect (Doc. 25 ¶ 333), (2) failed to disclose the defect in the
Extended Warranty and other communications with customers (*id.* ¶¶ 374-76,
388-89), (3) actively concealed the defect (*id.* ¶¶ 388-89, 392), and (4) denied

the existence of the defect (*id.* ¶¶ 389(a), 394, 533). Plaintiffs further allege that the Rear Subframe Defect is "difficult to see, . . . even by a trained mechanic" and that they could not have discovered the existence of the Rear Subframe Defect despite their exercise of due diligence. (*Id.* ¶¶ 317, 394.) In light of these allegations, the Court concludes, as other judges in this district have on similar facts, that Plaintiffs plausibly allege that Defendants have concealed "intrinsic qualities" of the Class Vehicles which Plaintiffs could not have discovered through the exercise of ordinary prudence. *See e.g., Amin*, 301 F. Supp. 3d at 1296 (finding a duty to disclose where plaintiffs alleged that Mercedes knew about the defect, denied its existence, and actively concealed it); *Bolling*, 2024 WL 3972987, at *16 (finding a duty to disclose where plaintiffs alleged, *inter alia*, that Mercedes knew about but failed to disclose the defect, and that consumers could not discover the defect through reasonable diligence); *McCabe*, 948 F. Supp. 2d at 1368 (same); *Monopoli*, 2022 WL 409484, at *11-12 (same); *Nalley*, 2022 WL 18459646, at *6 (same).

Whether Mercedes had a duty of disclosure is a question of fact that is better suited for adjudication on a more developed record. At this early stage,

Plaintiffs have plausibly alleged Defendants' duty to disclose the existence of the Rear Subframe Defect.[40]

## 4. Reliance

The justifiable reliance element of a fraud claim requires the plaintiff to "allege specific facts to support a finding that he acted upon or refrained from acting upon [the defendant's] actions." *Dixon v. Branch Banking & Tr. Co.*, 824 S.E.2d 760, 766 (Ga. Ct. App. 2019). Defendants argue that Plaintiffs cannot state fraud claims because they "identify no specific advertisement, representation, or material" on which they relied in purchasing their vehicles. (Doc. 28 at 45-47.) But, again, Plaintiffs' fraud claims are based on alleged concealment and omission, not affirmative misrepresentations. "[A]llegations sufficient to show justifiable reliance on an *omission* differ from those sufficient to show reliance on a *misrepresentation*." *Monopoli*, 2022 WL 409484, at *10 (emphases in original). As Judge Grimberg explained in *Monopoli*:

> By the very nature of fraudulent concealment, plaintiffs cannot be expected to point to the time, place, and precise substance of what should have been disclosed. Rather, it is enough for plaintiffs to

---

[40] Defendants argue Plaintiffs fail to show that Mercedes had *exclusive* knowledge of the Rear Subframe Defect, because some of Plaintiffs' allegations with respect to the knowledge element come from publicly-available sources, such as consumer complaints that were viewable online. But they have cited no Georgia case that imposes such a requirement in the common law fraud context. The Court addresses this "exclusive-knowledge" argument below with respect to state consumer protection claims that require such a showing.

>   allege that a fact was material and that it could have, and should
>   have, been disclosed prior to the time plaintiffs acted upon the
>   omission.

*Id.* (citing *McCabe*, 948 F. Supp. 2d at 1368 and *Amin*, 301 F. Supp. 3d at 1296);

*see also Callen*, 2020 WL 10090879, at *15 ("While a claim for fraudulent

misrepresentation is typically premised on an affirmative misrepresentation

involving a specific statement made at a specific place and time, fraudulent

concealment or omission is premised on the defendant's failure to speak and is

by its very nature, difficult to plead with particularity." (cleaned up)).

Plaintiffs have plausibly alleged their justifiable reliance on the

omissions at issue.  The purportedly concealed fact—that the Class Vehicles'

rear subframes contain a dangerous defect that leads to premature failure—

was certainly "material."   In addition, Plaintiffs allege that Defendants'

omissions "played a significant role in the decision to purchase the Class

Vehicles" and that Plaintiffs "would not have purchased Class Vehicles, or

would have paid less for them" had they known about the alleged defect.  (Doc.

25 ¶¶ 534, 541.)  These allegations are sufficient to demonstrate Plaintiffs'

justifiable reliance on the alleged fraudulent omissions.  *See, e.g., Bolling*, 2024

WL 3972987, at *17 (holding that Plaintiffs adequately alleged justifiable

reliance where they pled that "(1) the Defendants knew about the defect, (2)

the Defendants failed to disclose the defect, and (3) the Fraudulent

Concealment Plaintiffs would not have paid as much for the Class Vehicles or would not have purchased them at all"); *Nalley*, 2022 WL 18459646, at *5 (concluding that plaintiffs adequately pled justifiable reliance where they alleged that "they would not have purchased the vehicles, or paid as much for them, had they known of the defect").

### 5. Causation

Defendants also argue that Plaintiffs fail to show causation because they have not specifically identified any particular representation from Mercedes that caused them to purchase their vehicles. (Doc. 28 at 45-47.) Like Defendants' reliance argument, however, this argument is premised on the notion that Plaintiffs are proceeding on a fraudulent misrepresentation theory of liability. Plaintiffs' briefing explains that they are not. (Doc. 31 at 43.) To show causation, a plaintiff must demonstrate that he would have acted differently had he known the truth and that he suffered economic loss as a result. *CSS Real Estate Dev. v. State Bank & Trust Co.*, 749 S.E.2d 773, 774-75 (Ga. Ct. App. 2013)). Plaintiffs have done so here, as they allege that they would not have purchased their vehicles, or would have paid less for them, had they known about the Rear Subframe Defect. (Doc. 25 ¶¶ 534, 541.)

### 6. Economic Loss Rule

Finally, Defendants argue that the economic loss rule bars Plaintiffs' fraudulent omission claims.  (Doc. 28 at 53.)  The economic loss rule provides that "a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort."  *GE v. Lowe's Home Ctrs., Inc.*, 608 S.E.2d 636, 637 (Ga. 2005).  Under the economic loss rule, "a plaintiff can recover in tort only those economic losses resulting from injury to his person or damage to his property[.]"  *Hanover Ins. Co. v. Hermosa Constr. Grp., LLC*, 57 F. Supp. 3d 1389, 1395 (N.D. Ga. 2014) (quoting *GE*, 608 S.E.2d at 637).

Georgia law, however, "recognizes an exception to the economic loss rule, known as the misrepresentation exception, under which '[o]ne who supplies information during the course of his business' owes an independent duty of reasonable care to parties who rely on that information and use the information as the supplier intended."  *Monopoli*, 2022 WL 409484, at *15 (quoting *Holloman v. D.R. Horton*, 524 S.E.2d 790, 796 (Ga. Ct. App. 1999)).  This exception applies to fraud claims alleging misrepresentation as well as concealment.  *Holloman*, 524 S.E.2d at 797 ("The economic loss rule is inapplicable in the presence of passive concealment or fraud.").  The economic loss rule therefore does not bar Plaintiffs' fraud claims.  *See, e.g., Monopoli*, 2022 WL 409484, at *15 (finding that fraudulent concealment claims fell

within Georgia's exception to the economic loss rule); *Bolling*, 2024 WL 3972987, at *17 (same).

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' fraudulent omission claims is denied.[41]

## I.  Statutory Consumer Protection Claims

Plaintiffs assert claims under the consumer protection statutes of their home states.  Defendants move to dismiss these claims.  With the exception of certain, state-specific arguments discussed below, Defendants' arguments for dismissal of the consumer protection claims are generally the same as those raised with respect to the common-law fraud claims.[42]

### 1.  Reliance and Causation

Defendants argue that Plaintiffs' California, Connecticut, Illinois, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, Texas, and Virginia consumer protection act claims fail because Plaintiffs have not identified a specific misrepresentation on which they relied and that caused

---

[41] Counts 8, 13, 19, 28, 33, 38, 43, 48, 53, 58, 63, 68, 73, 78, 83, 88, and 93.

[42] Specifically, MBUSA's motion to dismiss contains a single discussion of both the common-law fraud claims and the consumer protection claims, which Defendants refer to collectively as the "fraud-based claims."  (Doc. 28 at 25.)

them to be injured.[43]  (Doc. 28 at 28-30.)  As discussed with respect to the
fraudulent omission claims, however, Plaintiffs bring their claims on an
omission or concealment theory of liability, not based on affirmative
misrepresentations.  Each state identified above recognizes omission-based
consumer protection act claims.[44]  Plaintiffs' failure to plead an affirmative
misrepresentation therefore does not bar recovery on their consumer

---

[43] Defendants argue that Plaintiffs' Georgia and Florida consumer protection
statutory claims fail on this basis as well.  As discussed above, no Plaintiff has
a cause of action under the Georgia statutes, so those claims (Counts 5 and 6)
have been dismissed.  Moreover, the Florida consumer protection claim (Count
21) no longer remains in the case, as the Florida plaintiff has passed away.

[44] *See, e.g., Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 916 (C.D. Cal.
2010) (recognizing omissions-based claims under California's Unfair
Competition Law ("UCL") and Consumer Legal Remedies Act ("CLRA"));
*Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 140 (2d Cir. 2023) (Connecticut
Unfair Trade Practices Act ("CUTPA")); *Garland v. Child.'s Place, Inc.*, No. 23
C 4899, 2024 WL 1376353, at *5-6 (N.D. Ill. Apr. 1, 2024) (Illinois Consumer
Fraud and Deceptive Business Practices Act ("ICFA")); *Smith v. Capital One
Auto Fin., Inc.*, No. JKB-11-1023, 2011 WL 3328565, at *3 (D. Md. Aug. 2, 2011)
(Maryland Consumer Protection Act ("MCPA"))); *Tomasella v. Nestlé USA,
Inc.*, 364 F. Supp. 3d 26, 33 (D. Mass. 2019) (Massachusetts Chapter 93A);
*Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 652 (D.N.J. 2013)
(New Jersey Consumer Fraud Act ("NJCFA")); *Goshen v. Mut. Life Ins. Co.*,
774 N.E.2d 1190, 1195 (N.Y. Ct. App. 2002) (New York's General Business Law
§ 349(h)); *Desimone v. U.S. Claims Servs.*, No. 19-6149, 2020 WL 1164794, at
*3-5 (E.D. Pa. Mar. 11, 2020) (Pennsylvania Unfair Trade Practices and
Consumer Protection Law ("UTPCPL")); *Yumilicious Franchise, L.L.C. v.
Barrie*, 819 F.3d 170, 175 (5th Cir. 2016) (Texas Deceptive Trade Practices Act
("DTPA")); *Meng v. Drees Co.*, 77 Va. Cir. 442, 443 (Va. Cir. Ct. 2009) (Virginia
Consumer Protection Act ("VCPA")).

protection claims. Moreover, according to the well-pleaded complaint, Plaintiffs relied on Defendants' alleged omissions: They "would not have purchased Class Vehicles, or would have paid less for them" had they known of the concealed Rear Subframe Defect. (Doc. 25 ¶ 541.)

### 2. Pre-Sale Knowledge

Defendants argue that Plaintiffs' consumer protection act claims under California, Connecticut, New Jersey, New York, and Texas law fail because Plaintiffs have not sufficiently alleged Defendants' pre-sale knowledge of a defect. (Doc. 28 at 47-51.) For the reasons discussed *supra*, Section III(H)(2), Plaintiffs have adequately alleged Defendants' knowledge of the Rear Subframe Defect based on, *inter alia*, pre-production testing and data, consumer complaints, rear subframe replacement requests, and technical bulletins. Defendants have not identified any unique aspects of California, Connecticut, New Jersey, New York, or Texas law that would compel a contrary finding here with respect to Plaintiffs' consumer protection act claims.

### 3. Duty of Disclosure

Defendants argue, as they did with respect to the fraudulent omission claims, that Plaintiffs' statutory consumer protection claims fail because Plaintiffs have not adequately alleged a duty to disclose the Rear Subframe Defect. Plaintiffs do not dispute that the consumer protection statutes

pursuant to which they assert claims require a duty of disclosure. The Court explained above that Plaintiffs have pled such a duty under Georgia law. The consumer protection claims, however, require an analysis of the laws of each Plaintiff's home state.

"[T]he principle is recognized nearly universally that a manufacturer has a duty to disclose product defects when (1) it has superior knowledge of the problem, or (2) the defect implicates product safety." *In re Chrysler Pacifica Fire Recall Prod. Liab. Litig.*, 706 F. Supp. 3d 746, 770 (E.D. Mich. 2023). No one disputes this general proposition, and it is borne out by the comprehensive surveys of consumer protection statutes conducted by other courts. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *19-20 (D.N.J. May 8, 2017) (concluding that the consumer protection statutes of New York, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota, Nevada, New Hampshire, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, and Washington recognize a duty to disclose based on exclusive and superior knowledge of a defect or where a vehicle defect implicates safety); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) (finding that a "safety concern . . . gives rise to a duty to disclose" under the laws of California, Alabama, Arizona, Colorado, Connecticut, Florida, New Jersey, New York,

North Carolina, Ohio, Pennsylvania, and Texas); *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 686 (E.D. Mich. 2020) (recognizing that a duty to disclose exists under the laws of Illinois, Michigan, Missouri, New Jersey, New York, Ohio, and Pennsylvania where "the defendant either had exclusive knowledge of a defect, or the defect allegedly implicates vehicle safety"); *see also Chrysler Pacifica*, 2023 WL 8602971, at *15 (explaining that a duty to disclose arises from "superior and exclusive knowledge of the problem compared with buyers" in California, Kentucky, Massachusetts, Missouri, Rhode Island, Virginia, Pennsylvania, and Tennessee). This Court concludes that Plaintiffs may therefore show a duty of disclosure under the consumer protection laws of all relevant states by alleging facts to show that the Rear Subframe Defect implicates product safety and that Defendants had superior and exclusive knowledge of the defect relative to Plaintiffs.

With respect to product safety, Plaintiffs allege that the Rear Subframe Defect renders Class Vehicles "too dangerous to drive[.]" (Doc. 25 ¶ 10.) The defect allegedly causes "rear subframes to corrode to the point where [Plaintiffs'] vehicles [a]re no longer able to be operated safely and, in some cases, . . . they failed while the vehicle was in motion, causing the driver to partially or fully lose control of the vehicle." (*Id.* ¶ 394.) The Court finds these allegations sufficient to show that the alleged defect implicates product safety.

As for Defendants' knowledge of the defect, some states require only "superior" knowledge to give rise to a duty to disclose, while others require "superior *and* exclusive" knowledge. *Compare In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997) (duty to disclose arises under Missouri law where "one party has superior knowledge"), *and Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 553 (W.D. Mich. 1998) (duty to disclose can arise under Michigan law if "one party possesses superior knowledge, not readily available to the other and knows that the other is acting on the basis of mistaken knowledge"), *with Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) ("Pennsylvania . . . recognize[s] a duty to disclose where a defendant has exclusive and superior knowledge."). This distinction is immaterial here, as Plaintiffs have plausibly alleged that Defendants had both superior and exclusive knowledge of the defect.

Courts have generally found superior and exclusive knowledge where, for example, a defendant had knowledge of "information regarding the *full extent* of the defect" that was not available to the general public, *Francis*, 504 F. Supp. 3d at 685 (emphasis added), or where "the defendant knew of a defect while the plaintiffs did not and, 'given the nature of the defect, it was difficult to discover,'" *Persad*, 2018 WL 3428690, at *3 (quoting *MyFord Touch*, 46 F.

Supp. 3d at 960); *see also In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 965 (E.D. Mich. 2022) (finding exclusive knowledge of a defect under New York law where defendant had knowledge of a latent defect and "stood in a position of superior knowledge to any purchaser").

Defendants contend that Plaintiffs' allegations of publicly available information—such as online complaints about the defect—preclude a finding that they had "exclusive" knowledge of the defect. Plaintiffs, however, allege that pre-sale testing provided Mercedes with knowledge of the defect before any Class Vehicle went to market and before any Plaintiff purchased their vehicle. (Doc. 25 ¶¶ 334-37.) The knowledge acquired from that pre-sale testing was certainly "exclusive," as there is no indication that the results and data from these tests were available to the public. (*Id.* ¶ 337.) Even after the Class Vehicles went to market, Plaintiffs allege that Mercedes had access to certain information regarding the defect that was not publicly known. (*See, e.g., id.* ¶ 349 (stating that Mercedes would have "detailed and accurate data regarding the number and frequency of replacement part orders, including replacement rear subframes"); *id.* ¶ 352 ("The full universe of complaints made directly to Mercedes about the Rear Subframe Defect is information presently in the exclusive custody and control of Mercedes").) Such information would have given Mercedes exclusive knowledge regarding the full extent of the

nature and risk of the alleged defect that the public did not have. Moreover, Plaintiffs allege that the internal nature of the Rear Subframe Defect rendered it difficult for even trained mechanics to discover and that, "despite their exercise of due diligence," Plaintiffs could not discover the defect until their cars were no longer operable due to corrosion. (*Id.* ¶¶ 317, 394.)

Accepted as true, the CAC's detailed allegations establish that, despite the presence of certain, publicly available information, Mercedes had superior and exclusive knowledge of the defect, thus giving rise to a duty to disclose. *See, e.g., Francis*, 504 F. Supp. 3d at 685 (rejecting argument that public information from NHTSA and online forums precluded a finding of "exclusive" knowledge); *In re Volkswagen Timing Chain*, 2017 WL 1902160, at *19 (holding that defendant's knowledge of a defect through pre-production testing, consumer complaints, warranty data gathered from dealerships, and NHTSA complaints gave rise to a duty to disclose under New York, California, Connecticut, Michigan, Maryland, and Pennsylvania law).

### 4. Whether Plaintiffs' CLRA and Massachusetts Chapter 93A Claims Fail for Lack of Pre-Suit Notice

Defendants seek dismissal of Plaintiffs' California Consumer Legal Remedies Act claim (Count 10) and Massachusetts Chapter 93A claim (Count 40) because Plaintiffs allegedly failed to provide 30-days' notice before

initiating this lawsuit.  *See* Cal. Civ. Code § 1782 (stating that at least 30 days prior to commencing suit, the plaintiff must notify the defendant of the alleged CLRA violation and demand that the defendant cure the allegedly violative goods); Mass. Gen. Laws ch. 93A, § 9(3) (requiring 30-day pre-suit notice of the allegedly unfair or deceptive act and the injury suffered).

The relevant Plaintiffs do not dispute that they failed to provide 30-days' notice prior to filing suit.  They did not send a notice letter to Defendants until April 28, 2023—after this lawsuit was filed on February 10, 2023, and less than 30 days before the filing of the CAC on May 1, 2023.  (Doc. 25 ¶ 575 n.2; Doc. 25-6.)  This untimely notice, however, does not bar the CLRA and Chapter 93A claims.  Under the CLRA, a plaintiff may "alternatively file suit for injunctive relief without notice, give notice of intent to amend the claims to add a claim for damages, and amend thirty days after the notice."  *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) (citing Cal. Civ. Code § 1782(d)). California Plaintiff Neil's CLRA claim sought only injunctive relief (Doc. 25 ¶ 575), and the April 28, 2023, letter notified Defendants of Ms. Neil's intent to seek damages under the CLRA (*id.* at 198 n.2; Doc. 25-6).  The CAC also notes Plaintiffs' intent to seek leave to amend to incorporate a claim for damages under the CLRA.  (Doc. 25 at 198 n.2.)  Thus, Ms. Neil has complied with the CLRA's notice provision.

As for Chapter 93A, it appears that Plaintiffs failed to comply with the letter of the statute's notice requirement. *See Burns ex rel Off. of Pub. Guardian v. Hale & Dorr LLP*, 445 F. Supp. 2d 94, 96 (D. Mass. 2006) ("As a prerequisite to commencing a legal action under [Chapter 93A], the plaintiff must deliver to the purported violator a 'written demand for relief' which identifies the claimant and the allegedly wrongful conduct at least 30 days prior to the filing of a complaint."). However, "[a] failure to allege compliance with the statutory notice requirement is not necessarily a death knell for a Chapter 93A claim." *Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 20 (1st Cir. 2004). Massachusetts courts have generally "excused noncompliance with the demand requirement where the unique circumstances of the case demonstrate that the purposes of the demand requirement have been met or where plaintiffs have made efforts to cure a failure to deliver a demand letter." *Ryan v. Greif, Inc.*, No. 22-CV-40089-MRG, 2023 WL 8828220, at *20 (D. Mass. Dec. 21, 2023) (collecting cases).

In *Burns*, for example, the district court declined to dismiss a plaintiff's Chapter 93A claim on procedural grounds where she failed to deliver a pre-suit notice letter but "sent such a letter nearly one month prior to the filing of defendants' answer and thereafter moved to amend her complaint in order to plead that demand." 445 F. Supp. 2d at 97. Like in *Burns*, the notice letter

here (Doc. 25-6) was delivered to Defendants on April 28, 2023, nearly two months before MBUSA responded by filing its motion to dismiss.  The CAC, moreover, states that Mr. Russolillo had provided notice of Defendants' alleged violations of Chapter 93A pursuant to the statute's notice requirement.  (Doc. 25 ¶ 1045.)[45]  Consistent with the cases discussed above, the Court finds that Mr. Russolillo has pled adequate notice under Chapter 93A.

### 5. Whether the Michigan Consumer Protection Act Allows Claims Related to Automotive Transactions

Defendants seek dismissal of Mr. Jacobs's claim under the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §§ 445.901, *et seq.* (Count 45), arguing that transactions relating to motor vehicles are exempt from the statute's coverage because Michigan separately regulates motor vehicle sales, and the MCPA provides an exemption for such separately regulated transactions.  Plaintiffs argue that Defendants have not made an adequate showing as to the applicability of the MCPA exemption.

---

[45] It is further alleged that Plaintiffs sent Mercedes earlier letters (dated December 9, 2022, December 21, 2022, March 8, 2023, and March 27, 2023) pursuant to the Georgia Fair Business Practices Act, "requesting relief and repair of the defects exhibited in Class Vehicles" that were "sufficient to constitute notice of Mr. Russolillo's claims, as they [were] substantively identical to those of the Plaintiffs named in the letters."  (Doc. 25 ¶ 95.)

"The MCPA prohibits a number of '[u]nfair, unconscionable, or deceptive' practices in trade or commerce." *Shaker v. Champion Petfoods USA Inc.*, 625 F. Supp. 3d 621, 627 (E.D. Mich. 2022) *(*citing Mich. Comp. Laws § 445.903). "But by its own terms, the MCPA does not apply to a 'transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States.'" *Id.* (citing Mich. Comp. Laws § 445.904). The burden of proving an exemption is "upon the person claiming the exemption." Mich. Comp. Laws § 445.904(4).

To determine whether the MCPA exemption applies, "the relevant inquiry 'is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Liss v. Lewiston–Richards, Inc.*, 732 N.W.2d 514, 518 (Mich. 2007) (quoting *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999)). "Conduct is 'specifically authorized' when the general transaction is 'explicitly sanctioned' by law." *Shaker*, 625 F. Supp. 3d at 627 (quoting *Liss*, 732 N.W.2d at 520).

Defendants argue generally and without reference to any specific statute or regulation that the MCPA exemption applies because Plaintiffs' claims relate to automotive transactions. (Doc. 28 at 54-55.) The legal framework recited above, however, suggests that the MCPA-exemption analysis is not so clear cut. "[H]istorically, application of the exception by Michigan courts has

involved careful parsing of the 'authorizing' statute's language to ensure that it covers the transaction at issue." *Francis*, 504 F. Supp. 3d at 691 (citation omitted). Defendants have not cited the statute or regulation that they contend would cover the transaction at issue. The Court therefore cannot perform the "careful parsing" required to apply the MCPA exemption. Although Defendants have cited some Michigan cases that have adopted the argument they ask the Court to accept here, (Doc. 28 at 54-55), the Court will decline to dismiss Plaintiffs' MCPA claim (Count 45) without the benefit of more detailed briefing on the matter.[46]

### 6. Whether the Kentucky Consumer Protection Act Claim Fails for Lack of Privity

Defendants seek dismissal of Ms. Turner's claim under the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, (Count 30), on the ground that Ms. Turner purchased her vehicle from a third-party seller, (Doc. 25 ¶ 62), and therefore lacks contractual privity with Mercedes. "[T]he KCPA requires that privity of contract exist between the

---

[46] *See, e.g., In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 643 (E.D. Mich. 2019) ("[G]M has not yet identified a specific statutory provision that purports to authorize the transactions at issue here. In the absence of such a detailed statutory analysis, the Court declines to hold, at this time, that the exemption bars Steketee's MCPA claim. The Court will revisit this issue on summary judgment.").

parties." *House v. Bristol-Myers Squibb Co.*, No. 3:15-CV-00894-JHM, 2017 WL 55876, at *7 (W.D. Ky. Jan. 4, 2017) (citing *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992)); *Keaton v. G.C. Funeral Home, Inc.*, 436 S.W. 538, 546 (Ky. Ct. App. 2013) ("Claims may only be brought under the KCPA by individuals who personally purchase goods or services from a merchant.").

Plaintiffs acknowledge Ms. Turner's lack of privity but argue that, under *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727 (W.D. Ky. 2013), an exception exists where a claim is asserted "against a manufacturer making an express warranty that includes an end-user customer (like Ms. Turner)." (Doc. 31 at 42.) Subsequent courts, however, have declined to follow *Naiser* and found that no such exception exists under Kentucky law. *See, e.g., Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 962 (E.D. Ky. 2019) (noting that *Naiser* "broke ranks" from Kentucky courts applying "the clear holding in *Skilcraft* requiring privity"); *Burton v. Ethicon Inc.*, No. CV 5:20-280-DCR, 2020 WL 5809992, at *8 (E.D. Ky. Sept. 29, 2020) ("It does not appear that any judge in this district has applied the exception created in *Naiser* and the undersigned declines to do so now."); *In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 20-MD-02938-DJC, 2023 WL 8810517, at *16 (D. Mass. Dec. 20, 2023) ("Courts analyzing Kentucky law have since declined to

follow *Naiser's* exception to the privity requirement.").  The Court therefore declines to follow the exception articulated in *Naiser* and finds that Ms. Turner's KCPA must be dismissed for lack of privity.  Ms. Turner's KCPA claim (Count 30) is dismissed.

### 7. Whether Ms. Neil's Claims Under California Law Fail for Lack of Injury

Finally, Defendants contend that the California Plaintiff, Ms. Neil, cannot state claims under California state law (Counts 10-15) because her vehicle has not exhibited any subframe corrosion and she has not suffered a personal injury.  (Doc. 28 at 55-56.)  Defendants cite *Am. Suzuki Motor Corp. v. Superior Ct.*, 44 Cal. Rptr. 2d 526 (Ct. App. 1995), for the proposition that "'class-action plaintiffs' who 'have suffered no personal injury or property damage from a vehicle they claim is defectively designed' and whose vehicles have 'remained fit for their ordinary purpose' fail to state a claim" under California law.  (Doc. 28 at 39 (quoting *Suzuki*, 44 Cal. Rptr. 2d at 527).)

The rule articulated in *Suzuki* (which is relevant only to implied warranty claims) applies where the allegedly defective vehicle "remained fit for [its] ordinary purpose."  44 Cal. Rptr. 2d at 531.  As discussed above with respect to the implied warranty claims, Plaintiffs have plausibly alleged that

the Class Vehicles were *not* fit for their ordinary purpose.  Ms. Neil's claims are therefore not barred.

In sum, Plaintiffs' Kentucky consumer protection claim (Count 30), based on the KCPA, is dismissed for lack of privity.  The Georgia (Counts 5 & 6) and Florida (Count 21) consumer protection claims fail because there are no plaintiffs who can assert them.  Defendants' motion to dismiss is denied with respect to the remaining consumer protection claims.[47]

### J. Unjust Enrichment

Defendants seek dismissal of Plaintiffs' common-law unjust enrichment claims.  For the reasons stated above, Georgia's choice-of-law rules require application of Georgia law to these claims.  *See, e.g., Monopoli*, 2022 WL 409484, at *4-5 (applying Georgia common law to out-of-state plaintiffs' unjust enrichment claims, where, as here, the parties identified no foreign statute that would govern such claims).  Defendants argue that the existence of valid warranties precludes unjust enrichment claims.

"The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated."  *May v. S.E. GA Ford, Inc.*, 811 S.E.2d 14,

---

[47] Counts 7, 10, 15, 16, 26, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, and 90.

18 (Ga. 2018); *St. Paul Mercury Ins. Co. v. Meeks*, 508 S.E.2d 646, 648 (Ga. 1998) ("[U]njust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract." (cleaned up)). "A claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails." *Wachovia Ins. Servs. v. Fallon*, 682 S.E.2d 657, 665 (Ga. Ct. App. 2009) (cleaned up).

The existence of valid warranties in this case precludes Plaintiffs' unjust enrichment claims. Although Plaintiffs argue that certain limitations in the NVLW are unenforceable, they do not dispute the underlying validity of the contract. *See In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, No. 1:13-CV-2195-TWT, 2014 WL 3360233, at *3 (N.D. Ga. July 9, 2014) (dismissing an unjust enrichment claim where "Plaintiffs allege[d] that the Defendant ha[d] not honored warranty claims . . . and that the warranty contain[ed] unenforceable *limitations*, [but] they never den[ied] the general validity of the warranty."). In fact, Plaintiffs' express warranty claims are predicated on the validity of the NVLW because they seek a repair/replacement remedy that is provided under that warranty. Plaintiffs "may not rely on unjust enrichment" because "[a] legal contract governs the dispute at issue[.]" *Bonem v. Golf Club of Ga., Inc.*, 591 S.E.2d 462, 467 (Ga. Ct. App. 2003); *see also Callen*, 2020 WL 10090879, at *13 (dismissing unjust enrichment claim

where Plaintiffs did "not dispute that the parties [were] bound by the terms of the" warranties.); *Pinon,* 2019 WL 11648560, at *13 (dismissing unjust enrichment claims, even where plaintiffs' express warranty claims did not survive the motion-to-dismiss, because it was "undisputed that express contracts—the NVLWs—govern the subject-matter of this dispute."). Finally, "'a plaintiff may not plead an unjust enrichment claim in the alternative to a claim for breach of contract when it is undisputed . . . that a valid contract exists.'" *Atlas*, 2014 WL 3360233, at *3 (quoting *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1310 (N.D. Ga. 2012); *Pinon,* 2019 WL 11648560, at *13. Thus, Plaintiffs' unjust enrichment claims are dismissed.[48]

---

[48] Counts 9, 14, 20, 29, 34, 39, 44, 49, 54, 59, 64, 69, 74, 79, 84, 89, and 94.

## IV.   Conclusion

The claims brought on behalf of the Florida subclass (Counts 21, 22, 23, 24, and 25) are **DISMISSED** due to Mr. Averbach's death.   MBUSA's and MBG's motions to dismiss (Doc. 28, 32) are **GRANTED IN PART and DENIED IN PART** as set forth in this order.   The Court's disposition of Defendants' motions is summarized in the table below.

| Claim | Motion to Dismiss Disposition |
|---|---|
| Breach of Express Warranty Claims (Counts 1, 11, 17, 27, 31, 36, 41, 46, 51, 56, 61, 66, 71, 76, 81, 86, and 91) | Granted |
| Magnuson-Moss Warranty Act Claims (Counts 3 and 4) | Granted |
| Georgia, Kentucky, Ohio, and Tennessee Implied Warranty Claims (Counts 2, 32, 67, and 82) | Granted |
| All Other Implied Warranty Claims (Counts 12, 18, 37, 42, 47, 52, 57, 62, 72, 77, 87, and 92) | Denied |
| Fraudulent Omission Claims (Counts 8, 13, 19, 28, 33, 38, 43, 48, 53, 58, 63, 68, 73, 78, 83, 88, and 93) | Denied |
| Georgia and Kentucky Statutory Consumer Protection Claims (Counts 5, 6, and 30) | Granted |
| All Other Statutory Consumer Protection Claims (Counts 7, 10, 15, 16, 26, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, and 90) | Denied |
| Unjust Enrichment Claims (Counts 9, 14, 20, 29, 34, 39, 44, 49, 54, 59, 64, 69, 74, 79, 84, 89, and 94) | Granted |

Plaintiffs' motion to open discovery pending resolution of the motions to dismiss (Doc. 61) is **DENIED AS MOOT** as the motions to dismiss have now been adjudicated.  The discovery period will begin 30 days after the appearance of the first defendant by answer to the complaint, unless the parties consent to begin earlier.  Local Rule 26.2(A), NDGa.

**SO ORDERED** this 31st day of December, 2024.

SARAH E. GERAGHTY
United States District Judge