IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: ARC ARIBAG INFLATORS PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 3051<br>1:22-md-3051-TWT<br><br>ALL CASES |

**OPINION AND ORDER**

This matter is presently before the Court on 24 motions, chiefly Defendants' collective and individual motions to dismiss and Plaintiffs' motions for jurisdictional discovery. [Docs. 178–88, 272, 279, 287, 289, 294, 305, 309, 311, 319, 322, 328].[1] Also pending are Plaintiffs' Motion for Oral Arguments on Motions to Dismiss [Doc. 252] and Motion for Leave to File Sur-Reply In Opposition to Defendants' Motion to Dismiss [Doc. 256] which are DENIED.[2] The Parties have fully briefed the pending motions, and the Court addresses each of them in this omnibus order.

[1] Unless otherwise indicated, all citations are to the electronic docket, and any included page number references are to the page numbers imprinted by the Court's docketing software.

[2] Plaintiffs direct these two motions to the first wave of the motions to dismiss, that is to the motions filed by those Defendants who were first served and appeared before Plaintiffs served a second set of Defendants. The first wave of motions mainly focus on the merits of the claims, while the second wave of motions, filed by the later-served Defendants, mainly challenge the Court's exercise of personal jurisdiction. The Parties have briefed the issues raised in those motions in their written submissions, and the Court does not require oral argument to further assist its deliberation. Thus, the Court denies the motion. The Court also denies the motion for leave to file sur-reply. "Absent extraordinary circumstances, not present here, sur-replies are not allowed." *Parker v. Selene Fin., LP*, 2024 WL 3833853, at *2 (N.D. Ga. July 8, 2024), *R.*

## I. Background[3]

This is a multidistrict litigation (MDL) with over 20 consolidated cases. [*See* Docs. 1, 2, 119]. In their operative pleading—i.e., the Corrected Consolidated Class Action Complaint ("Second Amended Complaint" (SAC))[4]—Plaintiffs allege that their vehicles have defective airbag inflators. SAC Vol. I ("SAC I") ¶ 1 [Doc. 157]. They seek to hold three sets of defendants liable: (1) the manufacturer of the allegedly defective airbag inflators, ARC Automotive, Inc. ("ARC"; referred to in the automotive industry as a "Tier 2 supplier"); (2) the airbag manufacturers who supplied airbag modules comprising the allegedly defective ARC airbag inflators ("Airbag Suppliers"; referred to in the industry as "Tier 1 suppliers"); and (3) the auto manufacturers and distributors who incorporated those airbag modules into

*& R. adopted* 2024 WL 4251742 (N.D. Ga. July 26, 2024). To the extent that, as Plaintiffs contend, Defendants misrepresent Plaintiffs' position on a given issue, the Court can recognize such a misrepresentation. And to the extent the Court considers a reply brief to have raised a new argument, it will recognize and disregard such an argument. *See Boring v. Pattillo Indus. Real Est.*, 426 F. Supp. 3d 1341, 1349 (N.D. Ga. 2019) (refusing to consider new arguments raised for the first time in a reply brief); *Stevenson v. Great Am. Dream, Inc.*, 2015 WL 3650384, at *2 (N.D. Ga. June 11, 2015) (noting that where a party raises a new argument in a reply brief, the court has the option to give the opposing party an opportunity to address the new argument or to disregard it).

[3] For purposes of the present motions to dismiss for failure to state a claim, the Court accepts "the factual allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff[s]." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

[4] For ease of reference, in this order, the Court refers to the Corrected Consolidated Class Action Complaint as the SAC. The SAC comprises two volumes: SAC Vol. I, [Doc. 157], and SAC Vol. II, [Doc. 157-1].

"Class Vehicles" that they manufactured, distributed, marketed, and sold ("Automakers"). *See* SAC I ¶¶ 18–19, 24, 263. Plaintiffs identify Class Vehicles as certain models and model years of the following vehicles makes: Audi; Mini Cooper; BMW; Chrysler; Dodge; Jeep; Ford; Lincoln; Mercury; Buick; Cadillac; Chevrolet; GMC; Hummer; Isuzu; Oldsmobile; Pontiac; Saab; Saturn; Hyundai; Kia; Porsche; and Volkswagen. *Id.* ¶ 375; SAC, Ex. E [Doc. 157-2 at 55].

Plaintiffs allege that the airbag inflators that ARC manufactured between 2001 and 2018 for the driver and passenger side airbags of the Class Vehicles ("ARC airbag inflator" or "ARC inflators") are defectively designed. SAC I ¶¶ 18–21, 272, 297–301. Airbag systems use a controlled explosion to rapidly inflate the airbag cushion when a collision occurs. *Id.* ¶ 270. A chemical propellant creates the explosive charge, and it is housed in a metal canister, the airbag inflator, which controls its release. *Id.* The ARC airbag inflators use ammonium nitrate, a highly explosive and unstable propellant known to be associated with airbag ruptures and requiring properly designed and engineered ventilation measures. *Id.* ¶ 272, 279, 282. The ARC airbag inflators were assembled using a "friction welding process [that] allowed for the chance that asymmetrical and brittle weld flash [(excess metal that collects at the seam of two pieces being welded)] could form at the seams of any inflator." *Id.* ¶ 288, 291. When exposed to gas flow during airbag deployment, pieces of the asymmetrical weld flash near the gas exit port of the airbag inflator may

dislodge. *Id.* 293. If a dislodged weld flash is large enough to block the gas exit port, it restricts the exit, causing the pressure in the inflator housing to increase. *Id.* The increased pressure ultimately ruptures the airbag inflator and propels some of its parts towards the vehicle occupant, resulting in injury or death. *Id.* ¶ 294. The rupture may also cause the airbag module itself to break free and strike the occupant, with the same result. *Id.* ¶ 295. Plaintiffs maintain that all ARC airbag inflators have "asymmetrical and unstable weld 'flash' in the interior of the inflator housing combined with insufficient ventilation using a single exit orifice" ("Inflator Defect" or "Defect"), which causes the ARC airbag inflators to rupture when the airbags housing them are deployed. *Id.* ¶ 283.

At least ten ARC airbag inflators, seven on the driver's side and 3 on the passenger side, have ruptured. SAC I ¶ 335. Two of the ruptures resulted in driver fatalities. *Id.* Two inflators ruptured during Lot Acceptance Testing (LAT) at ARC's factory. *Id.* To date, none of Plaintiffs' vehicles have had an airbag inflator rupture, and no Plaintiff claims that he or she had been injured by an ARC airbag inflator rupture. But after a years-long investigation, on April 27, 2023, the National Highway Traffic Administration (NHTSA) "tentatively concluded that a defect related to motor vehicle safety exists in the frontal driver and passenger air bag inflators under investigation that were produced before . . . January 2018[.]" *Id.* ¶¶ 1, 6. The 67 million allegedly defective ARC airbag inflators are incorporated into the airbag modules of the

vehicles of 12 major vehicle manufacturers. *Id.* ¶ 1. Although the NHTSA demanded that ARC recall its airbag inflators, ARC has not done so. *Id.* ¶ 1, 4. And while some Automakers have issued recalls, these recalls, limited to a few makes and models, are inadequate in scope. *Id.* ¶¶ 6–7.

According to Plaintiffs, "ARC, the Airbag [Suppliers], and the Automaker[s] . . .shared information and worked together throughout the design, manufacturing, assembly and investigation process" of the ARC inflators, engaged with each other to ensure that the "inflators were designed, manufactured, and tested to meet the Tier 1 and Automaker requirements," and, thus, the Airbag Suppliers and the Automakers would have reviewed and approved before the ARC inflators were produced, purchased, and installed. SAC I ¶¶ 264–266.

Plaintiffs, for themselves and on behalf of members of a putative plaintiff class of buyers or lessees of Class Vehicles, assert claims for fraud for the failure to disclose and for concealing the Defect and violations of state consumer protection laws against all three sets of Defendants. SAC II ¶¶ 434–770, 789–4176. Against the Automakers, they additionally assert a false advertising claim under California law, *id.* ¶¶ 771–788, and unjust enrichment and breach of warranty claims under the laws of all 50 states and the District of Columbia, *see e.g., id.*, ¶¶ 821–854, 1509–1545. They also assert nationwide claims for fraud against all Defendants and for unjust enrichment against the Automakers. *See id.* ¶¶ 408–433. Defendants, in groups and

individually, challenge Plaintiffs' claims for various reasons. Chief among the challenges are (1) the Court's lack of personal jurisdiction over certain foreign Automakers and a foreign Airbag Supplier; (2) lack of personal jurisdiction over ARC in transferor courts outside of Tennessee; (3) Plaintiffs' lack of standing to assert claims under laws of states other than the state under which their individual claims arise; (4) improper shotgun pleading; and (5) Plaintiffs' failure to state cognizable claims. The Airbag Suppliers and the domestic Automakers ("U.S. Automakers") Audi of America, LLC ("Audi"), BMW of North America, LLC ("BMW America") and BMW Manufacturing Co. ("BMW Manufacturing" and together with BMW America, "BMW"), FCA US LLC ("Fiat Chrysler"), Ford Motor Company ("Ford"), General Motors LLC (GM), Hyundai Motor America ("Hyundai"),[5] Kia America, Inc. ("Kia"), Porsche Cars North America, Inc. ("Porche"), and Volkswagen Group of America, Inc. ("Volkswagen") seek dismissal on behalf on their Defendant group. Several other Defendants, including ARC, the individual U.S. Automakers, and the foreign Automakers, seek dismissal on an individual basis.

Below, the Court analyzes these and the other issues raised in the numerous motions to dismiss filed by Defendants. The Court first takes up the

[5] The SAC does not name "Hyundai Motor America" as Defendant or otherwise reference this entity. However, the SAC does name as Defendants "Hyundai America, Inc." a domestic corporation and "Hyundai Motor Group" and "Hyundai Motor Company," both foreign corporations. SAC I ¶¶ 110–113. It appears that "Hyundai Motor America" is Defendant Hyundai America, Inc., and the Court proceeds under this understanding.

personal jurisdiction challenges, then addresses the standing challenge, and reserves the remainder of this order for the numerous challenges to the merits of Plaintiffs' claims.

Before turning to the substance of the Parties' arguments, the Court addresses the following "housekeeping" matters. **First**, the Court does not recognize arguments incorporated by reference in support of or in opposition to a motion. Here, many movants and respondents employ this tactic. [*See, e.g.*, Docs. 178 at 1–5; 179 at 4–5; 187 (*passim*); 188-1 at 8 n.3; 228 at 7; 279 at 1; 289 at 1; 305 at 1]. Arguments incorporated by reference "serve[] only to circumvent the [page limitations in the] Local Rules and lead the Court through a paper maze of filings." *Murdock v. Am. Mar. Officers Union Nat'l Exec. Bd.*, 2022 WL 18024476, at *2 (S.D. Fla. July 13, 2022); *Gov't Emps. Ins. Co. v. Path Med.*, 2018 WL 11487963, at *1 (M.D. Fla. Mar. 2, 2018) ("These 'Hey, Judge! What he said!' cross-references are inappropriate and unduly tax the Court's resources."); *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004) (incorporation of arguments by reference "makes a mockery of [court] rules governing page limitations and length"). Thus, the Court addresses only those arguments that are fully raised in each brief and does not address those arguments that a movant or respondent "incorporates" or "joins" by reference to another filing.

**Second**, the Parties have abused the Court's page limit restrictions in two additional ways. The movants and respondents reserve case law citations

for footnotes and include single-spaced footnotes that take over substantial portions of a given brief and bleed from one to the next because no space separates them. [*See, e.g.*, Doc. 220 at 34–40; 246 at 18–28]. While the Court appreciates the complexities of the briefing involved,[6] going forward, it expects the Parties to reserve footnotes in their briefs for supplemental information rather than serving as a depository for the case law on which they rely. Even more problematically, certain briefs reserve citations to, or discussions of, the authority in support of a given position to charts appended to the brief. [*See, e.g.*, Docs. 178-3, 181-3, 181-5, 181-7, 221-1, 249-1, 249-2]. The Court expects to review the law and the arguments supporting a given position in the brief itself and will not entertain future briefs that reserve legal citations and explanations for appended documents *or* use appended documents to further supplement legal analysis.

**Third**, the Court cautions the Parties that a notice of supplemental authority is not an opportunity to rehash arguments on a given issue. Here, the notices of supplemental authority filed by the Parties summarize the aspects of the supplemental authority that the filing Party considers favorable. [*See* Docs. 267, 276, 286, 291, 300]. This then triggers a round of briefing. [*See* Docs. 268, 269, 278, 297, 298, 307, 320,]. The Court understands that the Party drawing the Court's attention to supplemental authority is likely doing so

[6] For this reason, the Court granted page limit extensions to those who requested them.

because it considers the authority to favor its position, and it can analyze an authority and determine its weight and relevance. Going forward, the Parties should restrict any notices of supplemental authority to a statement identifying the authority, with the authority attached as an exhibit. The Court shall disregard any additional information included in such a notice and will not consider any responses or replies.

## II. Lack of Personal Jurisdiction

ARC and several of the foreign Defendants challenge personal jurisdiction. But while the foreign Defendants argue that the Court lacks personal jurisdiction over them and, thus, that they should be dismissed as Parties to this litigation, ARC contends that some (but not all) of the transferor courts lack personal jurisdiction and, thus, that the Court should dismiss certain of the transferred actions against ARC. The Court begins its analysis by setting out the legal standard applicable to personal jurisdiction challenges generally and then addresses ARC's personal jurisdiction argument, followed by the argument of each of the foreign Automakers.

### A. Legal Standard

In MDL proceedings, "following transfer under [28 U.S.C. §] 1407, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1137 (S.D. Fla. 2019) ("*Takata I*"). As such, for the cases transferred

to the MDL, "the Court must determine whether the transferor district courts had [personal] jurisdiction over the . . . [challenging] Defendants; and for [those cases filed directly in this District], the Court must determine whether *it* can exercise [personal] jurisdiction over the . . . [challenging] Defendants. *Id.*

"Personal jurisdiction can arise specifically or generally from a defendant's contacts in the state." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

> A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State. Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation modified). "The paradigm forums in which a corporate defendant is 'at home' are the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 403 (2017). General personal jurisdiction over the foreign Defendants and ARC is not at issue; Plaintiffs contend that the jurisdiction-challenging Defendants are subject to the Court's exercise of specific personal jurisdiction.

"A federal court sitting in diversity," as here, "undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United

States Constitution." *See Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010) (internal quotation marks omitted) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). "When a federal court uses a state long-arm statute, because the extent of the statute is governed by state law, the federal court is required to construe it as would the state's supreme court." *Id.* at 1258 (quoting *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1265 (11th Cir.1998)).

"If a state's long-arm statute is satisfied, the next step is to assess personal jurisdiction under constitutional due process principles," with the aid of "a three-part test." *Ekpo v. Playa Mgmt. USA, LLC*, 2022 WL 2048665, at *2 (N.D. Ga. June 7, 2022) (first quote); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313 (11th Cir. 2018) (second quote).

First, courts consider whether the plaintiffs have established that their claims arise out of or relate to at least one of the defendant's contacts with the forum. *Id.* Second, courts ask whether the plaintiffs have demonstrated that the defendant purposefully availed itself of the privilege of conducting activities within the forum state. *Id.* Third, courts "consider whether the defendant has made a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.*

The "plaintiff . . . bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal*, 593 F.3d at 1257 (citation modified); *see also United States ex rel.*

*Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1356 (11th Cir. 2021) ("To establish personal jurisdiction over a nonresident defendant, the plaintiff has the burden of establishing a prima facie case by presenting enough evidence to withstand a motion for directed verdict." (citation modified)). In evaluating a plaintiff's prima facie case of personal jurisdiction on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "[t]he district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). "[I]f the complaint alleged sufficient facts, and the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Diulus v. Am. Express Travel Related Servs. Co.*, 823 F. App'x 843, 848 (11th Cir. 2020) (citation modified); *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006) (explaining that where the defendant contests the allegations in the complaint through affidavits, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction"). "And where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must draw all reasonable inferences in the plaintiff's favor." *Mortg. Invs.*, 987 F.3d at 1356 (citation modified).

### B. Jurisdiction Over ARC

For the 17 cases filed against ARC across nine states, ARC maintains that it is not subject to personal jurisdiction in any of the forums except Tennessee, where it has its principal place of business.[7] [Doc. 179-1 at 16–22]. Plaintiffs counter that because ARC is subject to personal jurisdiction in Tennessee and the Tennessee cases, including *Anderson v. ARC Auto., Inc.*, No. 23-CV-00233 (E.D. Tenn. June 30, 2023), were transferred to this MDL as member cases, this Court has personal jurisdiction over ARC to adjudicate the claims asserted in the SAC. [Doc. 219 at 18–19]. ARC, however, does not challenge the Court's pretrial authority to oversee the claims against it in this MDL; rather, it contests personal jurisdiction in transferor courts outside of Tennessee. [*See* Doc. 245 at 8].

"Every federal court to have considered the issue has affirmed that the transferee court can exercise personal jurisdiction to the same extent that the transferor court could." *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1379 (J.P.M.L. 2020). Thus, for the cases against ARC filed outside of Tennessee, the question before the Court is whether the transferor courts had personal jurisdiction over ARC. ARC says no. It argues, and Plaintiffs do not contest, that it is not subject to general personal jurisdiction in any of the states, except Tennessee, where it was sued. [Doc. 179-1 at 19]. ARC also

[7] ARC is incorporated in Delaware, but no case was filed against ARC in that state. [Doc. 179-1 at 19 & n.4].

argues that the SAC lacks facts to support the exercise of specific jurisdiction against ARC in the non-Tennessee cases because, for example, the SAC fails to allege facts indicating that ARC purposefully directs its activities at residents in those states. [Doc. 179-1 at 20–21] Plaintiffs do not dispute this argument either. Rather, they propose that the Court focus on the merits of the claims asserted in the SAC and leave ARC to re-raise its personal jurisdiction challenge "[i]f and when this Court remands those cases to their transferor courts." [*See* Doc. 219 at 19].

ARC's challenge is properly raised under Rule 12(b)(2), and Plaintiffs neither provide nor does the Court perceive any compelling reason to defer its adjudication. Plaintiffs have failed to rebut ARC's argument that it is not subject to personal jurisdiction in the non-Tennessee cases. Accordingly, the Court **GRANTS** ARC's motion to dismiss, [Doc. 179], to the extent that it **DISMISSES WITHOUT PREJUDICE** the claims against ARC in the following 13 cases: *Jophlin v. ARC Automotive, Inc.*, No. 22-CV-02507 (D.S.C. Aug. 1, 2022); *Long v. ARC Automotive, Inc.*, No. 22-CV-01098 (N.D. Ala. Aug. 29, 2022); *Mann v. ARC Automotive, Inc.*, No. 22-CV-03285 (N.D. Ga. Aug. 16, 2022); *Underwood v. ARC Automotive, Inc.*, No. 22-CV-01043 (N.D. Ala. Aug. 17, 2022); *Tribble v. ARC Automotive, Inc.*, No. 22-CV-03573 (N.D. Ga. September 2, 2022); *Topa v. ARC Automotive, Inc.*, No. 22-CV-00958 (N.D.N.Y. Sept. 13, 2022); *Jones v. ARC Automotive, Inc.*, No. 22-CV-00397 (S.D. Iowa Nov. 29, 2022); *Thomas v. ARC Automotive, Inc.*, No. 22-CV-05067 (N.D. Ill.

Sept. 16, 2022); *Aula v. ARC Automotive, Inc.*, No. 22-CV-12738 (E.D. Mich. Nov. 11, 2022); *McCarthy v. ARC Automotive, Inc.*, No. 22-CV-05708 (D.N.J. Sept. 26, 2022); *Wilson v. ARC Automotive, Inc.*, No. 22-CV-09432 (S.D.N.Y. Nov. 3, 2022); *Hudson-Battie v. ARC Automotive, Inc.*, No. 22-CV-03809-ELR (N.D. Ga. Sept. 21, 2022); and *Clark v. BMW Mfg. Co.*, No. 22-CV-03244 (D.S.C. Sept. 23, 2022).[8]

### C. Jurisdiction Over the Foreign Defendants

Several foreign Automakers and a foreign Airbag Supplier challenge the Court's exercise of personal jurisdiction over them, arguing that the SAC fails to allege a prima facie case justifying the exercise of specific personal jurisdiction against them under the applicable long-arm statutes. Plaintiffs counter that the Court has jurisdiction over these foreign Defendants under the relevant long-arm statutes based on each Defendant's own in-state conduct and, alternatively, based on the in-state conduct of the foreign Defendant's U.S. subsidiary. The Court addresses these personal jurisdiction challenges below.

[8] In its opening brief, ARC also argues for the dismissal of nine member cases because of Plaintiffs' failure to serve ARC with the Complaint and summons in each of those cases. [Doc. 179-1 at 19–24]. But because ARC's agreement to waive service in those nine cases moots its service-based challenge, [Doc. 245 at 12], the Court does not address the merits of ARC's argument.

### 1. ZF Germany

Plaintiffs assert claims for fraud (by omission and concealment) and the violation of statutory consumer protection laws against the "ZF Defendants," a related group of five Airbag Suppliers comprised of ZF Active Safety and Electronics US LLC ("ZF Electronics"), ZF Passive Safety Systems US Inc. ("ZF Systems"), ZF Automotive US Inc. ("ZF Automotive"), ZF TRW Automotive Holdings Corp. ("ZF-TRW"), and ZF Friedrichshafen AG ("ZF Germany"), SAC I ¶ 52. Apart from ZF Germany, the other four ZF Defendants are U.S.-based companies headquartered in Michigan. *See id.* ¶¶ 53–56, 58. The European-based ZF Germany is "the parent owner" of the U.S.-based ZF Defendants. *Id.* ¶ 58. Plaintiffs assert that the Michigan transferor court and, thus, this transferee Court, has personal jurisdiction over ZF Germany under the Michigan long-arm statute. [Doc. 293 at 8 n.2 (citing *Takata I*, 396 F. Supp. 3d at 1137)]. Under the Michigan long-arm statute,

> [t]he existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
>
> (1) The transaction of any business within the state.
>
> (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort . . . .

Mich. Comp. Laws Ann. § 600.715. According to Plaintiffs, both subsections support the Court's exercise of personal jurisdiction over ZF Germany. [Doc. 293 at 10–13].

The SAC alleges the following regarding the corporate structure of the ZF Defendants: On May 15, 2015, ZF Germany acquired the U.S.-based TRW Automotive Holding Corp. and its subsidiaries (collectively, "TRW"), which now operate as the Michigan-based ZF-TRW and its subsidiaries. SAC I ¶¶ 61, 66. ZF Electronics (formerly, TRW Automotive U.S. LLC) "designed, manufactured, and sold some airbag modules that incorporated ARC's Defective Inflators." *Id.* ¶ 53. ZF Systems (formerly, TRW Vehicle Safety Systems, Inc.) "worked closely" with ZF Electronics to design the airbag modules that incorporated the ARC inflators. *Id.* ¶ 54. ZF Automotive (formerly, TRW Automotive Inc.) is the parent and 100% owner of ZF Electronics and ZF Systems and "shared responsibility" with ZF Electronics for the design and manufacture of the airbag modules with the ARC inflators. *Id.* ¶ 55. ZF-TRW (formerly, TRW Automotive Holding Corp.) is the parent and 100% owner of ZF Automotive, and it entered contracts under which its subsidiaries designed, manufactured, and sold the airbag modules with ARC inflators to several Automakers. *Id.* ¶¶ 56 & n.18, 60. According to Plaintiffs, the four U.S-based ZF Defendants "share personnel and frequently operate jointly as one unit." *Id.* ¶ 57.

ZF Germany asserts that it was not involved in the design, manufacture, or sale of airbags with the ARC inflators at issue because those inflators were used by TRW only for the 2008 through 2012 model year Chevy Malibu and ZF Germany did not acquire TRW until 2015, three years after the last model year for which TRW supplied the ARC inflators. [Doc. 279-1 at 10 (citing Decl. of Kelly Laliberte ¶ 16 [Doc. 279-2])].[9] Plaintiffs do not directly rebut this assertion, arguing instead that they are unable to "test the veracity of ZF Germany's assertions" because discovery has not opened. [Doc. 293 at 15]. But ZF Germany represents that the ZF Defendants have already produced to Plaintiffs documents substantiating this assertion, [Doc. 301 at 13], and Plaintiffs do not explain what additional documents they require to test this assertion. Plaintiffs also contend that even if the last of the ZF-TRW airbag modules with ARC inflators were supplied three years before ZF Germany acquired TRW, this fact is of no moment if ZF Germany acquired TRW's liabilities. [Doc. 293 at 15]. This argument is unpersuasive for two reasons. First, not only does the SAC not allege that ZF Germany acquired the liabilities of TRW, but Plaintiffs also provide no support for their speculation. Second, referencing the publicly available merger plan for the TRW acquisition, ZF

[9] The Court appropriately considers the Laliberte Declaration for the purposes of ZF Germany's motion to dismiss. *See Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1221 (S.D. Fla. 2009) ("While the consideration [of evidentiary] materials ordinarily would convert a motion to dismiss into one for summary judgment, . . . in the context of personal jurisdiction the motion remains one to dismiss even if evidence outside the pleadings is considered.").

Germany shows that following TRW's acquisition, ZF-TRW retained "the claims, obligations, debts, liabilities and duties of" TRW. [Doc. 301 at 13n.7 (citing Agreement & Plan of Merger (Sep. 15, 2014) at § 1.1, *available at* https://www.sec.gov/Archives/edgar/data/1267097/000110465914066397/a14-20989_1ex2d1.htm)]. Thus, to establish the Court's jurisdiction over ZF Germany, Plaintiffs must show that their claims arise out of ZF Germany's Michigan-directed actions following its acquisition of TRW.

Under § 600.715(1) of the Michigan long-arm statue, "even the slightest act of business in Michigan" suffices as a "transaction of business," but to support the exercise of personal jurisdiction, the plaintiff's cause of action must arise out of that act. *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 667 (6th Cir. 2023) (citation modified). And to support jurisdiction under § 600.715(2), either the defendant's tortious conduct or the plaintiff's injury must occur in Michigan. *Id.* at 668. Plaintiffs point to "extensive allegations that ZF Germany transacts business in Michigan." [Doc. 293 at 10]. Indeed, the SAC alleges that ZF Germany "integrated its physical locations" with ZF-TRW and its subsidiaries, has described itself and the U.S-based ZF Defendants as a unified entity, has voting power over and appoints board members to the boards of the U.S.-based ZF Defendants. SAC I ¶¶ 65, 67, 70–72. It also alleges that, as part of TRW's integration, ZF Germany created a new division the "Active & Passive Safety Technology Division," which manages TRW's business activities, and has merged ZF Germany's and ZF-TRW's product compliance

functions. *Id.* ¶¶ 69, 73–74. The problem with this alleged business activity by ZF Germany is that Plaintiffs' claims against the Airbag Module Defendants stem from their sale of airbag modules containing the defective ARC inflators for incorporation into the Class Vehicles without disclosing their knowledge of the Inflator Defect, and none of ZF Germany's Michigan-directed business activities, which all occurred after it acquired TRW, relate to TRW's manufacture and supply of airbags with the relevant ARC inflators.

Although the SAC alleges that ZF Germany approves the U.S.-based ZF Defendants' statements "to the NHTSA regarding airbag module design and failure," SAC I ¶ 63, the SAC does not allege that the ZF Defendants made any misrepresentations concerning the ARC inflators to the NHTSA. Indeed, it does not even allege whether the statements concern airbags with ARC inflators. And even assuming that ZF Germany had a duty to disclose the Defect allegedly present in the airbag modules supplied by TRW, the SAC's allegations fail to show that ZF Germany, which had not yet acquired TRW and, thus, had no role in the manufacturing of the ARC inflator-containing airbag modules, had knowledge of the Defect before the only two named Plaintiffs who own a 2012 or older Chevy Malibu (Ninotchka Harpey-Bey and Patricia Mobley, SAC I ¶¶ 149, 250) bought their vehicles. Plaintiffs also theorize that through its role in governing its U.S.-based affiliates, ZF Germany participated in the fraud alleged. [*See* Doc. 293 at 12–13]. But the SAC is silent about any action by ZF Germany involving a decision not to

disclose the Defect, and (as discussed below) the SAC does not allege active concealment by any Airbag Suppliers, much less ZF Germany's participation in any such concealment.

In short, the SAC fails to present a prima facie case for the exercise of specific personal jurisdiction under the Michigan long-arm based on ZF Germany's transactions of business or its commission of a tortious act.

Plaintiffs alternatively argue that the Court may exercise jurisdiction over ZF Germany because the U.S.-based ZF Defendants are its alter ego. [Doc. 293 at 18–19]. Under the alter-ego theory of jurisdiction "a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Indusource, Inc. v. Sandvik Tooling France S.A.S.*, 2016 WL 6216003, at *4 (E.D. Mich. Oct. 25, 2016) (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 450 (6th Cir. 2012)). However, "Michigan courts will not pierce the corporate veil unless, (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Indusource*, 2016 WL 6216003, at *4 (citation modified). Even where one business entity operates as a "mere instrumentality" of another, "Michigan will not impose alter ego liability on a parent corporation for having a separate corporation as its mere instrumentality when that parent corporation has not exercised control over

the subsidiary in a manner amounting to a fraud or wrong." *In re Flint Water Cases*, 584 F. Supp. 3d 383, 408 (E.D. Mich. 2022).

Here, the SAC alleges facts that, Plaintiffs contend, show that the U.S.-based ZF Defendants are mere instrumentalities of ZF Germany, and it also alleges that the ZF Defendants fraudulently failed to disclose the Inflator Defect. But it does not allege that ZF Germany exercised control over the U.S.-based ZF Defendants in a manner that amounted to fraud. In *Green v. Ziegelman*, 310 Mich. App. 436, 457–459 (Mich. Ct. App. 2015), the Michigan Court of Appeals held that there was evidence showing the defendant used the corporate form to commit a fraud or wrong where the defendant, for example, misled the plaintiffs into believing that the alleged instrumentality entity was a viable business although it had no independent source of income and caused the instrumentality entity to breach its agreement with one of the plaintiffs knowing that the instrumentality entity liability could be rendered uncollectible. *See also EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 500 (6th Cir. 2021) (By "directing its wholly owned subsidiary to stop maintaining the [power plant] and thereby breach its contractual obligations, [the parent] exercised its control over [subsidiary] in a way that wronged [the plaintiff]"). Although, according to Plaintiffs, ZF Germany exerted significant control over the daily operations of the U.S.-based ZF Defendants, they do not allege that ZF Germany misused the corporate form to defraud Plaintiffs. At best, the SAC alleges that the U.S.-based ZF Defendants' failure to disclose the Defect should

also be attributed to ZF Germany because it exerts a high level of control over their actions. This does not suffice to justify piercing the corporate veil under Michigan law.

For the above-discussed reasons, Plaintiffs fail to state a prima facie case for the Court's exercise of personal jurisdiction over ZF Germany. And in view of this failure, jurisdictional discovery is not warranted. *See Beckham v. Baker & Hostetler, LLP*, 2023 WL 9957259, at *8 (N.D. Ga. Aug. 17, 2023) ("It is an abuse of discretion . . . if a court orders jurisdictional discovery when a plaintiff fails to establish a prima facie case of personal jurisdiction."). Accordingly, the Court **GRANTS** ZF Germany's motion to dismiss, [Doc. 279], **DENIES** Plaintiffs' related motion for jurisdictional discovery, [Doc. 294], and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against ZF Germany.

**2. BMW Germany**

Plaintiffs assert claim for fraud (by omission and by concealment), the violation of statutory consumer protection laws, breach of warranties, and unjust enrichment against Bayerische Motoren Werke Aktiengesellschaft ("BMW Germany"), a German-based company. SAC I ¶ 80. BMW Germany designs and manufactures vehicles in Germany. Decl. of Ronny Löwa ("Löwa Decl.") ¶12 [Doc. 299-1]. BMW Germany seeks dismissal from this action, arguing that Plaintiffs fail to allege facts sufficient to support the Court's exercise of personal jurisdiction against it under the long-arm statutes of New Jersey and South Carolina (the forums of the transferor courts). [Doc. 287-1 at 8–9]. Plaintiffs contend that the exercise of jurisdiction is proper because

BMW Germany "has purposefully availed *itself* of doing business in New Jersey and South Carolina, including by establishing [BMW America] and [BMW Manufacturing] there and conducting critical activities through those entities." [Doc. 310 at 7].

BMW Germany asserts, and Plaintiffs agree, that because the long-arm statues of South Carolina and New Jersey permit the exercise of personal jurisdiction consistent with due process, it is appropriate to merge the long-arm and due process inquiries "and determine only whether the exercise of jurisdiction over BMW Germany comports with due process. [Docs. 287-1 at 16 (citing (S.C. Code Ann. § 36-2-802; N.J. Court Rules, R. 4:4-4); 310 at 15]. Thus, the Court employs the familiar three-part test to determine (1) whether Plaintiffs' claims relate to BMW Germany's contact with the transferor forum states; (2) whether BMW Germany purposefully availed itself of the privilege of conducting activities within those states; and (3) whether "the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Waite*, 901 F.3d at 1313. The Court first takes up the question whether BMW Germany's purposefully availed itself of the privilege of conducting business in either New Jersey or South Carolina. For the reasons discussed below, the Court concludes that Plaintiffs fail to allege facts showing BMW Germany's purposeful conduct targeting New Jersey or South Carolina.

Plaintiffs point to conduct by BMW Germany that they claim establishes BMW Germany's purposeful conduct directed at New Jersey and South

Carolina. First, Plaintiffs assert that BMW Germany targets the U.S., generally, and the transferor forum states specifically, by designing BMWs for compliance with U.S. regulations. [Doc. 310 at 16 (*citing* Löwa Decl. ¶¶ 12–13)]. Second, Plaintiffs contend that BMW Germany established its presence in the U.S. through BMW America (in New Jersey) and BMW Manufacturing (in South Carolina) and has used those states as "as hubs for the marketing, sale, manufacturing, assembly, and distribution of its vehicles, including the Class Vehicles, throughout the United States." [*Id.* at 18 (citing Exs. 14, 15, 18 [Docs. 310-15, 310-16, 310-19]). According to Plaintiffs, BMW Germany operates its global business through an entity called the BMW Group, which includes BMW America and BMW Manufacturing. [Doc. 310 at 7–8 (citing Exs. 1–3 [Docs. 310-2–310-4])]. Third, Plaintiffs also maintain that BMW Germany ships its vehicles and component parts to New Jersey and South Carolina. [*Id.* at 19–20].

The Court, however, agrees with BMW Germany that Plaintiffs have not established a prima facie case for the exercise of personal jurisdiction. Plaintiffs must carry "the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal*, 593 F.3d at 1257 (citation modified). But Plaintiffs stumble. While in opposition to BMW Germany's motion, Plaintiffs point to evidence that they contend shows BMW Germany purposefully directs its business activities to the transferor forum states, what they do not (and cannot) do is cite to the SAC's allegations in

support. This is because the SAC alleges only two facts specific to BMW Germany: (1) BMW America "imports, promotes, advertises, distributes, and sells BMW [Germany] and/or BMW brand cars, trucks, and sport utility vehicles in the United States" and (2) BMW Germany is incorporated and headquartered in Germany. SAC I ¶¶ 79–80. The SAC goes on to allege that the "BMW Defendants" (referring collectively to BMW Germany, BMW Manufacturing, and BMW America) conduct business in South Carolina and New Jersey, maintain contractual relationships with ARC or the Airbag Suppliers for component parts for installation in Class Vehicles, and market and sell vehicles intrastate. *Id.* ¶ 82. But this conclusory recitation of activities is unsupported by any facts concerning *BMW Germany's* actions directed to South Carolina or New Jersey. And "[w]here a complaint lacks jurisdictional allegations to sufficiently establish a prima facie case, the district court doesn't go to the second and third steps of the burden-shifting process, and the motion [to dismiss] should be granted." *Andres v. Raytheon Techs. Corp.*, 2022 WL 1015489, at *2 (S.D. Fla. Apr. 5, 2022). Because the SAC fails to allege facts supporting BMW Germany's purposeful availment of the privilege of conducting activities in either transferor forum state, the exercise of personal jurisdiction over BMW Germany is improper. This ends the jurisdictional inquiry. Accordingly, the Court **GRANTS** BMW Germany's motion to dismiss, [Doc. 287], **DENIES** Plaintiffs' related motion for jurisdictional discovery, [Doc.

311], and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against BMW Germany.

**3. Porsche Germany**

Dr. Ing. H.C. F. Porsche AG ("Porsche Germany") seeks dismissal from this action, arguing that the Court lacks personal jurisdiction. [Doc. 289-2]. Plaintiffs counter that Porsche Germany is subject to the Court's exercise of jurisdiction under Georgia's long-arm statute, which applies because the only member case naming Porsche Germany as a Defendant is the one filed by Stephen Gearhart in this Court. [Doc. 308 at 12–13]. Plaintiffs rely on the section of the Georgia long-arm, which "permits jurisdiction where a plaintiff's cause of action 'arises out of' a nonresident defendant's 'transact[ion] of any business within [Georgia].'" *Diamond Crystal*, 593 F.3d at 1264 (alteration in original) (quoting O.C.G.A. § 9-10-91(1)). The phrase "transacts any business" as employed in § 9-10-91(1), in interpreted literally to mean "that the nonresident defendant has purposefully done some act or consummated some transaction in Georgia" and does not require that the defendant be present in state. *Id.*

Plaintiffs argue that Porsche Germany has transacted business in Georgia by importing and selling its vehicles in the U.S. through PCNA, its Georgia-based subsidiary and co-Defendant. [Doc. 308 at 13–14]. But the SAC fails to allege facts supporting this contention. It simply alleges that the Georgia-headquartered PCNA "is the importer and distributor of Porsche brand vehicles sold in the United States." SAC I ¶ 123. There is no allegation

to suggest that Porsche Germany *itself* imports its vehicles to Georgia or for sale in Georgia. Plaintiffs fail to rebut Porsche Germany's showing that PCNA buys and takes possession of vehicles from Porsche Germany *in* Germany and then imports those vehicles into the U.S. for distribution through its own dealership network. Decl. of Michael Löffler ¶¶ 17–18 [Doc. 289-5]. Moreover, Plaintiffs' contention that Porsche Germany transacts business *through* PCNA fails. At best, Plaintiffs provide that Porsche Germany and PCNA share a "close corporate relationship." [Doc. 308 at 9–10]. But the fact remains that each is a separate corporate entity, *see* SAC I ¶¶ 122–23, and the SAC alleges no facts to indicate that PCNA acts as Porsche Germany's agent or that it is appropriate to "pierce the corporate veil." conduct is attributable to Porsche Germany. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000), *abrogated on other grounds by Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025) ("Where the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary." (citation modified)).

In sum, because the SAC fails to allege facts showing that Porsche Germany transacts any business in Georgia, the Georgia long-arm statute does not support the Court's exercise of personal jurisdiction over Porsche Germany. *See Gerow v. Newsom*, 2024 U.S. Dist. LEXIS 131275, at *11 (M.D. Fla. June

25, 2024) ("If the complaint lacks allegations to show jurisdiction is appropriate under either [the statutory or the constitutional] part of the analysis, the plaintiff fails to establish a prima facie case of personal jurisdiction."). Moreover, because the SAC fails to present a prima facie case supporting the exercise of jurisdiction, jurisdictional discovery is not warranted. The Court, therefore, **GRANTS** Porsche Germany's motion to dismiss, [Doc. 289], **DENIES** Plaintiffs' related motion for jurisdictional discovery, [Doc. 309], and **DISMISSES WITHOUT PREJUDICE** Porsche Germany.

#### 4. Audi Germany and Volkswagen Germany

Audi Aktiengesellschaft ("Audi Germany") and Volkswagen Aktiengesellschaft ("Volkswagen Germany") also moves for their dismissal from this action for lack of personal jurisdiction. [Docs. 305, 319]. According to the SAC, Audi Germany is headquartered in Germany and Audi of America, LLC ("Audi"), a Virginia headquartered company, imports and distributes Audi brand vehicles in the U.S. SAC I ¶ 132. Volkswagen AG is also a German-based corporation and the parent of the Virginia-headquartered Volkswagen Group of America, Inc. ("Volkswagen"), which advertises, markets, and sells Volkswagens in the U.S. and "houses the U.S. operations of a worldwide family of distinguished and exciting brands including Audi . . . and Volkswagen." *Id.* ¶¶ 133–34. Volkswagen AG and Volkswagen together operate as the "Volkswagen Group," which "cultivates a market for, designs, develops, manufactures, and/or sells Volkswagen and Audi automobiles and the replacement component parts for these vehicles" in the U.S. *Id.* ¶ 133.

Audi Germany and Volkswagen Germany contend that the SAC's allegations fail to show that they directed their conduct into the forum state. [Docs. 305-1 at 20–24; 319-1 at 19–22]. Plaintiffs maintain that the Court has jurisdiction over both Defendants under the long-arm statute of Virginia, the transferor forum. [Doc. 321 at 7–8; 327 at 16]. Plaintiffs rely on Va. Code Ann. § 8.01-328.1(A)(1), which authorizes the exercise of personal jurisdiction over a defendant "as to a cause of action arising from [the defendant's] transacting any business in [Virginia]." And as the Parties acknowledge, [Docs. 305-1 at 17; 321 at 17; 327 at 15], because Virginia's long-arm reach extends to the outer limits of the due process clause, "the statutory inquiry merges with the constitutional inquiry." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F3d 273, 277 (4th Cir. 2009). As discussed above, the constitutional inquiry necessitates establishing three elements, one of which is the defendant's purposeful availment of the privilege of conducting business in the forum state (here, Virginia). *Waite*, 901 F.3d at 1313. Below, the Court first addresses Audi Germany's challenge to personal jurisdiction and then turns to Volkswagen Germany's challenge.

Plaintiffs maintain that Audi Germany purposefully availed itself of the privilege of conducting business in Virginia through "principally through its agreements and other interaction with its exclusive importer and distributor of Audi-manufactured vehicles in the U.S., [Volkswagen]." [Doc. 321 at 16–17]. The issue with Plaintiffs' assertion is that it is unsupported by the SAC's

factual allegations. "A party cannot amend a complaint by arguments of counsel made in opposition to a motion to dismiss. In the post-Twombly world, the complaint is judged as it is and not on whether a set of facts could be imagined that would support the claim." *In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371, 1381 (N.D. Ga. 2010) (citation modified). The SAC alleges that Volkswagen does business as *Audi of America, Inc.*—not Audi (*LLC*), the alleged U.S. importer and distributor of Audis—and that Volkswagen engages in the "advertising, marketing, and sale of VW automobiles nationwide" and "houses the U.S. operations of a worldwide family of distinguished and exciting brands including Audi[.]" SAC I ¶ 134. It also alleges that Volkswagen and Volkswagen Germany, as the "Volkswagen Group" "cultivate[] a market for, designs, develops, manufactures, and/or sells Volkswagen and Audi automobiles and the replacement component parts for these vehicles" in the U.S. *Id.* ¶ 133. Even assuming that the SAC's reference to Audi (*LLC*) as the U.S. importer and distributor of Audis was intended to be a reference to Audi of America *Inc.* (i.e., Volkswagen) instead, the SAC's allegations give no hint of *Audi Germany's* Virginia-directed activity.

Audi Germany provides the declaration of Magus Weiss, who explains that Volkswagen is the exclusive U.S. importer and distributor of Audi Germany-manufactured vehicles and uses the trade name Audi of America, Inc. Decl. of Magnus Weiss ("Weiss Decl.") ¶ 14 [Doc. 305-3]. Based on this, Plaintiffs argue that Audi Germany purposely directed its business activity

and sales into Virginia. [Doc. 321 at 16–19]. But there is no circumventing the fact that the SAC is silent about Audi Germany's Virginia-targeted activities. For example, there is no allegation in the SAC that Audi Germany directs or controls Volkswagen's activities or that Volkswagen acts on Audi Germany's behalf.

Indeed, instead of citing to the SAC's allegations, Plaintiffs refer to the Weiss Declaration's assertions regarding Volkswagen's role in the importation and distribution of Audi Germany-manufactured vehicles and to court findings regarding Audi Germany's actions in other cases. [*See e.g.*, Doc. 321 at 12]. But Plaintiffs' efforts are unavailing. The SAC does not allege facts showing that Audi Germany purposefully availed itself of the privilege of doing business in Virginia and, as such, fails to establish a prima facie case supporting the exercise of personal jurisdiction over Audi Germany. Thus, the Court lacks personal jurisdiction over Audi Germany, and in the absence of a prima facie case for jurisdiction, jurisdictional discovery is inappropriate. The Court, therefore, **GRANTS** Audi Germany's motion to dismiss, [Doc. 305], **DENIES** Plaintiffs' related motion for jurisdictional discovery, [Doc. 322], and **DISMISSES WITHOUT PREJUDICE** Audi Germany.

As they do in response to Audi Germany's challenge, Plaintiffs respond to Volkswagen Germany's jurisdictional challenge by arguing that Volkswagen Germany's Virginia contacts through Volkswagen subject it to jurisdiction in that state. [Doc. 327 at 9]. They point out that "a corporation can purposefully

avail itself of a forum by directing *its agents or distributors* to take action there" [Doc. 327 at 9 quoting *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014)]. But once again, the SAC's factual allegations fail to support Plaintiffs' argument. The SAC alleges that Volkswagen Germany "jointly actively cultivates a market for, designs, develops, manufactures, and/or sells Volkswagen and Audi automobiles and the replacement component parts for these vehicles" in the U.S. and ships vehicles to the U.S., including through Virginia. SAC I ¶¶ 133, 136. Not only are these allegations conclusory, but they say nothing about Volkswagen Germany's *Virginia* targeted activities.

Plaintiffs emphasize that Volkswagen is Virginia based and "jurisdiction results from [Volkswagen Germany's] substantial conduct directed at Virginia through its subsidiary there," [Doc. 327 at 21], but the SAC does not include any allegations that Volkswagen Germany acts through its Virginia subsidiary. Plaintiffs point out that a Virginia court has previously rejected Volkswagen Germany's argument that "there is no connection between [the German Defendants, including Volkswagen Germany] and Virginia because plaintiffs' claims involve conduct initiated by [Volkswagen], and not the German Defendants." [Doc. 327 at 20 (quoting *Re Volkswagen "Clean Diesel" Litig.*, 100 Va. Cir. 134 (Va. Cir. Ct. 2018) (citation modified))]. But there, the complaint alleged facts showing that "[e]mployees and agents of the German Defendants enter[ed] the forum state," that the German Defendants allegedly developed "marketing and advertising schemes . . . in the

Commonwealth," and also alleged an agency relationship. *Clean Diesel Litig.*, 100 Va. Cir. 134. The SAC contains no such allegations. And Plaintiffs' effort to augment the SAC's allegations with additional facts is too little too late. The SAC fails to make out a prima facie case for jurisdiction against Volkswagen Germany because it fails to allege facts indicating that Volkswagen Germany's purposefully directed its conduct to Virginia.

The Court, therefore, **GRANTS** Volkswagen Germany's motion to dismiss, [Doc. 319], and, because in the absence of a prima facie case for jurisdiction, jurisdictional discovery is not appropriate, **DENIES** Plaintiffs' related motion for jurisdictional discovery, [Doc. 322], and **DISMISSES WITHOUT PREJUDICE** Volkswagen Germany.[10]

## III. Shotgun Pleading

Several Defendants seek dismissal of the SAC as an impermissible shotgun pleading. Although Plaintiffs take liberty with the pleading form, with one exception, the Court is unpersuaded that their abuse rises to a level that justifies dismissal.

### A. Legal Standard

A plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 8 by providing "a short and plain statement of the claim showing

---

[10] Because ZF Germany, BMW Germany, Porsche Germany, Audi Germany, and Volkswagen Germany are dismissed from this action, the Court's references to "the Airbag Suppliers" and to "the Automakers" from this point forward excludes the respective dismissed Defendants.

that the pleader is entitled to relief" as well as a "brief factual description" of the circumstances that surround the acts upon which a plaintiff bases a claim for relief. *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1294 (N.D. Ga. 2005) (citing Fed. R. Civ. P. 8(a)(2)). A shotgun pleading "fails to satisfy these basic requirements." *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020). Indeed, a shotgun pleading is "never plain because it is impossible to comprehend which specific factual allegations the plaintiff intends to support which of his causes of action, or how they do so." *Id.*; *see also Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356–57 (11th Cir. 2018) ("Shotgun pleadings . . . exact an intolerable toll on the trial court's docket, lead to unnecessary and unchanneled discovery, and impose unwarranted expense on the litigants, the court and [its] resources. Moreover, justice is delayed for the litigants who are 'standing in line,' waiting for their cases to be heard."); *Chapman v. AI Trans.*, 229 F.3d 1012, 1027 (11th Cir. 2000) ("We have frequently railed about the evils of shotgun pleadings and urged district courts to take a firm hand.").

Broadly speaking, there are four (4) types of shotgun pleadings:

> [t]he most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that . . . is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of

> asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (collecting cases). Put simply, the "unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

**B. Discussion**

The Airbag Suppliers argue that in the SAC Plaintiffs commit the first and the fourth "sins" of shotgun pleading, denying them adequate notice of the claims Plaintiffs assert against them and the grounds for those claims. [Doc. 178-1 at 23–24]. First, Plaintiffs undoubtedly commit the "sin" of adopting by reference into various counts all the allegations of each preceding count such that each successive count becomes an amalgam of all the counts before it. *See, e.g.*, SAC II ¶¶ 434, 507, 576, 645, 670, 689, 714, 749, 830, 981, 1080, 1151, 1209, 1591, 2073, 2234, 2279, 2237, 3761, 3829, 3897, 3966, 4037, 4106, and 4152. As the Airbag Suppliers correctly point out, this type of loose pleading practice leads to absurdities. [Doc. 178-1 at 27]. For example, through incorporation, counts against the Automakers for breaches of warranty carryover factual allegations irrelevant to those claims and claims for liability (from previous counts) on other grounds and against other Defendants. The Court does not condone this unfortunately all too common practice of pleading.

Nevertheless, because each count sufficiently explains the basis for the claim, which can be related back to the SAC's factual assertions, the Court concludes that Plaintiffs' "incorporat[ion] by reference" of allegations from preceding counts warrants the SAC's dismissal.

Second, although the Airbag Suppliers argue that the SAC lumps together ARC, the Automakers, and the Airbag Suppliers, without specifying which act or omission each Airbag Module Defendant is allegedly responsible for [Doc. 178-1 at 24–25], a fair reading of the SAC shows that it sufficiently alleges the role each set of Defendants played in the ARC airbag inflator supply chain, how they acquired knowledge of the alleged Inflator Defect, and their failure to inform Plaintiffs of the Defect. *See, e.g.*, SAC I ¶¶ 263–269, 325–326, 368, 377–379. Thus, although the SAC alleges numerous claims against "All Defendants" and speaks in terms of "Defendants" knowledge of the Defect and failure to share that knowledge with Plaintiffs, the Court is unpersuaded that it fails to give Defendants fair notice of the conduct they are responsible for. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1275 (11th Cir. 2019) (concluding that allegations against "all Defendants" did not run afoul of Rule 8(a) because the complaint gave "fair notice that each and every one of them is alleged to have" engaged in the same wrongful conduct). This conclusion also holds for the Airbag Suppliers, who complain that the SAC makes no distinction between them but rather forms of them a monolith titled "Airbag Module Defendants." [Doc. 178-1 at 25–26]. In

addition to sufficiently alleging the role of the Airbag Suppliers, the basis for their knowledge of the Inflator Defect, and their inaction, the SAC clarifies that each Plaintiff's claim is limited to the Airbag Supplier who supplied the airbag module for that Plaintiff's Class Vehicle. *See, e.g.*, SAC II ¶ 460 (Alabama Plaintiffs asserting claim for violation of the Alabama Deceptive Trade Practices Act against the "[Airbag Suppliers] for their respective Class Vehicles[.]"). Accordingly, the Court declines the invitation to dismiss the SAC on these grounds.

## IV. Lack of Standing

The U.S. Automakers seek the dismissal of certain claims for Plaintiffs' lack of standing under Article III of the Constitution. [Docs. 181-1 at 22–24; 184-1 at 9–10]. Through a separate motion, the four corporate groups[11] that Plaintiffs identify as the Airbag Suppliers—AUTOLIV, INC. and a related entity ("the Autoliv Defendants"), Joyson Safey Systems ("Joyson"), TG Missouri Corporation ("TGMO"),[12] and ZF Active Safey and Electronics US

[11] The SAC names a fifth Airbag Module Defendant, Mobis Parts America, LLC, but Plaintiffs voluntarily dismissed their claims against this Defendant. [Doc. 161].

[12] The SAC names Toyoda Gosei North America, Inc. ("TGNA") as a Defendant. However, after the Airbag Module Defendants filed their motion to dismiss, on the Parties' joint motion, the Court substituted TGMO as Defendant for TGNA and adopted the Parties stipulation that the SAC's allegations regarding TGNA (except those as to its principal place of business and registered agent) be treated as allegations pleaded against TGMO and that TGNA, rather than TGMO, be considered to have joined the Airbag Defendants' motion to dismiss. [Doc. 216]. The Airbag Module Defendants

LLC and related entities ("the ZF Defendants")—argue that Plaintiffs lack standing to sue them because no Plaintiff has alleged that his or her injury is traceable to any particular Airbag Module Defendant. [Doc. 178-1 at 18–22, 28–29]. The Court addresses both positions, beginning with the U.S. Automaker's arguments.

"The standing doctrine stems directly from Article III's 'case or controversy' requirement and implicates [the court's] subject matter jurisdiction." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021) (citation modified); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1270 (11th Cir. 2020) (Pryor, J., dissenting) ("To satisfy the case-or-controversy requirement, a plaintiff must have standing to sue."). And "[a]ttacks on subject matter jurisdiction . . . are governed by Rule 12(b)(1)" of the Federal Rules of Civil Procedure. *Kennedy*, 998 F.3d at 1230. At the pleading stage, a plaintiff survives a Rule 12(b)(1) motion if the complaint alleges that the plaintiff has "an injury-in-fact" that is both "causal[ly] connect[ed]" to the defendant's actions and "redress[able] by a favorable decision" has standing under Article III. *Id.* at 1229.

### A. U.S. Automakers' Standing Challenge

The U.S. Automakers argue that Plaintiffs' claims under the laws of 14 states (i.e., Alaska, Colorado, Hawaii, Louisiana, Maine, Nebraska, New

---

represent that their arguments to dismiss the SAC apply with equal force to TGMO. [Doc. 178-1 at 21].

Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, Utah, West Virginia, and Wyoming) fail for lack of standing. [Doc. 181-1 at 22–24. *See also, e.g.*, Docs. 183-1 at 8–10; 185-1 at 4–5; 187 at 3–4]. This is so, the U.S. Automakers maintain, because no Plaintiff resides in those states and none alleges that he or she sustained the injury (i.e., purchased or leased their Class Vehicle) in those states.[13] Likewise, the U.S. Automakers argue that Plaintiffs' nationwide claims for fraud and unjust enrichment fail because these claims arise under state law, including the law of states where no Plaintiffs live or bought their vehicle. Separately, Audi contends that Plaintiffs do not and cannot allege facts to show an injury traceable to its conduct. [Doc. 184-1 at 9–10]. The Court first addresses the U.S. Automakers' argument and then turns to Audi's challenge.

"Article III has two related, but distinct requirements for class representative standing[:]" (1) the representatives must have Article III standing for their own claims and (2) they "must also be part of the class and possess the same interest and suffer the same injury as the class members." *In*

[13] Hyundai and Kia separately move to dismiss the claims against them to the extent that any Plaintiff with only a Hyundai Class Vehicle also asserts claims against Kia and any Plaintiff with only a Kia Class Vehicle also asserts claims against Hyundai. [Doc. 180-1 at 8]. In response, Plaintiffs represent that Plaintiffs with Hyundai Class Vehicles are only pursuing claims against Hyundai and those with Kia Class Vehicles are only pursuing claims against Kia. [Doc. 229 at 12]. This clarification moots Hyundai and Kia's argument. The same holds for Volkswagen's argument that a named Plaintiff who owns a Volkswagen Class Vehicle but not an Audi Class Vehicle lacks standing to sue Audi and vice versa. [Docs. 182-1 at 7–9; 225 at 6 n.4]. *See also* Doc. 185-1 at 4 (Ford asserting that Plaintiffs who do not own Ford Class Vehicles lack standing to sue Ford) *and* Doc. 224 at 6 (Plaintiffs' concession that those who do not buy or lease a Ford Class Vehicle lack standing to sue Ford)].

*re Zantac (Ranitidine) Prods. Liab. Litigation*, 2022 WL 16729170, at *4 (11th Cir. Nov. 7, 2022) (citation modified). The U.S. Automakers do not take issue with either of these requirements as it concerns Plaintiffs. Rather, they question Plaintiffs' ability to assert causes of action under the law of the 14 states where they do not reside or did not buy their vehicles. But this "is not a standing question at all." *Zantac*, 2022 WL 16729170, at *5. "[W]hether a plaintiff can represent unnamed class members whose claims fall under different states' laws . . . is a question that concerns Rule 12(b)(6) or Rule 23—not Article III." *Id.* *6. When faced with this law, the U.S. Automakers pivot to argue that the Court should dismiss the challenged claims under Rule 12(b)(6). The problem, however, is that they did not move for dismissal on Rule 12(b)(6) grounds; rather, they premised their argument on standing—a Rule 12(b)(1) issue. And the Court is not inclined to take up this argument raised, and superficially at that, for the first time in a reply. Because the U.S. Automakers have failed to show that Plaintiffs lack standing to assert the challenged claims, the dismissal .

The U.S. Automakers also argue that Plaintiffs cannot maintain their nationwide fraud and unjust enrichment claims for several other reasons. To the extent that Plaintiffs assert those nationwide claims under Georgia law, the U.S. Automakers contend that the claims fail because (1) Plaintiffs and putative class members who did not buy or lease their vehicle in Georgia could not have sustained an injury under Georgia law; (2) these individuals do not

have the meaningful connection to Georgia that is required to apply Georgia law over the claims of a nationwide class; and (3) in MDL proceedings, the court applies the choice of law rules of each transferor forum and those rules will not uniformly point to Georgia common law. [Doc. 181-1 at 24–25].

The U.S. Automakers' first argument is simply a variant of their lack of standing argument, and it is unpersuasive for the same reason. Their next two arguments concern choice of law questions, which are not suited for resolution at the pleading stage. Georgia "must have a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests, in order to ensure that the choice of [Georgia] law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985) (citation modified). Answering this question requires factual development. *See Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1568 (11th Cir. 1990) ("[T]o determine which sovereign has the most significant relationship to a particular issue, a court must instead examine the facts and circumstances presented in each particular case." (citation modified)). Accordingly, the U.S. Automaker's challenge to the nationwide fraud and unjust enrichment claims on standing and choice-of-law grounds is premature.

Plaintiffs alternatively assert their nationwide fraud claim under "the common law" of every state. SAC II ¶¶ 409–10, 426, The U.S. Automakers argue that this claim fails because there is no uniformity within the 50 states in the common law of fraud. [Doc. 181-1 at 25–26]. The Court agrees. Contrary

to Plaintiffs' assertion that "there are no true conflicts among the states' laws of fraudulent concealment," [SAC I ¶ 410], state laws on fraud vary materially. "In a fraud claim, some states require justifiable reliance on a misrepresentation, while others require reasonable reliance. States impose varying standards to determine when there is a duty to disclose facts." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 743 n.15 (5th Cir. 1996) (internal citations omitted); *see DeArmey v. Hawaiian Isles Kona Coffee Co., Ltd*, 2019 WL 6723413, at *3 (C.D. Cal. July 22, 2019) (noting that the common law of fraud "varies materially from state to state"). The undersigned's experience in applying fraud-law from various states to the Rule 12(b)(6) challenges raised by certain Defendants bears out this observation. Because there is no uniform common law of fraud, Plaintiffs cannot maintain a nationwide fraud claim under the common law.

**In sum,** the U.S. Automakers fail to show that Plaintiffs' fraud claims under the common law of Alaska, Colorado, Hawaii, Louisiana, Maine, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, Utah, West Virginia, and Wyoming should be dismissed for Plaintiffs' lack of standing or that Plaintiffs' Georgia-law based nationwide fraud and unjust enrichment claims should be dismissed on the grounds discussed in this section. However, the U.S. Automakers' argument for the dismissal of Plaintiffs' common-law based nationwide fraud claim prevails and, accordingly. the Court **GRANTS** the U.S. Automaker's Motion to Dismiss, [Doc.

181], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs' nationwide fraud claim (Nationwide Count 1) premised on the common law of fraud.

Next, the Court turns to Audi's challenge to Plaintiffs' standing. Audi raises a factual challenge to the Court's subject matter jurisdiction under Rule 12(b)(1). Audi argues that Plaintiffs' allegations fail to show an injury (specifically, the injury of Eva Jacinto, the sole named Plaintiff who owns an Audi Class Vehicle) that is "fairly traceable" to Audi's actions. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Audi maintains that the SAC incorrectly alleges that it "is the importer and distributor of Audi brand vehicles sold in the United States," [Doc. 184-1 at 9 (quoting SAC I ¶ 132)], and further asserts that it does not import, sell, distribute, or service Audis or issue vehicle warranties for Audi brand vehicles in the U.S. and has not done so in the past, [Doc. 184-1 at 9 (citing Decl. of Peter Green ("Green Decl.") [Doc. 184-2]).

Plaintiffs counter that Audi is properly named as Defendant and that because Audi's challenge raises a dispute of material facts at the pre-discovery stage, its dismissal on standing grounds would be premature. [Doc. 226 at 7]. Plaintiffs argue that the declaration of Peter Green, a Product Analysis Technical Lead with Volkswagen, on which Audi relies, directly contradict the SAC's allegations and that because the contradictions "implicate[] the elements of the plaintiff's claim," Audi's Motion presents a premature request for summary judgment. [*Id.* at 6–7]. They contend that the Green Declaration's

assertion that Audi has not issued vehicle warranties for or designed, manufactured, sold, or serviced Audi brand vehicles contradicts the SAC's allegation that Audi is the distributor of Audi brand vehicles in the U.S. [*Id.* at 6]. And they argue that Audi's dismissal is not appropriate because "deciding whether Audi in fact [warranted or made representation about Audi Class Vehicles and was in the business of selling them] goes to essential elements of Plaintiff[s'] claims." [*Id.* at 6–7].

The Green Declaration does not tee up any dispute going to the merits of Plaintiffs' claims.[14] Rather, it highlights the fact that the SAC incorrectly identifies Audi as a vehicle importer and distributor, and Audi's Motion underscores the SAC's lack of allegations that render Plaintiffs' injury fairly traceable to Audi. First, Plaintiffs do not counter Audi's showing that it does not the importer and distributors of Audi vehicles. Second, contrary to Plaintiffs' argument, the Green Declaration's assertion that Audi does not issue vehicle warranties for or design, manufacture, sell, or service Audi brand vehicles does not contradict the SAC's allegations regarding Audi. This is because the SAC contains no allegations indicating that Audi had a role in the manufacturing, designing, advertising, warrantying, or servicing of Audi Class Vehicles. In fact, according to the SAC, the Volkswagen Group jointly

[14] The Court considers the Green Declaration because Audi's jurisdictional challenge is factual, leaving the court "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1308 (N.D. Ga. 2020) (citation modified).

"cultivates a market for, designs, develops, manufactures, and/or sells Volkswagen and Audi automobiles and the replacement component parts for these vehicles" in the U.S. SAC I ¶ 133. And although the SAC generally alleges that the Automakers "issued an express written warranty for each defective Class Vehicle they sold," *see, e.g.*, SAC II ¶ 440, it does not allege that Audi *sold* Audi brand vehicles or even that it issued the warranty for them. Plaintiffs also do not rebut Audi's showing that Volkswagen (referred to as VWGoA in the Green Declaration) issues and administers the New Vehicle Limited Warranty for Audi brand vehicles in the U.S. Green Decl. SAC II ¶ 8.

As to Plaintiff's claim that the SAC alleges that Jacinto relied on *Audi's* advertisements, marketing, and statements regarding vehicle safety and that Audi had pre-sale knowledge of the Defect, in part, because of its engagement in the airbag design process with ARC, [Doc. 226 at 5, 8], the SAC alleges no such thing. To be clear, the SAC does allege that the "Automaker Defendants" were aware of the Inflator Defect because of their knowledge of ARC's airbag testing results and their own tests on airbag modules, among other things, and nonetheless sold the Class Vehicles. *See, e.g.*, SAC ¶¶ 10, 264, 267–68. But the Automakers acquired this knowledge through their role in the design and testing of the airbag modules, which was connected to their involvement in the design and manufacturing of the Class Vehicles. *See, e.g.*, *id.* ¶¶ 263–64. The SAC does not allege that Audi had a role in the design or manufacturing of Audi Class Vehicles and, thus, fails to plausibly allege that it acquired pre-sale

knowledge of the Defect through involvement in the design and testing of the ARC airbag inflators. Moreover, the SAC does not specify that any marketing messages and statements that Jacinto saw or heard were those made by *Audi America* (Plaintiffs' name for Audi).

Because Audi shows that it is incorrectly identified as the importer and distributor of Audi Class Vehicles and the SAC fails to allege that Audi had a role in the manufacturing, selling, advertising, warrantying, or servicing of those vehicles, Plaintiffs cannot show that their injury is fairly traceable to Audi. Accordingly, the Court **GRANTS** Audi's Motion to Dismiss for Plaintiffs' lack of Article III standing and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against Audi.[15]

**B. The Airbag Suppliers' Standing Challenge**

The Airbag Suppliers' overarching argument for lack of standing is that "every Plaintiff appears to assert his or her claim against *every* [Airbag Module Defendant]." [Doc. 178-1 at 28]. And because *all* of the Airbag Suppliers "could not have possibly harmed anyone of the named Plaintiffs, let alone all of them," Defendants argue, the SAC fails to trace each Plaintiff's injury to a specific Airbag Module Defendant's conduct. [*Id.* (citing *Lujan*, 504 U.S. at 560)]. The Airbag Suppliers acknowledge, however, that because each Plaintiff owned or leased one or (at most) two Class Vehicles, "each Plaintiff has standing to sue,

[15] Because Audi is dismissed from this action, the Court's references to "the Automakers" or "the U.S. Automakers" from this point forward excludes Audi.

*at most*, one or two [Airbag Suppliers.]" [*Id.* at 29]. This is just what each Plaintiff does. As noted above, each Plaintiff sues the airbag module supplier for his or her "respective Class Vehicles." *See, e.g.*, SAC II ¶ 460. While each Plaintiff does not specify the Airbag Module Defendant who supplied the airbag module for his or her Class Vehicle, the SAC alleges that each Airbag Module Defendant make and sell airbag modules to the Automaker, SAC I ¶¶ 31–32 (Autoliv); 37 (Joyson); 49 (TGNA); and 52–56 (ZF Defendants), they provide examples of this supply chain, SAC I ¶¶ 278, 341, 343, 355, 363, and 366, and Plaintiffs identify the year, make, and model of their own vehicles. SAC I ¶¶ 142–255. Based on Plaintiffs' identification of their vehicles, the Airbag Suppliers are in the best position to determine which one of them supplied the airbag module in a given Plaintiff's vehicle. And, collectively, the SAC's allegations suffice to raise an inference that each Plaintiff's injury is traceable to the conduct of a specific Airbag Supplier.

As to the Autoliv Defendants and Joyson, specifically, the Airbag Suppliers also extend the following arguments. Regarding the Autoliv Defendants, they appear to argue that injury traceable to airbag modules of non-party Delphi Automotive should not be attributed to the Autoliv Defendants because the SAC's allegation that the Autoliv Defendants are successors-in-interest to the liabilities of Delphi is mere speculation based on "information and belief." [Doc. 178-1 at 19]. As to Joyson, the Airbag Suppliers

argue that Plaintiffs fail to allege facts to show that Joyson bears responsibility for non-party Takata Corporation's airbag modules. [*Id.* at 20].

The Airbag Suppliers' specific challenge to the SAC's allegations regarding the Autoliv Defendants' acquisition of Delphi's liabilities fails. According to the SAC, in 2009, the Autoliv Defendants acquired Delphi. SAC I ¶ 36. The SAC further alleges on "information and belief" that the Autoliv Defendants are the successors-in-interest to Delphi's liabilities. *Id.* Delphi not only manufactured 11 million of the alleged defective inflators under a license from ARC, *id.* ¶ 36, but it also manufactured airbag modules that were installed in Kia automobiles. *See* SAC I ¶ 341 (ARC airbag inflator placed in a Delphi airbag module in a 2004 Kia Optima). And at least two Plaintiffs allege that they own early model-year Kia vehicles with defective ARC airbag inflators. *E.g., id.* ¶¶ 163 (Plaintiff Latricia Ford owns a 2008 Kia Sportage), 252 (Plaintiff Richard Topa owns a 2006 Kia Sportage). By alleging that they are the successors to Delphi's liabilities, presumably, Plaintiffs seek to hold the Autoliv Defendants responsible for Delphi's conduct. The fact that their successor liability allegation is based on information and belief does not bar that door here. This is because "facts based 'upon information and belief' may support a claim when facts 'are not within the knowledge of the plaintiff but he has sufficient data to justify' an allegation on the matter." *Sosa v. Martin Cnty., Fla.*, 2023 WL 1776253, at *9 (11th Cir. Feb. 6, 2023) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1224 (3d ed.

2012). Plaintiffs reasonably justify their assertion that the Autoliv Defendants are successors-in-interest of Delphi's liabilities based on the fact that the Autoliv Defendants acquired Delphi. They need not affirmatively state the Autoliv Defendants' position as successors when that fact, pertaining to the Autoliv Defendants' corporate acquisitions, is not reasonably within their knowledge bank.

The Airbag Suppliers also contend that they are not in fact the successors to Delphi's liabilities and refer the Court to the NHTSA's September 5, 2023 Initial Decision regarding the ARC airbag inflators, which Plaintiffs filed, in support of their contention. [Doc. 178-1 at 19 (citing [Doc. 165-1 at 4 n.1])]. Even assuming that it is appropriate for the Court to consider this document in deciding the instant motion to dismiss, all that Initial Decision reflects is that Autoliv ASP, Inc. provided the NHTSA "some information" that indicated that "it may not have legal liability for the Delphi-manufactured inflators" and that the NHTSA "has not verified the entity that has legal responsibility under 49 U.S.C. Chapter 301 for those inflators." [Doc. 165-1 at 5 n.1]. This does not carry the day for the Autoliv Defendants.[16]

[16] The Airbag Module Defendants also argue that the SAC does not name any vehicle with an airbag module manufactured by the Autoliv Defendants and fails to identify any Plaintiff who bought such a vehicle. But considering their resistance to Plaintiffs' assertion that the Autoliv Defendants are the successors-in-interest to Delphi's liabilities, it is unclear whether Defendants exclude Plaintiffs with early model-year Kia vehicles, which it may be reasonably inferred, based on the SAC's allegation that a Delphi airbag module was present in an early model-year Kia Optima, have Delphi airbag modules. Thus, the Court is unpersuaded.

The challenge to Joyson's responsibility for Takata airbag modules also fails but for a different reason. The Airbag Suppliers argue that Joyson's affiliates purchased certain assets of Takata pursuant to a reorganization plan approved by the United States Bankruptcy Court for the District of Delaware and that, in acquiring Takata's asserts, it did not assume Takata's liabilities. [Doc. 178-1 at 20]. Unlike with the Autoliv Defendants and Delphi, the SAC does not, in fact, allege that Joyson became the successor-in-interest to Takata's liabilities. Not does it reference Takata's relationship to Joyson in the section introducing Joyson. [*See* SAC I ¶¶ 37–40]. The SAC notes Takata's incorporation into Joyson (through Takata's acquisition by Joyson predecessor Key Safety System) in the context of relating an incident where an ARC inflator in a Takata-assembled airbag module ruptured during testing. But it does not appear that the SAC asserts liability against Joyson as Takata's successor. Thus, to the extent the Airbag Suppliers contend that the SAC seeks to hold Joyson responsible for Takata's acts, their argument is moot.

**In sum**, the SAC alleges sufficient facts to indicate that Plaintiffs have standing to sue the specified Airbag Suppliers. The Court, thus, **DENIES** the Airbag Suppliers' Motion to Dismiss, [Doc. 178], to the extent that it seeks dismissal of Plaintiffs' claims against them for lack of standing.

### V. Mootness of Claims for Recall-Covered Vehicles

GM contends that the Class Vehicles of 14 Plaintiffs (i.e., Anthony Wayne Brown (California),[17] Marcos Diaz (California), Celeste Felice (Florida), Dwayne Stowe (Georgia), Nicole Senkpeil (Illinois), Melissa Warren (Illinois), George Welch (Illinois), Leaha Barber (Kentucky), Manakia Eiland (Mississippi), Julie Struble (New Hampshire), Matthew Shephard (Pennsylvania), Aaron Jophlin (South Carolina), Elisabeth Lovett (Tennessee), and Kenneth Allan (Wisconsin) (the "Recall Plaintiffs")) are covered by GM's 2023 recall, which entitles the Recall Plaintiffs to free replacement of the airbag modules in their Vehicles and renders their claims moot (in a prudential sense). [Doc. 186-1 at 15–16]. Not so, Plaintiffs assert, arguing that the Recall Plaintiffs seek money damages, including for overpayment for their Vehicles, and GM's recall does not offer any compensation. [Doc. 222 at 12].

"Mootness doctrine is an adjunct to Article III's 'cases' and 'controversies' requirement." *Solak v. Ford Motor Co.*, 683 F. Supp. 3d 658, 663 (E.D. Mich. 2023) (citation modified). "Prudential mootness typically occurs when a controversy, not actually moot, is so attenuated that considerations of

[17] Two Plaintiffs named Brown who own GM Class Vehicles—Anthony Wayne Brown (owner of a 2014 Chevrolet Traverse) and Tina Brown (owner of a 2012 GMC Yukon). SAC I ¶¶ 169, 215. GM simply identifies Plaintiff "Brown" as covered by its recall. Because GM identifies no other Plaintiff who owns a GMC Yukon but does identify Chevrolet Traverse owning Plaintiffs (Nicole Senkpeil and Melissa Warren) as covered by the recall, the Court assumes that GM's reference to "Brown" is to Anthony Wayne Brown, who owns the same model year Chevrolet Traverse as Senkpeil. SAC I ¶¶ 169, 193.

prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Id.* In view of GM's recall, the Court considers the Recall Plaintiffs claims prudentially moot.

The crux of Plaintiffs' damages theory is that had they known of the Defect, they would have paid less for their Class Vehicles. In other words, the Inflator Defect allegedly diminished the value of the Recall Plaintiffs' Class Vehicles such that they overpaid for it at the point of sale. *See, e.g.*, SAC I ¶¶ 169, 183, 220, 242. But "the recall, which remedies the [Inflator Defect], moots Plaintiffs' overpayment claim because it removes the defect upon which the [P]laintiffs' diminished-value injury claim is based." *Pacheco v. Ford Motor Co.*, 2023 WL 2603937, at *5 (E.D. Mich. Mar. 22, 2023) (citation modified). And beyond speculation about whether GM's recall offers an adequate and timely inflator module replacement, they do not contend that the recall is ineffective. And "[n]umerous courts have declined to adjudicate automotive defect cases based on the mere prospect that a recall proves ineffective." *Solak*, 683 F. Supp. 3d at 664 (dismissing the plaintiff's claims, including those seeking overpayment damages, on prudential mootness grounds where the automaker initiated a recall to replace the defective airbags).

**Accordingly,** the Court **GRANTS** GM's motion to dismiss, [Doc. 186], to the extent that it **DISMISSES WITHOUT PREJUDICE** all claims by Plaintiffs A.W. Brown (California), Diaz (California), Felice (Florida), Stowe (Georgia),

Senkpeil (Illinois), Warren (Illinois), Welch (Illinois), Barber (Kentucky), Eiland (Mississippi), Struble (New Hampshire), Shephard (Pennsylvania), Jophlin (South Carolina), Lovett (Tennessee), and Allan (Wisconsin) as moot.

## VI. Failure to State a Claim

### A. Legal Standard

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, a defendant may move to dismiss the complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a 12(b)(6) motion to dismiss, the court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *United States v. Stricker*, 524 F. App'x 500, 505 (11th Cir. 2013). Even so, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555); *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282–83 (11th Cir. 2007). Thus, a complaint must satisfy certain pleading standards, and "the pleading standards in the Federal Rules of Civil Procedure apply to state-law claims litigated in federal court." *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1292 (11th Cir. 2025) (citation modified).

"[A] pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief" to satisfy "the pleading requirements of Rule 8." *True v. AbbiVie, Inc.*, 806 F. Supp. 3d 1361, 1368 (N.D.

Ga. 2025) (citation modified). Additionally, to survive a Rule 12(b)(6) motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Put differently, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This so-called "plausibility standard is not akin to a 'probability requirement;'" rather, the plaintiff must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim. *Id.*; *Twombly*, 550 U.S. at 556.

Notably, while "Rule 8(a)'s simplified pleading standard applies to [most] all civil actions," actions alleging fraud represent an exception. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). Rule 9(b) requires that "[i]n alleging fraud or mistake a party must state with particularity the circumstances constituting fraud or mistake." This "heightened pleading standard" requires the fraud plaintiff "to allege the who, what, when, where, and how of the fraudulent conduct." *Pop*, 2025 WL 2177719, at *4, 7 (citation modified). That is, "the plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiff; and (4) what the defendants gained by the alleged fraud." *Id.* at *7 (citation modified).

## B. Discussion

### 1. Sufficiency of Allegations Against Hyundai's and Kia's Parent Companies

Dismissal of Plaintiffs' claims against the South Korean companies Hyundai Motor Company ("Hyundai Korea") and Kia Corporation ("Kia Korea") is warranted for Plaintiffs' failure to allege sufficient facts to render their claims plausible. The following represents the entirety of the SAC's allegations concerning Hyundai Korea and Kia Korea: The companies are South Korea's two largest automobile manufacturers. SAC I ¶¶ 110, 115. Hyundai Motor is Kia Korea's largest investor, and both companies are part of the South Korea-based general partnership Hyundai Motor Group ("HMG"). *Id.* ¶¶ 110, 116. Hyundai Korea and Kia Korea are the parent companies of the U.S. based Hyundai America Inc. ("Hyundai") and Kia America, Inc. ("Kia"), respectively. *Id.* ¶ 116. Hyundai and Kia, both principally based in California, "manufacture[], design[], and distribute[] new vehicles under [their respective] brand[s]" and "also market[] lease[], warrant[], and oversee[] regulatory compliance and warranty servicing of [their respective] brand vehicles throughout the United States." SAC I ¶¶ 111, 114. Although not clearly stated, Plaintiffs appear to allege that HMG publicly refers to Hyundai Korea, Kia Corp, Hyundai, and Kia as the "Hyundai Kia Automotive Group," *id.* ¶ 116, and the four Defendants "frequently act jointly to advance the interest of all of selling cars in the United States," *id.* ¶ 110. The SAC refers to the four Defendants collectively as the "Hyundai-Kia Defendants" but includes no

allegations specific to Hyundai Korea's and Kia Korea's role concerning the Class Vehicles.

Hyundai Korea and Kia Korea together move to dismiss Plaintiffs' claims against them, arguing that the SAC fails to allege facts supporting their role in any wrongdoing against Plaintiffs. [Doc. 272-1 at 5]. They maintain that the SAC commits the "rare sin" of group pleading "without specifying which of the defendants are responsible for which acts or omissions" and fails to allege facts sufficient to state a claim against Hyundai Korea and Kia Korea. [*Id.* at 4–6 (quoting *Weiland*, 792 F.3d at 1323)]. The Court agrees. Although the SAC alleges that Hyundai Korea and Kia Korea are automakers, it does not allege that they manufacture, sell, distribute, market, warranty, or service the Class Vehicles. Rather, Plaintiffs allege that Hyundai and Kia perform those acts in the United States. And although Plaintiffs claim that Hyundai Korea and Kia Korea "frequently" act jointly with Hyundai and Kia to advance their collective interest in selling cars in the U.S., they fail to include sufficient facts showing that Hyundai Korea and Kia Korea either sell cars in the U.S. or that Hyundai's and Kia's sales activities are attributable to them. Plaintiffs' claim against Hyundai Korea and Kia Korea fail for the SAC's lack of particularized allegations showing that Hyundai Korea and Kia Korea play a role in the making, marketing, warrantying, or selling of the Hyundai and Kia Class Vehicles.

Plaintiffs resist this conclusion, arguing that the SAC does allege facts indicating Hyundai Korea's and Kia Korea's role in the manufacture, distribution, and sale of the Class Vehicles. [Doc. 275 at 7–11]. They point out that HMG refers to Hyundai Korea, Hyundai, Kia Korea, and Kia as the Hyundai Kia Automotive Group and that HMG lists the U.S. facilities as part of that group. [*Id.* at 7; SAC I ¶ 116]. Plaintiffs also cite to Hyundai Korea's financial statement, which acknowledge that Hyundai Korea and its subsidiaries (including, Hyundai) "manufacture and distribute motor vehicles and parts." [Doc. 275 at 7 & n.2 (citation modified)]. They request that the Court take judicial notice of the several cited financial statements because they are "publicly available financial disclosure documents." [Doc. 275 at 7 n.2]. To a limited extent, courts in the Eleventh Circuit do take judicial notice of financial statements. Specifically, "a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999). But this is not a securities case, and Plaintiffs provide no support for their proposition that the Court may take judicial notice of financial statements presented on a company's website, as opposed to filed with the SEC. Moreover, Plaintiffs appear to rely on the financial statements to establish as true the fact that Hyundai Korea and Hyundai manufacture

and distribute motor vehicles. Thus, the Court declines to take judicial notice of the cited financial statement.

But even if the Court were to take notice of Hyundai Korea's financial statements, it would not change the outcome. The fact that Hyundai Korea and Hyundai manufacture and distribute automobiles, as stated in the financial statements, is apparent from the SAC, which alleges that Hyundai Korea and Hyundai are both automakers. And the fact that Hyundai Korea manufactures and distributes automobiles says nothing about its role in the manufacturing and distribution of its, or Kia Korea's, role in the manufacturing and distribution of the Class Vehicles. This is also true of the fact that HMG lists Hyundai's and Kia's U.S. facilities as part of the Hyundai Kia Automotive Group. While the Hyundai Kia Automotive Group may claim the Hyundai and Kia U.S. manufacturing and research facilities, this fact does not suffice to indicate that Hyundai Korea and Kia Korea manufacturer their automobiles there. Indeed, according to the SAC, Hyundai and Kia use their respective U.S. facilities for manufacturing purposes.

Plaintiffs rely on *Ford v. Hyundai Motor Am.*, 2021 WL 7448507, at *19 (C.D. Cal. Oct. 5, 2021), where the court found the plaintiffs to have stated "sufficient facts regarding [Hyundai Korea] and [Hyundai's] corporate relationship to plead that [Hyundai] is either an agent or alter ego of Hyundai Korea." [Doc. 275 at 13 (quoting *Ford*, 2021 WL 7448507, at *19 )]. But there, the complaint alleged as follows:

> [Hyundai Korea], through its various entities, designs, manufactures, markets, distributes, and sells Hyundai automobiles . . . in the United States. . . . [O]ver 50% of Hyundai vehicles sold worldwide are sold in the United States. . . . [Hyundai Korea] is a fully owned subsidiary of HMC and . . . [Hyundai] acts as [Hyundai Korea's] United States sales and marketing division, overseeing sales and other operations across the United States. [Hyundai Korea] communicates with [Hyundai] concerning virtually all aspects of the Hyundai products it distributes within the United States and . . . Defendants jointly designed and manufactured the vehicles, developed the post-purchase owner's manuals and warranty booklets for the Class Vehicle, and made decisions regarding the alleged Defect. . . . [Hyundai Korea] and [Hyundai] each knew of and ratified the acts and omissions of the other and . . . there existed a unity of ownership between [Hyundai Korea] and [Hyundai] [such] that they were alter egos.

*Ford*, 2021 WL 7448507, at *19 (citation modified). The SAC's allegations do not even come close. The improper grouping of Defendants aside, the SAC fails to allege sufficient facts regarding Hyundai Korea and Kia Korea's actions that render Plaintiffs' claims against these two Defendants plausible. Accordingly, the Court **GRANTS** Hyundai Korea and Kia Korea's Motion to Dismiss, [Doc. 272], and **DISMISSES WITH PREJUDICE** Plaintiffs' claims against them.

#### 2. Viability of Fraud-Based Claims

The SAC asserts state-specific common law claims for fraud by omission and concealment for all 50 states and also advances claims premised on fraud under numerous, state-specific consumer protection statutes. *See, e.g.*, SAC II ¶¶ 409–10, 483–86, 552–55, 806–09, 1494–97. Several Defendants argue that the dismissal of Plaintiffs' fraud-based claims (i.e., Plaintiffs' common law fraud claims and statutory consumer protection claims that rest on allegations of fraud) is necessary because the SAC fails to plead fraud with particularity.

[*See, e.g.*, Docs. 178-1 at 29–31; 181-1 at 37–38]. Alongside their Rule 9(b) argument, some Defendants also contend that the fraud-based claims fail because the SAC does not allege facts showing (1) Plaintiffs' reliance on Defendants' representations; (2) Defendants' pre-sale knowledge of the Inflator Defect; and (3) Defendants' duty to disclose the Defect. [*See, e.g.*, Docs. 178-1 at 31–43; 180-1 at 6–7; 188-1 at 13–15]. Starting with the Rule 9(b) argument, the Court takes up each of Defendants' arguments in turn.

At the outset, the Court notes that some arguments are unique to a given Defendant or a set of Defendants, others tend to overlap, and there are also those that present alternative bases for dismissal of the challenged claims as to some or all Defendants. The Court has endeavored to resolve these arguments as efficiently and fulsomely as possible. Thus, at times, the Court does not address a separate ground for dismissal for a claim that has failed for an alternative reason. However, in instances where the Court considers alternative arguments and dismisses a given claim under both arguments, the dismissal is intended to be in the alternative, as supported by each of the arguments addressed.

**a. Particularity of Fraudulent Conduct**

The Airbag Suppliers argue that the SAC fails to allege facts specifying the allegedly fraudulent conduct in which each of them engaged. [Doc. 178-1 at 29]. They argue that the SAC lacks facts identifying any instance where any one of the Airbag Suppliers omitted disclosing the alleged Inflator Defect and does not even specify the person or entity responsible for making the

disclosure. [*Id.* at 30]. The Airbag Suppliers further contend that not only does the SAC not allege that the Airbag Suppliers wrote or disseminated the advertising and other informational material to which Plaintiffs were allegedly exposed, it also does not allege which documents the Airbag Suppliers omitted disclosing and which of them did so. [*Id.* at 31].

The Court agrees with Plaintiffs, however, that the SAC sufficiently discloses "the who, what, when, where, and how of the fraudulent conduct." [Doc. 220 at 23]; *Pop*, 2025 WL 2177719, at *4, 7 (citation modified). Generally,

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1366 (N.D. Ga. 2013) ("*McCabe I*") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). However, "[t]he Rule 9(b) particularity requirement functions differently in the context of omission-based fraud claims. By the very nature of fraudulent concealment, plaintiffs cannot be expected to point to the time, place, and precise substance of what should have been disclosed." *McClure v. Toyota Motor Corp.*, 759 F. Supp. 3d 1333, 1357 (N.D. Ga. 2024) (citation modified). Consequently, "it is enough for a plaintiff to allege that a fact was material and that it could have, and should have, been disclosed prior to the time plaintiffs acted upon the omission." *Id.* (citation modified).

The SAC satisfies Rule 9(b)'s requirement by alleging the who, what, when, where, and how of Defendants' fraudulent omissions and concealment, to the extent practicable at this early stage. Specifically, the SAC identifies each of the Airbag Suppliers (who). SAC I § II.A.2. It also alleges that starting with their earliest knowledge of the alleged Defect based on their involvement in the design, manufacturing, assembly, and investigation of the ARC airbag inflators and through to each Plaintiff's lease or purchase of a Class Vehicle, the Airbag Suppliers chose not to warn about or disclose the Defect (what and when) through means that were "readily available," including stickers, placards, pamphlets, and complete disclosure by way of recalls (where and how). Id. ¶¶ 264, 266, 269, 377–78. As to the materiality of the omitted disclosure, the SAC alleges that (1) the alleged Defect renders the airbags in the Class Vehicles unsafe and dangerous, (2) the Airbag Suppliers' silence "distorted and misrepresented the true value of every Class Vehicle," (3) had the Airbag Suppliers disclosed the Defect, Plaintiffs would not have bought the Class Vehicles or would have paid less for them, and (4) the Airbag Suppliers maintained their silence to continue to profit from the "manufacture, marketing, sale, service, and use" of the allegedly defective airbag inflators and the Class Vehicles equipped with them. *Id.* ¶¶ 376, 378, 380–81. These allegations are sufficient under Rule 9(b). *See McClure*, 759 F. Supp. 3d at 1358 (finding similar allegations of fraudulent omission satisfied Rule 9(b)'s particularity requirement); *McCabe I*, 948 F. Supp. 2d at 1367 (same). This is

so even though the SAC directs the above identified to Defendants, collectively, often without distinguishing between the three sets of Defendants and without identifying any specific Airbag Module Defendant entity, because the SAC explains (1) the role of each set of Defendants in the airbag supply chain, (2) how each Airbag Module Defendant contributes to that chain, and (3) the basis for their knowledge of the alleged Inflator Defect, and it accuses each Defendant of engaging in the same fraudulent conduct.

Contrary to the Airbag Suppliers' contention, the fraud-based claims do not fail because the SAC does not allege that the Airbag Suppliers wrote or disseminated the advertising and other informational material Plaintiffs observed or because it does not allege which documents the Airbag Suppliers omitted disclosing. Plaintiffs' fraud allegations are premised on "an *omission*—a non-statement" and, thus, Plaintiffs need not identify materials by the Airbag Suppliers containing the omissions. *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1337 (S.D. Fla. 2016) ("*Takata II*"); *see also Sowa v. Mercedes-Benz Grp. AG*, 764 F. Supp. 3d 1233, 1279 (N.D. Ga. 2024) (identification of specific fraudulent statements, their time and place, and their content not necessary to allege fraudulent omission-based claims).

Similarly, the U.S. Automakers argue that the SAC does not identify "any specific statements or omissions from any Defendant in any specific

document, advertisement, or conversation." [Doc. 181-1 at 37].[18] However, as noted above, the SAC alleges omission-based fraud claims and, thus, it need not identify specific materials with the omissions. As it does for the Airbag Suppliers, the SAC alleges that (1) the identified Automakers (who), (2) were aware of the Inflator Defect from the time of their involvement in the design, manufacturing, assembly, and investigation of the ARC airbag inflators through the time of each Plaintiff's lease or purchase of their Class Vehicle (when), (3) but chose not to warn about or disclose the Defect (what) through means that were "readily available," including stickers, placards, pamphlets, advertising, owner manuals, and recalls (where and how). SAC I § II.A.3, ¶¶ 266, 269, 377–78.[19]

[18] PCNA presents an iteration of this argument, including that the SAC does not provide details of the advertisements that the sole Porche Class Vehicle owning Plaintiff (Stephen Gearhart (Florida)) encountered or facts supporting the existence of the Defect in a Porche vehicle. [*See* Doc. 187 at 2–3]. This argument fails for the reasons discussed in this and other sections of this order. The Court, however, does not separately address the remainder of PCNA's Motion, which addresses Gearhart's claims under Florida law and certain requests for relief because it relies on the arguments made by the U.S. Automakers in their joint Motion. Thus, the fate of PCNA's Motion is tied to the Court's treatment of the U.S. Automakers' Motion.

[19] Although the SAC also alleges that, through unspecified "advertisements, promotional materials and other public statements," each Automaker "uniform[ly] and pervasive[ly] market[ed] [the] message that its vehicles are safe and dependable," *see, e.g.*, SAC I ¶¶ 142, 144, 151, 186, 223, Plaintiffs restrict their common law fraud claims to Defendants' concealment and failure to disclose the Defect, *see, e.g.*, SAC II ¶¶ 2625–2640 (Count 30(d), which is representative of Plaintiffs' fraud claims). Plaintiffs' fraud claims do rely on the Automakers' marketing misrepresentations, but that reliance is simply to support the allegation that the "incomplete representations about the safety and reliability of the Class Vehicles" imparted a duty on these Defendants to "disclose the whole truth." *See, e.g.*, SAC II ¶ 2630. Thus, the

BMW specifically argues that the SAC's "lumping" together of BMW America and BMW Manufacturing is particularly problematic, under both Rules 8 and 9, because "even Plaintiffs recognize [that they] serve different roles"—that is, BMW America distributes cars and BMW Manufacturing assembles cars. [Doc. 183-1 at 11–12 (citing SAC I ¶¶ 78–79)]. This argument is unavailing. True, the SAC alleges that BMW Manufacturing "designs, manufactures, assembles, and tests BMW brand cars" while BMW America "imports, promotes, advertises, distributes, and sells . . . BMW brand cars, trucks, and sport utility vehicles." SAC I ¶¶ 78–79. BMW appears to argue that BMW Manufacturing only "assembles" vehicles and, thus, that Plaintiffs fail to allege facts showing that it also engages in marketing, promoting, advertising, distributing, and selling BMWs. [Doc. 183-1 at 11–12]. But, as it does for BMW America, the SAC specifically alleges that BWM Manufacturing also "markets, promotes, advertises, distributes, and sells BMW brand cars, trucks, and sport utility vehicles." *Id.* ¶ 79. At this stage, the Court takes the

SAC does not seek to assert a fraudulent misrepresentation claim against the Automakers. If, in fact, Plaintiffs seek to also advance a fraudulent misrepresentation claim, the Court agrees with the U.S. Automakers that the SAC fails to plead such a claim with the particularity that Rule 9 requires. For example, Plaintiffs "do not plead the precise statements made in [the Automakers'] advertisements, fail to include examples of advertisements, or when they saw advertisements. Plaintiffs do not include descriptions of what advertisements they saw—whether it was in a newspaper, on television, online, in a mailing or some other medium." *Ray v. Spirit Airlines, Inc.*, 2015 WL 11143079, at *5 (S.D. Fla. June 4, 2015), *aff'd*, 836 F.3d 1340 (11th Cir. 2016). But again, it does not appear that Plaintiffs base their fraud claims on the Automakers' alleged affirmative misrepresentations.

SAC's allegation as true and concludes that Plaintiffs have sufficiently allege that BWM Manufacturing specifically engages in the above-described conduct.

BMW also urges the Court to dismiss Plaintiffs' claims for fraud and for violations of statutory consumer protection laws against BMW Manufacturing, arguing that it is an assembly factory and does not engage in the sale of or advertising for the BMW Class Vehicles. [Doc. 183-1 at 13–14]. BMW contends that it is implausible that two companies promote, advertise, distribute, and sell BMWs in the United States, especially given that one is named BMW *Manufacturing*. [Doc. 243 at 7–8 (emphasis in original)]. The Court is unpersuaded. Again, the SAC alleges that BMW Manufacturing engages in sales and advertising of BMWs. The fact that it is a vehicle *manufacturing* company does not render this alleged role implausible. In short, the SAC sufficiently alleges that BMW Manufacturing sells and advertises BMWs and, thus, the dismissal of Plaintiffs' fraud and fraud-based statutory consumer protection claims against BMW Manufacturing on this basis is not warranted.

Accordingly, the Airbag Suppliers' and the U.S. Automakers' arguments that the SAC fails to allege fraud with particularity fails. And the Court **DENIES** the motions to dismiss, [Docs. 178, 181, 183], to the extent that they request the dismissal of Plaintiffs' fraud claims for lack of compliance with Rule 9.

**b. Economic Loss and Manifestation Rules as a Bar**

The U.S. Automakers argue that the economic-loss rule bars Plaintiffs' common law fraud claims under the laws of over half of the 50 states and that

it also bars Plaintiff's fraud-based consumer protection claims under the statutes of some of these states.[20] According to the U.S. Automakers, some states also preclude fraud-based statutory consumer protection claims when the defect has not manifested. Below, the Court first addresses the application of the economic loss rule and then turns to the state-specific requirement for manifestation.

**i. Economic Loss Rule**

"The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *In re Grandparents.com, Inc.*, 614 B.R. 625, 633 (Bankr. S.D. Fla. 2020) (citation modified). "The economic loss rule generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract, not tort. Under the economic loss rule, a plaintiff can recover in tort only those economic losses resulting from injury to his person or damage to his property[.]" *Murray v. ILG Techs., LLC*, 378 F. Supp. 3d 1227, 1243 (S.D. Ga. 2019), *aff'd*, 798 F. App'x 486 (11th Cir. 2020). Here, the SAC does not allege personal injury or property damage; rather, alleging overpayment and diminishment in value, the SAC seeks the return of Plaintiffs' purchase price.[21] *See, e.g.*, SAC II ¶¶ 23, 143, 255, & § IX. Plaintiffs

[20] The Court refers to common law fraud claims and claims alleging fraud-based violations of consumer protection statutes collectively as "fraud-based claims."

[21] The SAC also requests that the Court award compensatory damages. SAC II § IX(E). However, no Plaintiff alleges that he or she has incurred repair or other expenses because of the Defect.

do not dispute that they seek only economic losses. They contend that one or more exceptions to the application of the economic loss rule shield their claims.

Before considering whether the economic loss rule bars Plaintiffs' fraud claims, it is important to understand the parameters of those claims. The SAC asserts substantively identical claims for fraud (by omission and concealment) under the common law of each of the 50 states. Plaintiffs base these claims on Defendants' failure to disclose the Inflator Defect, which, Plaintiffs allege, was intended to and succeeded in inducing them to buy or lease their Class Vehicles. *See, e.g.*, SAC II ¶¶ 2637–38. In this respect, Plaintiffs' fraud by omission and concealment claims are akin to fraud in the inducement claims. Importantly, as to the Automakers, Plaintiffs allege that although the Inflator Defect rendered the Class Vehicles dangerous and unreliable, the Automakers promoted the Class Vehicles as "safe and dependable" and intentionally concealed the Defect. *See, e.g.*, SAC I ¶¶ 142, 143, 146, 153, 160, 167, 175, 184, 186, 189, 191, 203, 207, 228, 255, 376–379. Thus, the thrust of Plaintiffs' fraud claims is that by failing to disclose the Defect, the Automakers misrepresented the safety and reliability of the Class Vehicles. This alleged misrepresentation by the Automakers concerns the Class Vehicles' quality. Similarly, as pled, ARC's and the Airbag Suppliers' fraudulent conduct also concerns the Class Vehicles' quality because these Defendants allegedly failed to disclose a defect affecting the Class Vehicles' safety and dependability. The SAC does not allege any other fraudulent conduct by any Defendant. In essence, Plaintiffs' fraud

claims duplicate the warranty dispute. For example, Plaintiffs base their breach of express warranty claims on the Automakers' alleged failure to deliver on the warranty that, among other things, the Class Vehicles were "safe and reliable." *See, e.g.*, SAC II ¶¶ 440, 1863, 2312, 2735, 3383, 3903. With this understanding, the Court takes up the Parties' arguments.

According to the U.S. Automakers, the economic loss rule bars Plaintiffs' common law fraud claims for the following 27 states: Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Illinois, Kentucky, Maine, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wisconsin. [Doc. 181-1 at 39 & n.29]. Plaintiffs respond that the dismissal of their fraud claims under the economic loss rule is not warranted for one of three reasons. First, they contend that the following 25 states recognize fraud or fraudulent inducement as exceptions to the economic loss rule: Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Kentucky, Maine, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wisconsin. [Doc. 221 at 54 & n.39]. Second, they argue that the following states recognize an exception to the economic loss rule where a safety defect is at issue or there is a risk of injury or death: Kentucky, Maine,

Maryland, New Jersey, North Carolina, and Pennsylvania.[22] [*Id.* at 54 & n.40]. Third, they argue that Arkansas, Maryland, Michigan, Missouri, New Jersey, New York, Oklahoma, Pennsylvania, and Tennessee do not recognize the economic loss rule or do not apply it to "certain claims." [*Id.* at 55 & n.41].

Because Arizona, California, Colorado, Georgia, Illinois, New Hampshire, New York, North Carolina, South Dakota, Tennessee, and Texas exempt fraud claims generally or the specific type of fraud claims alleged here from the economic loss rule's bar, Plaintiffs' fraud claims under the laws of these states survive the U.S. Automakers' challenge. *See Barrett-Jackson Auction Co. LLC v. Mountain Sports Int'l Inc.*, 2020 WL 9349176, at *4 (D. Ariz. Sept. 9, 2020) (surveying Arizona law and concluding that "the economic loss doctrine does not bar Plaintiff's claims for fraud and negligent misrepresentation"); *Meneses v. FCA US LLC*, 2025 WL 2994998, at *6 (C.D. Cal. Oct. 3, 2025) (applying California law and explaining that "[f]raud is an

[22] Plaintiffs solely rely on *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 687 (E.D. Mich. 2020), for the argument that Kentucky, Maine, New Jersey, North Carolina, and Pennsylvania do not apply the economic loss rule to claims alleging safety-related defects or the risk of injury or death. [Doc. 221-2 at 3]. *Francis* synthesizes the law of several states and concludes that they limit the economic loss rule to specific causes of actions or decline to apply to cases alleging fraudulent inducement or the withholding of information about safety-related defects. 504 F. Supp. at 687. Moreover, the authorities that *Francis* cites for the application of the economic loss rule in Kentucky, Maine, New Jersey, and North Carolina do not recognize an exception in tort cases concerning a safety-related defect or risk of injury. Thus, Plaintiffs' argument that these states recognize an exception where the tort claim concerns the withholding of information about a safety-related defect is unsupported.

independent, intentional tort, for which recovery in tort is not barred by the economic loss rule" and this "is just as true for fraud claims involving concealment as it is for those involving affirmative deception"); *In re Bloom*, 2022 WL 2679049, at *4 (10th Cir. July 12, 2022) (considering "the Colorado Supreme Court's comment on the development of Colorado law" and concluding that "common law fraud and fraudulent concealment claims are both tort claims that arise independent of a contract, so they would not be barred by the economic loss rule"); *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC*, 486 P.3d 439, 455 (Colo. App. 2021) (relying on "the significant developments in the law pertaining to the economic loss rule's applicability to intentional torts," and concluding "that the district court erred when it applied the economic loss rule to dismiss [the plaintiff's] claims of fraudulent concealment"); *Bolling v. Mercedes-Benz USA, LLC*, 2024 WL 3972987, at *17 (N.D. Ga. Aug. 27, 2024) ("*Bolling I*") (holding that the economic loss rule does not bar fraudulent concealment claims under Georgia law); *Iwaski v. P&G Rare Violins, Inc.*, 2025 WL 2720408, at *4 (N.D. Ill. Apr. 17, 2025) (allowing fraud claims, including fraud by non-disclosure claim, to proceed because "Illinois expressly recognizes fraud claims as an exception to the economic loss doctrine"); *Simpson v. Nissan of N. Am., Inc.*, 2023 WL 7308072, at *13 (M.D. Tenn. Nov. 6, 2023) (concluding that fraudulent omission claim not barred by the economic loss rule in New Hampshire where the "omission at issue induced the plaintiff to enter into the

contract" and declining to dismiss fraud claim alleging that if the plaintiff had been informed of her vehicle's defect, she would not have bought the vehicle (citation modified)); *Acquard v. Big Heart Pet Brands, Inc.*, 2020 WL 12904361, at *6 (W.D.N.Y. Nov. 30, 2020), *R. & R. adopted*, 2021 WL 6550088 (W.D.N.Y. Jan. 4, 2021) (recognizing that "numerous courts applying New York law" have declined to bar fraud claims under the economic loss rule); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297–98 (S.D.N.Y. 2015) (noting "the absence of any contrary authority from the New York state courts" and declining to "dismiss Plaintiffs' fraud claims on the basis of the economic loss doctrine); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 966 (N.D. Cal. 2014) (concluding that North Carolina law does not support the dismissal of fraudulent concealment claim under the economic loss rule); *Cummings v. Carroll*, 270 N.C. App. 204, 231 (N.C. Ct. App. 2020), *aff'd in part, rev'd in part*, 379 N.C. 347 (N.C. 2021) (reiterating that, under North Carolina law, "[t]he economic-loss rule does not bar fraud claims, even where the alleged fraud also breaches a contractual term between the parties"); *City of Sioux Falls v. Azzuro, Inc.*, 798 F. Supp. 3d 963, 1002 (D.S.D. 2025) (agreeing with the prediction "that the South Dakota Supreme Court would hold that the economic loss doctrine does not bar fraud . . . claims which concern misrepresentations [of "past or existing facts"] about the quality or characteristics of goods being sold under contract" and declining to dismiss fraud claims under the economic loss rule); *Stockley v. Nissan of N. Am., Inc.*,

701 F. Supp. 3d 682, 710 (M.D. Tenn. 2023) (recognizing that Tennessee law supports an exception to the economic loss rule for fraudulent omission claims by an "ordinary consumer" who alleges that the defendant's failure to disclose the defect induced her into buying the product at issue); *SBI Crypto Co. v. Whinstone US, Inc.*, 2023 WL 7443202, at *5 (W.D. Tex. Oct. 25, 2023), *R. & R. adopted*, 2023 WL 7429179 (W.D. Tex. Nov. 9, 2023) (declining to dismiss fraud claims because the economic loss rule does not apply "when a plaintiff can provide a plausible basis for claims of fraud" as Texas recognizes an independent duty to refrain from "avoiding fraud of all kinds, including fraudulent omission"); *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 (Tex. 2011) (explaining that Texas courts allow recovery of "pure economic loss" for certain torts, including fraud and fraudulent inducement) (citation modified).

Plaintiffs' fraud claim under Maryland law survives because the state "recognize[s] an exception [to the economic loss rule] where the plaintiff alleges the concealment or failure to warn of a defect giving rise to a "serious risk of bodily harm." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 590 (E.D. Mich. 2018) ("*In re Gearshift Litig. I*"). Under Maryland law, "in limited circumstances, those in which a product defect presents a substantial, clear and unreasonable risk of death or personal injury, it is inappropriate to draw a distinction between mere economic loss and personal injury." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 123–24 (Md. App.

Ct. 2007) (citation modified). Thus, a plaintiff may "assert a cognizable products liability theory of recovery, [in] an action sounding in tort, but one premised on economic loss alone," if the plaintiff "allege[s] facts that demonstrate that the product at issue creates a *dangerous condition*, one that gives rise to a *clear danger of death or personal injury*." *Id.* at 124, 129 (emphasis in original) (reversing the grant of summary judgment on fraudulent concealment claims because "so long as sufficient allegations of a serious risk of bodily harm or death has been made," there is no reason "why the petitioners should be barred from asserting a claim for economic loss resulting from fraudulent concealment"). Here, the SAC adequately alleges that the Inflator Defect presents a serious risk of injury or death. For example, according to the SAC, when the airbag is deployed, the ARC airbag inflator may rupture due to its defective design, resulting in the forceful propulsion of metal fragments towards the vehicle's occupant(s), and ruptures of ARC's inflators have caused fatalities in two instances and serious injuries in other instances. SAC I ¶¶ 2, 335, 339, 341, 361.

Plaintiffs' fraud claims under Arkansas law also survives because the state does not recognize the economic loss rule. *See Willman v. Riceland Foods, Inc.*, 630 F. Supp. 2d 999, 1002–03 (E.D. Ark. 2007) ("Under Arkansas law, economic loss without other damage, can be awarded in cases where negligence, misrepresentation, and fraud are alleged.").

Contrary to Plaintiffs' argument, however, Alabama, Florida, Kentucky, Maine, Michigan, Minnesota, Missouri, Nebraska, New Jersey, Oklahoma, Pennsylvania, South Carolina, Utah, and Wisconsin either do not recognize fraud as an exception or do not exempt fraud claims from the economic loss rule's application where, as here, the alleged fraud concerns the quality or nature of the product. Specifically, Plaintiffs allege that, although the Inflator Defect rendered the Class Vehicles dangerous and unreliable, the Automakers promoted them as "safe and dependable" and intentionally concealed the Defect. *See, e.g.*, SAC I ¶¶ 142, 143, 146, 153, 160, 167, 175, 184, 186, 189, 191, 203, 207, 228, 255, 376–379. Again, the thrust of Plaintiffs' fraud claims is that by failing to disclose the Defect, the Automakers misrepresented the safety and dependability of the Class Vehicles. This alleged misrepresentation through non-disclosure or concealment concerns the Class Vehicles' quality. The SAC does not allege any other fraudulent conduct that may have affected Plaintiffs' decision to buy (or lease) their Class Vehicles. The above-mentioned states apply the economic loss rule to bar the type of fraudulent concealment and omission claims that Plaintiffs make. *See Harris Moran Seed Co. v. Phillips*, 949 So. 2d 916, 931 (Ala. Civ. App. 2006) (affirming dismissal of fraudulent suppression claim under Alabama law based on the application of the economic loss rule); *Burt v. Volkswagen Grp. of Am., Inc.*, 790 F. Supp. 3d 1309, 1324 (N.D. Ala. 2025) (dismissing Alabama-law based fraudulent misrepresentation claim on other grounds but noting that had the plaintiff "properly alleged

actionable misrepresentation" the economic loss rule would have barred her from recovering damages for her allegedly defective vehicle); *Takata II*, 193 F. Supp. 3d at 1339 (holding that where "the fraudulent concealment claims allege precisely what a breach of warranty claim would allege—namely that the [class] vehicles did not work as promised[,] . . . Florida's economic loss rule applies to such claims); *Riley v. Gen. Motors, LLC*, 664 F. Supp. 3d 1336, 1346 (M.D. Fla. 2023) ("Fraudulent concealment claims in the products liability sphere that seek to recover only economic damages are clearly barred by Florida's economic loss rule." (citation modified)); *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 414 (6th Cir. 2022) (explaining that Kentucky's application of "the economic-loss rule bars recovery for fraud," including fraudulent inducement); *Am. Aerial Servs. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111 (D. Me. 2014) ("conclud[ing] that Maine would extend the economic loss doctrine to claims for fraudulent misrepresentation by a seller to a buyer where the misrepresentation concerns the quality of the goods or product promised in the sales contract" and dismissing fraud claims on summary judgment); *Murphy v. P&G Co.*, 695 F. Supp. 2d 600, 607–08, 608 n.5 (E.D. Mich. 2010) (explaining that where, as here, "the only misrepresentation by the dishonest party concerns the quality or character of the goods sold" and results in only economic damages, Michigan law precludes the fraud claim); *Forjas Y Macquinados, S.A. De C.V. v. Mectron Eng'g Co.*, 2019 U.S. Dist. LEXIS 21535, at *16–17 (E.D. Mich. Feb. 11, 2019) (concluding

that "Plaintiffs' fraudulent inducement claim does not satisfy Michigan's limited exception to the economic loss rule" because the "representations identified by Plaintiffs[] as fraudulent are really alleged misrepresentations about the nature, quality, and capabilities of the [product]" and "Plaintiffs do not allege any independently fraudulent or otherwise sinister activity"); *Marvin Lumber & Cedar Co. v. Ppg Indus.*, 223 F.3d 873, 885 (8th Cir. 2000) (agreeing that the economic loss rule does not bar fraud claims that are "independent of the contract," but recognizing, under Minnesota law, "a limitation on this exception" and affirming dismissal of "fraud claims concerning representations about [the product]" because such "representations or descriptions about goods may become express warranties" and "are not independent of the contract"); *Flynn v. CTB, Inc.*, 2015 WL 5692299, at *12 (E.D. Mo. Sept. 28, 2015) (recognizing that "where the fraudulent misrepresentation concerns the quality, character, or safety of the goods sold, the economic loss doctrine bars the fraud claim because it is substantially redundant with warranty claims" and barring fraudulent misrepresentation and inducement claims under Missouri law where the "[p]laintiffs' damages flow[ed] from their frustrated expectations about the quality and performance of the [product]");[23] *Kuecker Logistics Grp., Inc. v. Greater Omaha Packing*

[23] Plaintiffs rely on *Browning v. Anheuser-Busch, LLC*, 539 F. Supp. 3d 965, 974 (W.D. Mo. 2021) (Ketchmark, J.), for the proposition that Missouri's economic loss rule does not apply to consumers' fraud claims. [Doc. 221-2 at 4]. But, as that court later acknowledged, the Missouri Supreme Court has not "specifically addressed whether the economic loss doctrine applies only to

*Co.*, 2023 WL 3198418, at *2 (D. Neb. Apr. 14, 2023) (predicting that although "the Nebraska Supreme Court would recognize fraud in the inducement as a non-controversial exception to the economic loss doctrine," it "would also recognize an exception to the exception where the tort claims are substantially redundant of warranty claims or where the misrepresentations are not independent of the contracts" and, consequently, dismissing fraud claim based on misrepresentation that "plainly relates to the quality or character of goods"); *In re Subaru Battery Drain Prods. Liab. Litig.*, 2021 WL 1207791, at *29 (D.N.J. Mar. 31, 2021) (explaining that New Jersey courts "recognize[] an exception to the economic loss rule for affirmative fraudulent misrepresentations, but [they] decline[] to apply the exception to claims of fraudulent concealment or omission" and dismissing fraud claims premised on allegations that the defendant had knowledge of the vehicle defects but, while marketing them as "safe and reliable," failed to disclose the defect to the plaintiffs during the sale); *McCowan v. Williams Indus. Servs. Grp., Inc.*, 2019 WL 4884230, at *7 (N.D. Okla. Oct. 3, 2019) (applying Oklahoma's law on the economic loss rule and granting summary judgment on the fraudulent

---

commercial-purchasers or commercial transactions." *Tuter v. Freud Am., Inc.*, 2022 U.S. Dist. LEXIS 178459, at *30 (W.D. Mo. Sep. 30, 2022) (Ketchmark, J.). Unlike *Browning*, *Tuter* analyzes Missouri law to conclude that the state's highest court would extend the economic loss rule to tort claims for consumer transactions. *See Holman v. Ali Indus., LLC*, 654 F. Supp. 3d 871, 882 (W.D. Mo. 2023) (agreeing with *Tuter* that "Missouri courts have not delineated a commercial-consumer distinction in the economic loss doctrine" and dismissing consumer's claim under the economic loss rule). Thus, here, the Court applies Missouri law on the economic loss rule to Plaintiffs' fraud claims.

dismissal claim where the plaintiff claimed only economic loss); *Fields v. Hench's Country Liv'n Homes of Calera*, 806 F. Supp. 3d 1254, 1259 (E.D. Okla. 2025) (noting that "Oklahoma recognizes the economic loss rule only in the context of manufacturers' products liability, barring recovery solely for injury to the product resulting in economic loss"); *Hatboro Horsham Sch. Dist. v. TAMKO Bldg. Prods., LLC*, 2025 WL 2935251, at *5 (E.D. Pa. Oct. 15, 2025) (concluding, under Pennsylvania law, that although "the economic loss doctrine does not bar fraudulent concealment claims when . . . the defendant committed fraud to induce another to enter into a contract," a plaintiff "cannot rely on the inducement exception to overcome the economic loss doctrine" where, as here, the alleged fraud "concern[s] the quality or characteristics of the goods sold" (citation modified)); *Carroll v. Isle of Palms Pest Control, Inc.*, 446 S.C. 177, 186 (S.C. 2025), *reh'g denied* (Aug. 11, 2025) (refining South Carolina's economic loss rule and holding that "the rule applies only in the product liability context and when the only injury is to the product itself. In such instances, the loss is economic or commercial, and the remedy is limited to the laws of contract or warranty."); *Sapp v. Ford Motor Co.*, 386 S.C. 143, 146 (S.C. 2009), *abrogated on other grounds by Carroll*, 446 S.C. 177 (affirming dismissal of tort claims, including for "fraud/misrepresentation," under the economic loss rule because "[t]he only damage caused by the defect in the trucks was damage to the trucks themselves—purely an economic loss"); *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 196 (Utah

2018) ("[T]he economic loss rule applies to a fraudulent inducement claim that overlaps completely with a contract claim—in the sense that the alleged fraudulent inducement is also a breach of a warranty in the contract." Thus, "where the party's tort claim is a mere duplication of its breach of contract claim, there is no exception to the economic loss rule. The tort claim is barred."); *and Kaloti Enters. v. Kellogg Sales Co.*, 283 Wis.2d 555, 585, 587 (Wis. 2025) (holding that "a fraud in the inducement claim is not barred by the economic loss doctrine where the fraud is extraneous to, rather than interwoven with, the contract" but that fraud claims concerning "the performance or the quality or character of the goods sold" are barred because such "[m]atters are expressly or implicitly dealt with in the contract").

As to Plaintiffs' statutory consumer protection claims, the U.S. Automakers maintain that the economic loss rule also bars Plaintiffs' claims alleging fraud-based violations of the consumer protection statutes in the following 10 states: Florida, Maryland, Michigan, Missouri, New York, North Carolina, Oklahoma, Pennsylvania, Tennessee, and Wisconsin. [Doc. 181 at 39 & 39 n.30]. The U.S. Automakers neither separately identify the authority that supports the dismissal of the statutory consumer protection claims nor explain why authority supporting the dismissal of common law claims fraud claims equally supports the dismissal of those fraud-based statutory claims that they target. [See Doc. 181-7 at 14–15]. Nevertheless, the Court has reviewed the cited cases for the relevant states to determine whether they discuss the

application of the economic loss doctrine to claims under that state's statutory consumer protection laws. To the extent they do not, the U.S. Automakers' argument fails for lack of support. Specifically, the cases that the U.S. Automakers cite for the economic loss rule as applied in Florida, Missouri, Oklahoma,[24] Tennessee and Wisconsin do not discuss the rule in the context of statutory consumer protection claims. And although in *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 622 (D. Md. 2014), a case the U.S. Automakers cite, the Maryland district court dismissed a claim under the Maryland Consumer Protection Act for the plaintiff's failure to plead an injury, it did not apply the economic loss rule. In contrast, *Murphy*, one of the two cases that the U.S. Automakers advance for the dismissal of fraud-based claims under the Michigan economic loss rule, *does* consider the rule in the context of claims under the Michigan Consumer Protection Act (MCPA). In a footnote, Murphy suggests that "[t]he underlying rationale of the economic loss

[24] To be clear, *Walls v. Am. Tobacco Co.*, 11 P.3d 626, 630 (Okla. 2000), which the U.S. Automakers advance in support of the dismissal of Plaintiffs' fraud and statutory consumer protection claims under Oklahoma law notes that the dismissal of a claim alleging the violation of the Oklahoma Consumer Protection Act (OCPA) is proper where "the plaintiffs . . . incurred no monetary damages and . . . received precisely what they had bargained for." Correspondingly, *Walls* concluded that "to have a private right of action under § 761.1(A), a consumer must suffer some detriment or loss as a result of a violation of the OCPA." The Court does not perceive *Walls*' analysis as an application of the economic loss rule to the OCPA claim. Moreover, the U.S. Automakers fail to provide any authority indicating that the economic loss Plaintiffs allege—for example, the diminished value of their Class Vehicles—does not qualify as monetary damages. And Plaintiffs maintain that contrary to their expectations of the sale, they received defective vehicles—i.e., they did not receive that which they bargained for.

doctrine" applies to MCPA claims. 695 F. Supp. 2d at 606 n.3. However, the Court declines to dismiss the MCPA claim based on *Murphy*'s dictum. Not only does "[a] competing footnote in a Michigan Court of Appeals case suggests otherwise," the "case on which [*Murphy*] relies for the proposition that the economic loss doctrine bars MCPA claims does not so hold." *Hall v. Trivest Partners, L.P.*, 2023 WL 5941729, at *8–9, 9 n.3 (E.D. Mich. Sept. 12, 2023), *rev'd on other grounds*, 178 F. 4th 986 (6th Cir. 2026).

The U.S. Automakers cite to *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, *21 (S.D.N.Y. 2021), and *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009), as supporting the dismissal of Plaintiffs fraud-based claim under New York General Business Law § 349 (Count 33(c)). [Doc. 249-2 at 9]. But neither case expressly applies the economic loss rule. Moreover, *HSM Holdings* cites *Spagnola* for the proposition that "[a] Section 349 claim should also be dismissed if the plaintiff fails to allege a loss independent of the loss caused by the alleged breach of contract." 2021 WL 918556, at *21 (citation modified). The Second Circuit has clarified, however, that *Spagnola* "*do[es] not establish a requirement* that a plaintiff allege an injury under § 349 independent of their contract damages." *Milligan v. GEICO Gen. Ins. Co.*, 2022 WL 433289, at *6 (2d Cir. Feb. 14, 2022) (emphasis in original). Rather, under *Spagnola*, "no § 349 claim exists where the plaintiffs allege damages in the amount of the purchase price of their contracts, but fail to allege that defendants have denied them the services for which they contracted." *Id.*, 2022

WL 433289 at *6 (citation modified). Although, here, Plaintiffs claim the same loss from the U.S. Automakers' deceptive practices as they do from their breach of warranty, this case does not involve the provision of services. The Court, thus, is not persuaded that the cases the U.S. Automakers cite support the dismissal of Plaintiffs' § 349 claim under the economic loss rule.[25]

Similarly, while the U.S. Automakers rely on *Buffa v. Cygnature Constr. & Dev., Inc.*, 2016 WL 7984216, at *7 (N.C. Ct. App. Dec 30, 2016), this case does not support the dismissal of Plaintiffs' consumer protection claim under the North Carolina Unfair and Deceptive Trade Practices Act (NC UDTPA), N.C. Gen. Stat. § 75-1.1, *et seq.*, under the economic loss rule. In *Buffa*, the trial court applied the economic loss rule to grant summary judgment on the plaintiffs' NC UDPTA claim. 2016 WL 7984216, at *7. Although the appeals court affirmed that decision, it did so on the basis that although the

> claim of unfair and deceptive trade practices relies on the allegation that [the defendant] was aware of a defect in the design of their windows . . . and failed to notify the [plaintiffs] of the defect with the intent the [plaintiffs] would rely upon [the defendant's] failure to disclose when purchasing the windows[,] [a] review of the record provides that other than allegations in the complaint, there is no evidence of systematic window failure or a design flaw.

*Buffa*, 2016 WL 7984216, at *7. Thus, according to the court in *Buffa*, the plaintiffs had essentially asserted a breach of warranty claim, which is not

[25] Plaintiffs also assert a claim for the violation of New York General Business Law § 350 (Count 33(d)). The U.S. Automakers do not provide authority supporting the dismissal of Count 33(d) under the economic loss rule.

"sufficiently unfair or deceptive to sustain a UDTPA claim." *Id.* (quoting *Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012)). The question here is not whether Plaintiffs have alleged a sufficiently unfair or deceptive act to support their NC UDPTA claim. Rather, the question is whether the fact that Plaintiffs allege only economic losses forecloses their NC UDTPA claim. *Buffa* does not answer that question. Moreover, the Court is persuaded that North Carolina law limits the application of the economic loss rule to negligence claims. *In re Gearshift Litig. I*, 355 F. Supp. 3d 582, 592 (E.D. Mich. 2018) (analyzing North Carolina law and declining to dismiss the fraud and fraud-based statutory consumer protection claims).

For the last statutory consumer protection claim they challenge under the economic loss rule—Plaintiffs' claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Cons. Stat. § 201-1, *et seq.*—the U.S. Automakers advance *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 681 (3d Cir. 2002). The Third Circuit, however, has "set aside [its] holding in *Werwinski* with respect to the economic loss doctrine's application to UTPCPL claims." *Earl v. NVR, Inc.*, 990 F.3d 310, 314 (3d Cir. 2021). Instead, according to *Earl*, "the economic loss doctrine no longer may serve as a bar to UTPCPL claims." *Id.*

**In sum**, the U.S. Automakers' fail to prevail in their argument that the economic loss rule bars Plaintiffs' fraud claims under the laws of Arizona, Arkansas, California, Colorado, Georgia, Illinois, Maryland, New Hampshire,

New York, North Carolina, South Dakota, Tennessee, and Texas and that the rule bars Plaintiffs' statutory consumer protection claims for Florida, Maryland, Michigan, Missouri, New York, North Carolina, Oklahoma, Pennsylvania, Tennessee, and Wisconsin. However, their challenge to Plaintiffs' fraud claims under the common law of the remaining 14 states succeeds. Accordingly, the Court **GRANTS** the U.S. Automakers' Motion, [Doc. 181], to the extent that it **DISMISSES WITH PREJUDICE** the following claims for fraud by omission and concealment: Alabama (Count 1(d)), Florida (Count 10(d)), Kentucky (Count 18(d)), Maine (Count 20(d)), Michigan (Count 23(d)), Minnesota (Count 24(e)), Missouri (Count 26(d)), Nebraska (Count 28(d)), New Jersey (Count 31(d)), Oklahoma (Count 37(d)), Pennsylvania (Count 39(d)), South Carolina (Count 41(e)), Utah (Count 45e)), and Wisconsin (Count 50(d)).[26]

**ii. Manifestation Requirement**

The U.S. Automakers next argue that Plaintiffs cannot maintain their fraud-based statutory consumer protection claims under the laws of the following 16 states because the SAC fails to allege that the Defect manifested in Plaintiffs' vehicles: Alabama, Arkansas, California, Georgia, Illinois, Massachusetts, Maryland, Michigan, Montana, New Jersey, New York, North

[26] Plaintiffs assert their causes of action in section VIII of the SAC. The Court refers to Plaintiffs' asserted Counts by the subsection of section VIII that they appear in. For example, Plaintiffs' claim for fraud under Alabama law appears in Section VIII(1)(d).

Carolina, Oklahoma, Oregon, Texas, Washington.[27] [Doc. 181 at 40 & n.31]. The chart through which the U.S. Automakers provide supporting authority for each of the challenged statutory claims, includes parentheticals quoting the authority or summarizing the outcome. Many of the U.S. Automakers' parentheticals pertain to the dismissal of fraud claims, but nowhere do these Defendants explain why a court's dismissal of a common-law fraud claim under a given state's law also supports the dismissal of fraud-based statutory consumer protection claims. Nevertheless, the Court has reviewed all cited authority. To the extent that the U.S. Automakers' authority lacks a discussion of the manifestation requirement under the relevant state's consumer protection statutes, the U.S. Automakers' argument fails for their failure to properly support and develop it. Specifically, the U.S. Automakers fail to support their argument that Plaintiffs' fraud-based statutory consumer protection claims for Alabama, California, Illinois, Massachusetts, Maryland, Michigan, Montana, Oregon, and Washington fail for the lack of the Defect's manifestation in Plaintiffs' vehicles.

Some of the cases the U.S. Automakers cite concern whether the plaintiff alleges a cognizable injury to confer standing under Article III. Although the U.S. Automakers present cherry-picked quotations, these cases

[27] The U.S. Automakers also challenge Plaintiffs' statutory consumer protection claim under Florida law. [Doc. 181 at n.31]. However, they include no authority in support, [*see* Doc. 181-7 at 15–17], and represent in their Reply, [Doc. 249-2 at 12], that they do not contend that the claim fails for lack of defect manifestation.

are generally not helpful to their argument. For example, *Varner v. Domestic Corp.*, 2017 WL 3730618, at *6 (S.D. Fla. Feb. 7, 2017), on which the U.S. Automakers rely for the dismissal of Plaintiffs' claim under the Montana Unfair Trade Practices Act of 1973 (MUTPA), Mont. Code § 30-14-101, *et seq.*, recognized that because the plaintiffs asserted "that the defect is already present in all of the Named Plaintiffs' Defective Refrigerators whether or not physical damage from fire has resulted" and that the defect "basic functionality" of those refrigerators, they "generally have Article III standing to bring this suit." *Varner* does not discuss whether defect manifestation is required to sustain a MUTPA claim.

The same is also holds for *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 970 (N.D. Cal. 2015), from which the U.S. Automakers harvest the proposition that "[w]hen economic loss is predicated solely on how a product functions, and the product has not malfunctioned, . . . something more is required than simply alleging an overpayment for a 'defective' product." They contend that *Cahen* supports the dismissal of Plaintiffs' claims under California's Consumer Legal Remedies Act (CLRA), Cal. Civ. Code § 1750, *et seq.*, and Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.* [Doc. 249-2 at 11]. However, the issue on hand in *Cahen* was whether the plaintiffs had sufficiently alleged an injury to establish standing under Article III based on a speculative future risk of their vehicles being hacked. *Cahen*, 147 F. Supp. at 970. Here, the question is not whether Plaintiffs have

sufficiently alleged an injury for Article III standing but whether they may maintain their CLRA and UCL claims in the absence of allegations of injury related to the Defect's manifestation in their vehicles. *Cahen* does not answer this question. Moreover, as *Cahen* observed, even in cases where the alleged defect has not manifested, the plaintiffs may establish a cognizable injury through "specific allegations of diminution in value." 147 F. Supp. at 970 (quoting *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Litig.*, 790 F.Supp.2d 1152, 1166 n.11 (C.D.Cal.2011) ("*In re Toyota Acceleration*")). Plaintiffs allege that the safety-related Inflator Defect has diminished the value of their vehicles, *e.g.,* SAC I ¶¶ 23, 142–43, 151, 170.

Also, and specifically as to the statutory consumer protection claims for Illinois, Massachusetts, Michigan, Oregon, and Washington, the U.S. Automakers rely on a single case in support of dismissal. [Doc. 187-7 at 16–17 (citing *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *14 (E.D. Mich. June 7, 2018))]. However, *Miller* did not address the manifestation requirement in dismissing statutory consumer protection claims. Rather, in analyzing the fraud by omission claim, the Court noted that two of the plaintiffs did not allege that the defect manifested in their vehicles and, thus, "fail[ed] to establish that they suffered any detriment connected to [the defendant's] alleged failure to disclose" the defect. 2018 WL 2740240, at *12. Ultimately, the court dismissed the fraud claim for Plaintiffs' failure to meet Rule 9's particularity requirement

and, correspondingly, dismissed the statutory consumer protection claims under the same standard. Because it did so without discussing the significance of the lack of defect manifestation under each of the relevant statutory claims, the Court finds little support in *Miller* for the U.S. Automakers' argument.

In their Reply, the U.S. Automakers cite two new cases as additionally supporting the dismissal of Plaintiffs' consumer protection claims for Massachusetts and Washington.[28] Both cases are inapposite. Analyzing the economic injury requirement for a claim under the Massachusetts Consumer Protection Law (MCPL), Mass. Gen. L. ch. 93A, § 1, *et seq.*, the court in *Martin v. Mead Johnson Nutrition Co.*, 2010 WL 3928707, at *1 (D. Mass. Sept. 30, 2010), noted that "overpayment for a product is not a recoverable injury *where the plaintiff no longer has the product in her possession and* did not suffer physical injury or property damage because of the product." But that rule is not applicable here as there is no contention that Plaintiffs are not in possession of their vehicles. Similarly unhelpful, *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *9 (W.D. Wash. July 22, 2021), *amended*, 2023 WL 1879534 (W.D. Wash. Feb. 10, 2023), addressed the typicality requirement for class certification and observed simply that "disparate manifestations of the alleged PSR defect" may make it "*less likely*" for the plaintiffs to prevail on their claim

[28] Generally, the Court does not consider authority in support of the movant's original argument that is cited for the first time in a reply brief. The Court has considered it here, however, in the interest of a more fulsome application of the relevant state law.

under the Washington Consumer Protection Act (WCPA), Wash. Rev. Code § 19.86.010, *et seq. Beaty* did not determine that a plaintiff *cannot maintain* a claim under the WCPA in the absence of defect manifestation.

Similarly, the U.S. Automakers' reliance on *Cunningham v. Ford Motor Co.*, 641 F. Supp. 3d 400, 418 (E.D. Mich. 2022), for the dismissal of Plaintiffs' claim under the Georgia Uniform Deceptive Trade Practices Act (GUDTPA), O.C.G.A. § 10-1-370, *et seq.*, is to no avail. Although in *Cunningham*, the court dismissed the GUDTPA claim, it did not do so for lack of manifestation of the alleged defect. Rather, it did so, in part, because of the plaintiff's failure to allege an on-going harm from the defendant's deceptive trade practice to support the issuance of injunctive relief under GUDTPA. 641 F. Supp. 3d at 418.

Plaintiffs' claim for violation of the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8-1, *et seq.*, survives the U.S. Automakers challenge. The Court finds *Tijerina v. Volkswagen Grp. of Am., Inc.*, 2023 U.S. Dist. LEXIS 187865 (D.N.J. Oct. 19, 2023), on point. There, the court declined to dismiss the NJCFA claim by a plaintiff (Upshur) whose vehicle had not manifested the defect for failure to "plead ascertainable loss" because "allegations that the class vehicles are worth less because of the . . . defect satisfies the ascertainable loss element for stating a claim since such a loss is quantifiable." 2023 U.S. Dist. LEXIS 187865, at *41, *81–*82.

The absence of allegations indicating the Defect's manifestation in Plaintiffs' vehicles also does not require the dismissal of Plaintiffs' fraud-based consumer protection claims under New York General Business Law §§ 349 and 350. The Court is persuaded by *Nuwer v. FCA US LLC*, 552 F. Supp. 3d 1344, 1358 (S.D. Fla. 2021), which analyzed decisions applying New York law and determined that "a claim for economic damages could be made even in the absence of a manifested defect." The *Nuwer* court declined to dismiss the plaintiff's claims under New York law, including the claim under § 350 (although the defect had not manifested), because the complaint alleged economic injury from, among other things, overpayment and diminished value. 552 F. Supp. 3d at 1358.

Plaintiffs' claim for the violation of the North Carolina Unfair and Deceptive Trade Practices Act (NCDTPA), N.C. Gen. Stat. § 75-1.1, *et seq.*, also survives. The case the U.S. Automakers rely on, *Bailey v. LeBeau*, 339 S.E.2d 460, 463 (N.C. Ct. App. 1986), is not factually on point. *See In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 792–93 (C.D. Cal. 2022), ("*In re ZF-TRW Litig.*"), *opinion clarified sub nom. In re ZF-TRW Airbag Control Units Prods.*, 2022 WL 19425927 (C.D. Cal. Mar. 2, 2022) (distinguishing *Bailey* and concluding that the complaint's allegation that plaintiffs' vehicles were worth less than the price plaintiffs paid sufficed "to establish an injury under the NCDTPA").

The case the U.S. Automakers cite as supporting the dismissal of Plaintiffs' claim under the Oklahoma Consumer Protection Act (OCPA), Okla. Stat. Ann. tit. 15, § 751, *et seq.*, is also distinguishable. In *Sisemore v. Dolgencorp, LLC*, 212 F. Supp. 3d 1106, 1110 (N.D. Okla. 2016), the court dismissed the OCPA claim because the plaintiff could not establish that he had suffered actual damages by "simply purchasing a product whose labeling violates the OCPA." There, the plaintiff alleged nothing more than that he was harmed because he paid for the product. 212 F. Supp. at 1110. In contrast, here, Plaintiffs allege that Defendants' fraudulent conduct caused them to *overpay* for their vehicles and that the Defect diminished the value of their vehicles. Accordingly, *Sisemore* does not dictate the dismissal of Plaintiffs OCPA claim for lack of the Defect's manifestation.

This is also true about *Martin v. Ford Motor Co.*, 914 F. Supp. 1449 (S.D. Tex. 1996), the U.S. Automakers' authority supporting the dismissal of Plaintiff's claim under the Texas Consumer Protection Act of 1977 (TCPA), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.* There, the plaintiffs' statutory consumer protection claim under Texas law failed to survive summary judgment because the plaintiffs were unable to present *any* evidence of injury from the allegedly inadequate warning about lap belt use on their vehicles' visors. 914 F. Supp. at 1455. In contrast, Plaintiffs allege injury from overpayment and diminished value. *Martin* does not support the dismissal of Plaintiffs' TCPA claim.

Plaintiffs do not emerge unscathed from the U.S. Automakers' challenge. The U.S. Automakers prevail in their effort to dismiss Plaintiffs' consumer protection claims under the Arkansas Deceptive Trade Practices Act (ADTPA), Ark. Code Ann. § 4-88-101, *et seq.*, and the Georgia Fair Business Practices Act (GFBPA), O.C.G.A. § 10-1-390, *et seq. See Motal v. Allstate Prop. & Cas. Ins. Co.*, 2021 WL 724564, at *3 (E.D. Ark. Feb. 24, 2021), *aff'd*, 2023 WL 3515690 (8th Cir. May 18, 2023) (noting that the 2017 version of the ADTPA continues to require proof of actual damages and that "actual damage 'is sustained when the product has actually malfunctioned or the defect has manifested itself but not when the only alleged injury is the diminution in value of the product'") (quoting *Wallis v. Ford Motor Co.*, 362 Ark. 317, 328 (Ark. 2005))); *and Edel v. Southtowne Motors of Newnan II, Inc.*, 338 Ga. App. 376, 380 (Ga. Ct. App. 2016) (affirming dismissal of GFBPA claim where the plaintiffs had not made a warranty claim that was denied, had not incurred repair costs, and had not "otherwise shown an actual injury suffered," because "a private right of action [under GFBPA] is available only to a person who suffers injury or damages as a result of a violation" and, under GFBPA's requirements, "the measure of damages . . . is that of actual injury suffered" and the only damages that the plaintiffs could seek under the circumstances—a "refund of the purchase price and restitution"—could not serve as "actual damages" under the GFBPA).

**In sum**, the U.S. Automakers' fail to prevail in their argument that the absence of allegations of the Defect's manifestation in Plaintiffs' vehicles precludes Plaintiffs' fraud-based claims under the consumer protection statutes of Alabama, California, Georgia (GUDTPA only), Illinois, Maryland, Massachusetts, Michigan, Montana, New Jersey, New York, North Carolina, Oklahoma, Oregon, Texas, and Washington. However, they prevail in their challenge to Plaintiffs' fraud-based claims under the consumer protection statutes of Arkansas and Georgia (GFBPA, specifically). Accordingly, the Court **GRANTS** the U.S. Automakers' Motion to Dismiss, [Doc. 181], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs' claims for the violation of ADTPA (Count 4(c)) and GFBPA (Count 11(d)).

**c. Knowledge of the Inflator Defect**

Both the Airbag Suppliers and the U.S. Automakers challenge the sufficiency of the SAC's allegations regarding their knowledge of the Inflator Defect before each Plaintiff bought or leased his or her vehicle. According to the Airbag Suppliers, although knowledge of the misrepresentation is an "essential element of any fraud-based claim," the SAC fails to allege that the Airbag Suppliers had knowledge of the alleged Defect in the ARC airbag modules. [Doc. 178-1 at 31–32, 32 n.8]. Both set of Defendants assert that the knowledge requirement applies to Plaintiffs' common-law fraud claims under

the laws of each of the 50 states and to the majority of Plaintiffs' fraud-based statutory consumer protection claims.[29]

Characterizing the allegations of the Airbag Suppliers' knowledge as scant and speculative, the Airbag Suppliers contend that (1) the SAC fails to allege that they knew that the inflator testing results showed a design defect; (2) the 11 in-the-field airbag ruptures across 14 years does not equate to knowledge of a widespread design defect in all ARC airbag inflators; and (3) the NHTSA investigation undertaken to determine whether there was a defect cannot support the inferential leap that the Airbag Suppliers knew of the defect. [Doc. 178-1 at 33–34]. The U.S. Automakers' Motion repackages these arguments, maintaining that the SAC's allegations of lot-specific ruptures during testing, the NHTSA investigation, and the field ruptures fails to support that Defendants were aware that the Defect affected *all* ARC airbag inflators. [Doc. 181 at 40–43]. The U.S. Automakers also raise iterations of this argument in support of their individual Motions. [Docs. 180-1 at 6–7; 182-1 at 9–10; 188-1 at 13–15]. The Court is unpersuaded.

---

[29] The Airbag Suppliers identify the following 31 states with consumer protection statutes that require a showing of knowledge: Alabama; Arizona; Arkansas; California; Colorado; Delaware; Florida; Georgia; Idaho; Illinois; Indiana; Iowa; Kansas; Kentucky; Louisiana; Michigan; Missouri; Nevada; New Hampshire; New Jersey; New Mexico; North Dakota; Ohio; Oregon; South Dakota; Tennessee; Texas; Utah; Virginia; Washington; and Wyoming. [Doc. 178-1 at 32 n.8]. According to the U.S. Automakers, the consumer protection statues of all states require some degree of knowledge or intent, except for the following nine states: Alaska, Hawaii, New Hampshire, Nebraska, North Carolina, Rhode Island, Tennessee, Vermont, and West Virginia. [Doc. 181-6].

The SAC alleges that "ARC, the Airbag [Suppliers], and the Automaker[s] . . . shared information and worked together throughout the design, manufacturing, assembly and investigation process using the APQP process, in which the suppliers and customers communicate during every step of design and testing." SAC I ¶ 264. It outlines the Design Failure Mode and Effects Analysis (DFMEA) process used to identify possible problems that could arise with the design of the ARC airbag inflators, and it alleges that a Control Plan is created once the DFMEA is completed to minimize the chance of the identified manufacturing errors occurring. *Id.* ¶¶ 15, 265. It further alleges that the Airbag Suppliers and the Automakers reviewed the DFMEA and the Control Plan and then engaged with ARC on any redesign to lower the risk that a failure mode will occur. *Id.* ¶¶ 265–66. Based on this process, the SAC alleges that the Airbag Suppliers and the Automakers reviewed and approved the ARC airbag inflator design and manufacture, including the use of friction welding without a process for inspecting the center support for weld flash, before the inflators were produced and installed. *Id.* ¶ 266. It also alleges that the use of phase stabilized ammonium nitrate (PSAN) is considered "overly risky and inappropriate by most in the scientific, research, safety, Automaker, and supplier manufacturing communities," that "Takata's use of PSAN in its deadly airbag inflators focused the industry's attention on the potential for PSAN to be volatile," and that Defendants knew that "ARC's airbag inflator housing needed to, at least, incorporate features that mitigate

against structural failure due to the risk of excessive pressure" resulting from PSAN use. SAC I ¶¶ 280–281, 280 n. 39. But according to the SAC, the approved ARC airbag inflator design did not include a pressure relief mechanism and used a welding method that produced asymmetrical and unstable weld flash. *Id.* ¶¶ 283, 297–299. The SAC also alleges that Defendants' knowledge of the Inflator Defect continued to grow post-production because there were multiple ARC inflator ruptures during ARC's LAT (i.e., during lot testing), of which the Airbag Suppliers and the Automakers were notified, and there were several ARC inflator ruptures in the field. *Id.* ¶¶ 9–10. And it further alleges that Defendants gained additional knowledge about evaluating the propensity of the ARC airbag inflators to fail once the NHTSA investigation, launched in 2015, was underway. *Id.* ¶¶ 308, 310–11, 318, 325–26.

Together, these allegations raise a plausible inference that all three sets of Defendants knew of the Defect pre-production and that their knowledge base continued to grow as they investigated the LAT ruptures, from the field ruptures, and from the information shared and learned during the NHTSA investigation. Plaintiffs do more than "simply allege that testing was completed and showed a defect." *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1221 (S.D. Fla. 2021). Rather they recount the detailed failure testing process in place; they further allege that the Airbag Module and the Automakers were integrally involved in that process; and they also allege

knowledge in the industry of the risk that PSAN use presented. *See Sowa*, 764 F. Supp. 3d at 1281 (finding that although the plaintiffs did not specify what test results showed, detailed allegations of the defendants' pre-sale testing and monitoring of corrosion-related issues plausibly supported knowledge of the defect).

**d. Duty to Disclose the Inflator Defect**

Plaintiffs' fraud claims are premised on Defendants' concealment of and failure to disclose the Inflator Defect. *See e.g.*, SAC II ¶¶ 2614–2622, 2629–2640 (alleging, as to the statutory consumer protection and the fraud claims under New Hampshire law (Counts 30(c), (d)), that Defendants failed to disclose and concealed the Inflator Defect). Both the Airbag Suppliers and the U.S. Automakers argue that the SAC fails to allege facts supporting their duty to disclose and that Plaintiffs cannot maintain their fraud claims in the absence of that duty. [Docs. 178-1 at 34–35; 181-1 at 43–46]. Although they raise the same issue, because the briefs broach the issue from different angles, the Court separately takes up the arguments asserted by each set of Defendants in turn, first addressing the Airbag Suppliers' arguments and then turning to the U.S. Automakers' arguments.

**i. Airbag Suppliers' Duty**

The Airbag Suppliers argue that their role was limited to supplying the Automaker with airbag modules, that in that role, they did not interact with

(or even know the identity of) any Plaintiff, and that they had no practical ability to disclose the Defect.[30] [Doc. 178-1 at 36–37].

As to the argument of the lack of ability to disclose, the SAC alleges that Defendants had the means to convey the Inflator Defect, including through labels, stickers, placards, pamphlets, and by full and complete recalls. To the extent the Airbag Suppliers contend that these means of disclosure were unavailable to them as a practical matter, this is not the stage to flesh out that factual debate.

Regarding their argument of a lack of duty to disclose, the Airbag Suppliers contend that Plaintiffs cannot maintain fraud claims against them in the following 42 jurisdictions: Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South

[30] They also argue that to the extent they owed any duty to disclose, that duty was to the respective Automakers they supplied, but because the SAC alleges that the Automakers knew of the Defect, the learned intermediary doctrine precludes claims against the Airbag Module Defendants based on their failure to disclose. [Doc. 178-1 at 36 n.9]. But the Airbag Module Defendants fail to rebut Plaintiffs' challenge that they offer no law applying the doctrine to the fraud and statutory consumer protection claims at issue here. The Court, thus, considers the Airbag Module Defendants to have conceded this point, and in the absence of relevant authority declines to apply the learned intermediary doctrine as the Airbag Module Defendants propose.

Dakota, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming law. [Doc. 178-1 at 38–41]. These jurisdictions, the Airbag Defendants argue, require conditions that are lacking here—a relationship, a sales transaction, or other dealings between them and Plaintiffs or an affirmative, misleading statement by them—to impose a disclosure duty. [*Id.*]

"Although, generally, a duty to speak arises if there is a confidential relationship between the parties, a duty to speak may arise if there are special circumstances mandating disclosure." *Takata II*, 193 F. Supp. 3d at 1337. Plaintiffs respond that the law of various states recognizes a duty to disclose based on the three "special circumstances" at play here. [Doc. 220 at 32–38]. First, Plaintiffs maintain that the exception where a critical safety defect exists applies here because the Inflator Defect presents a safety concern and that Alabama, Florida, Georgia, Illinois, Ohio, Pennsylvania, South Carolina, Texas, and Virginia recognize a duty under this exception. [*Id.* at 33]. They also maintain that their nationwide fraud claim under Georgia law against the Airbag Suppliers survives for the same reason. [*Id.*] Second, they assert that the Airbag Suppliers' superior knowledge (as compared to Plaintiffs knowledge) triggers a duty to disclose in 24 states (i.e., Alabama; Arkansas; Connecticut; Florida; Idaho; Indiana; Louisiana; Maine; Maryland; Massachusetts; Michigan; Montana; Nevada; New Hampshire; New Jersey; New York; North Carolina; Ohio; Oklahoma; South Carolina; Texas; Vermont; Virginia; and Wisconsin) and the District of Columbia. [*Id.* at 34–35]. Third,

Plaintiffs contend that the SAC alleges active concealment, which triggers a duty to disclose under the laws 10 states (i.e., Arkansas; Connecticut; Delaware; Illinois; New York; North Carolina; Oregon; Pennsylvania; Vermont; and Virginia). [*Id.* at 36–38].

As a preliminary matter, of the 42 jurisdictions in which the Airbag Suppliers maintain they had no duty to disclose, Plaintiffs fail to identify any special circumstance supporting a duty (in the absence of some relationship between the parties or the defendant's misstatement, which are not alleged here) recognized in the following 13 states: Alaska; Arizona; Colorado; Hawaii; Kansas; Kentucky; Mississippi; New Mexico; North Dakota; South Dakota; Utah; West Virginia; and Wyoming.[31] Thus, Plaintiffs' claims against the Airbag Suppliers for fraud by omission and by concealment under the laws of the above-mentioned states are not viable.

As to the three exceptions Plaintiffs advance, none of the cases on which Plaintiffs rely apply the relevant exception in the absence of either a

[31] For Alaska, Arizona, Colorado, Hawaii, Utah, West Virginia, and Wyoming, Plaintiffs contend generally that the Airbag Module Defendants' argument that these states require a sales transaction is merely a variant of the argument that a fiduciary or special relationship is required to impose a duty to disclose. [Doc. 220 at 38]. Plaintiffs maintain that this argument "fails for the same reason." [Doc. 220 at 38]. That reason, presumably, is that these states recognize one or more of the special circumstances that Plaintiffs identify. However, Plaintiffs provide no authority to show that these states apply any of the exceptions on which they rely. And furthermore, as discussed below, none of the state-specific cases Plaintiffs cite support the imposition of a duty to disclose on the Airbag Module Defendants under the exceptions Plaintiffs identify. Thus, the Court is not persuaded by this generalized argument.

relationship between the plaintiff and the defendant or a misrepresentation. The Court discusses below each of the three exceptions on which Plaintiffs rely and analyzes the authorities provided in support.

**(a) Critical Safety Defect**

The cases on which Plaintiffs rely for a duty to disclose a critical safety defect fail to support the imposition of this duty on an intermediate auto part manufacturer and supplier whose product incorporates an allegedly defective part manufactured by another party. The case Plaintiffs cite for the Airbag Suppliers' duty to disclose under Georgia, Illinois, Ohio, South Carolina, and Texas law concern the manufactures and sellers of the allegedly defective vehicles. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *3 (D.N.J. May 8, 2017) ("*VW Timing Chain*"). Indeed, Georgia cases "find[ing] a duty to disclose outside of the confidential relationship context have involved at least some relationship between the parties," but such a relationship is absent where "Defendants had [no] direct knowledge of Plaintiffs' purchases of the vehicles in question and had no apparent relationship with Plaintiffs." *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1351 (N.D. Ga. 2015) ("*McCabe II*"). Here, Plaintiffs point to no allegation that raises an inference of a relationship between the Airbag Suppliers and Plaintiffs or even that these Defendants knew of Plaintiffs' purchase or lease transactions.

Similarly, *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372 (S.D.N.Y. 2017) ("*GM Ignition Switch*"), cabined the duty to disclose under

Alabama and Illinois law to a defendant who made incomplete representations about the safety of the allegedly defective vehicles. Here, Plaintiffs do not allege that the Airbag Suppliers made any representations to them, much less incomplete representations about the safety of their airbag modules. While *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 637–39 (E.D. Mich. 2019) ("*GM Air Conditioning*") imposed a duty to disclose on an auto manufacturer and seller under Florida law, it did so based on the seller's alleged "exclusive knowledge" in the context of a "buyer-seller relationship[]." 406 F. Supp. 3d at 638 (quoting *Majdipour v. Jaguar Land Rover N. Am., LLC*, 2015 WL 1270958, at *13 (D.N.J. Mar. 18, 2015). The facts as alleged in the SAC do not support a buyer-seller relationship between Plaintiffs and the Airbag Suppliers. Finally, Plaintiffs' authority for a duty to disclose under Pennsylvania and Virginia law concerns the duty of auto manufacturers and distributors. *See Zwiercan v. Gen. Motors Corp.*, 2003 WL 1848571, at *2 (Pa. Ct. Com. Pl. Mar. 18, 2003) *2 (acknowledging auto manufacture's duty to disclose a life-threatening defect under Pennsylvania law); *McCabe I*, 948 F. Supp. 2d at 1353, 1368–69 (duty to disclose under Virgina law for an auto manufacturer and a distributor of allegedly defective vehicles). In short, there is no support for Plaintiffs' position that the Airbag Suppliers—the manufacturers and suppliers of the airbag modules housing the allegedly defective ARC inflators—had a duty to disclose the alleged critical safety defect. Thus, Plaintiffs cannot maintain their fraud claims against the

Airbag Suppliers under Alabama, Georgia, Florida, Illinois, Ohio, Pennsylvania, South Carolina, Texas, and Virginia law based on the theory that these Defendants had a duty to disclose the alleged critical safety defect. And, because Georgia law does not impose a duty to disclose on the Airbag Suppliers under the circumstances alleged, Plaintiffs' nationwide fraud claim (Nationwide Count 1) against these Defendants, premised on Georgia law, also fails.

**(b) Superior Knowledge of the Defect**

For a duty to disclose based on the Airbag Suppliers' superior knowledge, these Defendants argue that the "superior knowledge" cases on which Plaintiffs rely impose a duty to disclose only where there is some relationship between the plaintiff and the defendant. [Doc. 246 at 21–22]. The Airbag Suppliers are correct. For example, while Alabama law imposes a duty to disclose on a defendant with superior knowledge, *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1011 (N.D. Cal. 2018) ("*EcoDiesel*"), it nonetheless requires a "sufficient relationship" between the parties. *See Hines v. Riverside Chevrolet-Olds, Inc.*, 655 So. 2d 909, 920 (Ala. 1994), *overruled on other grounds by State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998). The Airbag Suppliers thus contend that Plaintiffs cannot maintain fraud claims based on a duty imposed by their superior knowledge because not only does the SAC fail to allege that

they had superior knowledge of the Inflator Defect, the necessary relationship between the parties is also absent here. [Doc. 246 at 21–22].

The Airbag Suppliers' first argument fails. The SAC sufficiently alleges that the Airbag Suppliers had knowledge of the alleged Inflator Defect. *Supra* § VI.B.2.c. And it further alleges that Plaintiffs had no way to know when they bought or leased that their Class Vehicles that their vehicles had an airbag with the alleged defective ARC inflators. SAC I ¶¶ 142–255.

The Airbag Suppliers' second argument, however, has merit. The law requires *some* relationship or transaction between the parties, which is missing here. *Hines*, for example, recognized "a sufficient relationship" to impose a disclosure duty on the auto manufacturer because the new-car buyer plaintiffs were "members of a group or class of persons who [the auto manufacturer] expected or had special reason to expect would be influenced by its decision not to disclose information about the repainting of damaged automobiles." 655 So. 2d at 920. Like the car buyers and auto manufacturer in *Hines*, here, Plaintiffs and the Airbag Suppliers had no "contractual relationship or other dealings." *Id.* at 919. But unlike in *Hines* where the plaintiffs bought the cars that the defendant manufactured, Plaintiffs did not buy airbag modules that the Airbag Suppliers manufactured. And while the SAC alleges that the Airbag Suppliers remained silent about the alleged Inflator Defect so that they could profit from the sales of Class Vehicles and the defective ARC inflators, SAC I ¶ 378, this allegation is too slim a reed to

support an inference that the Airbag Suppliers therefore considered *Plaintiffs* in the ambit of those whom they had special reason to expect would be influenced by their failure to disclose.

The laws of the other states Plaintiffs invoke also fail to support imposing a duty on the Airbag Suppliers based on their superior knowledge. For instance, Plaintiffs rely on *EcoDiesel* for a duty to disclose in Maine. However, *EcoDiesel* merely indicates that Maine supports a duty "depending on the facts of the case." 295 F. Supp. 3d at 1009 (quoting *Martin v. Ort*, 2016 WL 1069907, at *3 n.3 (Me. Super. Ct. Feb. 3, 2016)). This general statement fails to establish that, in Maine, a supply chain intermediary's superior knowledge imposes a duty to disclose on that party.[32]

The same holds for *Roe v. Ford Motor Co.*, 2021 WL 2529825, at *12 (E.D. Mich. June 21, 2021), which concerns an auto manufacturer and simply indicates that Arkansas recognizes that "special circumstances" may extend the duty to disclose to instances beyond those where the parties have a contractual or fiduciary relationship. To impose a such a duty, the court considers the "circumstances surrounding the transaction which give rise to a relationship that requires disclosure." *Lambert v. Firstar Bank, N.A.*, 83 Ark.

[32] In fact, although Plaintiffs cite to *EcoDiesel*'s statement on Maine law in arguing for a duty based on a superior knowledge, the thrust of their argument is that a defendant's active concealment supports a duty to disclose. [Doc. 220 at 35 n.11]. The Court therefore additionally considers Plaintiffs' argument regarding Maine law in the context of the active concealment exception.

App. 259, 265 (Ark. Ct. App. 2003). But Plaintiffs point to no Arkansas authority that indicates that a defendant's superior knowledge gives rise to a relationship supporting a duty to disclose where the defendant neither manufactured the vehicles at issue or the allegedly defective part in those vehicles.

Plaintiffs' argument for a duty to disclose under the law of the other states they identify fares no better. *See Rosen v. Mercedes-Benz USA, LLC*, 2022 WL 20766104, at *5 (N.D. Ga. Nov. 1, 2022) (recognizing duty under Connecticut law for *automaker's* superior knowledge); *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 187 (D.D.C. 2016) (acknowledging simply that D.C. law recognizes a duty to disclose where a "material fact is unobservable or undiscoverable" in a suit by an alleged *third-party beneficiary to a contract*); *VW Timing Chain*, 2017 WL 1902160 at *19 n.9 (extending duty to disclose vehicle defect to *automobile manufactures and sellers* under Florida, Michigan, North Carolina, and New York law); *Sowards v. Rathbun*, 134 Idaho 702, 707 (Idaho 2000) (recognizing disclosure duty under Idaho law specific to fiduciary or confidential relationships, misstatements, and contracting party); *Bledsoe v. FCA US LLC*, 2023 WL 2619132, at *24–25 (E.D. Mich. Mar. 23, 2023) (recognizing duty to disclose under Idaho law in the context of third party beneficiaries, fiduciary and confidential relationships, and misstatements); *Northrop Corp. v. Gen. Motors Corp.*, 807 N.E.2d 70, 87 (Ind. Ct. App. 2004) (Indiana law recognizes duty to disclose for contracting party with superior

knowledge); *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1384 (La. 1990) (considering "the relationship of the parties" as a factor in imposing a duty to disclose and recognizing a *vendor's* duty to share superior knowledge of material fact with buyer); *Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 535–38 (Md. Ct. Spec. App. 2008) (imposing duty on real estate developer who "successfully conceals a defect from his initial purchaser" to disclose actively concealed material fact to subsequent purchasers); *Morrow v. Bank of Am., N.A.*, 375 Mont. 38, 57 (Mont. 2014) (addressing a lender/borrower relationship and noting that a party with superior knowledge may have a duty to disclose to the other party); *Ingaharro v. Blanchette*, 122 N.H. 54, 57 (N.H. 1982) (noting, in the context of a real property sale, that some courts impose a duty on the seller to disclose a latent defect to the buyer); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 795 (E.D. Mich. 2019) (acknowledging that "[i]n Nevada, a party's superior knowledge imposes a duty to speak in certain transactions" but that "at a minimum, some form of relationship between the parties" is required (citation modified)); *Catalano v. BMW of N. Am., LLC*, 2016 WL 3406125, at *4 (S.D.N.Y. June 16, 2016) (finding duty to disclose vehicle defect under New York law for auto maker and seller); *Citizens State Bank v. FDIC*, 639 F. Supp. 758, 763 (W.D. Okla. 1986) (under Oklahoma law, superior knowledge and justifiable reliance may raise a duty to disclose in the context of a loan agreement); *Cohen v. Blessing*, 259 S.C. 400, 403 (S.C. 1972) (recognizing duty to disclose latent defect under South Carolina law in real

estate transaction); *McCabe I*, 948 F. Supp. 2d at 1369 (finding that Texas law supports an automaker's and a distributor's duty to disclose superior knowledge of defect); *Vinci v. V.F. Corp.*, 2018 WL 1027429, at *9 (D. Vt. Feb. 21, 2018) (concluding that Vermont law supports vendor's duty to disclose superior knowledge of a material fact to buyer, based on the parties' course of dealing); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) (finding automaker has duty to disclose defect under Virginia law); and *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 41–42 (Wis. 1980) (duty on real estate seller to disclose material facts to buyer under Wisconsin law). These cases show that some transaction or relationship must undergird a defendant's duty to disclose. But the facts alleged fail to satisfy this requirement as to the Airbag Suppliers.[33]

Accordingly, Plaintiffs cannot maintain their fraud claims against the Airbag Suppliers under Alabama, Arkansas, Connecticut, District of Columbia, Florida, Idaho, Indiana, Louisiana, Maine, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey,

[33] Plaintiffs also rely on the following cases for the proposition that certain states do not require a fiduciary relationship to impose a duty to disclose: *EcoDiesel*, 295 F. Supp. 3d at 1008–12 (Massachusetts, Maryland, New Jersey, Ohio, and South Carolina); *Schmitz v. Nat'l Collegiate Athletic Ass'n*, 67 N.E.3d 852, 870–71 (Ohio Ct. App. 2016) (Ohio); and *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 854 (Okla. 2020), *as corrected* (Oct. 21, 2020) (Oklahoma). The Court, however, is not prepared to craft a duty to disclose specific to the Airbag Module Defendants based on this general, unexceptional statement. And Plaintiffs provide no case law indicating that these states would recognize a duty to disclose based on the Airbag Module Defendants' superior knowledge under the facts at alleged here.

New York, North Carolina, Ohio, Oklahoma, South Carolina, Texas, Vermont, Virginia, and Wisconsin law based on the theory that these Defendants had a duty to disclose their alleged superior knowledge.

**(c) Active Concealment of the Defect**

Based on the Airbag Suppliers' active concealment, Plaintiffs contend that "several states" (i.e., Arkansas, Connecticut, Delaware, Illinois, Maine, New York, North Carolina, Oregon, Pennsylvania, Vermont, and Virginia) either impose a duty to disclose or do not require a duty to disclose. [Doc. 220 at 35 n.11, 36–38]. Plaintiffs' state-specific authority indicates that conduct beyond mere silence is required to impose or suspend the requirement for a duty to disclose. That is, to support their fraud claims against the Airbag Suppliers, Plaintiffs must allege an "active" or affirmative act of concealment. [*See* Doc. 220 at 35 n. 11, 36 n.12]. According to Plaintiffs, the SAC sufficiently does so by alleging that Defendants (which includes the Airbag Suppliers) knew about and investigated the Inflator Defect over many years but did not disclose the Defect to the NHTSA or launch a comprehensive recall. [*Id.* at 36–37]. The Court disagrees.

At most, the SAC alleges *inaction* by the Airbag Suppliers; it does not allege any active steps by them to conceal the alleged Defect. That is, the allegation that the Airbag Suppliers knew about and investigated the Defect does not suffice to indicate active concealment. Similarly, these Defendants' failure to recall the airbag modules with the defective ARC inflators and to disclose the Defect to the NHTSA, without more, also does not show active

steps to conceal the Defect. Although Plaintiffs cite to paragraphs 4–5, 7–8, 10–15, 335–74, 376–79, and 414–21 of the SAC in support, they fail to explain how any fact-based allegations in these paragraphs pertain to the Airbag Suppliers' active concealment. Indeed, the cited allegations go to Defendants' knowledge of the Defect, to the Automakers' recall decisions, to ARC's and the Automakers' involvement in the NHTSA investigation, or to the materiality of the Defect and Defendants' silence. While the SAC also alleges that "ARC worked with others to conceal" the Defect and had "help" from the Airbag Suppliers and the Automakers, SAC I ¶ 8, this allegation is conclusory, failing to identify any independent or concerted affirmative conduct by the Airbag Suppliers.

Relying on *EcoDiesel*, 295 F. Supp. 3d at 1008, and *In re Toyota Acceleration*, 754 F. Supp. 2d at 1192, Plaintiffs argue that the Airbag Suppliers' failure to disclose the alleged Inflator Defect to the NHTSA constitutes an active act of concealment. Plaintiffs' reliance is misplaced. In EcoDiesel, the defendants allegedly developed and implemented "defeat devices" that allowed the vehicles at issue to "simulate passing the EPA [Environmental Protection Agency] and CARB [California Ari Resources Board] emission testing" but did not disclose the devices on their EPA and CARB applications, which lead to the approval of the vehicles for sale. 295 F. Supp. 3d at 943. There, the installed devices were allegedly purposefully manipulated to allow vehicles lacking "proper emissions control under normal

driving conditions" to pass emissions tests, i.e., were inherently deceptive, and there was a requirement to disclose the presence of these devices to the regulators during the process to gain sales approval. 295 F. Supp. 3d 927, 943, 977, 1012. The allegations in *EcoDiesel* thus indicated that the defendants affirmatively concealed by cheating their way to regulatory approval (or by facilitating the applicant's cheating). But Plaintiffs' allegation that the Airbag Suppliers failed to share their knowledge with the NHTSA does not rise to that level. Likewise, in *In re Toyota Acceleration*, the plaintiffs alleged more than simply that the defendant failed to disclose the defect to the NHTSA. Rather, there, the complaint alleged that the defendant actively concealed the defect by withholding relevant customer complaints and misstating evidence. 754 F. Supp. 2d at 1192. The SAC makes no such allegations regarding the Airbag Suppliers. The Court concludes that the SAC fails to allege that the Airbag Suppliers actively concealed the Inflator Defect. As such, Plaintiffs cannot maintain their fraud claims against the Airbag Suppliers under Arkansas, Connecticut, Delaware, Illinois, Maine, New York, North Carolina, Oregon, Pennsylvania, Vermont, and Virginia law based on these Defendants' alleged active concealment of the Defect.

**In sum**, the Court **GRANTS** the Airbag Suppliers' Motion, [Doc. 178], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs' fraud claims against the Airbag Suppliers under the common law of Alabama (Count (1)(d)), Alaska (Count 2(d)), Arizona (Count (3)(d)), Arkansas (Count 4(d)), Colorado

(Count 6(d)), Connecticut (Count 7(d)), Delaware (Count 8(e)), District of Columbia (Count 9(d)), Florida (Count 10(d)), Georgia (Count 11(e)), Hawaii (Count 12(d)), Idaho (Count 13(d)), Illinois (Count 14(e)), Indiana (Count 15(d)), Kansas (Count 17(d)), Kentucky (Count 18(d)), Louisiana (Count 19(c)), Maine (Count 20(d)), Maryland (Count 21(d)), Massachusetts (Count 22(d)), Michigan (Count 23(d)), Mississippi (Count 25(d)), Montana (Count 27(d)), Nevada (Count 29(d)), New Hampshire (Count 30(d)), New Jersey (Count 31(d)), New Mexico (Count 32(d)), New York (Count 33(e)), North Carolina (Count 34(d)), North Dakota (Count 35(d)), Ohio (Count 36(e)), Oklahoma (Count 37(d)), Oregon (Count 38(d)), Pennsylvania (Count 39(d)), South Carolina (Count 41(e)), South Dakota (Count 42(d)), Texas (Count 44(d)), Utah (Count 45(e)), Vermont (Count 46(d)), Virginia (Count 47(d)), West Virginia (Count 49(d)), Wisconsin (Count 50(d)), and Wyoming (Count 51(d)). And, because Georgia law does not impose a duty to disclose on the Airbag Suppliers under the circumstances alleged, Plaintiffs' nationwide fraud claim (Nationwide Count 1) against these Defendants, premised on Georgia law, also fails and is **DISMISSED WITH PREJUDICE**.

**ii. Automakers' Duty**

In turn, the U.S. Automakers challenge Plaintiffs' fraud claims under the laws of the following 22 states: Alabama, Arizona, Arkansas, California, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Michigan, Missouri, Montana, New Jersey, New York, North Carolina, Ohio, South

Carolina, Texas, Vermont, and Virginia.[34] [Doc. 181-1 at 43–46]. The Court has dismissed eight of the challenged fraud claims under the economic loss rule, but it nevertheless addresses the U.S. Automakers' alternative argument for the dismissal of those claims.

As they do in their opposition to the Airbag Suppliers' challenge, Plaintiffs maintain that the facts alleged support one or more special circumstances that either impart or excuse the duty to disclose under the laws of many states. In addition to the three special circumstances discussed above (i.e., superior knowledge, critical safety concern, and active concealment), Plaintiffs additionally identify the Automakers' incomplete representations of the Class Vehicle's safety and dependability as a fourth applicable special circumstance. [Doc. 221 at 49–53]. Below, the Court addresses the Parties' arguments as to each basis for the Automakers' duty to disclose.

The U.S. Automakers recognize that under the laws of California, Iowa, Massachusetts, Montana, New York, North Carolina, and Vermont, the defendant's exclusive or superior knowledge of a material fact triggers the duty to disclose, but they argue that the SAC does not allege that Defendants had such knowledge. [Doc. 181-1 at 45]. This argument fails. Not only does the SAC

[34] The U.S. Automakers also argue that Plaintiffs' fraud-based statutory consumer protection claims for Arkansas, California, Georgia, Montana, New York, and North Carolina fail for the SAC's failure to allege facts to support a duty to disclose. [Doc. 181-1 at 43–46]. The Court addresses this argument later, in the section discussing the viability of Plaintiffs' statutory consumer protection claims.

sufficiently allege that the Automakers had knowledge of the alleged Inflator Defect, *supra* § VI.B.2.c., it also alleges that Plaintiffs did not have that knowledge at the time of sale or lease. *See* SAC I ¶¶ 142–255. Thus, the SAC sufficiently alleges that the Automakers' knowledge of the Inflator Defect was superior to Plaintiffs, and due to that superior knowledge, the Automakers had the duty to disclose the Inflator Defect under the laws of the above-mentioned states.

This leaves unresolved the U.S. Automakers' challenge to Plaintiffs' fraud claims under Alabama, Arizona, Arkansas, Georgia, Florida, Illinois, Indiana, Kentucky, Michigan, Missouri, New Jersey, Ohio, South Carolina, Texas, and Virginia law. Thus, the Court next turns to whether Plaintiffs successfully counter the U.S. Automakers' challenge as to the fraud claims for these 16 states under any of the three other special circumstances at issue.

According to Plaintiffs, defects that pose safety concerns are sufficiently material to impart a duty to disclose. [Doc. 221 at 51 (citing *McCabe I* and *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1286-87 (C.D. Cal. 2016))]. Plaintiffs do not specify the challenged states that recognize a duty to disclose such defects. However, *McCabe I*, the case Plaintiffs cite, indicates that Georgia,[35] Texas, and Virginia recognize that a party has the duty to disclose

---

[35] The U.S. Automakers contend that Georgia law will not impose a duty to disclose under any circumstance absent "a fiduciary or other relationship of trust or confidence" between the parties. [Doc. 181-1 at 27]. It is apparent that Georgia law requires "at least *some* relationship between the parties" *McCabe II*, 160 F. Supp. 3d at 1351 (emphasis added). At this early stage, the Court

a material fact, such as a safety defect, that the other party is unaware of, and that Florida recognizes this duty where the party has superior knowledge. 948 F. Supp. 2d at 1369–72. Here, the SAC alleges that the Inflator Defect presents a safety issue, that the Plaintiffs could not and did not know of the Defect at the time of sale or lease, that the Automakers had knowledge of the Defect at or before the time that Plaintiffs purchased or leased their Class Vehicles, and that the Automakers were aware that Plaintiffs did not expect their airbags to be defective. These alleged facts sufficiently support the Automakers' duty to disclose the Inflator Defect under Georgia (limited to Plaintiffs who bought or leased vehicles from authorized dealers), Florida, Texas, and Virginia law.

For active concealment, Plaintiffs rely on *EcoDiesel* for the proposition that "an act of affirmative concealment by the defendant effectively negates the duty to disclose requirement." [Doc. 221 at 52 (quoting *EcoDiesel*, 295 F. Supp. 3d at 1008)]. Of the remaining 10 challenged states, *EcoDiesel* discusses

cannot say that there is *no relationship* between Plaintiffs and the Automakers. The SAC alleges that the Automakers sold their vehicles through their network of dealers, issued an express written warranty, and that this warranty formed the basis of the bargain for Plaintiffs' purchase or lease of the Class Vehicles. *See, e.g.*, SAC I ¶27; SAC II ¶¶ 440-41, 1132–33, 1201-02. Although a slim reed, these allegations support the inference of a relationship between those Georgia Plaintiffs who bought their vehicles from an Automaker's authorized dealer (i.e., Plaintiffs Dwayne Stowe, Latasha Tinch, and Nelson Yerger) and that Automaker. To be clear, the SAC contains no indication of a relationship between the Automakers and Georgia Plaintiffs who bought used vehicles from third-party dealers or other sources unaffiliated with the Automakers; accordingly, those Plaintiffs cannot maintain a fraud claim under Georgia law.

the law of only two—South Carolina and New Jersey.[36] *EcoDiesel's* discussion of New Jersey law is limited to acknowledging that New Jersey generally recognizes a duty to disclose based on the parties' relationship, "customs in the trade," or "other objective circumstances." 295 F. Supp. 3d at 1008. In short, *EcoDiesel* does not establish that New Jersey law triggers the duty to disclose, or waives its absence, where the plaintiff alleges fraud by active concealment. But it indicates that South Carolina does. 295 F. Supp. 3d at 1010. Thus, to the extent that the SAC alleges active concealment (as opposed to inaction, such as silence) by the Automakers, the U.S. Automakers' challenge to Plaintiffs' fraud claim under South Carolina law fails.[37]

The Parties disagree over whether the SAC alleges facts supporting the Automakers' active concealment of the Inflator Defect. [Docs. 181-1 at 45–46;

[36] The other states that *EcoDiesel* discusses are either not part of the U.S. Automakers' challenge or are those states that impart a duty to disclose based on superior knowledge (e.g., Massachusetts).

[37] Under South Carolina law, a duty to disclose may arise where "the circumstances of the case, the nature of [the parties'] dealings, or [the parties] position towards each other" imply a relationship of trust or confidence. *Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 539 (D.S.C. 2021) (quoting *Regions Bank v. Schmauch*, 582 S.E.2d 432, 445 (S.C. Ct. App. 2003)). In *Harrell*, the court denied an automobile manufacture's motion to dismiss the fraudulent concealment claim because the plaintiff alleged that the manufacturer had pre-existing knowledge of the alleged manufacturing defect but took active steps, including issuing a series of technical service bulletins that cast the defect as "a normal feature," to conceal the defect and these "allegations could 'constitute circumstances' or 'nature of dealings' that give rise to a duty to speak." 517 F. Supp. 3d at 529. Here too Plaintiffs allege that the Automakers had preexisting knowledge of the defect at issue and, to the extent that they sufficiently allege the Automakers' active concealment of that defect, their South Carolina-law based fraud claim survives.

221 at 52]. The U.S. Automakers maintain that the SAC does not allege facts supporting the Automakers' pre-existing knowledge much less any affirmative action by them to conceal that knowledge. [Doc. 181-1 at 45–47]. This failure, according to the U.S. Automakers, dooms Plaintiffs' fraud claims for states, such as Arizona, California, Florida, Indiana, Massachusetts, and North Carolina, that require allegations of affirmative acts of concealment. [*Id.*] Because Plaintiffs have shown that one of the other special circumstances triggers the Automakers' duty to disclose under California, Florida, Massachusetts, and North Carolina law, the sufficiency of Plaintiffs' active concealment allegations remain relevant only as to their fraud claims under Arizona and Indiana law and based on Plaintiffs' reliance on *EcoDiesel*, under South Carolina law.

Plaintiffs' point to paragraphs 8, 376–79, and 414(f) of the SAC to show that they plausibly allege the Automakers' active concealment. [Doc. 221 at 52]. But the referenced, factually supported allegations concern Defendants' *failure to disclose* the Defect, i.e., their *inaction or silence*. Specifically, paragraphs 376–79 of the SAC allege that the existence of the Inflator Defect was a material fact, that each entity in the airbag supply chain—i.e., ARC, the Airbag Suppliers, and the Automakers—chose not to disclose it through any of the available means of disclosure, and that Defendants' intent was to mislead consumers. Similarly, paragraph 414(f) of the SAC goes to Defendants' inaction; it asserts that although Defendants were aware of the Defect, they

failed to inform consumers, disclose the defect to the NHTSA, or launch a comprehensive recall. But silence is not active concealment. *See United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000) ("[T]he common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information[,]" "[t]he latter is characterized by mere silence."). And although Plaintiffs cite paragraph 8 of the SAC, which asserts that "ARC worked with others to conceal" the Defect and had "help" from the Automakers in doing so, this is a conclusory assertion, *supra* § VI.B.2.d.i.c., and Plaintiffs fail to identify any factual allegations in the SAC that support it. Indeed, the section of the SAC titled "Defendants' Concealment of the Defect" points exclusively to Defendants' silence. *See* SAC I ¶¶ 376–79. Thus, Plaintiffs have failed to show that the Automakers had a duty to disclose the Defect under the common law of fraud in Arizona, Indiana, and South Carolina.

Last up is Plaintiffs' argument that the Automakers' incomplete representations about the safety and reliability of the Class Vehicles (i.e., the Automakers' "half-truth") triggered their duty to disclose the Inflator Defect (i.e., the "whole truth"). [Doc. 221 at 52]. The two cases Plaintiffs advance in support indicate that under Alabama, California, and Florida law a partial representation triggers the duty to disclose. *See Takata II*, 193 F. Supp. 3d at 1337–38 (applying Alabama law); *In re NJOY, Inc. Consumer Class Action Litig.*, 2015 WL 12732461, at *18 (C.D. Cal. May 27, 2015) (applying California

and Florida law). The U.S. Automakers further acknowledge that Indiana recognizes the duty where partial misrepresentations are made to the plaintiff. [Doc. 181-1 at 45]. But they maintain that the SAC fails to allege facts sufficient to show that the Automakers made such misrepresentations. [*Id.*]. Although the SAC does not identify the materials specifically, it alleges that through "advertisements, promotional materials and other public statements," each Automaker "uniform[ly] and pervasive[ly] market[ed] [the] message that its vehicles are safe and dependable" and that Plaintiffs were exposed to that marketing message. *See, e.g.*, SAC I ¶¶ 142, 144, 151, 186, 223. These allegations suffice to support the position that the Automakers made incomplete representations about the safety and reliability of the Class Vehicles and, thus, that they had a duty to disclose the Inflator Defect under the laws of Alabama, California, Florida, and Indiana.

**In sum,** of the 22 fraud claims that the U.S. Automakers challenge for lack of a duty to disclose, Plaintiffs successfully show that one or more special circumstance triggered the U.S. Automakers' duty to disclose the Inflator Defect under the laws of Alabama, California, Florida, Georgia (limited to Plaintiffs who bought or leased vehicles from authorized dealers), Indiana, Iowa, Massachusetts, Montana, New York, North Carolina, Texas, Vermont, and Virginia. Thus, while Plaintiffs' fraud claims under the laws of one or more of these states may fail for other reasons, they do not fail for the lack of the Automakers' duty to disclose. However, Plaintiffs fail to identify a condition

triggering the Automakers' duty to disclose to support the remaining challenged fraud claims.[38] Thus, the Court **GRANTS** the U.S. Automakers' Motion, [Doc. 181], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs fraud by omission and concealment claims against the Automakers under the law of Arizona (Count 3(d)), Arkansas (Count 4(d)), Georgia (Count 5(e), as to Plaintiffs who acquired used Class Vehicles from sources unaffiliated with the Automakers), Illinois (Count 14(e)), Kentucky (Count 18(d)), Michigan (Count 23(d)), Missouri (Count 26(d)), New Jersey (Count 31(d)), Ohio (Count 36(e)), and South Carolina (Count 41(e)).

**e. Reliance and Causation**

The U.S. Automakers seek the dismissal of Plaintiffs' common-law fraud claims for Arkansas, Georgia, and Montana and their fraud-based claims for Alabama, Arizona, California, District of Columbia, Indiana, Illinois, Kansas, Maryland, Michigan, Montana, Nevada, New Hampshire, New York, Pennsylvania, South Dakota, Texas, Vermont, and Virginia, arguing that these states require reliance and causation, which the SAC fails to allege. [Doc.

[38] Plaintiffs repeatedly reference "App'x B" for state law in support of their arguments. [*E.g.,* Doc. 221 at 52–53]. However, Appendix B to Plaintiffs' response brief, [Doc. 221-2], contains case law regarding the issue of economic loss and manifestation only. They also cite to their response brief in opposition to the Airbag Suppliers' Motion to Dismiss, [Doc. 220], in support of the proposition that "are several bases that trigger the Automakers' duty to disclose the Inflator Defect here." [Doc. 249 at 50 (citing AMD Opp. § II.C.)]. Plaintiffs make no effort to explain how the arguments and case law in the cited section of their opposition to the Airbag Suppliers' Motion apply to the U.S. Automakers' Motion. Thus, to the extent that the citation is intended to incorporate the arguments and authority raised in section II.C. of Plaintiffs' opposition to the Airbag Suppliers' Motion, the Court rejects this effort.

181-1 at 47]. Moreover, they contend that Plaintiffs' fraud-based statutory consumer protection claims for Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Iowa, Kentucky, Massachusetts, Minnesota, Missouri, Montana, New Jersey, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Washington, West Virginia, and Utah fail because the SAC does not allege causation. [*Id.*] The explanatory parentheticals accompanying the cases the U.S. Automakers cite, indicate that the cited cases either support the general proposition that reliance, causation, or both are required under the laws of the specified state or that a plaintiff alleging fraud must specify the misrepresentations on which he or she relied. [*See* Doc. 181-7 at 17–21]. Relying on this authority, the U.S. Automakers claim that Plaintiffs are required to allege that "they were aware of, and relied upon, specific misrepresentations or omissions, and that this reliance caused their damages." [Doc. 181-1 at 47]. But as Plaintiffs point out, in addition to alleging misstatements by the Automakers, the SAC alleges fraud based on *omissions*. [Doc. 221 at 53]. And the U.S. Automakers identify no authority, and the Court is aware of none, supporting their contention that Plaintiffs are required to allege that they were *aware of Defendants' omission* but, nevertheless, they relied on that omission to their detriment.

To the extent the thrust of the U.S. Automakers' argument is that Plaintiffs fail to allege individualized facts showing reliance and causation, this argument fails. Each Plaintiff alleges that he or she would have become

aware of a disclosure by the Automaker of the Inflator Defect in his or her Class Vehicle but that the relevant Automaker made no such disclosure before the time of sale or lease and that he or she had no way to learn of the Defect. SAC I ¶¶ 142–255. Each Plaintiff further alleges that he or she would not have bought the Class Vehicle or, at least, not paid as much for it if he or she had known about the Defect. *Id.* The SAC sufficiently, albeit in a cookie cutter manner, indicates each Plaintiff's reliance on Defendants' omission and the resulting damages by alleging that Defendants, did not disclose the Defect, each Plaintiff relied on the non-disclosure, including the non-disclosure by the relevant Automaker, in buying or leasing his or her Class Vehicle, and that, consequently, each Plaintiff paid for a vehicle he or she would not have otherwise bought or leased or overpaid for it. *See, e.g.*, *In re Takata Airbag Prods. Liab. Litig.*, 462 F. Supp. 3d 1304, 1318–19 (S.D. Fla. 2020) ("*Takata III*") (declining to dismiss nationwide-class common-law fraudulent concealment and fraud-based statutory consumer protection claims under the laws of various states over the sufficiency of the plaintiffs' reliance allegations where the plaintiffs alleged that they lacked knowledge of the omitted facts, would not have acted as they did and would have either paid less for or not bought or leased their vehicles if they had known of the airbag defect). It is not implausible in the context of the non-disclosure of a safety-related airbag defect for the reliance and causation scenario alleged to apply to each Plaintiff. And

because each Plaintiffs plausibly allege reliance and causation, the U.S. Automakers fail to prevail on their argument.

**f. Omission-Based Claims Not Recognized**

Plaintiffs' common law fraud claims for Arkansas, Missouri, Montana, and Texas should be dismissed, the U.S. Automakers argue, because the applicable common law does not recognize independent fraudulent omission or concealment claims. [Doc. 181-1 at 48–49]. While Arkansas, Montana, and Texas do not recognize fraudulent omission or concealment claims as independent causes of action, Missouri does not bar such claims. In Arkansas and Texas, "[f]raudulent concealment is a [statute of] limitations defense, not a claim." *Riggs-Degraftenreed v. Wells Fargo Home Mortg. Inc.*, 2014 WL 12613403, at *2 (E.D. Ark. June 27, 2014), *aff'd,* 676 F. App'x 613 (8th Cir. 2017); *White v. Statebridge Co., LLC*, 2023 WL 2472657, at *13 (E.D. Tex. Feb. 6, 2023), *R. & R. adopted*, No. 22-CV-713, 2023 WL 2465774 (E.D. Tex. Mar. 10, 2023) ("[F]raudulent concealment is not an independent cause of action, but is rather a tolling provision to prevent the defendant from relying upon a statute of limitations period as an affirmative defense." (quoting *Buraimoh v. BMW of N. Am., LLC*, 2020 WL 7711823, at *6 (W.D. Tex. Dec. 29, 2020))). And "Montana caselaw reveals that fraudulent concealment does not operate as a standalone claim." *Nelson v. Forest River, Inc.*, 2023 WL 2610769, at *6 (D. Mont. Mar. 23, 2023).

However, although the Missouri Supreme Court "has not recognized a separate tort of fraudulent nondisclosure, *Hess v. Chase Manhattan Bank,*

*USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007), this does not foreclose a nondisclosure-based fraud claim. Missouri does recognize fraudulent misrepresentation and, where a plaintiff alleges fraud by nondisclosure, "a party's silence in the face of a legal duty to speak replaces the first element: the existence of a representation." *Hess*, 220 S.W.3d 758 at 765. "Thus, while a fraudulent concealment or nondisclosure claim is not a separate cause of action under Missouri law, it falls under the rubric of fraudulent misrepresentation" and is "valid under Missouri law as subsumed by fraudulent misrepresentation." *Tucker v. Ethicon, Inc.*, 2021 U.S. Dist. LEXIS 22315, at *21 (E.D. Mo. Feb. 5, 2021).

For these reasons, the Court **GRANTS** the U.S. Automakers' Motion to Dismiss, [Doc. 181], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs' fraud claims for Arkansas (Count 4(d)), Montana (Count 27(d)), and Texas (Count 44(d)) in their entirety (i.e., against all Defendants).

### 3. Viability of Statutory Consumer Protection Claims

The Airbag Suppliers present several grounds for the dismissal of Plaintiffs' fraud-based statutory consumer protection claims. They argue that several of the same reasons dictating the dismissal of the common law fraud claims also apply to Plaintiffs' statutory claims. Specifically, the Airbag Suppliers argue that Plaintiffs cannot maintain consumer protection claims for states that require: (1) a duty to disclose; (2) consumer-oriented conduct; or (3) affirmative statements. The Airbag Suppliers additionally contend that several of the other statutory claims fail for various reasons, including as

barred because they concern regulated activity and for Plaintiffs' failure to comply with applicable pre-suit notice requirements.

Likewise, the U.S. Automakers seek the dismissal of certain fraud-based statutory consumer protection claims by Plaintiffs for various reasons, including among other reasons, the SAC's failure to allege a duty to disclose, its failure to allege active concealment, the insufficiency of omission-based fraud to support the statutory violation, and the SAC's failure to plead the required intent to defraud. [Doc. 181-1 at 43–47, 49–50]. The Court addresses these arguments below.

**a. No Duty to Disclose**

The Airbag Suppliers assert that Plaintiffs' claims of fraudulent omission or concealment-based violations of the consumer protection statutes of Arkansas, Colorado, Connecticut, Delaware (as to Count 8(c)), Michigan, Nevada, New Jersey, North Carolina, Oregon, Pennsylvania, and South Carolina also fail because these statues are construed to require a duty to disclose and (for the same reasons as for the common law fraud claims) the Airbag Suppliers had no such duty. As to statutory consumer protection claims under the laws of six of the challenged states (i.e., Arkansas, Colorado, Delaware, Michigan, Nevada, and New Jersey), Plaintiffs respond that the relevant statutes do not in fact require a duty to disclose. [Doc. 220 at 38 n.13]. For claims under the consumer protection statutes of Connecticut, North Carolina, Oregon, Pennsylvania, and South Carolina, Plaintiffs maintain that the duty to disclose required by these statutes is satisfied for the same reasons

as it is satisfied for the common law fraud claims. [*Id.* at 38]. But, in the context of the common law fraud claims under the laws of these states, as discussed above, Plaintiffs fail to establish that the Airbag Suppliers had a duty to disclose. Thus, their statutory consumer protection claims under Connecticut, North Carolina, Oregon, Pennsylvania, and South Carolina law also fail. Below, the Court addresses the challenge to the statutory claims for the remaining six states.[39]

Regarding Arkansas, Plaintiffs simply quote the statutory language[40] without providing authority to indicate that Arkansas courts interpret the statutory language to excuse a duty to disclose for claims under the Arkansas Deceptive Trade Practices Act (ADTPA), Ark. Code Ann. § 4-88-101, *et seq.*, based on fraudulent concealment or omission. They do not. *See White v. Volkswagen Grp. of Am., Inc.*, 2013 WL 685298, at *9 (W.D. Ark. Feb. 25, 2013) (dismissing ADTPA claims alleging fraudulent concealment and omission for lack of a basis to impose a duty to disclose on the defendant).

---

[39] Plaintiffs assert claims under the South Carolina Unfair Trade Practices Act (SCUTPA) and the South Carolina Regulation of Manufacturers, Distributions, and Dealers Act (Counts 41(c) and 41(d), respectively). Both are consumer protection statutes. The Airbag Module Defendants' "no duty to disclose" challenge is restricted to Plaintiffs' SCUTPA claim. [*See* Doc. 178-1 at 42 n.11 (referencing SCUTPA)]. Thus, the Court's reference to South Carolina's consumer protection statute in this Section, § VI.B.3.a., is limited to SCUTPA.

[40] Specifically, Plaintiffs rely on the following language, [Doc. 220 at 38 n.13]: "The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." Ark. Code § 4-88-107(b).

For Colorado, Plaintiffs point out the court in *Martinez v. Lewis*, 969 P.2d 213, 221 (Colo. 1998), decided the plaintiff's claim under the Colorado Consumer Protection Act (CCPA), Colo. Rev. Stat. § 6-1-101, *et seq.*, without invoking a duty to disclose as a claim element. But there, the CCPA claim failed on other grounds and, thus, the absence of a discussion of a duty to disclose is unsurprising. *See id.* at 221-23. Rather, the Court is persuaded that for claims alleging a failure to disclose under the CCPA, "[t]here can be no failure to disclose absent a duty to disclose." *Francis v. Mead Johnson & Co.*, 2010 WL 5313540, at *5 (D. Colo. Dec. 17, 2010).

As to Delaware, Plaintiffs' reliance on *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *7 (Del. Ch. Apr. 10, 2008), is unavailing. Not only does *CHR Holding* not involve a statutory consumer protection claim, but, in the context of "fraud by silence," the court simply noted that "there is no duty to speak absent special circumstances." *Id.* at *6. As discussed above, however, Plaintiffs have failed to establish that any of the special circumstances they assert imposes a duty to disclose on the Airbag Suppliers. This is fatal to their Delaware statutory consumer protection claims against these Defendants, because the Delaware Consumer Fraud Act, 6 Del. Code § 2531, *et seq.*, requires that "deliberate concealment of a material fact must be done 'in the face of a duty to speak.'" *Arcelik, A.S. v. E.I. Du Pont de Nemours & Co.*, 619 F. Supp. 3d 473, 485 (D. Del. 2022) (quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).

However, Plaintiffs' claim for the violation of the Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901, *et seq*., against the Airbag Suppliers fails for the same reasons. Plaintiffs rely upon *Flynn v. FCA US LLC*, 327 F.R.D. 206, 220 (S.D. Ill. 2018), where the court concluded that an MCPA "claim premised on a failure to disclose material facts does not require a consumer to prove reliance or a duty to disclose." *Flynn*'s reading of the MCPA notwithstanding, the Court is persuaded by the Michigan Court of Appeals' instruction that "it is proper to construe the provisions of the MCPA 'with reference to the common-law tort of fraud.'" *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 283 (1999) (citation omitted). And, in Michigan, the duty to disclose is an element of a fraudulent omission claim. *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 681 (E.D. Mich. 2020). Thus, in line with *Zine*, courts in Michigan have held that a duty to disclose is a required element of an MCPA claim. *See Jones v. Lubrizol Advanced Materials, Inc.*, 559 F. Supp. 3d 569, 613-14 (N.D. Ohio 2021), *granting reconsideration in part on other grounds*, 2021 WL 4582180 (N.D. Ohio Oct. 6, 2021); *Shain v. Advanced Techs. Grp., LLC*, 2017 WL 768929, at *12 (E.D. Mich. Feb. 28, 2017) ("The omission of facts does not constitute a violation of Michigan's consumer protection act absent a duty to disclose certain information to a consumer."); *Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 781 (W.D. Mich. 2006) (noting that a duty to disclose in an element of an MCPA cause of action).

Likewise, Plaintiffs' argument that the Nevada Consumer Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*, does not require a duty to disclose fails to prevail. Unlike in *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1199 (D. Nev. 2022), where the defendant, by relying upon authority for common law fraud, failed to show that statutory "fraud by omission . . . requires an affirmative duty to disclose," here, the Airbag Suppliers point to on point authority that supports their position. In *Cohen v. Subaru of Am., Inc.*, 2022 WL 714795, at *26 (D.N.J. Mar. 10, 2022), the court dismissed the Nevada statutory consumer protection claim concluding that Nevada law "requires a duty to disclose to state [that] claim." Similarly, in *MST Mgmt., LLC v. Chicago Doughnut Franchise Co., LLC*, 584 F. Supp. 3d 923, 933 (D. Nev. 2022), the court dismissed factual omission-based Nevada Deceptive Trade Practices Act claims because the plaintiffs failed to show that the defendants had a duty to disclose under the statute.

Finally, Plaintiffs' claim against the Airbag Suppliers under the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. §56:8-1, *et seq.*, fails because "New Jersey law requires a duty to disclose for omission-based claims under the NJCFA." *Subaru of Am.*, 2022 WL 714795 at *24. Plaintiffs' reliance on *Harvey v. Nissan N. Am., Inc.*, No. 2005 WL 1252341, at *14 (N.J. Super. Ct. Apr. 29, 2005), for the proposition that "duty to disclose is not necessary to have a knowing omission violate the [NJ]CFA" is unavailing. In fact. Plaintiffs' quote from *Harvey* is not a statement of New Jersey law but rather the

plaintiffs' argument. Indeed, rejecting that argument, the court applied "the standards set forth in the fraud cases regarding duty [to disclose]" to the NJCFA claim and concluded that the facts failed to show a special relationship, a fiduciary relationship, or a special trust to support such a duty. *Id.*

Because the Airbag Suppliers have successfully shown that Arkansas , Colorado, Connecticut, Delaware (as to Count 8(c)), Michigan, Nevada, New Jersey, North Carolina, Oregon, Pennsylvania, and South Carolina (as to Count 41(c)) require a duty to disclose to support a claim for the violation of the respective states' consumer protection statutes based on fraudulent omission or concealment and that Plaintiffs have failed to allege facts giving rise to that duty, Plaintiffs cannot maintain their fraud-based claims under the consumer protection statutes of these states.

The U.S. Automakers also argue that the Court should dismiss Plaintiffs' statutory fraud-based consumer protection claims under the laws of Arkansas (Count 4(c)), Georgia (Count 11(c)), California (Counts 5(d)–(f)), Montana (Count 27 (c)), New York (Counts 33(c)–(d)), North Carolina (Count 34(c)), and Ohio (Count 36(c)) for the failure to allege a circumstance giving rise to the duty to disclose. [Doc. 181-1 at 43–47]. They base their arguments for dismissal of the fraud-based statutory claims on the same grounds that they raise for the dismissal of the common law fraud claims. Thus, to the extent that Plaintiffs successfully establish a basis for the Automakers' duty to disclose as to a challenged fraud claim, they also succeed in establishing an

underlying duty to disclose in support of any corresponding challenged statutory consumer protection claim. In short, for the reasons that Plaintiffs establish that their fraud claims against the Automakers under the laws of California, Georgia (as to the GUDTPA claim by Plaintiffs who bought or leased from an Automaker-authorized dealer), Montana, New York, and North Carolina are supported by a duty to disclose, *supra* § VI.B.2.d.ii., they also establish that their corresponding challenged fraud-based statutory consumer protection claims are supported by the Automakers' duty to disclose. However, Plaintiffs fail to show a cognizable duty to disclose under the laws of Arkansas, Georgia (as to the GUDTPA claim by Plaintiffs who acquired their Class Vehicles from a source other than an Automaker-authorized dealer), and Ohio.[41] *See supra* § VI.B.2.d.ii. Thus, Plaintiffs cannot maintain their statutory consumer protection claims against the Automakers for Arkansas (Count 4(c)), Georgia (Count 11(c), in part), and Ohio (Count 36(c)).

**b. No Consumer-Oriented Conduct**

The Airbag Suppliers seek the dismissal of Plaintiffs' statutory consumer protection claims for ten states (i.e., Arizona, Delaware (Count 8(d)), Idaho, Kansas, Maryland, New York (Counts 33(c), (d)), Texas, Utah (Count

---

[41] Although Plaintiffs argue that the SAC sufficiently alleges the U.S. Automakers' active concealment, which supports a duty to disclose under the Ohio Consumer Sales Practices Act, (OCSPA), Ohio Rev. Code Ann. § 1345.01, *et seq.*, [Doc. 221 at 52 n.37], they not only fail to provide authority in support, but they also fail to allege active concealment by the Automakers, *supra* § VI.B.2.d.ii.

45(c)), and Virginia),[42] arguing that they did not transact consumer sales or engage in consumer-oriented conduct as the applicable statutes require. Plaintiffs rhetorically question how the Airbag Suppliers concealment of the Defect is not consumer oriented and argue that the relevant statues do not require that these Defendants have privity with consumers. However, Plaintiffs fail to rebut the position that the relevant consumer protection statutes do not recognize claims against parts manufacturers who do not engage in any consumer sales or interactions or make an affirmative misstatement.

Arizona's Consumer Fraud Act (ACFA), Ariz. Rev. Stat. Ann. § 44–1522, *et seq.*, "'is designed to root out and eliminate unlawful practices in merchant-consumer transactions.'" *Powers v. Guar. RV, Inc.*, 229 Ariz. 555, 561 (App. 2012) (quoting *People ex rel. Babbitt v. Green Acres Trust*, 127 Ariz. 160, 164 (App. 1980), *superseded by statute on other grounds*, 1981 Ariz. Sess. Laws, Ch. 295, § 5). The SAC alleges no such transaction between Plaintiffs and the Airbag Suppliers.

In Delaware, "[c]onsumers lack standing to raise deceptive trade practice claims under the [Deceptive Trade Practices Act], because the Act protects *competing business interests* against unfair trade practices." *Nieves*

[42] The Airbag Module Defendants also argue for dismissal of Plaintiffs' Illinois statutory consumer protection claim. The Court does not address it here because, as explained elsewhere in this Order, the Court dismisses the claim on another ground.

*v. All Star Title, Inc.*, 2010 WL 2977966, at *6 (Del. Super. Ct. Jul. 27, 2010) (emphasis in original). No such interests are at play between Plaintiffs and the Airbag Suppliers.

To have standing to assert an Idaho Consumer Protection Act (ICPA) claim, "'the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively.'" *Duspiva v. Fillmore*, 154 Idaho 27, 36 (2013) (quoting *Taylor v. McNichols*, 149 Idaho 826, 846 (2010)). Again, the SAC does not allege a contractual relationship between Plaintiffs and the Airbag Suppliers. Plaintiffs point out that it is unclear whether Taylor requires a direct contractual relationship between the plaintiff and the defendant. [Doc. 220 at 40 n.14 (citing *In re Insulin Pricing Litig.*, 2019 WL 643709, at *19 (D.N.J. Feb. 15, 2019))]. But "[t]o interpret [*Taylor*'s] holding as requiring a contractual relationship generally but not direct contractual privity would render the phrase 'with the party alleged' superfluous. That phrase (and the rest of the holding in *Taylor*) is binding on this Court." *In re Duramax Diesel Litig.*, 2018 WL 3647047, at *9 (E.D. Mich. Aug. 1, 2018).

The Kansas Consumer Credit and Protection Act prohibits a "supplier" from "engag[ing] in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a). The Act is "construed liberally to streamline the law of consumer transactions and to protect consumers from unscrupulous suppliers." *Moore v. Bird Eng'g Co., P.A.*, 273 Kan. 2, 10 (2002).

And it broadly defines "consumer transaction" as "a sale, lease, assignment or other disposition for value of property . . . within this state . . to a consumer" and does not require that the "supplier" have direct dealings with the consumer.[43] Kan. Stat. Ann. §§ 50-624(c), (i). Even so, to fall within the Act's ambit, the "supplier" must "in the ordinary course of business, solicit[], engage[] in, or enforce[] consumer transactions." Kan. Stat. Ann. § 50-524(i). The SAC's allegations fail to raise the inference that, by supplying airbag modules to automakers, the Airbag Suppliers either directly or indirectly solicit, engage in, or enforce the sale or lease of vehicles. *See Moore*, 273 Kan. at 10 (determining that the defendant who provided engineering services to consumers was a "supplier" within the KCPA's definition because, in the ordinary course, he "engage[d]" in the "sale of his engineering services" to consumers).

Likewise, the Maryland Consumer Protection Act ("Maryland CPA"), Md. Code, Com. Law, § 13-101, *et seq.*, requires that "the deceptive trade practice must occur *in the sale* or offer for sale to the consumer." *Morris v. Osmose Wood Preserving*, 340 Md. 519, 541 (1995) (emphasis added). In the case of a "deceptive trade practice committed by someone who is not the seller," the non-seller's wrongful practice must "so infect the sale or offer for sale to a

[43] Under the Act "[s]upplier means a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." Kan. Stat. Ann. § 50-624(i).

consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale." *Id.* The defective trade practice of a defendant supplier or manufacturer of a component part who is not "involved in selling, offering, or advertising the" the end product to consumers or has not "attempted to influence" consumers to buy the end product does not occur "in" the consumer sale. *Id.* at 542. Here, Plaintiffs do not allege that the Airbag Suppliers engaged in any of these consumer-oriented acts. In the absence of allegations of the Airbag Suppliers' involvement in the sale of vehicles to consumers, Plaintiffs' Maryland CPA claim against these Defendants fails. *White v. Kennedy Krieger Inst.*, 221 Md. App. 601, 653 (2015) ("Liability has only been extended to third parties under the CPA in limited instances where the third party's actions were so integral that the sale of consumer goods would not have proceeded without their involvement." (citation omitted)).

Both sections of New York's General Business Law under which Plaintiffs assert claims against the Airbag Suppliers require "consumer-oriented conduct." *St. Patrick's Home for the Aged & Infirm v. Laticrete Int'l*, 696 N.Y.S.2d 117, 122 (N.Y. App. Div. 1999). And a business-to-business supplier of materials who has no contact with consumers does not engage in consumer-oriented conduct by selling materials to a business that uses them in the end product. *Id.* The Airbag Suppliers supplied airbag modules to auto manufacturers; the SAC does not allege that they have any consumer contact in that process to support an inference of consumer-oriented conduct.

Texas's Deceptive Trade Practices-Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, does not "reach upstream manufacturers and suppliers when their misrepresentations are not communicated to the consumer." *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). The thrust of *Amstadt* is that the upstream manufacturer or supplier "must be connected to the consumer transaction in order to be held liable for deceptive trade practices." *Church & Dwight Co. v. Huey*, 961 S.W.2d 560, 565 (Tex. App. 1997). Such a connection exits when the manufacturer's "marketing efforts [are] incorporated into [the seller's] marketing efforts, and they form[] the basis for [the consumer's] decision to use the product." *Id.* An automobile distributor's deceptive omission also becomes "incorporated into" the consumer sales of the vehicles. *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 877 (S.D. Ohio 2012) (applying TDTPA). But the misstatements by a manufacturer of an automobile component are not incorporated into the vehicle sales to consumers where the component manufacturer "never communicated directly to consumers." *Bledsoe v. FCA US LLC*, 663 F. Supp. 3d 753, 806 (E.D. Mich. 2023) (same); *contrast Chavez v. Ford Motor Co.*, 2018 U.S. Dist. LEXIS 224235, at *9 (W.D. Tex. Sep. 26, 2018) (finding no "upstream manufacturer" liability for deceptive statements where the plaintiff did not allege that the manufacturer interacted with her), *with O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 977 (N.D. Ill. 2021) (declining to insulate the defendant as an "upstream manufacturer" and dismiss the

TDTPA claim where the plaintiff alleged that the manufacturer directly communicated its misrepresentations to him before the sale). Plaintiffs' allegations fail to show that the Airbag Suppliers, who supplied airbag modules for incorporation into vehicles, were connected to the consumer sales transactions for those vehicles. Specifically, the Airbag Suppliers neither supplied nor manufactured the vehicles and Plaintiffs do not allege that the Airbag Suppliers communicated directly with them.

The Utah Consumer Sales Practices Act ("UCSPA") applies to "suppliers" (i.e., those "who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer"). *Copeland v. Albion Labs., Inc.*, 2015 U.S. Dist. LEXIS 154757, at *7 (W.D. Wash. Nov. 16, 2015) (quoting Utah Code. Ann. § 13-11-3(5)). As with the claim under the KCPA, which employs the same definition of "supplier," Plaintiffs' claim under UCSPA also fails because the SAC does not allege facts to show that the Airbag Suppliers either directly or indirectly solicit, engage in, or enforce the sale or lease of vehicles. Moreover, to the extent Plaintiffs maintain that the Airbag Suppliers engage in the sale of vehicles because they supply a vehicle component to automakers, courts interpret the UCSPA to require that the upstream "seller must directly engage in the deceptive representation to be held liable." *Id.* at *9 (dismissing UCSPA claim where the plaintiff did not allege that the upstream seller made representations to consumers or alleged that it was responsible for the re-seller's representations). The SAC does not

allege that the Airbag Suppliers made direct representations to consumers, nor does it allege that they were involved in the Automakers' representations. Plaintiffs point out that the UCSPA "is broad enough to impose liability upon suppliers of consumer goods." [Doc. 220 at 40 n.14 (selectively quoting *Utah v. B & H Auto*, 701 F. Supp. 201, 205 (D. Utah 1988)]. They fail to explain how the airbag modules sold by the Airbag Suppliers to the Automaker as a component for assembly into new vehicles qualifies as a "consumer good" or how the Airbag Suppliers are covered by the scenario *B & H Auto* envisions—UCSPA liability reaching an upstream stream supplier of a product (as opposed to a component supplier) who deceptively sells to an innocent intermediary and whose deceptive actions "significantly impact the later consumer transaction" for that product. The Court agrees that the UCSPA would cover the type of "indirect" dealing with consumers that *B & H Auto* contemplates. But Plaintiffs have failed to show that the UCSPA also reaches the actions of the Airbag Suppliers. The Court concludes that it does not.

Finally, the Virginia Consumer Protection Act (VCPA) prohibits deceptive acts by a "supplier in connection with a consumer transaction." Va. Code § 59.1-200. Virginia courts interpret "consumer transaction" to "exclude transactions in which goods are first sold to an intermediary . . . and used as components." *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2015 WL 3824020, at *3 (N.D. Ga. June 19, 2015). Such "commercial transactions" between businesses are outside the VCPA's scope. *Id.* But the Airbag Suppliers'

sales represent just such transactions. As in *In re Atlas*, Plaintiffs do not allege that they bought the airbag modules with the ARC inflators directly from the Airbag Suppliers; rather, the SAC alleges that the Airbag Suppliers sold the modules to the Automakers who installed them in vehicles during manufacturing. This commercial transaction between two businesses for a product's component for assembly into the product for consumer sale does not give rise to a consumer's claim for deceptive practices under the VCPA. *Benkirane v. City Concrete Corp.*, 85 Va. App. 460, 475 (2025) (noting that interpreting the VCPA's "consumer transaction" to include "any transaction resulting in an end-product that is ultimately used for 'personal, family, or household purposes' would bring about an "absurd result" and that "the relevant question is whether the bargained-for '*goods . . .*' are 'to be used' for personal purposes, not whether any eventual end-product to which the goods . . . contribute is for personal use").

Because the Airbag Suppliers have successfully shown that they did not conduct consumer sales or otherwise engage in consumer-oriented conduct, Plaintiffs cannot maintain their consumer protection statutory claims for the following states: Arizona, Delaware (Count 8(d)), Idaho, Kansas, Maryland, New York (Counts 33(c), (d)), Texas, Utah (Count 45(c)), and Virginia.

**c. No Misstatements Specified**

The Airbag Suppliers challenge Plaintiffs' statutory consumer protection claim under California's False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500, et seq., (Count 5(e)), arguing that Plaintiffs allege only

omissions and no affirmative misstatements by the Airbag Suppliers.[44] [Doc. 178-1 at 43 & n.16].The issue with this argument is that the SAC does not assert a FAL claim against the Airbag Suppliers; it asserts that claim against only the Automakers. SAC II ¶¶ 722–788. So it is irrelevant, for purposes of the FAL claim, whether the SAC alleges affirmative misstatements by the Airbag Suppliers.

Moreover, according to Plaintiffs, the Ninth Circuit has clarified that "FAL permits pure omissions claims premised on a duty to disclose." [Doc. 220 at 40 n.15 (citing *Hodson v. Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018)]. And, in the context of a "pure omission" claim, a plaintiff may "plead a safety hazard to establish that the defendant had a duty to disclose." *Hodsdon*, 891 F.3d at 864. The Airbag Suppliers do not rebut this argument; rather, they shift gears and argue that the FAL claim fails because it does not plausibly allege Defendants' knowledge of the Inflator Defect. [Doc. 246 at 25 n.19]. Not so. As discussed above, *supra* §§ III.D; VI.B.2.c., the SAC sufficiently alleges knowledge. Ultimately, however, the Court need not decide whether the SAC's allegations sufficiently support a pure omission-based FAL claim against the Airbag Suppliers because the SAC asserts no such claim against them.

[44] Also up for dismissal are Plaintiffs' statutory claims under Illinois and Wisconsin law. [Doc. 178-1 at 43]. However, because Plaintiffs concede that "the Illinois and Wisconsin statutes do not extend to pure omissions," [Doc. 220 at 41 n.15], the Court does not address those claims here.

The U.S. Automakers also challenge Plaintiffs FAL claim, arguing that the statute does not extend to omission-based fraud. [Doc. 181-1 at 49]. Not only does *Hodson* indicate otherwise, "California appellate courts have held that a claim may be stated under . . . [FAL] in terms constituting fraudulent omissions so long as the omission is contrary to a representation actually made by the defendant or the omission is of a fact the defendant was obliged to disclose." *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1101 (N.D. Cal. 2021) (citation modified). The U.S. Automakers argue that Plaintiffs do not meet either condition because no California Plaintiff alleges that he or she was exposed to any specific representations, nor does the SAC allege facts supporting the Automakers' duty to disclose. [Doc. 249 at 34]. This argument fails. Although the SAC does not name a specific advertisement containing the representation, there is no ambiguity about the representation that Plaintiffs attribute to the Automakers. Frank Talavera, a California resident who bought a Class Vehicle (a 2011 Cadillac SRX) in California, alleges that he was exposed to GM's advertising and promotional materials and, through them, to GM's representation that its vehicles are "safe and dependable" and that, at no point before the sale, did GM disclose that Talaveras' Class Vehicle had a defective airbag. SAC I ¶ 244. Other California Plaintiffs allege the same. *See e.g., id.* ¶¶ 181, 182, 186, 220, 222, 240. Although the same, this commonality does not render the allegations deficient. It is plausible, in the vehicle sales context, that each Plaintiff encountered the

relevant Automaker's promotional materials regarding his or her Class Vehicle and that the promotional material touted the vehicle as safe and dependable. And because the promotional materials allegedly represented the Class Vehicles as safe and dependable, arguably, the Automakers had the duty to disclose the Inflator Defect because the Defect renders vehicles unsafe. At this early stage, the SAC's allegations of the Automakers' partial representations suffice to support Plaintiffs' FAL claim. Thus, the Airbag Suppliers' and the U.S. Automakers' effort to dismiss the FAL claim as impermissibly premised on omissions fails.

**d. No Intent to Defraud**

To state a viable claim under the Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5-1, *et seq*., and the North Carolina Uniform Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1, *et seq*., the U.S. Automakers contend, the SAC must allege that Defendants had the specific intent to deceive but that it fails to do so. [Doc. 181-1 at 49–50]. This argument fails.

The U.S. Automakers maintain that because "Plaintiffs have not even adequately pled Defendants' pre-suit knowledge, much less any intent to defraud," Plaintiffs' ICSA claim fails. [Doc. 181-1 at 50]. Although Plaintiffs do not rebut the U.S. Automakers' contention that they must allege an intent to defraud in furtherance of their IDCSA claim, they do argue that the SAC plausibly alleges knowledge and that it raises a "plausible inference of intent." [Doc. 221 at 57]. The Court has also determined that the SAC sufficiently

alleges Defendants' knowledge of the Inflator Defect. *Supra* § VI.B.2.c. Moreover, the SAC alleges facts supporting Plaintiffs' allegation that Defendants intended to mislead consumers. SAC II ¶ 1559. For example, the SAC alleges that Defendants remained silent about the Inflator Defect to "continue[] to profit from the manufacture, marketing, sale, service, and use" of the allegedly defective inflators and the Class Vehicles and that they intended their silence to mislead Plaintiffs and others so that they could "generate and increase sales of the Class Vehicles, thereby increasing [their] relative share of the automotive components and automobile markets." SAC I ¶¶ 378–79.

As to the argument concerning the NCUDTPA, as Plaintiffs' correctly point out, the U.S. Automakers' authority for the intent requirement under North Carolina law concerns common law fraud rather than statutory fraud. [Doc. 221 at 57 n.45]. Thus, the U.S. Automakers fail to support their argument with applicable law. Moreover, North Carolina courts "'generally rule[] that the consumer need only show that an act or practice possessed the tendency or capacity to mislead, or created the likelihood of deception, in order to prevail under the states' unfair and deceptive practices act[,] . . . the intent of the actor is irrelevant.'" *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 452 (2009) (citation omitted). Also, rather than directly challenging Plaintiffs' position, the U.S. Automakers' reply shifts focus, raising a different reason why the NCUDTPA claim fails. They assert that Plaintiffs' claim is

premised on breach of contract and thus requires "allegations of egregious and aggravating circumstance" to state a claim for an NCUDTPA violation, and they claim, in a conclusory fashion that such allegations are absent from the Complaint. [Doc. 249 at 35]. This is not an instance where "a party [permissibly] responds directly to an opposing party's new issue[.]" *Solito v. Sam's E. Inc.*, 2025 WL 4093526, at *2 (N.D. Ga. Dec. 18, 2025). Instead, this is an impermissibly raised new argument in a reply, and for the several reasons that *Solito* identifies, the Court declines to consider the argument. *Id.* at *2–3 (declining to consider an issue "improperly injected" into the reply and explaining that the rule against considering such newly raised arguments "serves important ends, like giving litigants an opportunity to challenge the argument, preventing the Court from being forced to perform a litigant's research for it on a key legal issue, and eliminating the tactical advantage gained by a party saving his best argument for his reply" (citation modified)). Accordingly, the U.S. Automakers' argument in favor of the dismissal of Plaintiffs' claims for the violation of the ICDSA (Count 15(c)) and NCUDTPA (Count 34(c)) fails.

**e. No Allegations of Previous Violations**

Plaintiffs' claim pursuant to the Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code §§ 1345.01 *et seq.*, fails because the SAC does not contain allegations satisfying the Ohio CSPA's notice requirement. A consumer may bring a class action under the Ohio CSPA:

> only if the alleged violation: "was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code[.]"

*Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 636–37 (S.D. Ohio 2020) (quoting Ohio Rev. Code § 1345.09(B)). Thus, to maintain a class action claim under the Ohio CSPA claim, "[t]he plaintiff's complaint must allege that defendant's conduct was substantially similar to conduct that was either: (1) established as deceptive by an Ohio administrative rule; or (2) found to be deceptive by an Ohio state Court decision." *Id.* at 637; *see also Carder v. Graco Children's Prods.*, 558 F. Supp. 3d 1290, 1330 (N.D. Ga. 2021) (explaining that "'R.C. 1345.09(B) provides that a consumer may qualify for class-action status only when a supplier acted in the face of prior notice that its conduct was deceptive or unconscionable'" and that "'[t]he prior notice may be in the form of (1) a rule adopted by the Attorney General under R.C. 1345.05(B)(2) or (2) a court decision made available for public inspection by the Attorney General under R.C. 1345.05(A)(3).'" (quoting *Marrone v. Philip Morris USA, Inc.*, 110 Ohio St. 3d 5, 7-8 (2006))).

Although "Ohio courts . . . construe the [Ohio CSPA] liberally in favor of consumers," *Chapman v. Tristar Prods., Inc.*, 2016 WL 6216135, at *3 (N.D. Ohio Oct. 25, 2016), the SAC contains no allegations for the Court to liberally construe. Plaintiffs point to paragraph 3052 of the SAC as satisfying the

OCSPA's "liberal notice requirement." [Doc. 221 at 58 (quoting *id.* at *4)]. However, the cited paragraph merely alleges that by misrepresenting the Class Vehicles as safe and reliable or by failing to disclose the Inflator Defect, Defendants engaged in the unfair or deceptive practice of "[r]epresenting that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have" and that they are "of a particular standard, quality, and grade when they are not." There is no allegation that this conduct is substantially similar to an applicable rule or an Ohio court decision "that would put Defendant[s] on notice of the alleged unfair or deceptive conduct." *Foster*, 493 F. Supp. 3d at 637.

To the extent Plaintiffs now cite cases that they argue provides the required notice, they "may not amend th[eir] pleading through their opposition brief to Defendants' motion to dismiss." *Park 80 Hotels, LLC v. Holiday Hosp. Franchising, LLC*, 2023 WL 5523617, at *5 (N.D. Ga. Aug. 4, 2023). And to the extent Plaintiffs intend their contention that they may amend the SAC to allege additional facts regarding notice, [Doc. 221 at 58], to serve as a motion to amend, the request is not properly before the Court. *Terry v. Equifax Info. Servs., LLC*, 2025 WL 3909977, at *7 (N.D. Ga. Oct. 24, 2025) (explaining that a request to amend the complaint "embedded within [the plaintiff's] response brief, is procedurally improper" and that "a plaintiff may not simply await the Court's ruling on a motion to dismiss before filing a motion seeking leave to amend").

**In sum**, the Court **GRANTS** the U.S. Automakers' motion, [Doc. 181], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs' class-wide claim for a violation of the Ohio CSPA (Count 36(c)) against all Defendants. In the interest of clarity, the Court notes that this ruling does not affect any individual claim asserted by an Ohio Plaintiff. Thus, to the extent that such a claim survives any alternative challenge by one or more Defendants, that claim may proceed.

**f. No Actual and Tangible Financial Loss Allegations**

Next up is the U.S. Automakers' argument that Plaintiffs' statutory consumer protection claims for Arkansas, Georgia, Illinois, Montana, and New York, fail for the absence of allegations showing actual and tangible financial loss. [Doc. 181-1 at 53]. Because the Court has dismissed the challenged Arkansas and Georgia statutory claims (i.e., Counts 4(c) and 11(d)) on other grounds, it does not take up the U.S. Automakers' argument as to those claims. But it addresses the other challenged claims below.

The U.S. Automakers' effort to dismiss Plaintiffs' consumer protection claims under Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA"), 815 Ill. Comp. Stat. 505/1, *et seq.*, and Illinois Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), 815 Ill. Comp. Stat. 510/1, *et seq.*, fails. The two cases that these Defendants advance do not support their argument that the SAC fails to allege the type of loss that the Illinois statutes require. The first, *Koronthaly v. L'Oreal USA, Inc.*, 2008 WL 2938045, at *2 (D.N.J. July 29, 2008), concerns the New Jersey CFA rather than the Illinois

CFA and, thus, sheds no light on the Illinois CFA's requirements. The second, *Frye v. L'Oreal USA, Inc.*, 583 F.Supp.2d 954, 958 (N.D. Ill. 2008), favors Plaintiffs. There, the plaintiff failed to allege a "concrete and ascertainable" harm from her purchase of a lead-containing lipstick to satisfy the "actual damages" element of the Illinois CFA because she did not allege "that she would not have purchased lipstick, that she would have purchased cheaper lipstick, or that the lipstick in question had a diminished value because of the lead." *Id.* In contrast, here, Plaintiffs allege that Defendants' deceptive practices caused Plaintiffs to overpay for their allegedly defective Class Vehicles and that alleged Defect has "significantly diminished, and will continue to diminish, the value of the Class Vehicles." *See, e.g.*, SAC I ¶ 23, 146; SAC II ¶ 1472. Thus, the SAC's allegations suffice to show actual damages under the Illinois CFA. *C.f. Stemm v. Tootsie Roll Indus., Inc.*, 374 F. Supp. 3d 734, 743 (N.D. Ill. 2019) (concluding that the plaintiff failed to allege actual harm because she did "not allege that the candy that she did receive was defective in some way, or that she would have paid less in the marketplace for comparable products, but for the purported deception").

Next, the U.S. Automakers fail to sufficiently support their argument for the dismissal of Plaintiffs' claim under the Montana Unfair Trade Practices and Consumer Protection Act of 1973 ("Montana CPA"), Mont. Code § 30-14-101, *et seq.* They quote the Montana Supreme Court for the rule that "an 'ascertainable loss' under the [Montana] CPA does not require a showing of

'actual damages' [only] where the plaintiff demonstrates facts 'sufficient to establish a pecuniary loss.'" [Doc. 181-1 at 21 (second alteration in original) (quoting *Aiking-Taylor v. Serang*, 404 Mont. 554 (2011))]. Based on this, they argue that because "[n]o Plaintiff alleges that he or she has tried and failed to sell his or her vehicle for the purchase price (minus depreciation)," as *Aiking-Taylor* requires, dismissal of the Montana CPA claim is appropriate. The Court is not persuaded. The very language that the U.S. Automakers' quote indicates that a plaintiff need not allege actual damages to proceed under the Montana CPA where he or she alleges facts going to pecuniary loss. This proposition is in line with the Montana Supreme Court's "reject[ion] [of the] . . . argument that under the [Montana] CPA 'ascertainable loss of money and property' requires a showing of 'actual damages'[.]" *Puryer v. HSBC Bank USA, Nat'l Ass'n*, 391 Mont. 361, 375 (2018), Here, Plaintiffs allege that Defendants' alleged deception led Plaintiffs to overpay for their Class Vehicles and that the alleged Defect that Defendants failed to disclose has diminished the value of those vehicles. *See, e.g.*, SAC I ¶¶ 23, 154; SAC II ¶ 2417. And the U.S. Automakers fail to show that these allegations are insufficient to support a Montana CPA claim.

Last, Plaintiffs' claims for violations of New York General Business Law § 349, N.Y. Gen. Bus. Law § 349, *et seq.*, and New York General Business Law § 350, N.Y. Gen. Bus. Law § 350, *et seq.*, are not subject to dismissal for failure to allege a cognizable injury. To allege an "actual injury claim under §§ 349

and 350[,] a plaintiff [must] . . . allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase," and she "show[s] this injury by alleging an overpayment, or a price premium, whereby [she] pays more than she would have but for the deceptive practice." *Hawkins v. Coca-Cola Co.*, 654 F. Supp. 3d 290, 301 (S.D.N.Y. 2023) (citation modified). Similar to the allegations in *Hawkins*, Plaintiffs allege that they bought the Class Vehicles because the Defendants represented the Vehicles as safe and reliable and that they would not have bought the Vehicles or would have paid less for them if they had known that the representations and omissions were false or misleading. *See, e.g.*, SAC II ¶¶ 2831–34, 2836–37. "At this early stage of the case, these allegations suffice to allege a price premium theory of injury." *Hawkins*, 654 F. Supp. 3d 290, 301 (S.D.N.Y. 2023) (concluding that the plaintiff sufficiently alleged an injury through her allegations that she bought the product at issue because it was represented as having certain characteristics and that she would not have paid or would have paid less for the product if she had known that the representations and omissions were false and misleading).

**In sum**, the U.S. Automakers do not prevail in their effort to dismiss Plaintiffs' Illinois (Count 14(c)), Montana (Count 27(c)), and New York (Count 33(c), (d)) statutory consumer protection claims for the SAC's failure to allege a cognizable loss under the statutes.

**g. Non-Compliance With Pre-Suit Notice Requirements**

Both the Airbag Suppliers and the U.S. Automakers move to dismiss several of Plaintiffs' statutory consumer protection claims citing the inadequacy of the SAC's allegations regarding pre-suit notice. Below, the Court first addresses the Airbag Suppliers' arguments and then the U.S. Automakers' arguments.

The Airbag Suppliers contend that the Court should dismiss Plaintiffs' Alabama, California,[45] Georgia (Count 11(d)), Indiana, Maine, Massachusetts, Texas, West Virginia, and Wyoming statutory consumer protection claims because Plaintiffs' pre-suit notices under the relevant statutes were either untimely or inadequate. [Doc. 178-1 at 44–46]. These Defendants argue that the consumer protection statutes of the above-mentioned nine states require a plaintiff to provide the defendant with a pre-suit notice that reasonably describes the allegedly unfair or deceptive practice and the injury the plaintiff suffered within a set period before the plaintiff files his or her claim.

Citing to their opposition to the U.S. Automaker's motion, Plaintiffs maintain that state procedural provisions do not apply to federal actions. [Doc. 220 at 44]. But as detailed below, *see* § V.B.4.b., this challenge fails. Thus, the

[45] Plaintiffs assert claims under several California consumer protection statutes. Because the Airbag Module Defendants cite to California Civil Code § 1782 for the applicable notice requirement, [Doc. 178-1 at 44 n.18], the Court perceives their challenge to be limited to Plaintiffs' claim for violations of the CLRA (i.e., Count 5(d)). This is because the notice provision of § 1782 attaches only to actions pursuant to Title 1.5 of the California Civil Code (i.e., the CLRA, Cal. Civ. Code §§ 1750–1784). *See* Cal. Civ. Code § 1782(a).

Court takes up Plaintiffs' alternative argument that they satisfied applicable pre-suit notice requirements. *Id.* With the exception of the notice requirements of California (as to the CLRA claim), the Airbag Suppliers have failed to show that dismissal of the challenged claims is warranted for lack of timely or effective notice.

First, as to timing, the Airbag Suppliers contend that Plaintiffs sent untimely, *post-suit* notice letters to the Airbag Suppliers rather than the required *pre-suit* notice letters and, thus, Plaintiffs' statutory consumer protection claims for the above-listed states should be dismissed. Plaintiffs counter that they cured any defect in their notice letters by providing Defendants with sufficient notice before they filed the SAC on August 28, 2023. *See Chen v. Wow Rest. TH LLC*, 2023 WL 3092618, at *4 (M.D. Fla. Apr. 26, 2023) (finding that the plaintiffs cured their failure to provide timely pre-suit notice "by providing sufficient notice prior to the filing of their amended complaint"). However, *Chen*, on which Plaintiffs rely, concerned notice under the Florida Minimum Wage Act, which is not at issue here. *See id.* at *3-4. Rather *Carder* is on point. There, the court rejected the plaintiffs' argument that they complied with the statutory notice requirement of the GFBPA, the same statute Plaintiffs invoke here, by giving the required notice more than 30 days before they amended their complaint. *Carder*, 558 F. Supp. 3d at 1328. The court deemed the post-suit notice insufficient "because the Consolidated Amended Complaint did not constitute a new lawsuit; instead, it was an

amendment of the original complaint[.]"[46] *Id.* Here, although Plaintiffs' pre-suit notice to the Airbag Defendants is untimely under the GFBPA, this does not warrant the dismissal of the GFBPA claim because, as discussed below, Plaintiffs successfully show that they are excused from providing pre-suit notice under Georgia law.

Not all courts require that a pre-suit notice be filed before suit is commenced. For example, under the more recent line of cases applying CLRA's notice requirement, courts dismiss CLRA claims with leave for the plaintiff to amend the complaint after complying with the notice requirement. *See, e.g., Oxina v. Lands' End, Inc.*, 2015 WL 4272058, at *4 (S.D. Cal. June 19, 2015). The Airbag Suppliers provide no authority analyzing the notice requirement under the relevant consumer protection statutes of Alabama, Indiana, Maine, Massachusetts, Texas, West Virginia, and Wyoming to support their argument for the dismissal of Plaintiffs' claims for the lack of pre-suit notice. As such, considering that the result of a failure to provide timely notice for violations of

[46] On reconsideration, the court concluded that the GFBPA claim did not fail for lack of notice because, as counsel belatedly discovered, one of the Georgia plaintiffs satisfied the pre-suit notice requirement by providing the defendant notice before she asserted her GFBPA claim for the first time through the amended complaint. *Carder v. Graco Children's Prods., Inc.*, 2021 WL 9721143, at *2 (N.D. Ga. Nov. 18, 2021). Here, Plaintiffs do not contend that they asserted their statutory consumer protection claims for the above-mentioned states for the first time in the SAC. Indeed, Plaintiffs asserted the relevant consumer protection claims in the "Consolidated Class Action Complaint," [Doc. 94], their first amended Complaint, which they filed five days after providing notice to all the Airbag Suppliers, with the exception of the ZF Defendants.

consumer protection laws is not uniform across all states, the Airbag Suppliers have failed to carry their burden of establishing that Plaintiffs' consumer protection claims under Alabama, Indiana, Maine, Massachusetts, Texas, West Virginia, and Wyoming necessarily fail for lack of timely notice. Thus, their dismissal challenge fails.

To the extent they seek to dismiss Plaintiffs' CLRA claim with prejudice for failure to provide timely notice, this challenge also fails in view of *Oxina's* approach. Moreover, although Plaintiffs assert their CLRA claim against all Defendants, they seek money damages only from ARC, Audi, Ford, and Airbag Supplier Joyson. SAC II ¶ 768. As to remaining Defendants, Plaintiffs seek injunctive relief only. *Id.* ¶ 769. Neither the Airbag Suppliers nor Plaintiffs brief whether the relief sought affects CLRA's pre-suit requirement. However, a plain reading of § 1782(a) shows that the CLRA requires notice only for "an action for damages," and allows consumers to sue for injunctive relief without complying with the pre-suit notice requirement, § 1782(d). Thus, the Airbag Suppliers' timeliness challenge fails altogether as to Airbag Suppliers except Joyson Safety System. And the argument for the dismissal of the CLRA claim against Joyson Safety System falls flat under *Oxina*'s approach. Plaintiffs sent Joyson Safety System their notice letter on June 23, 2023, more than 30 days *before* filing the SAC. [Doc. 178-14 at 7]. This rendered notice timely for CLRA purposes. Accordingly, dismissal of the challenged claims is not warranted for Plaintiffs' failure to provide timely notice.

Second, as to the adequacy of the notice, the Airbag Suppliers argue that Plaintiffs' notice letters were deficient in that they contained only "cursory and collective allegations regarding purported omissions and concealment" by all Airbag Suppliers, described injuries in "general terms," and failed to identify all members of the class on whose behalf Plaintiffs sent the notice letters. Plaintiffs have the better argument. They explain that the notice letters (1) detailed the Inflator Defect; (2) explained that Plaintiffs were deprived of the benefit of the bargain in purchasing or leasing their vehicles; (3) specify the sources of the Airbag Suppliers' knowledge; (4) allege that these Defendants failed to disclose and actively concealed the dangers and risks of the Defect; and (5) inform them that they had, thus, violated consumer protection laws across all U.S. jurisdictions.[47] [Doc. 220 at 45]. Plaintiffs' notice letters reasonably describe the Airbag Suppliers' allegedly unfair or deceptive practice and Plaintiffs' injuries.[48]

[47] The Airbag Module Defendants assert, and Plaintiffs do not dispute, that the Court may consider Plaintiffs' notice letters [Doc. 178-4] because they are central to Plaintiffs' claims and their content is undisputed. [Doc. 178 at 45 n.19 (quoting *Lockwood v. Beasley*, 211 F. App'x 873, 877 (11th Cir. 2006))]. The Court agrees.

[48] The Airbag Suppliers contend that the Texas consumer protection statute required Plaintiffs to include the amount of damages. But as Plaintiffs counter—and the Airbag Suppliers fail to rebut, [*see* Doc. 246 at 28]—the failure to specify the amount of damages does not warrant dismissal of the Texas consumer protection claim. Rather, the remedy is "abatement of the action for the statutory notice period, but these Defendants have "waived their objection to the lack of notice by failing to make a timely request for abatement." *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 347 (D.N.J. 2014) (citation modified).

Like the Airbag Suppliers, the U.S. Automakers also challenge the timeliness of Plaintiffs' pre-suit notice. They argue that the SAC does not identify any pre-suit notice and instead alleges, in a conclusory manner, only that Plaintiffs provided timely notice. [Doc. 181-1 at 52]. As a result, they claim, the Court should dismiss Plaintiffs' Alabama, California, Georgia, and Massachusetts[49] statutory consumer protection claims.

Plaintiffs respond that they are excused from providing pre-suit notice under Alabama, Georgia, and Massachusetts law because the SAC does not allege that any Automaker, except for PCNA maintains a place of business or holds assets in these states. The U.S. Automakers fail to rebut this argument, signaling their lack of opposition. *See Kramer v. Gwinnett Cnty., Ga.*, 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) (explaining that, in accordance with the Court's Local Rule 7.1B, "a party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."), *aff'd*, 116 F. App'x 253 (11th Cir. 2004).

Under Georgia law, the pre-suit notice requirement does "not apply if the prospective respondent does not maintain a place of business or does not

[49] The U.S. Automakers also argue for the dismissal of Plaintiffs' Ohio statutory consumer protection claim for the failure to adequately allege pre-suit notice. [Doc. 181-1 at 52]. This time around, the U.S. Automakers' challenge to the OCSPA claim emphasizes the SAC's failure to allege *when* Plaintiffs gave the required notice. Having dismissed Plaintiffs' class-wide claim for a violation of the OCSPA (Count 36(c)) for the lack of allegations going to notice, *supra* § VI.B.2.e., the Court does not address this alternative argument.

keep assets within the state." O.C.G.A. § 10-1-399. Because the SAC does not allege that any Defendant, other than PCNA, maintains a place of business in Georgia or keeps asserts here, Plaintiffs were not required to provide Defendants, other than PCNA, with pre-suit notice before asserting their GFPBA claim. Thus, except as applied to PCNA, the U.S. Automakers' do not prevail in their effort to dismiss Plaintiffs' GFPBA claim based on the SAC's failure to allege facts showing compliance with Georgia's pre-suit notice requirement fails. For the same reason, the Airbag Suppliers' challenge to the pre-suit notice for Plaintiffs' GFPBA claim fails.

The U.S. Automakers' challenge does succeed as to the GFPBA clams against PCNA. First, because the SAC alleges that PCNA maintains its principal place of business in Georgia, SAC I ¶ 123, Plaintiffs were required to provide pre-suit notice to PCNA. Second, Plaintiffs contention that the SAC indicates that Plaintiffs provided pre-suit notice "*before* filing the [SAC] on June 28, 2023," [Doc. 221 at 61], is unavailing. But, as discussed above, a post-suit notice, albeit provided before an amendment to the complaint, does not meet Georgia's pre-suit notice requirement. *See Carder*, 558 F. Supp. 3d at 1328. Accordingly, Plaintiffs' GFPBA claim against PNCA fails for lack of timely pre-suit notice.[50]

[50] The U.S. Automakers have secured the dismissal of Plaintiffs' GFBPA claim in its entirety. *Supra* § V.B.2.b.ii. Nevertheless, the Court has addressed this additional basis for the dismissal of the GFPBA claim by the U.S. Automakers and the Airbag Suppliers. Although the claim survives this

The pre-suit notice requirements of Alabama and Massachusetts track those of Georgia. *See Bolling v. Mercedes-Benz USA, LLC*, 2025 WL 83826, at *9 (N.D. Ga. Jan. 10, 2025) ("*Bolling II*") ("[T]here is only a pre -suit notification requirement [under Alabama law] if [the defendant] maintains a place of business or keeps assets within the state of Alabama." (citing Ala. Code § 8-19-10(e))); *Lima v. Post Consumer Brands, LLC*, 2019 WL 3802885, at *8 (D. Mass. Aug. 13, 2019) ("The Massachusetts requirement that a plaintiff send a pre-suit demand letter does not apply, however, where 'the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth.'" (quoting Mass. Gen. Laws ch. 93A, § 9(3))). And because no Defendant allegedly maintains a place of business in these states or keep assets there, Plaintiffs were also not required to provide pre-suit notice to Defendants before asserting statutory consumer protection claims under Alabama and Massachusetts law.

That leaves the U.S. Automakers' challenge to the adequacy of the SAC's pre-suit notice allegations under California law. The U.S. Automakers cite one case applying the CLRA and one case applying the UCL to extend the argument that the Court should dismiss Plaintiffs' CLRA and UCL claims with prejudice for lack of pre-suit notice. [Doc. 181-7 at 20]. First, as discussed above, Plaintiffs were not required to give pre-suit notice under the CLRA to

challenge as to all Defendants except PCNA, it remains subject to dismissal as to all Defendants, for the reason discussed in Section V.B.2.b.ii.

those Defendants against whom they seek only injunctive relief. Cal. Civ. Code § 1782(d). Second, dismissal of the CLRA claim against Defendants from whom Plaintiffs seek money damages is not warranted because, as discussed above, the more recent line of cases take a more flexible approach to the CLRA's pre-suit notice requirement, considering the requirement satisfied where the plaintiff provides notice 30 days before filing an amended complaint. *See Oxina*, 2015 WL 4272058 at *4. Here, the SAC alleges that Plaintiffs gave ARC, Audi, and Ford notice of issues raised in their CLRA claim, indicating that they gave notice sometime before filing the SAC. SAC II ¶ 768. The Consolidated Class Action Complaint, i.e., Plaintiffs' First Amended Complaint, also alleges that Plaintiffs provided ARC, Audi, and Ford notice, under § 1782, of the issues raised in their CLRA claim. FAC II ¶ 763 [Doc. 94-1]. Viewed in the light most favorable to Plaintiffs, the pleadings show that Plaintiffs had given notice to ARC, Audi, and Ford at least by the filing of the FAC, i.e., by June 28, 2023, more than 30 days before they filed the SAC. Accordingly, dismissal of the CLRA claim for untimely notice is not warranted.

As to the notice requirement under the UCL, the U.S. Automakers' authority does not address dismissal of UCL claims for failure to allege pre-suit notice. *See Milman v. FCA U.S., LLC*, 2018 WL 5867481, at *14 (C.D. Cal. Aug. 30, 2018) (dismissing UCL claims for failure to allege sufficient facts supporting fraudulent, unfair, and unlawful practices). Thus, the U.S. Automakers have "not cited any authority holding that the pre-suit notice

required by section 1782 (which is a specific provision of the CLRA) is mandated before filing suit under the UCL[.]" *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1004 (E.D. Mich. 2017) ("*In re Gearshift Litig. II*"). In sum, the statutory consumer protection claims that the Airbag Suppliers and the U.S. Automakers challenge do not fail on the pre-suit notice grounds addressed in this section.

#### h. Activity Governed By a Regulatory Regime

According to the Airbag Suppliers, Plaintiffs' consumer protection claims under the relevant statutes of Connecticut (Count 7(c)), Massachusetts (Count 22(c)), Michigan (Count 23(c)), and Tennessee (Count 43(c)) cannot proceed because these statutes exempt claims that concern activity governed by a regulatory regime. [Doc. 178-1 at 43]. Relying on the same reason, the U.S. Automakers place in their crosshairs Plaintiffs' statutory consumer protection claims for Michigan (Count 23(c)) and Oklahoma (Count 37(c)). [Doc. 181-1 at 50–51]. Both movants generally maintain that the automotive industry, specifically the manufacture and sale of automobiles, is heavily regulated. [Docs. 178-1 at 43; 181-1 at 51]. But both movants pay only lip service to this argument, and the Court declines to dismiss claims at this early stage based on such an underdeveloped position. "An analysis of whether claims are barred by the exemption requires the identification and careful consideration of the specific statute that purports to authorize the transaction at issue." *GM Air Conditioning*, 406 F. Supp. 3d at 642-43. The movants have

not provided the Court with the information necessary to it to undertake such an analysis. Their position may well carry the day; but this is not that day.

**i. Statute Not Applicable to Component Suppliers**

Plaintiffs cannot maintain their claim under the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-10, et seq., against the Airbag Suppliers. The Dealers Act seeks to hold liable "any manufacturer, . . . distributor, . . . or motor vehicle dealer" whose "unfair or deceptive acts or practices." S.C. Code Ann. §§ 56-15-30(a), 40(B). The Act defines "manufacturer" as "any person engaged in the business of manufacturing or assembling new and unused motor vehicles." Id. § 51-15-10(b). Plaintiffs contend, without any explanation or authority, that this definition of "manufacturer" "plausibly extends to [the Airbag Module] Defendants under the present facts." [Doc. 220 at 44]. The Airbag Suppliers, according to the SAC, are Tier 1 suppliers in the airbag supply chain who "supplied completed airbag modules to the Automakers, i.e., major auto manufacturers and distributors, who incorporated the modules into the completed Class Vehicles." SAC I ¶ 263. Under "the present facts," the Court remains unpersuaded that the Airbag Suppliers "are in the business of manufacturing or assembling new and unused motor vehicles" such that they qualify as manufacturers to whom the Dealer's Act applies. Accordingly, the Court GRANTS the Airbag Suppliers' motion, [Doc. 178], to the extent that it DIMISSES WITH PREJUDICE Plaintiffs' claim against the Airbag Suppliers for the violation of the Dealers Act (Count 41(d)).

#### j. Adequate Legal Remedies Bar Equitable Relief Claims

According to the U.S. Automakers, the availability of an adequate remedy at law through their other claims bars Plaintiffs' claims for equitable relief under the consumer protection statutes of California (Counts 5(d)–(f)), Georgia (Count 11(d)), and New York (Counts 33(c)–(d)). [Doc. 181-1 at 51]. They also argue that Plaintiffs cannot maintain their statutory consumer protection claim under Alabama law (Count 1(c)) because the statute prohibits the claim when asserted in conjunction with other fraud-based claims.

Because Plaintiffs cannot assert a private right of action for a violation of the GFBPA (Count 11(d)) in the absence of allegations indicating actual damages, *supra* § VI.B.2.b.i., their claim fails in its entirety. Thus, the Court does not address the alternative argument calling for the dismissal, in part, of the GFBPA claim to the extent that it seeks equitable relief.

Citing Alabama law, Plaintiffs maintain that it is permissible to assert claims in the alternative. [Doc. 221 at 59]. They also contend that remedies under California's UCL allows for the coexistence of claims seeking legal and equitable remedies. [*Id.* at 60]. And Plaintiffs distinguish the case that the U.S. Automakers rely on for New York law, *El Toro Grp., LLC v. Bareburger Grp., LLC*, 141 N.Y.S.3d 3, 4–5 (N.Y. Sup. Ct. App. Div. 2021), as one involving recission and not injunctive relief.

Regarding California's consumer protection statutes, the Ninth Circuit has held that "traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a

party requests [equitable relief] under the UCL and CLRA in a diversity action." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). However, "[m]any . . . courts post-*Sonner* . . . have held that money damages are an inadequate remedy for the future harm only remediable by injunctive relief." *Linton v. Axcess Fin. Servs., Inc.*, 2023 WL 4297568, at *3 (N.D. Cal. June 30, 2023) (citation modified) ("Because retrospective monetary damages will not prevent the future harm only remediable by an injunction ordering [the defendant] to stop issuing loans with unfair interest rates, the Court declines to extend *Sonner*'s inadequate-remedy-at-law requirement to [the plaintiff's] injunctive relief claim."). Here, as Plaintiffs allude, [Doc. 221 at 60], the SAC seeks to enjoin Defendants' "from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles." SAC II at § IX ¶ D. The U.S. Automakers do not address the adequacy of legal remedies in view of the requested injunctive relief aimed at preventing alleged future consumer deception. Thus, their effort to dismiss the California statutory consumer protection claims for equitable remedies fails.

For the same reason, the U.S. Automakers' argument that New York law requires the dismissal of statutory consumer protection claims to the extent that they seek equitable remedies also fails. Although *El Toro Grp.*, 141 N.Y.S.3d at 4–5, indicates that New York law requires the dismissal of a "cause of action [that] seeks the equitable remedy of rescission" where "plaintiffs have a complete and adequate remedy at law," the U.S. Automakers do explain how

legal remedies are complete and adequate when Plaintiffs also request an injunction prohibiting allegedly deceptive conduct in the future.

Last, "there is a split among the district courts sitting within the Eleventh Circuit—and even within the Northern District of Alabama—over whether a plaintiff may simultaneously maintain common law fraud claims and claims under ADTPA." *Morris v. Walmart Inc.*, 2020 WL 470287, at *6 (N.D. Ala. Jan. 29, 2020). The Court agrees with *Morris* that "decisions permitting both claims at the pleading stage have the better argument, because although the plain language of the [ADTPA's] savings clause requires a plaintiff to elect one or the other remedy, it does not specify *when* in the proceedings the plaintiff must do so." *Id.* at *6 (citation modified) (emphasis in original).

**k. Injunctive Relief Not Available**

The Airbag Suppliers correctly argue that Plaintiffs' GUDTPA claim (Count 11(c)) fails because Plaintiffs do not allege that they are likely to suffer future harm from Defendants' allegedly deceptive practices. [Doc. 178-1 at 44]. GUDTPA "offers only injunctive relief where the plaintiff has established a likelihood of future damage, but it does not address past harm." *Collins v. Athens Orthopedic Clinic*, 356 Ga. App. 776, 779 (2020). But the harm from Defendants' deceptive practices has already occurred—i.e., Plaintiffs bought vehicles they would not have otherwise bought or paid more for the vehicles than they would have if they had known of the Inflator Defect. *See* SAC II ¶ 1235. Although the SAC alleges that the Class Vehicles remain unsafe, *see*

SAC II ¶ 1236, Plaintiffs fail to explain how the injunctive relief they seek—"[a]n order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles," [Doc. 220 at 43 (quoting SAC II § IX(D))]—addresses any future harm to them. Plaintiffs do not allege that they intend to buy a Class Vehicle in the future.[51] *See Callen v. Daimler AG*, 2021 WL 4523436, at *6 (N.D. Ga. Oct. 4, 2021) (dismissing GUDPTA claim for failure to allege future harm where the plaintiff complained that the defendant denies the defect but did not allege that she "intends to purchase a Class Vehicle in the future or that she ever has paid, or intends to pay, to replace" the defective part); *Buske v. Owens Corning (Corp.)*, 2017 WL 1062371, at *3 (N.D. Ga. Mar. 21, 2017) ("Plaintiffs have not alleged that they intend to purchase the [defective product] in the future. Thus, they will not benefit from an injunction relating to the Defendants' marketing scheme.").

[51] In addition, the SAC requests that the Court direct Defendants to "permanently, expeditiously, and completely repair the Class Vehicles" and to fund a program for payment of out-of-pocked expenses and damages claims associated with the Defect. SAC II at 1222–23. To the extent that Plaintiffs may cast this as a request for injunctive relief to address future harm, the request "is practically indistinguishable from an order that [Defendants] pay Plaintiffs money," but "a plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 482 (N.D. Cal. 2014) (citation modified); *see Buske*, 2017 WL 1062371 at *3 (finding that plaintiffs could not seek injunctive relief in the form of an order requiring the defendant to "remove and replace" the defective product because the requested money damages would sufficiently compensate the plaintiffs).

Because Plaintiffs have not alleged "a future harm caused by the unfair practice," their GUDTPA claim fails. *Collins*, 356 Ga. at 779. [52]

On the other hand, Plaintiffs' claims for violation of the North Dakota Consumer Fraud Act (NDCFA), N.D. Cent. Code § 51-15-02, *et seq.*, and the Oklahoma Consumer Protection Act (OCPA), Okla. Stat. Ann. tit. 15, § 751, *et seq.*, survive the U.S. Automakers' effort to dismiss based on the argument that these statutes do not confer a private right of action for injunctive relief. [Doc. 181-1 at 50].

The U.S. Automakers cite to § 51-15-09 of the NDCPA in support of their argument. However, that section simply provides that, except for a specified deceptive act, which is not relevant here, chapter 51-15 "does not bar any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter." Nothing in this section indicates that the statute bars a private action for injunctive relief. In their reply the U.S. Automakers cite § 51-15-07 to argue that this section specifies that injunctive relief is available to the attorney general. [Doc. 249 at 35]. But the fact that the NDCPA specifies that the attorney general may seek injunctive relief to address an alleged violation of

[52] Plaintiffs do allege that they would buy *a* vehicle of their Automaker's brand in the future if Defendants' representations about the vehicle were accurate." *See* SAC I ¶¶ 184–86. But they do not specify that they intend to buy a Class Vehicle. In fact, Plaintiff Francine Lewis, who leased a new Volkswagen Jetta in 2019, bought the vehicle off the lease in October 2022, after she joined a California member case. *Id.* ¶ 189.

the statute does not in itself serve to bar a private party from doing so. And the lone case on which the U.S. Automakers rely, [Doc. 249 at 35], does not authoritatively address whether the NDCFA provides a private cause of action for injunctive relief. *See Chapman v. GM LLC*, 531 F. Supp. 3d 1257, 1302–03 (E.D. Mich. 2021) (considering the plaintiffs' failure to respond to the argument that the statute does not allow claims for injunctive relief as a concession and dismissing the North Dakota statutory consumer protection claim, among others, based on that concession).

The U.S. Automakers also fail to support their argument for the dismissal of the OCPA claim. First, Plaintiffs not only seek injunctive but also monetary relief under the OCPA. SAC II ¶ 3147. The U.S. Automakers do not acknowledge this fact and appear to seek the dismissal of the claim in its entirety. Second, the case that the U.S. Automakers rely on, *Tibbetts v. Sight 'n Sound Appliance Ctrs., Inc.*, 77 P.3d 1042 (Okla. 2003), *as corrected* (Sep. 30, 2003), "does not support [the U.S. Automakers'] argument that injunctive relief categorically is disallowed by the statute" in private actions. *Francis,* 504 F. Supp. 3d at 692. Accordingly, the U.S. Automakers' argument for the dismissal of Plaintiffs' OCPA claim on this basis fails.

In sum, the Airbag Suppliers successfully show that the dismissal of Plaintiffs' GUDTPA claim (Count 11(c)) is warranted for lack of foreseeable harm, but the U.S. Automakers fail to show that the dismissal of Plaintiffs'

NDCPA (Count 35(c)) and OCPA (Count 37(c)) claims is warranted because these statutes prohibit injunctive relief claims by private parties.

**Overall**, the Court **GRANTS** the U.S. Automakers' motion, [Doc. 181], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs' fraud-based statutory consumer protection claims against the Automakers under the law of Arkansas (Count 4(d)), Georgia (Count 11(c) as to Plaintiffs who acquired used Class Vehicles from sources unaffiliated with an Automaker), and Ohio (Count 36(c)). It also **GRANTS** the Airbag Suppliers' Motion, [Doc. 178], to the extent that it **DISMISSES WITH PREJUDICE** Plaintiffs statutory consumer protection claims against the Airbag Suppliers for Arizona (Count 3(c)), Arkansas (Count 4(c)), Georgia (Counts 11(c), (d)), Colorado (Count 6(c)), Connecticut (Count 7(c)), Delaware (Counts 8(c), (d)), Idaho (Count 13(c)), Illinois (Count 14(c)), Kansas (Count 17(c)), Maryland (Count 21(c)), Michigan (Count 23(c)), Nevada (Count 29(c)), New Jersey (Count 31(c)), New York (Counts 33(c), (d)), North Carolina (Count 34(c)), Oregon (Count 38(c)), Pennsylvania (Count 39(c)), South Carolina (Counts 41(c), (d)), Texas (Count 44(c), Utah (Count 45(c)), Virginia (Count 47(c)), and Wisconsin (Count 50(c)).[53]

[53] Plaintiffs seek to withdraw their claims under the consumer protection statutes of Illinois and Wisconsin. [Doc. 220 at 41 n.15]. But the proper way to withdraw a claim is through an amended complaint. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004) ("A plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a)[.]" (quoting 8 *Moore's Federal Practice* § 41.21[2], at 41–32)). Plaintiffs have not sought to amend their pleading to eliminate these claims, and because Plaintiffs agree that they cannot maintain their claims against the Airbag Module Defendants for violations of the Illinois

For the same reason that Plaintiffs' GUDTPA claim (Count 11(c)) fails as to the Airbag Suppliers, it also fails as to the other Defendants. Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' GUDTPA claim (Count 11(c)) as to all Defendants.

#### 4. Plausibility of Express Warranty Breach Claims[54]

Plaintiffs allege that the Automakers "issued an express written warranty" that "[t]he Class Vehicles would be free of defects in materials and workmanship at the time of sale" and that "[t]he Class Vehicles were safe and reliable, and their airbags would function properly in the event of a crash."

---

and Wisconsin consumer protection statutes, the Court grants the Airbag Module Defendants' motion to dismiss on this issue.

[54] The U.S. Automakers attach to their motions their Limited Warranties from one of more of the relevant years. [*See e.g.*, Docs. 180-2–13 (Hyundai and Kia Limited Warranties); 189-1 (GMC Limited Warranties); 183-2 (BWM Limited Warranty)]. Both sides agrees that, under the incorporation by reference doctrine, the Court may consider a document not included with Plaintiffs' pleadings if it is "referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity." [*E.g.*, Docs. 223 at 10 (quoting *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.,* 910 F.3d 1186, 1189 (11th Cir. 2018)); 243 at 6]. Plaintiffs do not contest that the SAC refers to the Limited Warranties and that the Warranties are central to their express warranty breach claims. They, however, argue that the Court should not consider Limited Warranties because they are incomplete and Plaintiffs have not had the opportunity to test their authenticity. [*E.g.*, Docs. 222 at 19–11; 223 at 10–11; 224 at 10; 227 at 10–11]. This is not an effective challenge to authenticity. As several U.S. Automakers point out, Plaintiffs have access to the warranty booklets in their Class Vehicles and yet they do not argue that the Warranties that the U.S. Automakers supply say something different or are inapplicable. And while the U.S. Automakers attach only the Limited Warranties section of the vehicle booklet, the applicable Limited Warranty sections are included in their entirety. Nevertheless, because the SAC provides the alleged express warranty terms, the Court perceives no need to consider the Limited Warranties the Automakers supply.

*E.g.*, SAC II ¶¶ 440, 513, 582, 720, 973, 1201, 1362, 1433, 1738, 2153, 3384, 4112. They assert that the Automakers breached the warranty because the Class Vehicles have the Inflator Defect. *E.g., id.* ¶¶ 442, 515, 722, 975, 1203, 1364, 1435, 1740, 2155, 3386, 4114. The U.S. Automakers advance three reasons why Plaintiffs' claims for the breach of express warranty fail. The first of these reasons is that the express warranty terms that the SAC identifies fail to cover the alleged Defect. As discussed below, this argument is dispositive. Thus, the Court does not address the U.S. Automakers' additional reasons for dismissal.

The U.S. Automakers contend that the express warranty that a vehicle is "free of defects in materials and workmanship" is limited to manufacturing defects and does not extend to design defect. [Doc. 181-1 at 27; *see also e.g.*, Docs. 182-1 at 10; 182-1 at 10–11]. Plaintiffs respond generally that discovery regarding "Plaintiffs' *actual* warranty terms or their validity" is necessary and that the Court should not consider any warranty documents the Automakers submit at this stage. [Doc. 221 at 28; *see also e.g.*, Doc. 225 at 9–10]. They also specifically respond to the U.S. Automakers' argument in three parts. First, Plaintiffs assert that "courts have assessed the Automakers' warranty terms and concluded they do cover design defects." [Doc. 221 at 29]. Second, they argue that even if the warranty was limited to manufacturing defects, their claims survive because the Automakers characterize the Defect as a "manufacturing issue" and, thus, it would be covered by the express warranty.

[*Id.* at 29–30 (quoting Doc. 181-1 at 2 n.3)]. Third, Plaintiffs point out that no design defect exclusion applies to the Automakers warranty that "the Class Vehicles were safe and reliable, and their airbags would function properly." [*Id.* at 29].

The question before the Court is whether the SAC alleges plausible claims for breach of an express warranty. The SAC itself characterizes the alleged terms of the "express written warranty" that the Automakers issued. In doing so, the SAC casts the first applicable term as warrantying a vehicle "free of defects in material and workmanship." But courts deem such a warranty to encompass manufacturing defects and not design defects because "a design defect cannot also be a defect in material and workmanship." *Bruce Martin Const., Inc. v. CTB, Inc.*, 735 F.3d 750, 754 (8th Cir. 2013). "Were it otherwise, a warranty for 'material and workmanship' would obviate the need for a design warranty entirely." *Id.* (concluding that an express warranty that covered "defects in material or workmanship" was "fatal" to a warranty claim based on a design defect); *see, e.g.*, *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1286 (N.D. Ga. 2018) (Merecedes warranty covering repairs to "correct defects in *material or workmanship*" excluded coverage for design defects); *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.*, 508 F. App'x 180, 185 (3d Cir. 2012) (concluding, under Pennsylvania law, that the "plain meaning of the 'material and workmanship' warranty, among other things, did not warranty design defects); *Coba v. Ford Motor Co.*, 932 F.3d 114, 123 (3d

Cir. 2019) ("[U]nder New Jersey law, a warranty that limits its coverage to defects in 'materials' and 'workmanship' does not, without more, apply to defects in 'design.'); *Rollolazo v. BMW of N. Am., LLC*, 2017 U.S. Dist. LEXIS 181157, at *30 (C.D. Cal. Feb. 3, 2017) (dismissing express warranty claims brought under the laws of several states because an express warranty that only covers "defects in materials and workmanship" does not support a warranty breach claim over a design defect); *Flores v. FCA US LLC*, 2021 U.S. Dist. LEXIS 55191, at *21, 25 (E.D. Mich. Mar. 24, 2021) (dismissing warranty breach claim over a design defect where the express warranty allegedly "only covers defects in 'material, workmanship or factory preparation'"). As alleged, the "material or workmanship" warranty term that the SAC characterizes covers material defects but not design defects.[55]

Plaintiffs' argument that other courts have concluded that the Automakers' warranties cover design defect is unavailing. There is no commonality between the warranty terms construed in the cases Plaintiffs cite and the "material and workmanship" warranty term as characterized in the SAC. *See Martell v. GM LLC*, 537 F. Supp. 3d 1192, 1200–05 (D. Or. 2021) (applying canons of construction and concluding that the presence of "materials and workmanship" in GM's warranty that specified coverage of "repairs to correct any vehicle defect, not slight noise, vibrations, or other

[55] The Court perceives no need to wait for discovery to elucidate the terms of the express warranty where the SAC identifies the applicable governing term.

normal characteristics of the vehicle related to materials or workmanship" did not serve to exclude design defects, in part, because a plain reading of the text showed that "materials and workmanship" did not modify "any vehicle defect" but rather modified the phrase "other normal characteristics"); *McKee v. GM LLC*, 376 F. Supp. 3d 751, 757 (E.D. Mich. 2019) (same); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1232 (S.D. Fla. 2014) (concluding that a Ford new vehicle warranty specifying that "[d]efects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period" and not exempting design defects from the "what is not covered" section did not exclude coverage for design defects); *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (same).[56] Thus, the Court is not persuaded that the warranty term as alleged in the SAC (i.e., a warranty that the vehicle "would

[56] Plaintiffs also rely on *Patrick v. Volkswagen Grp. of Am., Inc.*, 2020 WL 3883275, at *6 (C.D. Cal. Mar. 5, 2020), for the court's application of a Volkswagen warranty. But there, the court allowed the plaintiff's breach of express warranty claim to proceed under a warranty provision covering "any repair to correct a defect in manufacturer's material or workmanship (i.e., mechanical defects)" because the plaintiff alleged both a design *and a manufacturing defect*. *Patrick*, 2020 WL 3883275 at *6. And in *Parrish v. Volkswagen Grp. of Am., Inc.*, 463 F. Supp. 3d 1043, 1066 (C.D. Cal. 2020), the court declined to dismiss the breach of express warranty claim, perceiving an "open issue" under Pennsylvania law as to whether a "materials and workmanship" warranty covered design defects.

be free of defects in material and workmanship at the time of sale"), *see, e.g.*, SAC II ¶ 440, covers a design defect.

This conclusion dooms Plaintiffs' express warranty breach claims based on the "material and workmanship" warranty term because the SAC unambiguously alleges that the Inflator Defect is a design defect. Plaintiffs seek to escapes this conclusion by arguing that while they "primarily advance a defective design theory," they need not "'commit to a single theory' of origin before discovery." [Doc. 221 at 30]. While it may be that Plaintiffs need not commit to a given theory in their pleading, the problem is that they have undoubtedly done so. Not only does the SAC fail to indicate that Plaintiffs claim a manufacturing defect, but it also shows that they *only* advance a defective design theory. *See, e.g.*, SAC I ¶¶ 7, 11, 283, 297, 471 (alleging that the NHTSA found a design defect; that the Automakers refuse to recognize the "fleet-wide design defect"; that the ARC airbag inflators "had a serious design defect or defects"; that the ARC inflators' "design is what causes the ruptures"; that "[t]hese facts strongly suggest a systemic design defect in the inflators rather than a manufacturing defect occurring at one location, for one lot, for a short period of time, due to a non-conforming assembly process" and that Defendants violated consumer protection laws by misrepresenting that "defectively designed" vehicles as safe). Having committed to the theory that the ARC airbag inflators are defectively designed, Plaintiffs must bear the outcome. They cannot maintain a claim for breach of the "material and

workmanship" warranty term based on the presence of a design defect. Nor can they escape this outcome by pointing to the Automakers' characterization of the Inflator Defect as a "manufacturing issue." [Doc. 221 at 30]. Regardless of how Defendants may choose to perceive it, what matters is that the SAC characterizes the "issue" as a design defect. Thus, as plead, the Inflator Defect falls outside the scope of the "material and workmanship" express warranty.

Plaintiffs correctly point out that the SAC also alleges that the Automakers warranted that the vehicles "were safe and reliable, and their airbags would function properly in the event of a crash." Generally, "'[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty.'" *Barnes ex el. Gibson v. Medtronic, Inc.*, 2021 U.S. Dist. LEXIS 159341, at *11 (N.D. Ga. Aug. 24, 2021) (quoting O.C.G.A. § 11-2-313). While the SAC alleges that the Automakers extended the "safe and reliable" warranty in writing, it fails to plead the source of the warranty. [Doc. 249 at 18]. For example, it does not indicate that the warranty was within a new vehicle warranty booklet, was present on the window sticker of the vehicles, or was included in the Automakers' promotional materials. Not only does this deprive the Automakers of notice of the source of the warranty, the SAC's bald allegation regarding the "safe and reliable" warranty fails to identify "any specific affirmations or promises to support a claim for breach of an express warranty." *Stich v. Smith & Nephew, Inc.*, 2021 U.S. Dist. LEXIS 94923, at

*19 (D.N.J. May 19, 2021). In *Stich*, the plaintiff alleged that the defendant "expressly warranted that their Product was safe and effective and fit for use by consumers . . . [and] did not create the risk of or produce dangerous side effects[.]" *Id.* at *18. The court dismissed the express warranty claim, concluding that the plaintiff "fail[ed] to allege the actual language or source of any alleged warranty." *Id.* at 18-19. Similarly, here, the SAC alleges that the Automakers warranted that their vehicles were "safe and reliable" and that the airbags would work as intended. But as in *Stich*, these conclusory assertions are insufficient to support a claim for breach of express warranty. *Cf., Cassidy v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 20324, at *12-13 (E.D. La. Feb. 19, 2016) (concluding that the complaint "sufficiently identified an express warranty" because the allegations about coverage pointed to the source of the express warranty at issue); *Richards v. Johnson & Johnson, Inc.*, 2018 U.S. Dist. LEXIS 210184, at *10 (N.D.N.Y. Dec. 13, 2018) (finding that the complaint sufficiently "outline[d] the terms of the express warranty and identif[ied] its sources" by alleging that the defendant warranted that the product had certain specified characteristics in its product inserts, instructions for use, and sales pamphlets and advertisements).

The U.S. Automakers argue that statements of "safety" and "reliability" cannot serve as warranties because they are non-actionable puffery, [Doc. 249 at 18]. They also contend that the express warranty claims fail because the SAC does not allege that the Inflator Defect manifested during the warranty

period and because Plaintiffs did not present their vehicles for repair within the warranty term. [*Id.* at 19–21; *see also* Doc. 242 at 4]. The Court does not address these alternative grounds for the dismissal of the express warranty breach claims.

**Overall,** the Court concludes that Plaintiffs' express warranty claims against the Automakers fail and, accordingly, **GRANTS** the U.S. Automakers' motion to dismiss, [Doc. 181], and **DISMISSES WITH PREJUDICE** Plaintiffs' express warranty breach claims. It does not address the arguments that the individual U.S. Automakers present in their separately filed motions.

**5. Plausibility of Implied Warranty Breach Claims**

According to the U.S. Automakers, the Court may dismiss Plaintiffs' claims for breach of an implied warranty on several independent grounds. They argue that these claims fail for the lack of privity, the lack of pre-suit notice, the SAC's failure to allege unmerchantability, its failure to allege that the Defect manifested during the warranty period, and its failure to allege that Plaintiffs presented their vehicles for repair during the warranty period. [Docs. 181-1 at 14–20; 180-1 at 8–17; 182-1 at 11–14].The Court takes up each of these arguments in turn.

**a. Lack of Privity**

The U.S. Automakers argue that in several states, the requirement for contractual privity prevents implied warranties from flowing up the distribution chain. These Defendants identify 23 states with laws requiring contractual privity as a prerequisite to claims under an implied warranty

(Alabama, Arizona, California, Connecticut, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Michigan, New York, North Carolina, Ohio, Oregon, Rhode Island, Tennessee, Vermont, Virginia, Washington, West Virginia, and Wisconsin ("Privity States")). According to the U.S. Automakers, Plaintiffs cannot maintain their implied warranty breach claims under the laws of the Privity States because none of them bought or leased their vehicle from the Automakers. [Doc. 181-1 at 30]. The U.S. Automakers rely on the SAC's allegations to argue that Plaintiffs bought their vehicles from "independent, third-party dealerships, CarMax or Carvana, other used car sellers, . . . unspecified sellers" or "via inheritance." [*Id.* at 30–31, 31 n.16–19].

Plaintiffs do not dispute the absence of privity of contract between the Automakers and Plaintiff. Rather, they contend that five of the Privity States (California, Kansas, North Carolina, Rhode Island, and West Virginia) in fact require no privity. [Doc. 221 at 37 n.19]. And as to the remaining 18 Privity States, Plaintiffs maintain that these states recognize exceptions to the privity requirement that apply here. [*Id.* at 37]. Plaintiffs' successfully show that Kansas, Rhode Island, and West Virginia do not require privity for implied warranty claims in consumer transactions, but they fail to rebut the U.S. Automakers' position that privity is required to maintain their claims under the challenged California and North Carolina laws. They additionally fail to show that the identified exceptions to the privity requirement apply to their claims under the laws of the remaining Privity States.

**i. Privity Not Required**

Plaintiffs rely on *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D. Cal. 2014), to argue that California law does not require privity. Indeed, "[f]or the implied warranty claim under the Song-Beverly Act, there is no privity requirement." *Id.* at 982. But the SAC assert two separate claims for breach of implied warranty under California law—one (Count 17(a)) under California Commercial Code §§ 2314 (for the sale of goods) and 10212 (for lease contracts) and another (Count 17(b)) under the Song-Beverly Act (Civ. Code § 1790, *et seq*.). While the U.S. Automakers do not specify whether they seek the dismissal of both claims for lack of privity, the authority they cite for the privity requirement under California law speaks to claims under § 2314. Plaintiffs, of course, cite to authority regarding a wholly different statute. The Parties thus talk at cross purposes (and not for the first time here), impeding progress. Nevertheless, with regard to the California implied warranty claims, Plaintiffs fail to rebut the U.S. Automakers' argument that privity is required to maintain claims under §§ 2314 and 10212.

Contrary to the U.S. Automakers' position, "[s]ection 50-639(b) of the [Kansas Consumer Protection Act] has abolished any privity requirement in an action for breach of the implied warranty of merchantability involving a consumer transaction under Kansas law." *Gonzalez v. PepsiCo, Inc.*, 489 F. Supp. 2d 1233, 1246 (D. Kan. 2007). While the U.S. Automakers seek to downplay the relevance of *Gonzalez*, maintaining that the case represents the

federal district court's prediction of how the Kansas Supreme Court would rule, *Gonzalez's* well-reasoned "prediction" remains un-assailed.

Plaintiffs fail to carry the day as to their implied warranty breach claims under North Carolina law. They cite to two statutes (North Carolina General Statutes §§ 25-2-103(1)(d), 25-2-314),[57] one of which appears to exempt certain automobile manufactures from the privity requirement, without any discussion of how they apply here. [Doc. 221 at 37 n.19]. This does not suffice. Although § 25-2-103(1)(d)'s definition of "seller" appears to encompass auto manufacture not in privity with the vehicle buyer, Plaintiffs do not address the reach of this definition and whether and how it applies to claims of implied warranty breach. As the court in *Atl. Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N.C., Inc.*, noted, "the North Carolina Products Liability Act[58] eliminated the privity requirement against manufacturers, but only for actions seeking recovery for personal injury or property damage . . . Privity is still required in an action for breach of implied warranties that seeks recovery for economic loss." 175 N.C. App. 339, 345-46 (2006) (citations omitted); *see*

[57] Article 2 of North Carolina's Uniform Commercial Code-Sales provides that ""a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.C. Gen. Stat. § 25-2-314(1). And § 25-2-103(1)(d) of that Code provides that "[a]ny manufacturer of self-propelled motor vehicles, as defined in G.S. 20-4.01, is also a 'seller' with respect to buyers of its product to whom it makes an express warranty, notwithstanding any lack of privity between them, for purposes of all rights and remedies available to buyers under this Article."

[58] N.C. Gen. Stat. § 99B-2(b).

*Blackman v. Bos. Whaler, Inc.*, 649 F. Supp. 3d 142, 150 (E.D.N.C. 2023) ("Although North Carolina has abolished the privity requirement in certain situations, when a plaintiff asserts an implied warranty claim seeking only the recovery of economic loss, North Carolina requires privity of contract."). Because Plaintiffs seek to recover only economic losses North Carolina's privity requirement bars their implied warranty claims. *See City of High Point, N. Carolina v. Suez Treatment Sols. Inc.*, 485 F. Supp. 3d 608, 626-27 (M.D.N.C. 2020) (allowing implied warranty claim under § 25-2-314 to proceed in the absence of privity because the plaintiff alleged that it had suffered "more than pure economic loss").

Plaintiffs are equally cavalier in defense of their argument that Rhode Island law requires privity. They cite "R.I. Gen. Laws § 6A-2-318" and call it a day. [Doc. 221 at 37 n.19]. Nevertheless, the Court declines to dismiss their implied warranty claims under Rhode Island law because it is debatable, at the least, whether § 6A-2-318 abolishes the privity requirement. The cited statutory provision provides: "A seller's or a manufacturer's . . . warranty, whether express or implied, including but not limited to a warranty of merchantability provided for in § 6A-2-314, extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty." R.I. Gen. Laws § 6A-2-318. But the courts do not interpret this provision to have eliminated the privity requirement. *See Ace Am. Ins. Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 705 (D.

Md. 2008) (citing § 6A-2-318 and noting that, unlike Maryland, Rhode Island retains the privity requirement); *but see Ulrich v. GM, LLC*, 2025 U.S. Dist. LEXIS 34620, at *15 (E.D. Mich. Feb. 25, 2025) (concluding that § 6A-2-318 represents a "broad exception to privity"); *Sowa*, 764 F. Supp. 3d at 1271 (declining to dismiss Rhode Island-law based implied warranty claims against an auto manufacturer and a distributor despite the lack of privity because, under § 6A-2-318, the plaintiffs, as the vehicle end users, "could be reasonably expected to be affected by the [defect]").

The U.S. Automakers cite *Kilgore v. Bos. Sci. Corp.*, 2015 WL 5838513, at *5 (S.D. W. Va. Oct. 5, 2015), to support their identification of West Virginia as a "Privity State." But *Kilgore* applied *Florida law* in dismissing the implied warranty claim for lack of privity. This puts Plaintiffs ahead from the starting line. And it seals the deal that West Virginia's Supreme Court of Appeals has "held that the requirement of privity of contract in an action for breach of an express or implied warranty in West Virginia is hereby abolished." *McMahon v. Advance Stores Co.*, 227 W.Va. 21 (2010) (citation modified). Nevertheless, the U.S. Automakers maintain their challenge, pivoting to assert that no Plaintiff resides in the state. [Doc. 249 at 21 n.14]. As previously discussed, however, that fact is not a bar at this point.

Having concluded that Kansas, Rhode Island, and West Virginia are not "Privity States," the Court turns to the implied warranty claims under the 20 remaining Privity States to decide whether the exemptions to the privity

requirements that Plaintiffs identify shield these claims from dismissal. Plaintiffs contend that the Privity States recognize one or more of the following five circumstances to excuse the absence of privity: (1) the buyer is a third-party beneficiary to the contract between the seller and the manufacturer; (2) the seller is the manufacturer's agent; (3) an express warranty is issued; (4) the product is a "dangerous product"; and (5) the buyer alleges fraud. [Doc. 221 at 37–38].

Before addressing the Parties arguments, the Court notes that Plaintiffs do not rebut the U.S. Automakers' argument that Idaho, Michigan, North Carolina, Oregon, Vermont, Virginia, and Wisconsin require privity to maintain a breach of implied warranty claim. While they generally argue that the states that require privity "embrace one or more of the [specified] exceptions," [Doc. 221 at 37], the appendix containing the authority for this proposition includes no law for the above-mentioned states.[59] *See* App. A, Charts 1–3 [Doc. 221 at 2]. Accordingly, the Court deems Plaintiffs to have conceded that Idaho, Michigan, Oregon, Vermont, Virginia, and Wisconsin require privity and that they do not recognize an applicable exception.

[59] Citing two exemplar cases (one applying Alabama law and the other Florida law), Plaintiffs also broadly assert that the U.S. Automakers "cite inapposite cases" because unidentified cases "did not address third-party beneficiary or agency arguments" while other unidentified cases "show at minimum that privity is a factual question." [Doc. 221 at 38, n.22]. This does not sufficiently rebut the U.S. Automakers' showing that Idaho, Michigan, Oregon, Vermont, Virginia, and Wisconsin require privity.

### ii. Privity Exception: Third-Party Beneficiary

Plaintiffs argue that Alabama, California, Florida, Georgia, Illinois, and Kentucky do not require contractual privity between the buyer and the product manufacturer where the buyer is a beneficiary of the manufacturer's contracts with the seller. [Doc. 221 at 37]. The U.S. Automakers counter that this exception does not apply because the SAC pleads no facts establishing (1) that Plaintiffs who bought new vehicles are third-party beneficiaries of contracts between the Automakers and the independent dealerships they bought from and (2) that any contracts existed between the Automakers and third parties, such as CarMax, Carvana, unspecified sellers, and original vehicle owners, from whom Plaintiffs bought used vehicles. [Doc. 249 at 22].

Sixty-six Plaintiffs each bought a new or used Class Vehicle or leased a Class Vehicle from an "authorized" dealership.[60] Of the remaining forty-nine

[60] Specifically, Plaintiffs Robert Ballero Gonzalez (New York), Deneen Brown (North Carolina), Dennis Fett (Illinois), Michael Hayes (Sought Carolina), Brandy Knapp (Montana), Rene Madueno (California), James McCrory (Mississippi), Vincent Cerrato, Jr. (South Carolina), William Arthur Guest, Jr. (Illinois), Doug Phillip Paulson (Idaho), Julie Walling (Illinois), John Britton (California), Eniko Gedo (Illinois), Eva Jacinto (Florida), Matthew Kakol (New York), Shona Thomas (Illinois), Melissa Warren (Illinois), Marie Hudson (Illinois), Bobby Sims (Mississippi), Brenda Smith-Watson (Virginia), Michael Tropea (Massachusetts), Theresa Wolle (Tennessee), Kenneth Allan (Wisconsin), Moises Alonso (Alabama), Brian Belanger (Massachusetts), Tina Brown (New York), Christopher Carter (Arizona), Gregorio Escobedo (California), Stacey Kabir (Alabama), Daniel McCarthy (New Jersey), Tonjua Speck (California), Gilbert Starkey (Nevada), Julie Struble (New Hampshire), and Nelson Yerger (Georgia), bought their new vehicles from an authorized dealer. SAC I ¶¶ 143, 144, 146, 151, 154, 156–57, 170–71, 176, 180, 182, 185–88, 194–96, 200–01, 203, 206–08, 212, 215–16, 222, 228, 231, 240–41, 243, 246.

named Plaintiffs, four Plaintiffs bought new Class Vehicles from an unspecified source or a dealership that the SAC does not identify as "authorized,"[61] forty-four bought used Class Vehicles from a third-party dealer

---

Plaintiff Francine Lewis (New York) leased her Class Vehicle from an authorized dealer. *Id.* ¶ 189.

And Plaintiffs Clayton Fineout (Michigan), Bonnie Florentine (Illinois), Brad Hoschar (Pennsylvania), Tyler Baker (Vermont), Nicole Hearn (Alabama), Carla Taylor Long (Alabama), Patricia Taylor (Alabama), Celeste Felice (Florida), Stephen Gearhart (Florida), Eva Jacinto (California), Kristen Luiz (Massachusetts), Rittie Marshall (Tennessee), Anthony Raspantini (New Jersey), Nicole Senkpeil (Illinois), Leigh Schultz (Iowa), Billy Sellers (South Carolina), Matthew Shephard (Pennsylvania), Latasha Tinch (Georgia), George Welch (Illinois), Brandon Barker (New York), Corby Cline (Florida), William Demele (Washington), Tiffany Marvin (Washington), Jeffrey Rhoades (Michigan), Jeffrey Slusher (Kansas), Dwayne Stowe (Georgia), Frank Talavera (California), Jaime Duran (Nevada), Ryan Taylor (Tennessee), Richard Topa (New York), and Ronald Wolf (South Carolina) each bought a used vehicle from an authorized dealer. Id. ¶¶ 147–48, 152, 168, 172, 174, 177, 183–84, 190–93, 197–99, 202, 205, 211, 218–19, 230, 237–38, 242, 244, 247, 251–52, 255.

[61] Plaintiffs Steven Aula (Michigan), Aaron Jophlin (South Carolina), Anthony Wayne Brown (California), and Dave Bacon (South Dakota). Id. ¶¶ 161, 167, 169, 209.

such as CarMax, from the vehicle's original owner, or from an unspecified source,[62] and one inherited his from an unspecified source.[63]

No Plaintiff can maintain a breach of implied warranty claim under Alabama law based on the third-party beneficiary theory. "Generally, implied warranties apply only to the seller, not the manufacturer." *Horton Homes, Inc. v. Brooks*, 832 So. 2d 44, 48 (Ala. 2001). While, under Alabama law,

> an implied warranty may apply to a manufacturer despite the presence of an intermediary between it and the ultimate consumer . . . "when … the product has been specially manufactured for a particular customer and the manufacturer can reasonably expect the customer to be affected by any

[62] Plaintiffs David Anderson (Pennsylvania), Jonathan M. Carano (Michigan), Ninotchka Harpey-Bey (Nevada), Mark Hartman (Missouri), Steve Isbister (Ohio), Renee Lesesne (South Carolina), Janice McKennon (North Carolina), Loretta Mitchell (Connecticut), Bryan Polo (Virginia), Ryan Clark (South Carolina), Latricia Ford (South Carolina), Sheila Hall-Hudson (Tennessee), Rosalind Hudson-Battie (Georgia), Hannah Jones (Iowa), Jimmy Herrera (Florida), Tracy Miles (Alabama), Jordan E. Tribble (Georgia), Anita Victory (Arkansas), David Winslow (California), Elizabeth Valenzuela (Arizona), Leatha Barber (Kentucky), Rached Belhadj (Florida), Lisamarie Blumberg (Delaware), Katrina Chambliss (Virginia), Marcos Diaz (California), Manakia Eiland (Mississippi), Jamaria Fernandez (Virginia), Harley Graff (Missouri), Douglas Hall (Indiana), Westley Hamner (Alabama), Natasha Hochstetler (Minnesota), Stacey Kabir (Alabama), John Komoroski (Connecticut), Latunder Mercadel (Georgia), Felicia Owens (Tennessee), Kara Petschen (Minnesota), Anita Reddick (Georgia), Chad Sorenson (Washington), Michael Thomas (Georgia), Preshawn Long (Florida), Elisabeth Lovett (Tennessee), Patricia Mobley (South Carolina), Bobbie White (Alabama), Trois White (Alabama), and Earl Wilson (New York), each bought his or her used vehicle either from a dealership not associated with the vehicle's Automaker—for example, Jonathan M. Carano bought his 2010 Kia Rio from Village Ford—a third-party dealer (e.g., Carmax), the vehicle's original owner, or an unspecified source. SAC I ¶¶ 142, 145, 149–50, 153, 155, 158–60, 162–66, 173, 175, 178–79, 181, 204, 210, 213–14, 217, 220–21, 223–29, 232, 234–36, 239, 245, 248–50, 253–54.

[63] Plaintiff Scott Milewski (Michigan). *Id.* ¶ 233.

> problems with the product." . . . Alabama courts have not recognized . . . any [other] form of third-party-beneficiary exception to the privity requirement in implied warranty actions.

*McCabe v. Ford Motor Co.*, 774 F. Supp. 3d 349, 373 (D. Mass. 2025) ("*McCabe III*") (quoting *Horton Homes*, 832 So. 2d at 48). As in *McCabe III*, the SAC "does not contain any allegations suggesting that [the Automakers] 'specially manufactured' any vehicle 'for a particular consumer.' Thus, [each Automaker] is a 'manufacturer' in the traditional sense under Alabama law, not a seller—and not, therefore, subject to implied-warranty-of-merchantability liability as to the ultimate purchasers of its vehicles." *Id.*

Under California law, "a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant . . . A buyer and seller stand in privity if they are in adjoining links of the distribution chain." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (citations omitted). But "an end consumer . . . who buys from a retailer" is not in an "adjoining link" to the manufacture. *Id.* California courts have found "that the third-party beneficiary exception excuses the lack of privity" in the context of implied warranty breach claims. *See, e.g., Hawkins v. Shimano N. Am. Bicycle Inc.*, 729 F. Supp. 3d 989, 1026 (C.D. Cal. 2024). However, this exception does not rescue Plaintiffs' claims because the SAC fails to allege facts indicating that Plaintiffs are third-party beneficiaries to the contract between the Automakers and their authorized dealerships much less that contracts concerning the Class Vehicles exist between the Automakers and any sales source apart from their respective authorized dealerships.

For example, in *Hawkins*, the implied warranty claims under California law survived because the complaint alleged that the plaintiffs were "intended third-party beneficiaries of contracts between Defendants and their agents," that they were "the intended beneficiaries of Defendants' implied warranties," that the sellers "were not intended to be the ultimate consumers of the [product] . . . and have no rights under the warranty agreements provided with the [product]," and that "the warranty agreements were designed for and intended to benefit the ultimate consumers only." *Id.* at 1025; *see Rollolazo v. BMW of N. Am., LLC*, 2017 WL 1536456, at *14 (C.D. Cal. Feb. 3, 2017) (allowing implied warranty breach claims to proceed against the auto manufacturer under California law based on third-party beneficiary exception where the complaint alleged "that Plaintiffs purchased their vehicles from a network of dealers who are agents of [the manufacturer], and that the dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles" (citation modified)). The SAC contains no such allegations. At best, it alleges that the law of each state conferred an implied warranty of merchantability and that the Automakers breached that warranty because the Class Vehicles are unfit for their ordinary purpose. *See, e.g.,* SAC II 527–28, 734–35, 987–88, 1214, 1216, 1536, 1542, 1951–52, 2903–04, 3551–52, 3986–87, 4126–27. These allegations say nothing about Plaintiffs' third-party beneficiary status. Nor do the allegations that Plaintiffs identify in support of

their argument of third-party beneficiary status. [Doc. 221 at 37].[64] Because the SAC does not allege facts to indicate Plaintiffs' third-party beneficiary status, no Plaintiff can maintain a breach of implied warranty claim under California law based on the third-party beneficiary theory

This holds for Plaintiffs' implied warranty claims under Florida law too. Plaintiffs rely on *Rollolazo* for support. But there, the court allowed the implied warranty claims under Florida law to proceed because the above-discussed facts alleged in the complaint sufficiently supported the plaintiffs' status as third-party beneficiaries to the contracts between the auto dealerships and the auto manufacturer. 2017 WL 1536456 at *14. The complaint in *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223 (S.D. Fla. 2014), also alleged similar facts. "While the legal theory itself was not spelled out," the court allowed the plaintiff's "claim of breach of implied warranty through third-party beneficiary law" to proceed because the allegations supported the plaintiff's status as a third-party beneficiary. *Id.* at 1233-34.

Plaintiffs' Illinois and Kentucky-law based implied warrant claims also go the same way. Although Illinois recognizes the third-party beneficiary exception, its application is limited to instances "'where the manufacturer knew the identity, purpose and requirements of the dealer's customer and

[64] Those allegations state that the Automakers issued an express written warranty and that this warranty formed the basis of the bargain for Plaintiffs' purchase or lease of the Class Vehicles. SAC II ¶¶ 440-41, 1132-33, 1201-02.

manufactured or delivered the goods specifically to meet those requirements.'" *Elward v. Electrolux Home Prods.*, 214 F. Supp. 3d 701, 704–05 (N.D. Ill. 2016) (quoting *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980 (1980)). Noting the fact-intensive nature of the privity analysis, the court deemed the complaint's allegations that the defendant "was aware of remote customers' requirement" for its product and that it "delivered [the product] in order to satisfy that requirement" sufficient to indicate that the plaintiffs were third-party beneficiaries to the contract between the seller and the manufacturer. *Id.* at 706. Here, however, the SAC contains no such allegations. And as for Plaintiffs' Kentucky-law based implied warranty claims, "[w]hile Kentucky law has recognized a limited exception for third-party beneficiaries to the rule that express warranties require privity," that exception is not implicated in implied warranty breach claims. *Raymond v. Thor Motor Coach Inc.*, 2023 U.S. Dist. LEXIS 134020, at *23–24 (N.D. Ind. Aug. 2, 2023). "Therefore, there is no third-party beneficiary exception to Kentucky's requirement that the parties be in privity of contract in order to have a breach of implied warranty." *Id.* at *24; *see also Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 969 (E.D. Ky. 2019) (noting that Kentucky law is "clear that privity is a strict requirement for implied warranty claims" and declining to apply the third-party beneficiary exception to such a claim).

The result under Georgia law is mixed. Those Plaintiffs who bought used vehicles from a source other than their Automaker's authorized dealer cannot

assert claims for breach of the implied warranty. This is because "[u]sually, Georgia's implied warranties for goods do not pass to a second or subsequent purchaser, and may be enforced only by the original buyer, who stands in privity of contract with the seller-defendant." *McClure*, 759 F. Supp. 3d at 1351 (citation modified). Thus, Georgia-based Plaintiffs (i.e., Rosalind Hudson-Battie, Jordan E. Tribble, Latunder Mercadel, Anita Reddick, and Michael Thomas) cannot maintain implied warranty claims under Georgia law. "However, Georgia courts recognize an exception to privity where an automobile manufacturer, through its authorized dealer issues to a purchaser . . . a warranty by the manufacturer running to the purchaser[.]"[65] *Id.* This exception applies to the claims of the three remaining Georgia Plaintiffs (i.e., Dwayne Stowe, Latasha Tinch, and Nelson Yerger) who bought warrantied vehicles from authorized dealerships. *See* SAC I ¶¶ 202, 242, 246. Although the SAC fails to specify the source of these Plaintiffs' warranties, it generally alleges that the Automakers sell Class Vehicles through dealership networks and that they issued express written warranties for each Class Vehicle they sold. SAC I ¶ 27; SAC II ¶ 1201. Viewing the allegations in the light most favorable to Plaintiffs, the Court concludes that the SAC sufficiently alleges that the relevant Automakers issued warranties through their authorized

[65] Plaintiffs incorrectly cast this exception as the third-party beneficiary exception.

dealers that ran to Stowe, Tinch, and Yerger. Thus, these Plaintiffs' Georgia-law based implied warranty claims may proceed.

Plaintiffs' claims for breach of implied warranty under Alabama, California, Florida, Illinois, and Kentucky are foreclosed. Moreover, with the exception of the claims of those Plaintiffs who bought their vehicles from authorized dealerships, Plaintiffs may not assert implied warranty claims under Georgia law.

**iii. Privity Exception: Agency**

According to Plaintiffs, where the automobile dealers act as the auto manufacture's agent, Alabama, Connecticut, and Iowa excuse the need for privity in implied warranty claims. [Docs. 221 at 37; 229 at 7 (arguing in response to Hyundai and Kia's motion to dismiss that Taylor Long's implied warranty breach claim under Alabama law survives because she bought her used Kia Class Vehicle from a Kia-authorized dealership and the allegations of agency "suffice to allege privity")]. Plaintiffs contend that the SAC sufficiently alleges an agency relationship between the dealerships and the Automakers and that it is premature to consider the agency question at this stage because determining whether the dealerships are the Automakers' agents is a fact-dependent inquiry. The Court agrees that whether agency exists requires a factual inquiry, but a complaint must include sufficient facts to indicate that such a relationship allegedly exists. Here, the SAC fails to do so. The portions of the SAC that Plaintiffs rely on say nothing about agency; those paragraphs simply allege that the Automakers extended express written

warranties covering the Class Vehicles. SAC II ¶¶ 440, 905, 1362. But the cases on which Plaintiffs rely fail to show that, under the laws of the relevant states, a manufacturer's extension of an express warranty through the seller suffices to establish an agency relationship between the two.

For example, Plaintiffs cite to *Massey-Ferguson, Inc. v. Laird*, 432 So. 2d 1259 (Ala. 1983), where the court held that a jury could reasonably conclude that the seller of a combine was the manufacturer's agent. *Id.* at 1262. But that holding did not depend on the fact that the manufacturer had extended an express warranty. Rather, there, evidence that the manufacture's "literature was about the premises of [the seller's] business and that [the manufacturer's] employees accompanied [the seller's] employees when attempting to repair the combine is what teed up the jury question as to agency. *Id.* While only factual allegations supporting the inference of an agency relationship are required at this stage, the SAC contains no such allegations. Specifically, a review of the SAC reveals no other factual allegations to support an inference that the Automaker-authorized dealers, much less unassociated third-party sellers, acted as their Automaker's agent. The SAC does allege that the Automakers sold Class Vehicles "through networks of dealerships in each state and [U.S.] territory," and that they received "financial benefit and profits" from selling the Class Vehicles," *see, e.g.,* SAC I ¶¶ 27, 32, 82–83, 96–97, 89–90, 104–05, 114, 117–18, 124–25, 137, but these allegations are not sufficient to allege an agency relationship between those in-network dealers and the Automakers.

For example, under Alabama law, "[w]hether an express agency relationship exists depends on whether there is evidence of a retained right of control by the principal over the agent." *Chase v. Kawasaki Motors Corp.*, 140 F. Supp. 2d 1280, 1289 (M.D. Ala. 2001) (citing *McLemore v. Ford Motor Co.*, 628 So.2d 548, 551 (Ala. 1993)). But, here, the SAC contains no allegations to support an inference that the Automakers "retained right of control" over the actions of their associated dealers.

Soo too in Iowa. In *Bruce v. ICI Ams.*, 933 F. Supp. 781, 790 (S.D. Iowa 1996), which Plaintiffs advance, the fact that the buyer-plaintiff purchased the product from the manufacturer's authorized dealer did not shield the implied warranty breach claim against the manufacturer. There, the claim failed at summary judgment because the evidence failed to show that the manufacturer controlled the seller's operations related to the product. *Id.* Here, Plaintiffs' implied warranty breach claims are foreclosed at the pleading stage because the SAC fails to allege any facts from which the Automakers' control of the dealers may be inferred.

Similarly, under Connecticut law, while "it may be possible to satisfy the privity requirement by pleading facts which establish an agency relationship between a vehicle manufacturer and the Dealership," the allegation that a manufacturer extended an express warranty does not suffice to indicate that relationship. *Kahn v. Volkswagen of Am., Inc.*, 2008 WL 590469, at *8 (Conn. Super. Ct. Feb. 13, 2008). Indeed, in *Kahn*, although the

plaintiff alleged that the manufacturer had extended express warranties, the court declined to "dispense with the privity requirement" and concluded that the complaint failed to allege an agency relationship between the automobile dealer and the manufacturer. 2008 WL 590469, at *9. The following three elements are necessary to support an agency relationship under Connecticut law: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Kahn*, 2008 WL 590469, at *11. The SAC, however, is silent on factual allegations going to these elements that would raise a plausible inference of agency.

**iv. Privity Exception: Express Warranty:**

As another exception to the privity requirement, Plaintiffs argue that Illinois, Ohio, Tennessee, and Washington consider the privity requirement satisfied where the manufacture issued an express warranty. [Doc. 221 at 38]. However, this exception does not rescue their implied warranty claims under Illinois law. Illinois "still requires privity even where the manufacturer issues a written warranty, but has held that under [the] Magnuson-Moss [Warranty Act] privity is deemed to exist where there is a written warranty." *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 834 (2004); *See Bakopoulos v. Mars Petcare US, Inc.*, 592 F. Supp. 3d 759, 766-67 (N.D. Ill. 2022) (dismissing implied warranty claim in a case also alleging an express warranty because Illinois law requires "[p]rivity of contract . . . to recover economic damages for breach of implied warranty" and noting that although

"[t]he Illinois Supreme Court, interpreting federal law, found that privity wasn't required for federal claims for breach of an implied warranty brought under the [Magnuson-Moss Warranty] Act[,] . . . under *Illinois* law, a showing of privity remains generally required to bring a claim for breach of implied warranty" (citation modified)); *McCabe I*, 948 F. Supp. 2d at 1362–63 (rejecting the plaintiff's argument that Illinois has relaxed the privity requirement where the manufacturer extends an express warranty and dismissing implied warranty claim because "the privity requirement remains for claims brought under Illinois law").

For Ohio, "Plaintiffs provide no authority allowing them to bootstrap a contract-based implied warranty claim onto an express written warranty under Ohio law, and the Court is not aware of any." *Browning v. Am. Honda Motor Co.*, 2022 U.S. Dist. LEXIS 48555, at *22 (N.D. Cal. Mar. 18, 2022). Plaintiffs also cite the same Michigan district court case—*In re Gearshift Litig. I*—that failed to persuade the court in *Browning*. This was because *In re Gearshift I* "cite[s] without analysis a single Ohio district court case" that dealt with an implied warranty in tort, rather than, as here, in contract. *Browning*, 2022 U.S. Dist. LEXIS 48555, at *22. *See Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's, Enters.*, 50 N.E.3d 955, 962 (Ohio Ct. App. 2015) (affirming dismissal of breach of implied warranty claim where the manufacturer extended express written warranties for product sold through

an intermediary because the buyer-plaintiff and the manufacturer were not "immediate links in the distribution chain" and thus lacked privity).

Similarly, for their argument that under Tennessee law the manufacturer's provision of an express warranty satisfies the privity requirement for an implied warranty breach claim, Plaintiffs cite to *Francis*, 504 F. Supp. 3d at 677, which cites a Montana district court case that accepted, without referencing any authority, the plaintiffs' argument that they sufficiently stated a breach of implied warranty claim under the applicable state laws (including, presumably, Tennessee,) because the "[d]efendants made binding express warranties, forming a unilateral contract." *Bishop v. DeLaval Inc.*, 466 F. Supp. 3d 1016, 1024 (W.D. Mo. 2020). The Court remains unpersuaded. Plaintiffs, as the proponents of the specific exception to Tennessee's privity requirement, have the burden of showing that Tennessee law recognizes that exception. They have failed to do so, and thus their Tennessee-law based implied warranty breach claims fail for lack of privity. *See Harrison v. Gen. Motors, LLC*, 2023 WL 348962, at *13 (E.D. Mich. Jan. 19, 2023) (dismissing the implied warranty claim where the plaintiffs argued that the express warranty provided privity for their implied warranty claim but "cited no Tennessee law in support").

Finally, Plaintiffs' argument that Washington allows implied warranty breach claims to proceed where the manufacturer has supplied an express warranty is also unavailing. In *Tex Enters., Inc. v. Brockway Standard, Inc.*,

149 Wash. 2d 204, 212 (2003), on which Plaintiffs rely, the Supreme Court of Washington recognized that Washington law "distinguish[es] between express and implied warranties, restricting recovery for breach of implied warranty where it would have allowed recovery for breach of express warranty." And it held that "in cases where a commercial purchaser seeks to recover economic damages from a remote manufacturer, implied warranties do not arise absent privity or an underlying contract to which the remote commercial purchaser is a third-party beneficiary." *Id.* at 630. Although Plaintiffs cite to *Tex Enters.*, they provide no analysis. The Court does not read *Tex Enters.* as standing for the proposition that a manufacturer-defendant's extension of an express warranty creates the otherwise missing vertical privity with the "buyer who is in the distributive chain, but who did not buy the product directly from the defendant." *Id.* at 628. And, as previously discussed, the SAC fails to allege that Plaintiffs are third-party beneficiaries to a contract between the Automakers and the dealers for the Class Vehicles.

**v. Privity Exception: Dangerous Product**

Plaintiffs maintain that New York excuses the privity requirement for an implied warranty breach claim "where the product's defect is dangerous." [Doc. 221 at 38 (quoting *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 540-41 (D. Md. 2011))]. However, based on the well-reasoned analysis in *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 313 (N.D.N.Y. 2019), the Court is persuaded that "no thing-of-danger exception exists under New York law for claims involving purely economic injury." *See In re ZF-TRW Litig.*, 601 F. Supp. 3d at

834-35 (questioning *Doll*'s recognition of the dangerous product exception and dismissing implied warranty claims for failure to allege privity); *In re Rock 'n Play Sleeper Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2022 WL 22922234, at *14 (W.D.N.Y. June 2, 2022) ("There is scant support for a conclusion that [a privity exception for "things of danger"] represents New York law.").

**vi. Privity Exception: Fraud**

Plaintiffs rely on *In re Gearshift I*, 355 F. Supp. 3d at 593, to argue that Arizona recognizes an exception to the privity requirement in cases of fraud by the manufacturer. But *In re Gearshift I* addressed Arizona's privity requirement for common law fraudulent concealment claims not for statutory implied warranty breach claims, which are at issue here. *See id.* at 593-94. Plaintiffs provide no authority to support the proposition that Arizona waives the privity requirement in implied warranty breach claims where fraud is alleged, and the Court has found none. "Arizona law provides that, with one exception, the privity requirement extends to both implied and express warranties." *Eppich v. FCA US LLC*, 2021 WL 1951925, at *2 (D. Ariz. Jan. 21, 2021) (citation modified). "This exception extends a seller's express or implied warranty only to 'any natural person who is in the family or household of his buyer . . . who is injured in person.'" *Id.* (quoting A.R.S. § 47-2318). Plaintiffs do not contend that this exception applies to their claims. Moreover, "this exception does not eliminate the necessity of vertical privity, or privity in the chain of distribution." *Eppich*, 2021 WL 1951925, at *2 (citation modified).

Accordingly, Plaintiffs' breach of implied warranty claims against the Automakers survive under the laws of Georgia (limited to the claims of Plaintiffs who bought their vehicles from authorized dealerships), Kansas, Rhode Island, and West Virginia but fail under Alabama, Arizona, California, Connecticut, Florida, Georgia (limited to the claims of Plaintiffs who did not buy from an authorized dealerships), Idaho, Illinois, Iowa, Kentucky, Michigan, New York, North Carolina, Ohio, Oregon, Tennessee. Vermont, Virginia, Washington, and Wisconsin law. The Court **GRANTS** the U.S. Automakers' joint and individual motions to dismiss Plaintiffs' implied warranty breach claims, [Docs. 180, 181, 182, 187], to the extent that it **DISMISSES WITH PREJUDICE** the following claims: Alabama (Count 1(b)), Arizona (Count 3(b)), California (Count 5(b)), Connecticut (Count 7(b)), Florida (Count 10(b)), Georgia (Count 11(b), as to Plaintiffs who did not buy from authorized dealerships), Idaho (Count 13(b)), Illinois (Count 14(b)), Iowa (Count 16(b)), Kentucky (Count 18(b)), Michigan (Count 23(b)), New York (Count 33(b)), North Carolina (Count 34(b)), Ohio (Count 36(b)), Oregon (Count 38(b)), Tennessee (Count 43(b)). Vermont (Count 46(b)), Virginia (Count 47(b)), Washington (Count 48(b)), and Wisconsin (Count 50(b)).[66] The Court **DENIES** the U.S. Automakers' motion as to implied warranty breach claims under the

[66] In response to Hyundai and Kia's motion, Miles (an Alabama resident) seeks to withdraw her implied warranty breach claim under Alabama law. [Doc. 229 at 6 n.4]. Because Miles's claim is subject to Hyundai's challenge and the Court dismissed all Alabama-law based implied warranty breach claims, Miles's claim stands dismissed rather than withdrawn.

laws of Georgia (Count 11(b), as to Plaintiffs who bought their vehicles from authorized dealerships), Kansas (Count 17(b)), Rhode Island (Count 40(b)), and West Virginia (Count 49(b)).

**b. Pre-Suit Notice**

Of the implied warranty breach claims that either remained unchallenged on privity grounds or survived that challenge, those under the laws of the following 29 states are up for dismissal on pre-suit notice grounds: Colorado, Delaware, Georgia, Hawaii, Indiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, and Wyoming.[67] [*See* Doc. 181-4]. Unlike the Airbag Suppliers, the U.S. Automakers do not challenge the adequacy and timing of Plaintiffs' pre-suit notices. Rather, they argue that a pre-suit notice is a prerequisite to any implied warranty breach claim under the laws of the relevant states and that, here, these claims fail because the SAC does not allege that each Plaintiff notified the Automakers. [Doc. 181-1 at 31–33].

---

[67] For claims under Colorado, Hawaii, Maine, Maryland, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, Texas, Utah, and Wyoming law, the U.S. Automakers assert that there is no named Plaintiff who *could* have provided pre-suit notice. [Doc. 181-1 at 32 n.22]. However, as previously discussed, *supra* § IV.A., the absence of plaintiffs at this stage does not render the claims deficient.

Plaintiffs counter that pre-suit notice is only a prerequisite to state court lawsuits and that Federal Rule of Civil Procedure 3[68] displaces the notice requirement in suits filed in federal court. [Doc. 221 at 39–40]. Alternatively, they argue that (1) the SAC sufficiently alleges pre-suit notice under Rule 9(c), (2) many states only require notice to sellers and not to manufacturers, and (3) several states excuse the requirement or consider it satisfied when a complaint is filed, the defendants have actual knowledge, or where notice would be futile. [*Id.*]

Although Plaintiffs contend that state-law governed pre-suit notice requirements have no place in this federal suit, they do little to develop this argument beyond citing to some case law. [Doc. 221 at 38–39 n.23]. How does the outcome in a case parsing a specific state statutory notice provision and analyzing how that state's courts enforce it apply with a broad brush to other statutory notice provisions across all states? Plaintiffs do not explain.

The inquiry that Plaintiffs' position tees up is an intensive one, not to be undertaken lightly. To decide whether Rule 3 displaces a given state's pre-suit notice requirement, a court must follow a "multistep choice-of-law framework," asking at the first step "whether state law conflicts with a valid federal rule of procedure on point." *Albright v. Christensen*, 24 F.4th 1039, 1044 (6th Cir. 2022) (citing *Hanna v. Plumer*, 380 U.S. 460, 469-70 (2022)). If the state law

[68] Per Rule 3, "[a] civil action is commenced by filing a complaint with the court."

and federal rule "collide[]," the second step is to gauge "whether the federal rule is a general rule of practice and procedure that does not abridge, enlarge or modify any substantive right and is procedural in the ordinary use of the term." *Id.* at 1044–45 (citation modified). If the state law and federal rule do not collide, then the next step is to "wade into *Erie*'s murky waters." *Id.* at 1046, 1049 (quoting *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).

Deciding the first step requires interpretation of the state statutory provision with a view to how that state's courts interpret it. In *Albright*, the Sixth Circuit concluded that the following Michigan statutory pre-suit notice rule for medical malpractice actions conflicted with Rule 3: "'a person shall not commence an action alleging medical malpractice against a health professional or health facility unless the person has given the health professional or health facility written notice under this section not less than 182 days before the action is commenced.'" *Id.* at 1043 (quoting Mich. Comp. Laws § 600.2912b). The conflict arose because Rule 3 "requires only the filing of a complaint to commence an action—nothing more," but, as the Michigan Supreme Court has explained, under § 600.2912b(1)'s demands, "'a medical malpractice action can only be commenced by filing a timely [notice of intent] and then filing a complaint and an affidavit of merit.'" *Id.* at 1046 (quoting *Tyra v. Organ Procurement Agency of Mich.*, 498 Mich. 68, 94 (2015)) (alteration in original). Because "the Michigan statute—like Rule 3—affects *how* a lawsuit is

commenced"—i.e., by "add[ing] steps to the process of commencing an action," the statutory notice requirement locks horns with Rule 3. *Id.* at 1047. Ultimately, in view of its conflict with a valid Federal Rule, the Sixth Circuit concluded that Michigan's "presuit-notice requirements do not apply in diversity actions." *Id.* at 1049.

Here, not only does the language of the statutory pre-suit notice provisions differ from the language of the provisions considered in the cases Plaintiffs cite,[69] Plaintiffs extend no basis for the Court to conclude that each state's courts apply the relevant pre-suit notice provision in a way that augments Rule 3's procedure. For example, under Georgia's pre-suit notice provision, which reflects that of Uniform Commercial Code § 2-607(3)(a), "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." O.C.G.A. § 11–2–607(3)(a). On its face, the language of this and other similar UCC-derived notice provisions differs markedly from that of the provision at issue in *Albright*. Do Georgia courts and others applying similar, UCC-derived notice provisions consider them to "affect[] *how* a lawsuit is commenced"? What about state pre-suit notice provisions that differ from the

[69] Although Plaintiffs ask the Court to apply *Albright*, they fail to even identify the relevant pre-suit provisions for comparison with the provision at issue in *Albright*. The U.S. Automakers do no better; in a one sentence footnote, they simply argue that Plaintiffs "rely on irrelevant medical malpractice cases" and incorrectly portray *Albright* and *Pledger v. Lynch*, 5 F.4th 511 (2d Cir. 2021), as addressing only "whether an affidavit of merit from a medical provider is required for a complaint in federal court." [Doc. 249 at 24].

UCC's? Plaintiffs do not say. And this silence cannot carry the day. The Court declines Plaintiffs' invitation to hold that Rule 3 displaces state-specific pre-suit notice requirements in diversity actions alleging breach of warranty.

However, Plaintiffs' alternative argument that, in accordance with Rule 9(c), the SAC sufficiently alleges that Plaintiffs provided pre-suit notice defeats the U.S. Automakers' challenge. Again, the U.S. Automakers do not question the timing or adequacy of *the notice*, they contend instead that the SAC's *allegation of notice* is too generalized to suffice. [Doc. 181-1 at 31–33]. As to the breach of implied warranty claims, the SAC alleges that "Plaintiffs and Class Members timely provided the Automakers notice of the issues raised in this count and this Complaint and an opportunity to cure[.]"[70] *E.g.*, SAC II ¶¶ 852, 989, 1217. This allegation, albeit not particularized to any named Plaintiff, suffices under Rule 9(c), which allows a complaint to "allege generally that all conditions precedent have occurred or been performed." Courts recognize that, as to a condition precedent, a "general statement is an adequate averment under the loose guidelines of Rule 9(c)." *Kiernan v. Zurich Cos.*, 150 F.3d 1120, 1124 (9th Cir. 1998) (concluding that the general allegation that the insurance policy at issue was "in full force and effect" served to indicate that all the conditions precedent for the policy to be in "fully force and effect" were met).

[70]In full, the allegation reads: "Plaintiffs and Class Members timely provided the Automakers notice of the issues raised in this count and this Complaint and an opportunity to cure, *as alleged in the paragraphs addressing Defendants' notice, above*." However, it is unclear what "paragraphs addressing Defendants' notice" the SAC refers to.

Although, typically, "bare assertions are not sufficient to satisfy pleading requirements," under Rule 9(c), even an allegation "that the plaintiffs have given notice to the extent required," with "no facts supporting this conclusion" suffices. *In re ConAgra Foods, Inc.*, 908 F. Supp. 2d 1090, 1108-09 (C.D. Cal. 2012) (citation modified); *see Emp'rs Ins. Co. of WaUSAu v. BL Co. Conn., Inc.*, 2024 U.S. Dist. LEXIS 16600, at *15 (M.D. Fla. Jan. 31, 2024) (general allegation of notice sufficient). *Cf., Ganahl v. Stryker Corp.*, 2011 U.S. Dist. LEXIS 15219, at *9 (S.D. Ind. Feb. 15, 2011) (noting Rule 9(c)'s lenient requirement but dismissing warranty breach claims because the "complaint does not allege that [the plaintiff] provided Defendant notice of any kind—specific or general—or that [the plaintiff] performed any conditions precedent"). Under Rule 9(c)'s "loose guidelines," the SAC adequately pleads that the preconditions of notifying the Automakers of the alleged warranty breach and providing an opportunity to cure were met for each Plaintiff. Accordingly, the U.S. Automakers' motion to dismiss certain of the implied warranty breach claims for failure to allege pre-suit notice fails.

**c. Merchantability**

For each of the implied warranty breach claims, the SAC alleges that the applicable state law "conferred an implied warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which they were to be used" but that they are "unsafe to drive and unfit for ordinary purpose" due to the Inflator Defect, which renders them unmerchantable. *E.g.*, SAC II ¶¶ 454–55, 527–28, 734–35, 1305–06, 1376–77, 1807–08, 2602–03,

3261–62, 3917–18, 4126–27. The U.S. Automakers argue that the implied warranty claims fail because Plaintiffs fail to factually support their "conclusory claim" that the Class Vehicles are "unsafe to drive." [Doc. 181-1 at 34–35]. They contend that claims for breach of the implied warranty of merchantability fail unless the defect renders vehicles unfit for their "ordinary purpose of providing transportation." [Doc. 181-1 at 34 (quoting *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1533 (E.D. Mo. 1997))]. These Defendants point to the SAC as showing that Plaintiffs (and prior owners) have driven their vehicles without incident for years and, thus, that they are not unfit for their ordinary purpose. [Doc. 181-1 at 34–35].

"Cars are fit for their ordinary purpose of transportation . . . so long as their drivability or usefulness is not affected by the defect alleged." *Amin*, 301 F. Supp. 3d at 1287 (citation modified); *In re MyFord Touch*, 46 F. Supp. 3d at 980 ("[T]he ordinary purpose of a car is not just to provide transportation but rather safe, reliable transportation."). Here, the SAC sufficiently alleges that the Defect affects the Class Vehicles' safety and reliability, and thus the vehicles' usefulness, rendering them unfit for their ordinary purpose. For example, as pled, "[a]irbags are a critical safety feature in every car," that all Class Vehicles have ARC airbag inflators with the Defect, which causes the inflators to explode when the airbags are deployed during an accident. SAC I ¶¶ 283, 297, 375. In *In re ZF-TRW Litig.*, the plaintiffs also alleged a defect

affecting airbags and the defendants sought to dismiss the implied warranty claims for failure to allege vehicle unmerchantability. 601 F. Supp. 3d at 809. Instead of a defect causing airbags to explode when deployed during an accident, the *In re ZF-TRW* plaintiffs alleged that the defect in their vehicles would prevent airbags from deploying during an accident. *Id.* Although the plaintiffs "continued to drive their Class Vehicles[] and have not suffered serious bodily harm as a result of the Alleged Defect," the court concluded that the complaint plausibly alleged that the vehicles could not provide safe and reliable transportation and thus were not fit for their ordinary purpose. *Id.* at 810; *see Takata III*, 462 F. Supp. 3d at 1336 (rejecting, in a case where the alleged defect caused airbags to explode under certain conditions, the argument that implied warranty claims failed because the facts alleged did not indicate that the defect manifested in the vehicles). The SAC supports the same conclusion here. By alleging that the Defect in the Class Vehicles prevents airbags (a "critical safety feature") from performing as intended, the SAC plausibly states that the Class Vehicles are not merchantable. The U.S. Automakers correctly note that it can be inferred from the SAC that Plaintiffs have driven and continue to drive their vehicles without incident, but in this case, that fact is not dispositive. Because the Defect does not affect a vehicle's driving mechanism, an allegedly defective vehicle is able to provide transportation; the question is whether it can provide *safe and reliable* transportation. The answer, viewing the SAC's facts in the light most favorable

to Plaintiffs, is no. The U.S. Automakers' challenge to the SAC's vehicle merchantability allegations fails.

#### d. Defect Manifestation and Presentment for Repair

In a final effort to dismiss all the implied warranty breach claims, the U.S. Automakers argue that defect manifestation and presentment of the vehicle for repair during the applicable warranty period are preconditions for breach of warranty claims and that the SAC fails to allege that Plaintiffs met either precondition for their vehicles. [Doc. 181-1 at 36; *see also* Doc. 242 at 4 (Hyundai and Kia relying on the U.S. Automakers' argument regarding manifestation to argue that Plaintiffs' warranty claims have expired) *and* Docs. 186-1 at 14–15; 187 at 4–5]. They maintain that the time and mileage limits of the express warranties for Plaintiffs' vehicles extend to the implied warranties. [*Id.* at 36]. Regarding manifestation, the U.S. Automakers contend that the vehicle warranties have expired for "many Plaintiffs," that Plaintiffs do not allege that they have encountered issues with their airbags, and that absent an airbag malfunction during the warranty term, there is no warrantable repair. [*Id.* at 28; *see also* Doc. 182-1 at 13]. Regarding presentment for repairs, they contend that where a warranty provides for repair or replacement, a plaintiff must give the warrantor a reasonable opportunity to repair but that the SAC does not allege that Plaintiffs took their vehicles to a dealership for repairs. [Doc. 181-1 at 29].

Plaintiffs counter that any durational limits applicable to their implied warranties are unconscionable and, thus, unenforceable. [Doc. 221 at 42]. They

argue alternatively that their implied warranty claims survive because the Defect was present in the Class Vehicles at the time of sale and, thus, the Automakers breached the implied warranty of merchantability at the point of sale. [*Id.* at 42 n.29].

Discounting the implied warranty breach claims that the Court has thus far dismissed, claims under the following 33 jurisdictions remain standing: Alaska, Colorado, Delaware, District of Columbia, Georgia, Hawaii, Indiana, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, West Virginia, and Wyoming.

Of these, Plaintiffs identify the following 17 jurisdictions that recognize unconscionability as a bar to the enforcement of durational limits on implied warranties: Delaware, Georgia, Indiana, Kansas, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, Pennsylvania, South Carolina, South Dakota, Vermont, and Virginia. [Doc. 221-1 at 6–8]. The U.S. Automakers extend a two-part argument. First, they contend that the SAC does not allege unconscionability. Second, they argue that because the SAC alleges that Plaintiffs read and relied on the express warranties and viewed their terms as part of the benefit of the bargain,

Plaintiffs are foreclosed from asserting unconscionability of the warranties' terms. [Doc. 249 at 26].

The U.S. Automakers' second argument misses the mark. The SAC does not allege that Plaintiffs read all the terms of the express warranties ahead of their purchase. Rather, it contends that Plaintiffs were exposed to the Automakers' misrepresentations and that, in buying or leasing their vehicles, they relied on the express warranties that the vehicles were defect free, safe, and reliable and had properly functioning airbags. *See, e.g.*, SAC II ¶¶ 440–41, 444. 513–14, 517. The SAC says nothing about Plaintiffs' pre-sale knowledge of the duration limits of any warranty—express or implied.

Nevertheless, the U.S. Automakers are correct in that the SAC fails to plead sufficient facts to raise an inference of unconscionability. Plaintiffs generally contend that they have alleged unconscionability by pleading that "the Class Vehicles contain a defect that consumers could not discover, which Defendants knew about but did not disclose at the time of purchase, and because of the non-disclosure, Plaintiffs lacked the meaningful opportunity to negotiate the warranty."[71] [Doc. 221 at 33 n.15 (citing SAC II ¶¶ ¶¶ 652–55, 721–24, 906–09, 974–77, 1133–36, 1202–05, 1598–1601, 1639–1742, 2082–85,

[71] The latter statement, regarding Plaintiffs' lack of meaningful opportunity to negotiate the warranty, is Plaintiffs' argument. The statement is not present in the SAC, which alleges that the Inflator Defect is latent in the Class Vehicle, that the Automakers were aware of but failed to disclose the Defect, and that Plaintiffs were unaware of the Defect. *See, e.g.*, SAC I ¶¶ 246, 376, 378, 380, 385–86; SAC II ¶¶ 653–55, 679(d).

2154–57, 2313–16, 2523–26, 2804–07, 3025–28, 3248–51, 3385–88, 3538–41, 3768–71, 3836–39, 3904–07)]. But they fail to establish that these allegations suffice to allege unconscionability under the laws of each state that recognizes the concept.

"A plaintiff must allege both substantive and procedural unconscionability when claiming a breach of warranty based on the theory of unconscionability." *Rivera v. Ford Motor Co.*, 2017 WL 3485815, at *3 (E.D. Mich. Aug. 15, 2017) (citing *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1134 (11th Cir. 2010)). "'A contract is substantively unconscionable if its provisions are so outrageously unfair as to shock the judicial conscious.'" *Id.* at *4 (citation omitted). And in assessing procedural unconscionability, a court asks: "'[W]hat is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?'" *GM Air Conditioning*, 406 F. Supp. 3d at 628 (citation omitted). Plaintiffs rely on *In re Porsche*, where the court determined that the plaintiffs raised a *prima facie* case of unconscionability of the implied warranty's durational limits under New Jersey law by alleging, among other things, that the manufacturer knew that its product was inherently defective and that the buyer could not detect the defect. 880 F. Supp. 2d at 822–23. The court considered that such allegations indicate a "'substantial disparity in the parties' relative bargaining power.'" *Id.* at 822 (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989)). But—

> *In re Porsche* conflates a difference in knowledge with a difference in bargaining power. Bargaining power comes primarily from having viable alternatives in the marketplace and a vehicle consumer with many options . . . has real and substantial bargaining power even where a seller. . . knowingly fails to disclose a defect.

*GM Air Conditioning*, 406 F. Supp. 3d at 630 (joining "the majority of courts [that] have ruled that a seller's presale knowledge of an alleged defect, standing alone, is insufficient to establish procedural unconscionability") (citation modified). More recently, in *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 257 (D.N.J. 2020), the New Jersey district court concluded that "allegations of substantive unconscionability based on a defendant's knowledge of a latent defect are insufficient to withstand a motion to dismiss." *See also Amato v. Subaru of Am., Inc.*, 2019 WL 6607148, at *7 (D.N.J. Dec. 5, 2019) (finding that the plaintiffs' allegations that the car manufacturer knew of the latent defect before the sale of the relevant vehicles and acted to conceal the defect were insufficient to plead unconscionability of the warranty's durational limits). Similarly, in *McCabe I*, the court concluded that in Georgia, and in other jurisdictions relevant there, "Defendants' knowledge of the alleged defect at the time of sale, standing alone, is insufficient to render the [warranty's] time and mileage limitations unconscionable." 948 F. Supp. at 1359. Here too Plaintiffs' claim of unconscionability rests on the allegation of the Automakers' knowledge of the Inflator Defect, which courts tend to find insufficient. In the absence of authority that such an allegation suffices to raise an inference of unconscionability in each of the 17 relevant jurisdictions, the

Court concludes that the SAC fails to allege unconscionability of the implied warranty's durational limitations.[72]

Although Plaintiffs' unconscionability argument fails, the 33 implied warranty breach claims that remain standing nevertheless survive the U.S. Automakers' challenge. Here, as discussed above, Plaintiffs allege that the Class Vehicles are not fit for their ordinary purpose and, because the Class Vehicles came equipped with the defective ARC airbag inflators, that this lack of fitness was inherent at the point of sale. Thus, "the breach of [implied] warranty occurred at the point of sale." *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1278 (E.D. Mich. 2021); *see Stanley v. Nissan N. Am., Inc.*, 719 F. Supp. 3d 786, 813 (M.D. Tenn. 2024) (concluding that the expiration of the express warranties had "no effect" on the implied warranty claims where the plaintiffs alleged that their vehicles were inherently defective); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 883 (N.D. Cal. 2019)

[72] In addition to *In re Porsche*, addressed above, Plaintiffs rely on authority applying Alabama, California, Florida, Minnesota, New York, North Carolina, and Texas law. [Doc. 221 at 42–43, 43 n.30]. However, Plaintiffs' implied warranty claims under Alabama, California, Florida, New York, and North Carolina law no longer remain standing. As to Plaintiffs' implied warranty claim under Texas law, Plaintiffs do not identify Texas as a jurisdiction that recognizes unconscionability. [*See* Doc. 221-1 at 6–8]. But even assuming Texas recognizes unconscionability, Plaintiffs' authority in support fails to persuade the Court. Plaintiffs cite to *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d 1241, 1259 (S.D. Fla. 2017) ("*Takata IV*"), for the proposition that they have sufficiently alleged unconscionability under Minnesota and Texas law. However, *Takata IV* contains no relevant analysis. Accordingly, Plaintiffs have failed to persuade the Court that the SAC sufficiently alleges unconscionability under Minnesota and Texas law.

("Where, as here, Plaintiffs allege that their vehicles were unmerchantable due to an alleged latent safety defect that was present at the time of sale and that they could not reasonably have discovered sooner . . . they have set forth sufficient facts to defeat a motion to dismiss."). The U.S. Automakers maintain that because "implied warranty claims accrue on the date of deliver[y,] . . . [c]claims brought outside the warranty period are untimely." [Doc. 249 at 27]. They not only fail to cite any authority in support, the U.S. Automakers also fail to identify those Plaintiffs whose claims are arguably untimely. Thus, the Court remains unpersuaded that the dismissal of the remaining 33 implied warranty breach claims is warranted for lack of manifestation and presentment within the time and mileage limits of the express warranties.

**6. Viability of unjust enrichment claim**

Plaintiffs assert state-law specific unjust enrichment claims against the Automakers for all 50 states and the District of Columbia as well as for the nationwide class under Georgia law. Arguing that Plaintiffs' unjust enrichment claims are "grounded in fraud" but are not plead with the particularity that Rule 9(b) requires, the U.S. Automakers move to dismiss these claims. [Doc. 181-1 at 57]. They also muster many state-law specific reasons for dismissal. [*Id.* at 58–60]. The Court begins its analysis with the Rule 9(b) argument. It then takes up the state-law specific arguments. It does so with the caveat that where the U.S. Automakers successfully argue for the dismissal of an unjust enrichment claim for a particular state, the Court does

not address their alternative, state-law specific arguments for the dismissal of that claim.

First, although they argue that Rule 9(b) applies to Plaintiffs' unjust enrichment claims, the U.S. Automakers make no effort to support their underlying premise that these claims are "grounded in fraud." To be sure, unjust enrichment claims "emerg[ing] out of a pattern of fraudulent conduct" by the defendant, fall under Rule 9(b)'s heightened pleading requirement for fraud claims, *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013), but the U.S. Automakers' barebones assertion that Plaintiffs' unjust enrichment claims are fraud-based does not suffice to make the case that the Court should view them under the Rule 9(b) lens. Nevertheless, assuming Rule 9(b) applies to the unjust enrichment claims,[73] the SAC sufficiently alleges the Automakers' fraudulent conduct with particularity. *Supra* § VI.B.2.a. Moreover, contrary to the U.S. Automakers' argument, the SAC sufficiently alleges that Plaintiffs conferred a material economic benefit, in terms of profit, on the Automakers by buying or leasing their Class Vehicles. *See, e.g.,* SAC

[73] For example, Plaintiffs support their unjust enrichment claims with the allegation that the Automakers did not disclose the Inflator Defect to Plaintiffs and misled them about the Class Vehicles' quality and nature and profited from their deception. *E.g.,* SAC II ¶ 2645–46. These allegations go to fraud. However, the U.S. Automakers make no distinction between the particularity required for fraud-based allegations and any non-fraud-based elements of an unjust enrichment claim. The Court does not parse the issue, which neither side raises, and assumes for the purpose of this Motion that all elements of an unjust enrichment claim based on fraud must be pled with particularity.

¶¶ 428–29, 2644–45. The U.S. Automakers fail to show that Plaintiffs' unjust enrichment claims fail under Rule 9(b).

Second, according to the U.S. Automakers, Plaintiffs cannot maintain their unjust enrichment claims under the law of 38 states[74] because courts "regularly dismiss[] unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims." [Doc. 181-1 at 58–59 (quoting *GM Air Conditioning*, 406 F. Supp. 3d at 634)]. "A party may plead equitable claims in the alternative . . . if one or more of the parties contests the existence of an express contract governing the subject of the dispute." *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009). Plaintiffs do not rebut the state-specific law that the U.S. Automakers cite. Rather, they maintain that because the Parties' dispute whether the express warranties cover the Defect, the dismissal of the unjust enrichment is inappropriate. [Doc. 221 at 65].

---

[74] These states are Alabama, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wisconsin. [Doc. 181-1 at 58–59]. In addition, the U.S. Automakers cite Louisiana law in their legal citations table, [Doc. 181-9 at 2]. However, the Louisiana case they rely concerns the U.S. Automakers' argument regarding the effect of available legal remedies on unjust enrichment claims.

Contrary to Plaintiffs' argument, the Parties' dispute about warranty coverage does not preclude dismissal. That dispute does not concern the existence of an express contract—e.g., the express written warranty. And that contract governs the subject matter of the unjust enrichment claim. That is, the express written warranty governs the Automakers' obligations regarding vehicle defects, and Plaintiffs' unjust enrichment claims concern their allegedly defective vehicles. Although the U.S. Automakers successfully dispute that the express written warrant covers a design defect, [*see supra* § VI.B.3.], that dispute concerns the *scope* of the contract and not its *validity or enforceability*. *See Takata II*, 193 F. Supp. 3d at 1344 (acknowledging that "an unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract" and declining to dismiss the claim because the plaintiffs disputed the contract's enforceability (citation modified)). As in *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 288 (E.D. Mich. 2021), at its core, the dispute is about "what types of defect[s]" are covered under the warranty. But where, as here, "the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for . . . unjust enrichment." *Id.* at 294 (citation modified). In short, "[w]hen a consumer seeks compensation for a defective product . . . the warranty covers the subject matter in dispute and an unjust enrichment claim does not lie." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d at 846. "A plaintiff cannot use an unjust enrichment claim to alter or expand the terms

of an express warranty that covers the product that is the subject of his or her claim." *Id.* Accordingly, Plaintiffs' unjust enrichment claims under the laws of the 32 states that the U.S. Automakers identify fail.

Third, as to the remaining challenged claims, those under Hawaii, Louisiana, and Utah law, the U.S. Automakers argue that these claims fail because Plaintiffs have adequate legal remedies based on the same alleged conduct and, thus, cannot satisfy the unjust enrichment claim precondition requiring a lack of an adequate remedy at law. [Doc. 181-1 at 58]. Plaintiffs do not rebut the state-specific law the U.S. Automakers cite; instead they counter that the SAC pleads the unjust enrichment claim in the alternative and that this pleading comports with Rule 8(d)(3), which allows the pleading of inconsistent claims. [Doc. 221 at 64]. In support of their argument, Plaintiffs rely on *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig.*, 288 F. Supp. 3d 1087, 1258 (D.N.M. 2017). There, the court concluded that because an unjust enrichment claim presents a different damages theory from, for example, the consumer protection and torts claims, that "divergence is enough to amount to an alternative theory under Rule 8(d)." *Id.* at 1257. Thus, it allowed the plaintiffs to "plead both equitable and legal relief, although they may not, under state law, ultimately recover under both theories." *Id.* at 1259. The Court is not convinced that an unjust enrichment claim based on the *same facts* presents a "true alternative theory." *In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5 (N.D. Cal. Mar. 12, 2014), *order*

*corrected on denial of reconsideration*, No. 2014 WL 12649204 (N.D. Cal. Apr. 15, 2014). "[The] Plaintiffs are, of course, entitled to plead alternative claims." *Id.* (citing Fed. R. Civ. P. 8(d)). "However, 'where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action.'" *Id.* (citation omitted). Here, the acts and omissions that ungird, for example, Plaintiffs fraud claims also serve as the premise of their unjust enrichment claims. *Compare* SAC II ¶¶ 1336(g)–(h), 1837(g)–(h), and 3741(g)–(h) *to* 1352, 1853, and 3757. "Should [the] [P]laintiffs ultimately be unable to recover under a contract or tort theory, it does not mean a legal remedy was unavailable (thereby justifying an equitable remedy of unjust enrichment), but only that their claim lacks merit." *In re Ford Tailgate Litig.*, 2014 WL 1007066 at *5. Plaintiffs' unjust enrichment claims under Hawaii, Louisiana, and Utah law are barred.

Last, the U.S. Automakers maintain that Plaintiffs who did not buy or lease their vehicles from an Automaker-affiliated dealership cannot state an unjust enrichment claim because they cannot allege that their transactions unjustly enriched the Automakers.[75] The Court agrees. Plaintiffs' authority for

[75] Plaintiffs assert that the U.S. Automakers' over-inclusively identify 44 Plaintiffs as having their vehicles from unaffiliated dealerships. [*Compare* Docs. 181-1 at 60 n.73 *and* 221 at 66 n.57]. They argue that the U.S. Automakers' list includes 12 Plaintiffs who, in fact, bought their vehicles from Automaker-affiliated dealerships. [Doc. 221 at 66 n.57]. However, although the 12 Plaintiffs allege that they bought their used vehicles from a dealership affiliated with *an* Automaker, apart from Plaintiffs Fett's, Jacinto's, and

the argument that "non-direct purchasers can plead unjust enrichment against upstream defendants," [Doc. 221 at 65], does not address the purchase of vehicles from third-party sources not alleged to be affiliated with the vehicle manufacturer.

Overall, Plaintiffs' unjust enrichment claims against the Automakers fail under the laws of above-discussed states and the unjust enrichment claims of Plaintiffs Anderson (Pennsylvania),[76] Belhadj (Florida and Texas), Blumberg (Delaware), Chambliss (Virginia), Clark (South Carolina), Diaz (California), Duran (Nevada), Eiland (Mississippi), Felice (Florida), Fernandez (Virginia and Maryland), Ford (South Carolina), Graff (Missouri), Hall (Indiana and Illinois), Hall-Hudson (Tennessee), Hamner (Alabama),

---

Schultz's dealerships, those dealerships are not alleged to be affiliated with *their* Automaker. For example, Plaintiff Hartman bought his used 2016 Ford F-150 from Kunes Chevrolet in Morrison, Illinois, and he does not allege that Kunes Chevrolet is affiliated with Ford. SAC I ¶ 150. According to the SAC, Hartman bought his vehicle from a Chevrolet dealership—i.e., a dealership affiliated with Defendant GMC, and not one affiliated with Defendant Ford, the Automaker that manufactured Hartman's vehicle. Thus, with the exception of the three Plaintiffs misidentified by the U.S. Automakers, the unjust enrichment claims of the following Plaintiffs are properly at issue: Anderson, Harpey-Bey, Hartman, Isbister, Lesesne, McKennon, Mitchell, Polo, Clark, Ford, Hall-Hudson, Hudson-Battie, Jones, Herrera, Miles, Victory, Winslow, Felice, Valenzuela, Belhadj, Blumberg, Chambliss, Diaz, Eiland, Fernandez, Graff, Hall, Hamner, Hochstetler, Komoroski, Owens, Petschen, Reddick, Sorenson, Thomas, Duran, Long, Lovett, Mobley, White, and Wilson are properly at issue. *See* SAC II 142, 149, 150, 153, 155, 158-160, 162-166, 173, 175, 179, 181, 183, 186, 204, 213–14, 217, 220, 221, 223–227, 229, 234-236, 239, 245, 247-250, 253, 254.

[76] Included with each Plaintiff's name is that Plaintiff's state of residence and, to the extent different, the state from which Plaintiff bought or leased his or her vehicle.

Harpey-Bey (Nevada), Hartman (Missouri), Herrera (Florida), Hochstetler (Minnesota), Hudson-Battie (Georgia), Isbister (Ohio), Jones (Florida), Komoroski (Connecticut), Lesesne (South Carolina), Long (Alabama), Lovett (Tennessee), McKennon (North Carolina), Miles (Alabama), Mitchell (Connecticut), Mobley (South Carolina), Owens (Tennessee), Petschen (Minnesota), Polo (Virginia), Reddick (Georgia), Sorenson (Washington and Idaho), Thomas (Georgia), Valenzuela (Arizona), Victory (Arkansas), B. and T. White (Alabama), Wilson (New York), and Winslow (California) are foreclosed. Accordingly, the Court **GRANTS** the U.S. Automakers' motion to dismiss Plaintiffs' unjust enrichment claims to the extent that it **DISMISSES WITH PREJUDICE** the state-specific claims for Alabama (Count 1(e)), Arkansas (Count 4(e)), California (Count 5(h)), Colorado (Count 6(e)), Connecticut (Count 7(e)), Florida (Count 10(e)), Georgia (Count 11(f)), Hawaii (Count 12(e)), Idaho (Count 13(e)), Illinois (Count 14(e)), Indiana (Count 15(e)), Iowa (Count 16(e)), Kansas (Count 17(e)), Kentucky (Count 18(e)), Louisiana (Count 19(d)), Maryland (Count 21(e)), Massachusetts (Count 22(e)), Michigan (Count 23(e)), Minnesota (Count 24(f)), Mississippi (Count 25(e)), Missouri (Count 26(e)), Nebraska (Count 28(e)), New Hampshire (Count 30(e)), New Jersey (Count 31(e)), New Mexico (Count 32(e)), New York (Count 33(f)), North Carolina (Count 34(e)), North Dakota (Count 35(e)), Ohio (Count 36(f)), Oklahoma (Count 37(e)), Oregon (Count 38(e)), Pennsylvania (Count 39(e)), Rhode Island (Count 40(e)), South Carolina (Count 41(f)), Tennessee (Count 43(e)), Texas

(Count 44(e)), Utah (Count 45(f)), Virginia (Count 47(e)), Washington (Count 48(e)), West Virginia (Count 49(e)), and Wisconsin (Count 50(e)) and also **DISMISSES WITH PREJUDICE** the unjust enrichment claims asserted by Plaintiffs Anderson, Belhadj, Blumberg, Chambliss, Clark, Diaz, Duran, Eiland, Felice, Fernandez, Ford, Graff, Hall, Hall-Hudson, Hamner, Harpey-Bey, Hartman, Herrera, Hochstetler, Hudson-Battie, Isbister, Jones, Komoroski, Lesesne, Long, Lovett, McKennon, Miles, Mitchell, Mobley, Owens, Petschen, Polo, Reddick, Sorenson, Thomas, Valenzuela, Victory, B. and T. White, Wilson, and Winslow.

**7. Viability of restitution as a remedy for violation of statutory consumer protection laws**

For several of their state-law specific statutory consumer protection claims, Plaintiffs request that the Court award restitution, among other things, as a remedy for Defendants' unfair or deceptive practices. SAC II ¶¶ 481, 550, 619, 688, 770, 787, 803, 873, 941, 1012, 1029, 1100, 1169, 1237, 1259, 1330, 1399, 1476, 1565, 1635, 1706, 1774, 1831, 1901, 1974, 2047, 2119, 2207, 2278, 2351. The U.S. Automakers contend that because Plaintiffs allege that they have an adequate remedy at law, i.e., money damages based on the alleged diminution in value of their vehicles, the Court may not award them equitable restitution. [Doc. 181-1 at 60]. In support, the U.S. Automakers cite *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). [Doc. 181-1 at 60]. In *Sonner*, the Ninth Circuit "h[e]ld that the traditional principles governing equitable remedies in federal courts, including the requisite

inadequacy of legal remedies, apply when a party requests restitution under the UCL and CLRA in a diversity action." 971 F.3d at 844. Plaintiffs contend that not only are district courts within the Ninth Circuit divided on *Sonner*'s application at the pleading stage but that the Court should allow Plaintiffs to maintain their restitution request at this stage because, according to the SAC, Plaintiffs' "legal remedies may prove inadequate." [Doc. 221 at 67 (quoting SAC II ¶¶ 433, 459)]. To be sure, *Sonner* concerned the *securing* rather than the *pleading* of equitable remedies, but "[t]he unique procedural history in [*Sonner*] did not play a role in [the Ninth Circuit's] analysis of the traditional division between law and equity." *Teresa Adams v. Cole Haan, LLC*, 2020 WL 5648605, at *2 (C.D. Cal. Sep. 3, 2020).[77] The Court is persuaded by *Sonner*'s analysis and considers that analysis applicable to Plaintiffs' request for restitution under the several statutory consumer protection claims at issue here. Accordingly, the Court concludes that Plaintiffs' request for restitution must be supported by an allegation of inadequate legal remedies. *Shay v. Apple Inc.*, 2021 WL 1733385, at *4–5 (S.D. Cal. May 3, 2021) (relying on *Sonner* and requiring the plaintiff to "plead inadequate legal remedies in the operative pleading to allege claims for equitable relief"); *Stafford v. Rite Aid Corp.*, 2023

[77] Although the court in *Teresa Adams* cited a prior version of the *Sonner* opinion, the substance of the opinion remained unchanged in the amended version issued later the same day. *Compare Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) *with Sonner v. Premier Nutrition Corp.*, 962 F.3d 1072 (9th Cir. 2020).

WL 2876109, at *4–6 (S.D. Cal. Apr. 10, 2023) (dismissing claim for equitable relief for failure to allege an inadequacy of legal remedies).

The SAC, however, fails to allege that Plaintiffs' legal remedies are inadequate. According to the SAC, Plaintiffs' will have no adequate legal remedies if the Court enters judgment in favor of Defendants on Plaintiffs' claim for damages. *E.g.,* SAC II ¶ 433. But "a contingent event does not support an allegation that [the] Plaintiff[s] ha[ve] an inadequate remedy at law." *Shay*, 2021 WL 1733385 at *5; *Johnson v. Trumpet Behav. Health, LLC*, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) (noting that "conditional pleading [of inadequate remedies] does not satisfy *Sonner*'s rule" and concluding that an allegation seeking equitable relief "to the extent legal remedies are inadequate or if legal remedies are inadequate" is "not an allegation that [the plaintiffs] actually lack adequate remedies at law"). And any failure by Plaintiffs to prevail on their damages claim does not render the remedy inadequate. *See In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5; *Roffman v. Rebbl, Inc.*, 653 F. Supp. 3d 723, 731 (N.D. Cal. 2023) (noting that the plaintiff's "inability to obtain damages" would reflect her statutory and common law claims' "failure on the merits" and would not represent "an inherent limitation of the legal remedy that renders it inadequate" (citation modified)).

Overall, because Plaintiffs fail to allege that they lack an adequate legal remedy, they cannot maintain their request for restitution as a remedy under their statutory consumer protection claims. The Court **GRANTS** the U.S.

Automakers' motion to dismiss, [Doc. 181], to the extent that it **STRIKES** Plaintiffs' request for restitution as a remedy under their statutory consumer protection claims.

**8. Recall-related injunctive relief claim**

The SAC purports to seek relief in the form of injunctive relief requiring, for example, Defendants to remove the defective inflators from and to install safe inflators in the Class Vehicles. SAC I ¶¶ 19, 24. The U.S. Automakers argue that to the extent that Plaintiffs seek an order requiring a nationwide safety recall, the Court should dismiss Plaintiffs' request as recalls are the province of the NHTSA. [Doc. 181-1 at 61–66]. Plaintiffs' respond that their "requested injunctive relief does not interfere with NHTSA's investigatory and regulatory functions" and that, "[t]o the extent allegations in the [SAC] could be construed otherwise, Plaintiffs agree to strike any requests for recall-related injunctive relief, including paragraphs 24, 395, 458, 531, and 600." [Doc. 221 at 68]. The U.S. Automakers do not challenge Plaintiffs' claim that their requested relief does not interfere with NHTSA's investigatory and regulatory functions or their agreement to strike any requests for recall-related injunctive relief. Accordingly, in view of Plaintiffs' representation, the Court DENIES AS MOOT the U.S. Automakers' motion, [Doc. 181], to the extent that it seeks the dismissal of Plaintiffs' recall-related injunctive relief.

**9. Viability of Claims for "Old GM"-Made Class Vehicles**

Thirteen Plaintiffs own GM Class Vehicles dating back to model years 2002 through 2009. They are Plaintiffs B. and T. White (Alabama);

Hudson-Battie (Georgia), Schultz (Iowa), Sorenson (Washington and Idaho), Petschen (Minnesota), Wilson (New York), Milewski (Michigan and Ohio), Lesesne (South Carolina), Hall-Hudson (Tennessee), Marshall (Tennessee), Owens (Tennessee), and Polo (Virginia). SAC I ¶¶ 253, 165, 197, 239, 235, 254, 233, 155, 164, 191, 234, 160. As Plaintiffs acknowledge "[t]hrough 2009, GM Class Vehicles were made by a now bankrupt entity, General Motors Corp. (Old GM), the predecessor to Defendant GM LLC (GM)." [Doc. 222 at 9]. Under the bankruptcy "Sale Agreement and Sale Order," which "set out Old GM liabilities that [GM] would assume and not assume," GM "did not assume responsibility for [Old GM's] . . . implied warranties and statements in materials such as individual customer communications, owner's manuals, advertisements, and other promotional materials" *In re Motors Liquidation Co.*, 513 B.R. 467, 472–73 (Bankr. S.D.N.Y. 2014). Pointing to this language, GM argues that the Sale Order forecloses the implied warranty breach and fraud-based claims of Plaintiffs with 2009 and earlier model-year GM Class Vehicles. [Doc. 186-1 at 10]. Plaintiffs concede that the above-named Plaintiffs cannot maintain their implied warranty breach claims, but they argue that these Plaintiffs' fraud-based claim may proceed because they bought their Old GM Class Vehicles *after* the bankruptcy and at a time that GM had knowledge of the Defect and failed to disclose it.[78] However, although Plaintiffs

[78] The earliest alleged purchases of Old GM Class Vehicles occurred in 2011. SAC I ¶¶ 254, 164.

sufficiently allege GM's knowledge as to the Defect in the GM Class Vehicles, manufactured from 2010 onward, through its involvement in pre-sale testing, etc., [*see supra* § VI.B.2.c.], they fail to allege facts indicating that GM had knowledge of the Defect in Old GM Class Vehicles or that they made any representations regarding those Vehicles.

The Court agrees with GM that Plaintiffs' claims for implied warranty breach, fraud, violations of consumer protection statues, and unjust enrichment based on the alleged Defect in Old GM Class Vehicles fail. Thus, the Court **GRANTS** GM's motion to dismiss, [Doc. 186-1], to the extent that it **DISMISSES WITH PREJUDICE** all claims asserted against GM by Plaintiffs B. and T. White (Alabama); Hudson-Battie (Georgia), Schultz (Iowa), Sorenson (Washington and Idaho), Petschen (Minnesota), Wilson (New York), Milewski (Michigan and Ohio), Lesesne (South Carolina), Hall-Hudson (Tennessee), Marshall (Tennessee), Owens (Tennessee), and Polo (Virginia).

#### 10. Timeliness

According to the U.S. Automakers (collectively and individually) and ARC, most of Plaintiffs' claims run afoul of the respective statutes of limitations. [*See e.g.*, Docs. 181-1 at 54–55; 179-1 at 24–27; 180-1 at 10–13; 186-1 at 10–13]. The U.S. Automakers do not develop the factual and legal basis for their arguments in their collective opening brief; they rely instead of the arguments by the individual Automakers. Thus, below the Court first addresses ARC's timeliness challenge and then takes up the U.S. Automakers' challenge, as presented in their collective and individual motions.

**a. Claims against ARC**

ARC moves to dismiss the statutory consumer protection claims of 16 Plaintiffs as barred by the applicable statutes of limitations and of repose, and as to six of these Plaintiffs, ARC also seeks to dismiss their fraud claims for the same reason. [Doc. 179-1 at 24–27]. The challenged claims are as follows: Connecticut Unlawful Trade Practices Act claim (Count 7(c)) as to John Komoroski; Florida Deceptive and Unfair Trade Practices Act claim (Count 10(c)) as to Vincent Cerrato, Jr.; Idaho Consumer Protection Act claim (Count 13(c)) as to Chad Sorenson; Kentucky Consumer Protection Act claim (Count 18(c)) as to Leatha Barber; Michigan Consumer Protection Act and Michigan-law based fraud claims (Count 23(c), (d), respectively) as to Jeffery Rhoades and Jonathon Carano; Minnesota Uniform Deceptive Trade Practices Act claim (Count 24(d)) as to Natasha Hochstetler; Montana Unfair Trade Practices Act claim (Count 27(c)) as to Brandy Knapp; New Hampshire Consumer Practices Act claim (Count 30(c)) as to Julie Struble; New York General Business Law claims (Counts 33(c), (d)) as to Brandon Barker, Earl Wilson, Rochard Topa, Robert Ballero Gonzalez, and Tina Brown and New York-law based fraud claim (Count 33(e)) as to Wilson, Topa, Ballero Gonzalez, and Brown; Ohio Consumer Sales Practices Act claim (Count 36(c)) as to Scott Milewski and Steve Isbister; and Wisconsin Deceptive Trade Practices Act claim (Count 50(c)) as to Kenneth Allan. [*Id.*]

According to ARC, the claims of each of the above-listed Plaintiffs accrued at the time they each bought their Class Vehicle and, by the time they

filed suit, the relevant statutes of limitations had run.[79] Thus, according to ARC, the applicable statutes of limitation bar the statutory consumer protection claims of the 16 identified Plaintiffs and also bar the fraud claims of six of them. Plaintiffs respond that the Court should defer ruling on the statute of limitations issue to allow for factual development and, alternatively, that ARC's argument fails because Plaintiffs' claims did not accrue until they discovered the Defect and that ARC's fraudulent concealment tolled the statute of limitations. [Doc. 219 at 23–29]. The Court begins its analysis with the issue of fraudulent concealment and, concluding that the doctrine does not apply to toll the statute of limitations here, turns to Plaintiffs' argument that the "discovery rule" applies to the accrual of their claims.

**i. Fraudulent concealment:**

"The doctrine of fraudulent concealment will operate to toll the statute of limitations when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury." *Am. Home Assur. Co. v. Weaver Aggregate Transp., Inc.*, 990 F. Supp. 2d 1254, 1272 (M.D. Fla. 2013) (citation modified); *see Grover v. BMW of N. Am., LLC*, 434 F. Supp. 3d 617,

---

[79] Where different from a given Plaintiff's state of residence, ARC argues that, under Georgia's *lex loci delicti* choice-of-law rule, the Court should apply the law of the state where Plaintiff bought his or her Class Vehicle because Plaintiffs were allegedly defrauded at the time of sale and, thus, at the place of sale. [Doc. 179-1 at 25]. Plaintiffs do not challenge ARC's argument. Thus, the Court applies the law of the state of the Vehicle sale in analyzing ARC's arguments in this section.

632 (N.D. Ohio 2020) (noting that Ohio law tolls the statute of limitation based on fraudulent concealment upon a showing of defendants' "wrongful concealment of their actions," the plaintiff's failure to "discover the operative facts that are the basis of his cause of action within the limitations period," and "plaintiff's due diligence until discovery of the facts." (citation modified)). Plaintiffs argue that each of the relevant states recognize that fraudulent concealment tolls the statute of limitations.

Generally, for fraudulent concealment tolling to apply, there must either be "an affirmative act of concealment beyond mere silence" or non-disclosure in the face of a duty to disclose. *Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 636 (D. Conn. 2003). ARC asserts that Plaintiffs do not have the benefit of fraudulent concealment tolling because Plaintiffs fail to allege the circumstances of the fraud with particularity and they do not allege an affirmative act of concealment by ARC or, alternatively, that ARC remained silent while under a duty to disclose. [Doc. 179-1 at 27–28, 30–31].

ARC's first argument fails. For the reasons discussed above, the SAC's allegations meet Rule 9's particularity requirement. *See supra* § VI.B.2.a. However, ARC's second and third arguments regarding fraudulent concealment have merit.

While the SAC alleges that "ARC worked with others to conceal" the Defect and had "help" from the Airbag Suppliers and the Automakers, SAC I ¶ 8, this allegation is conclusory, failing to identify any independent or

concerted affirmative conduct by the Airbag Suppliers. As in case of the Airbag Suppliers, *supra* § VI.B.2.d.i.c., the SAC also fails to allege an affirmative act of concealment by ARC.

Plaintiffs resist this conclusion, arguing that, as in *Takata II*, they allege that ARC "failed to disclose its knowledge of a life threatening inflator defect prior to Plaintiffs' purchases through any mode of communication." [Doc. 219 at 27–28 (quoting *Takata II*, 193 F. Supp. at 1337)]. But in *Takata II*, the court did not hold that allegations of the defendant's failure to disclose a life-threatening defect equated to allegations of active concealment. Rather, the court held that the plaintiffs' allegations of the defendant's failure to disclose met Rule 9's heightened pleading standard. *Takata II*, 193 F. Supp. at 1336–37. Plaintiffs contend that like in *In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711 (S.D. Fla. June 1, 2017) ("*Takata V*"), they also allege that ARC "knowingly and actively concealed the defect from Plaintiffs for many years." [Doc. 219 at 28 (quoting *Takata V*, 2017 WL 2406711 at *11)]. As ARC correctly points out, however, in *Takata V*, as well as in *Takata II*, the court found that the plaintiffs had stated fraudulent concealment based on allegations that the defendant made incomplete representations, giving rise to a duty to disclose. *See Takata V*, 2017 WL 2406711 at *5; *Takata II*, 193 F. Supp. 3d at 1337. And Plaintiffs allege no such incomplete representations by ARC. To be sure, the SAC also alleges that "ARC worked with others to conceal" the Defect, SAC I ¶ 8, but this allegation is unsupported by facts indicating active concealment.

Moreover, the SAC alleges that ARC has "questioned the necessity" of providing the NHTSA with certain information, failed to provide documents in readable format, and, among other things, "advocated for the closure of the [NHTSA] investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures," SAC I ¶ 320, but Plaintiffs fail to explain how these actions constitute active concealment and provide law in support.

In the absence of allegations supporting active concealment, fraudulent concealment tolling may still apply if Plaintiffs establish that ARC had a duty to disclose the Defect. But Plaintiffs fail to establish that ARC owed them this duty. Again, they rely on *Takata V*, to argue that ARC had a duty to disclose. But in *Takata V*, the court found that the airbag manufacturer had a "duty to disclose additional facts about the safety of the airbags" because the plaintiffs alleged that the defendant manufacture had made "incomplete representations." *Takata V,* 2017 WL 2406711 at *5. Here, Plaintiffs fail to identify an allegation of ARC's incomplete representations in the SAC. Accordingly, the Court is unpersuaded that fraudulent concealment tolling applies to the 16 identified Plaintiffs' statutory consumer protection and, where challenged, their fraud claims against ARC.

**ii. Discovery Rule**

Fraudulent concealment tolling aside, Plaintiffs contend that the challenged claim under Florida, Idaho, Kentucky, Minnesota, Montana, New Hampshire, New York, Ohio, and Wisconsin law survive because, in those

states, the "discovery rule" applies to the accrual of fraud and fraud-based consumer protection claims. [Doc. 219 at 25 n.8]. Under the discovery rule, "claims accrue when the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." *City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *11 (S.D. Fla. Jan. 21, 2022) (citation modified); *see also e.g., Kimbrough v. Reed*, 130 Idaho 512, 515-16 (1997); *Grayiel v. AIO Holdings, LLC*, 648 F. Supp. 3d 812, 847 (W.D. Ky. 2022), *aff'd*, 2024 WL 2992676 (6th Cir. June 14, 2024).

In Plaintiffs' view, the facts giving rise to their challenged claims could not have accrued *any earlier than* August 2020, when the NHTSA announced that "it was investigating 'toroidal shaped hybrid air bag inflators, both passenger and driver side,' and requested additional information from ARC 'to facilitate its investigation of the potential risk of deployment-related field rupture'" because, before then, there was nothing publicly available "to suggest that Defendants were involved in the misconduct or concealment" that Plaintiffs allege. [Doc. 219 at 25 (quoting SAC I ¶¶ 383–84)]. Thus, according to Plaintiffs, the challenged claims under Florida, Minnesota, New York, and Wisconsin law are timely because a limitations period of at least three years applies and Cerrato (Florida), Hochstetler (Minnesota); Barker, Wilson, Topa, and Ballero Gonzalez (New York); and Allan (Wisconsin) filed suit within three years of the August 2020 announcement. [Doc. 219 at 25].

As an initial matter, although Plaintiffs maintain that the challenged claims could not have accrued before August 2020 and generally argue that the Court should not determine the statute-of-limitations trigger date at this stage, [Doc. 219 at 25], they provide nothing to indicate that their claims accrued at a point after August 2020. Thus, there is no indication that the challenged claims of Sorenson (Idaho), Barber (Kentucky), Knapp (Montana), Struble (New Hampshire), and Milewski and Isbister (Ohio), which are all subject to a two-year limitations period, accrued later than August 2020 and within two years of their late-June/early-July 2023-filed Complaints. In sum, the Court is persuaded that the discovery rule does not rescue the challenged Idaho, Kentucky, Montana, New Hampshire, and Ohio claims.

For Allan's Wisconsin claim, ARC argues that neither the discovery rule nor tolling resuscitates the claim because Allan bought his Class Vehicle more than three years before filing suit and the Wisconsin Deceptive Trade Practices Act has a three-year statute of repose. [Doc. 179-1 at 27]. "A statute of limitations bars an action not commenced within a specified amount of time after the cause of action 'accrues.' In a statute of repose, the legislature has already determined when the claim 'accrues'—at the time of the defendant's action." *Kain v. Bluemound E. Indus. Park, Inc.*, 248 Wis. 2d 172, 182 (Wis. Ct. App. 2001) (citation modified). Because "statutes of repose are unaffected by what the plaintiff knows," equitable tolling doctrines and the discovery rule

are "incompatible with a period of repose." *Neuser v. Carrier Corp.*, 2007 WL 484779, at *3 (W.D. Wis. Feb. 9, 2007) (citations omitted).

Plaintiffs claim a violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18(1), based on Defendants' untrue representations. SAC II ¶ 4072. However, because "Wisconsin Stat. § 100.18(11)(b)3 bars suit for fraudulent representation brought 'more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action' . . . the fraudulent representation statute is a statute of repose." *Kain*, 248 Wis. 2d at 182. And because Allan bought his Class Vehicle in 2015, SAC I ¶ 207, more than three years before he filed suit, the Wisconsin Deceptive Trade Practices Act claim's statute of repose bars his claim.

As to the remaining challenged claims, each of which has a limitations period of three or more years, ARC does not dispute that the discovery rule applies. Rather, ARC rebuts Plaintiffs' contention that they could not have reasonably discovered ARC's alleged concealment of the Defect until (at least) the NHTSA's August 2020 announcement. According to ARC, the NHTSA made several public statements, starting as early as 2015, that put Plaintiffs on notice regarding the NHTSA's investigation of ARC inflators. [Doc. 245 at 14–15 (citing seven NHTSA communications, including information requests to ARC)]. ARC characterizes the pre-August 2020 NTSA statements as "of the same type" as the August 2020 statement and as "clearly identif[ying] ARC airbag inflators as the subject of NHTSA's investigations." [*Id.* at 17]. Whether

Plaintiffs knew or should have known of any of the pre-August 2020 NHTSA statements and whether those statements sufficed to notify Plaintiffs of the facts giving rise to the challenged claims entail a fact intensive inquiry not appropriate at this pre-discovery stage. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2023 WL 5670825, at *3 (N.D. Fla. July 5, 2023) ("Statute of limitations defenses under the discovery rule require fact intensive inquiries, normally presenting questions of fact for the jury." (citation omitted)). Accordingly, ARC's argument that the statute of limitations bars the challenged claims of Cerrato (Florida), Hochstetler (Minnesota); and Barker, Wilson, Topa, Ballero Gonzalez, and Brown (New York), which were all asserted within three years of August 2020, is premature.

Overall, the Court **GRANTS** ARC's motion to dismiss, [Doc. 179], challenging on statute of limitations grounds the claims of Komoroski (Connecticut); Sorrenson (Idaho); Barber (Kentucky); Rhoades and Carano (Michigan); Knapp (Montana); Struble (New Hampshire); Milewski and Ibister (Ohio); and Wisconsin (Allan) and **DENIES** the motion as to the challenged claims of Cerrato (Florida); Hochstetler (Minnesota); and Barker, Wilson, Topa, Ballero Gonzalez, and Brown (New York). Accordingly, the Court **DISMISSES WITH PREJUDICE** the following claims: Komoroski's Connecticut Unlawful Trade Practices Act claim (Count 7(c)); Sorenson's Idaho Consumer Protection Act claim (Count 13(c)); Barber's Kentucky Consumer Protection Act claim (Count 18(c)); Michigan Consumer Protection Act and

fraud claims (Counts 23(c), (d), respectively) as to Rhoades and Carano; Montana Unfair Trade Practices Act claim (Count 27(c)) as to Knapp; New Hampshire Consumer Practices Act claim (Count 30(c)) as to Struble; Ohio Consumer Sales Practices Act claim (Count 36(c)) as to Milewski and Isbister; and Wisconsin Deceptive Trade Practices Act claim (Count 50(c)) as to Allan.

**b. Claims Against the Automakers**

The U.S. Automakers argue that no tolling doctrine rescues Plaintiffs' warranty claims and that fraudulent concealment does not rescue the tort and statutory consumer protection claims of those Plaintiffs who did not file suit within the original statute of limitations because Plaintiffs fail to allege facts showing concealment by the Automakers. [Docs. 180-1 at 11; 181-1 at 55–57; 186-1 at 13; 241 at 2–3; 188-1 at 11–12]. Unlike with the claims against ARC, fraudulent concealment *does* toll the statute of limitations for the tort and statutory consumer protection claims against the Automakers. First, the SAC's allegations meet Rule 9's particularity requirement. *See supra* § VI.B.2.a. Second, while the SAC does not allege an affirmative act of concealment by any Automaker, *see supra* § VI.B.2.d.ii. at 94–97, fraudulent concealment tolling applies, nevertheless, because Plaintiffs show that the Automakers had a duty to disclose the Defect but failed to do so. *See Fenn*, 283 F. Supp. 2d at 636-37. Thus, fraudulent concealment tolling applies to Plaintiffs' tort and statutory consumer protection claims under the laws of the above-discussed states, *supra* § VI.B.2.d.ii., where the Automakers had a duty to disclose. Moreover, like ARC, the U.S. Automakers do not dispute that a given state does not recognize

the discovery rule. Rather, they contend that Plaintiffs fail to allege facts sufficient to invoke the rule. [*See e.g.*, Doc. 182-1 at 14]. This argument fails for the same reason as ARC's argument. *See supra* § VI.B.10.a.ii.

The U.S. Automakers also argue that the warranty breach claims of several Plaintiffs fail because those claims accrued at delivery, regardless of Plaintiff's lack of knowledge, and those Plaintiffs did not file suit within their applicable statutes of limitations. [Docs. 185-1 at 5; 242 at 6; 249 at 40; 188-1 at 9–10]. Because all express warranty breach claims stand dismissed and several of the implied warranty breach claims fail on other grounds, the only surviving warranty breach claims challenged on timeliness grounds belong to the following: (1) Hyundai or Kia Class Vehicle-owning Plaintiffs Ford (South Carolina), Hoschar (Pennsylvania), and Victory (Arkansas), collectively "Hyundai-Kia Plaintiffs"; (2) Ford Class Vehicle-owning Plaintiffs Britton (California, Song-Beverly Act Claim only), Sellers (South Carolina), and Raspantini (New Jersey), collectively "Ford Plaintiffs"; (3) GM Class Vehicle-owing Plaintiffs Bacon (South Dakota), Belanger (Massachusetts), Duran (Nevada), Escobedo (California, Song-Beverly Act claim only), Hall (Indiana), Harpey-Bey (Nevada), Hayes (South Carolina), Hochstetler (Minnesota), McCarthy (New Jersey), Sims (Mississippi), Slusher (Kansas), Speck (California, Song-Beverly Act Claim only), Starkey (Nevada), Tropea (Massachusetts), and Yerger (Georgia), collectively, "GM Plaintiffs"; and

(4) Fiat Chrysler Class Vehicle-owning Plaintiff Rene Madueno (California, Song-Beverly Act claim only). [Docs. 185-1 at 5; 186-1 at 11 & n.9; 242 at 6].

Under Arkansas law, "'[a] breach of warranty occurs when tender of delivery is made, except that where a warranty *explicitly extends* to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.'" *Burns v. Toyota Motor Sales, U.S.A., Inc.*, 2015 WL 11117157, at *2 (W.D. Ark. Apr. 23, 2015) (emphasis in original) (quoting Ark. Code Ann. § 4-2-725(1)). However, Arkansas courts have held that "implied warranties cannot explicitly extend to future performance." *Id.* at *3 (citation omitted) (dismissing breach of implied warranty claim as time-barred). Accordingly, there is support for Hyundai and Kia's argument that the discovery rule does not toll Victory's Arkansas implied warranty breach claim. [*See* Doc. 229 at 6 (citing *id.* at *2–3)]. Thus, while Victory's implied warranty breach claim fails, because Hyundai and Kia fail to offer authority in support of the untimeliness of Ford's and Hoschar's claims, those claims do not fail on timeliness grounds.

The Ford Plaintiffs' implied warranty breach claims under California's Song-Beverly Act, Cal. Civ. Code § 1790, *et seq.*, and South Carolina law also do not fail as untimely. Plaintiffs provide authority indicating that the discovery rule applies to Song-Beverly Act claims and to South Carolina warranty breach claims. [*See* Doc. 224 at 9 & 6 (citing *Foulkrod v. Ford Motor*

*Co.*, 2019 WL 3064478, at *2 (C.D. Cal. Apr. 10, 2019), then citing S.C. Code Ann. § 36-2-725(2) ("A cause of action accrues for breach of warranty when the breach is or should have been discovered")]. And Ford offers no direct rebuttal to this argument. As for Raspantini's implied warranty breach claim under New Jersey law, Plaintiffs argue that fraudulent concealment tolls all their claims, [Doc. 224 at 8]. But, as Ford correctly notes, Plaintiffs do not sufficiently allege fraudulent concealment by Ford, [Doc. 241 at 2–2], and Plaintiffs fail to show that New Jersey recognizes a duty to disclose. *See supra* § VI.d.ii.

Plaintiffs also argue that the discovery rule and, alternatively, GM's and Fiat Chrysler's fraudulent concealment tolls the limitations period for the GM Plaintiffs' and Madueno's implied warranty breach claims. [Docs. 222 at 7 & n.5; 228 at 6–7]. Although they maintain that the discovery rule does not apply to implied warranty breach claims under the Song-Beverly Act, [*see* Doc. 250 at 3; 188-1 at 11 & n.8], GM and Fiat Chrysler do not dispute that fraudulent concealment tolls the limitations period for warranty claims in the relevant states. Rather, like the other U.S. Automakers, they also argue that Plaintiffs fail to allege fraudulent concealment by them. [Docs. 250 at 3–4; 188-1 at 10–11]. As discussed above, however, this argument fails to the extent that the states under which the GM Plaintiffs and Madueno assert their claims—i.e., California, Indiana, Massachusetts and Georgia—recognize a duty to disclose. Hayes's claim under South Carolina law also survives GM's timeliness

challenge, because South Carolina applies the discovery rule. S.C. Code Ann. § 36-2-725(2). However, McCarthy's New Jersey-law based claim against GM fails because New Jersey does not recognize a duty to disclose, *see supra* § VI.d.ii., and Bacon's, Duran's, Harpey-Bey's, Hochstetler's, Sims's, Slusher's, and Starkey's claims fail because Plaintiffs fails to show that Kansas, Minnesota, Mississippi, Nevada, and South Dakota, impart a duty to disclose on the Automakers.

In sum, the Court **GRANTS** Hyundai and Kia's, Ford's, and GM's Motion to Dismiss, [Doc. 180, 185, 186], to the extent that it **DISMISSES WITH PREJUDICE** the implied warranty breach claims of Plaintiff Victory (Arkansas; Count 4(b)), Raspintini (New Jersey, Count 31(b)), Bacon (South Dakota, Count 42(b)), Duran and Harpey-Bey and Starkey (Nevada, Count 29(b)), Hochstetler (Minnesota, Count 24(b)), Sims (Mississippi, Count ), and Slusher (Kansas, Count17(b)). The Court **DENIES** the other U.S. Automakers' motions, [Docs. 181, 188], to the extent that they seek dismissal on statute of limitations grounds.

## VII. Conclusion

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Dismiss by the Airbag Suppliers, [Doc. 178], ARC, [Doc. 179], the U.S. Automakers (collectively), [Doc. 181], Hyundai and Kia, [Doc. 180], Volkswagen, [Doc. 182], BMW, [Doc. 183], Ford, [Doc. 185], GM, [Doc. 186], PCNA, [Doc. 187], and Fiat Chrysler, [Doc. 188]. Specifically,

the Court **GRANTS** the above-identified motions for Plaintiffs' failure to state a claim to the extent that it **DISMISSES WITH PREJUDICE** those claims asserted in the SAC, [Docs. 157, 157-1], that are identified in the discussion above (and duplicated for ease of reference in the chart appended to this order), **STRIKES** Plaintiffs' request for restitution as a remedy under their statutory consumer protection claims, **DISMISSES AS MOOT** the claims against GM by Plaintiffs Allan, Barber, A.W. Brown, Diaz, Eiland, Felice, Jophlin, Lovett, Senkpeil, Shephard, Stowe, Struble, Warren, and Welch, and **DENIES** the motions in all other respects, unless indicated otherwise below.

Further, the Court **GRANTS** Audi's Motion to Dismiss for lack of standing, [Doc. 184], and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against it.

The Court also **GRANTS** Hyundai Korea and Kia Korea's motion to dismiss, [Doc. 272], for failure to state a claim and **DISMISSES WITH PREJUDICE** all claims by Plaintiffs against these two Defendants.

The Court further **GRANTS** ARC's motion to dismiss, [Doc. 179], for lack of personal jurisdiction and **DISMISSES WITHOUT PREJUDICE** the cases identified in the discussion above (and duplicated for ease of reference in the chart appended to this order).[80]

[80] To the extent that ARC is the sole Defendant in a given case, the case stands dismissed in its entirety, and to the extent that ARC is a co-Defendant, ARC stands dismissed from the case for lack of personal jurisdiction but the case proceeds against any other Defendant.

The Court **GRANTS** the Rule 12(b)(2) motions to dismiss by Defendants ZF Friedrichshafen AG, [Docs. 279], Bayerische Motoren Werke Aktiengesellschaft, [Doc. 287], Dr. Ing. H.C. F. Porsche AG, [Doc. 289], Audi Aktiengesellschaft, [Doc. 305], and Volkswagen Aktiengesellschaft, [Doc. 319], **DENIES** Plaintiffs' related motions for jurisdictional discovery, [Docs. 294, 309, 311, 322, 328], and **DISMISSES WITHOUT PREJUDICE** all claims by Plaintiffs against these Defendants.

Finally, the Court **DENIES** Plaintiffs' motion for oral arguments, [Doc. 252], and motion for leave to file a sur-reply, [Doc. 256].

SO ORDERED, this 2nd day of October, 2026.

Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge